OFFICE COPY

Lawrence Byrne
Lance Croffoot-Suede
Ruth E. Harlow
Brenda D. DiLuigi
LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
Tel: (212) 903-9000
Fax: (212) 903-9100





Attorneys for Plaintiff, Barclays Bank PLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

BARCLAYS BANK PLC,

               Plaintiff,

       v.

BEAR STEARNS ASSET MANAGEMENT INC.,
RALPH CIOFFI, MATTHEW TANNIN, BEAR,
STEARNS & CO. INC., and THE BEAR
STEARNS COMPANIES INC.,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Case No. 07 Civ. 11400 (LAP)

JURY TRIAL DEMANDED

## AMENDED COMPLAINT

     Plaintiff, Barclays Bank PLC ("Barclays"), brings this action against Bear Stearns Asset

Management Inc. ("BSAM"), Ralph Cioffi, Matthew Tannin (collectively, the three "BSAM

Defendants"), Bear, Stearns & Co. Inc. ("Bear Stearns"), and The Bear Stearns Companies Inc.

("Bear Stearns Companies" or the "Company").

## I.    SUMMARY OF THE ACTION

     1.    This action arises from one of the most high-profile and shocking hedge fund

failures in the last decade:  In a matter of days in June 2007, Bear Stearns Companies' and

BSAM's reputation as one of the premier credit investment franchises on Wall Street collapsed along with two BSAM hedge funds that at one time held approximately $20 billion in assets.

2.     The then-chief executive of Bear Stearns Companies, James Cayne, admitted that with the funds' demise the Company's carefully-honed reputation for sound risk management and prudent investing suffered a "body blow of massive proportion."

3.     At BSAM's request, Barclays had played a unique role in the structure that BSAM created to house and operate one of those funds, the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. (the "Enhanced Fund"). Barclays provided leverage and liquidity to the structure and became the sole participating shareholder in – and thus had the sole direct economic exposure to – the master Enhanced Fund. Through the wrongdoing alleged herein, the defendants caused Barclays to lose hundreds of millions of dollars.

4.     Defendant BSAM not only established the structure at issue but also served as the investment manager for the Enhanced Fund, among many other roles described below. Defendants Ralph Cioffi, the Senior Portfolio Manager who led BSAM's High-Grade Structured Credit Strategies group, and Matthew Tannin, that group's Chief Operating Officer, were responsible for BSAM's creation and operation of the structure, its management of the Enhanced Fund, and its negotiations and communications with Barclays.

5.     Barclays now knows that from March 2006 into at least mid-June 2007, the BSAM Defendants deceived Barclays through a series of targeted misrepresentations *first*, to secure Barclays' provision of its initial leverage for and then its growing financial stake in the "enhanced" fund structure; *second*, to secure a doubling of Barclays' economic commitment to the structure in March 2007; and *third*, to deceive Barclays – and keep it in place as the critical

leverage counterparty and sole participating shareholder – with ongoing positive reports about the Enhanced Fund's performance, even into mid-June 2007, until Barclays' losses had snow-balled. While BSAM and Tannin were typically the direct communicators with Barclays, Cioffi knew of all their deception; he directed and approved their statements and conduct toward Barclays. The BSAM Defendants continued their misrepresentations until the Enhanced Fund had entirely collapsed.

6.      The BSAM Defendants' misstatements and failures of disclosure included hiding their cavalier and illegal approach to self-dealing transactions; knowingly mis-marking assets and net asset value ("NAV") of the Enhanced Fund; misrepresenting their supposed capabilities to monitor the risks in the structure and then calibrate Barclays' exposure accordingly; and misrepresenting the investment restrictions and reporting obligations that BSAM supposedly intended to follow solely for Barclays' benefit. Perhaps most harmfully, the BSAM Defendants' hid the failures of their complex, proprietary investment and hedging strategies from Barclays for months, and hid their inability to manage liquidity pressures in the BSAM high-grade structured credit investment structures from Barclays even longer.

7.      If the BSAM Defendants had not made numerous material misrepresentations to secure Barclays' participation in the structure, Barclays never would have played the role it did. If, as required, the BSAM Defendants had later disclosed the real values, real performance, impermissible portfolio composition, and failing strategies of the Enhanced Fund structure to Barclays as they occurred, Barclays would have avoided the losses caused by the defendants by terminating its participation in the structure.

8.      The deceptions by BSAM, Cioffi, and Tannin were so extreme as to include these examples:

     i.  BSAM reported the Enhanced Fund's performance for certain months as positive or slightly negative, and long hid from Barclays that in reality the fund's value had instead diminished by 11% or **38%** during those months. BSAM failed to provide Barclays, as required, with advance warning so that it could react to any anticipated decrease of more than 10% by terminating its participation in the structure.

     ii.  BSAM continued to supply positive performance reports to Barclays and engage in transactions that increased risk in the fund at the same time Cioffi and Tannin were admitting internally that their systems did not work, discussing the impending "wipe out" of the fund, and trying to deceive an outside buyer (one candidate was the private equity firm Cerberus) to come in and buy all of their operations before the "wipe out" occurred.

     iii.  Cioffi extracted his personal $2,000,000 investment from the Enhanced Fund structure in March 2007 – at the same time that the BSAM Defendants convinced Barclays to double its investment – due to the performance problems that were not revealed to Barclays or other outsiders until much later.

    9.    Moreover, once the Enhanced Fund structure was established and Barclays had undertaken its dependent role within BSAM's structure, the BSAM Defendants owed fiduciary and other special duties to Barclays.  But instead of satisfying those duties and protecting Barclays' interests, BSAM, Cioffi and Tannin acted to serve their own goals and, together with Bear Stearns and Bear Stearns Companies, abandoned the BSAM Defendants' obligations to Barclays.

    10.    In late June 2007, the Securities and Exchange Commission ("SEC") opened an inquiry into BSAM's long-after-the-fact revisions to the Enhanced Fund's performance reports and BSAM's pricing practices.  By October, federal prosecutors in the Eastern District of New York had opened a criminal investigation into the June collapse of both BSAM hedge funds. (The other collapsed master fund was the Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (the "High-Grade Fund").)

11.     In addition to the broader federal investigations, *The Wall Street Journal* and *Business Week* report that the SEC and federal prosecutors are investigating charges of insider trading against Cioffi based on his $2,000,000 withdrawal.

12.     The SEC and the Department of Justice investigations are ongoing.

13.     A number of state agencies also have initiated investigations into and/or actions regarding the funds' collapse and the BSAM Defendants' conduct.  On November 14, 2007, the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts (the "Massachusetts Securities Division") filed an administrative complaint, Docket No. E-2007-0064 (the "Massachusetts Complaint"), against BSAM alleging violations of the Massachusetts Uniform Securities Act.  The Massachusetts Complaint recounts BSAM's failure to obtain approval from unaffiliated directors for numerous related-party transactions; its violation, therefore, of Section 206(3) of the federal Investment Advisers Act of 1940 and of representations in fund offering materials; and BSAM's failure to disclose to investors in both the High-Grade and the Enhanced Fund structures that it was not seeking and would not obtain the required approval.

14.     The Massachusetts Complaint attaches documents which establish that hundreds of related-party "principal transactions" were processed without prior approval.  According to the complaint and those documents, 78.95% of 342 principal transactions that took place in 2006 were not properly approved by unaffiliated directors.

15.     The fraud was not limited to BSAM.  Rather, in certain important instances, the BSAM Defendants combined forces with Bear Stearns to attempt to prolong the cover-up of the BSAM funds' performance problems and then to pass risks or especially risky assets on to others.  When Bear Stearns aided BSAM in these instances, Bear Stearns knew about the

Enhanced Fund's struggling operations and falling asset values, Barclays' unique role in the Enhanced Fund structure, and the BSAM Defendants' duties toward Barclays.

16.     For example, BSAM, Cioffi, and Bear Stearns worked together to try to make more money for themselves, pass along risk to new groups of investors, and raise the Enhanced Fund's and the High-Grade Fund's supposed "marked to market" value by establishing Everquest Financial Ltd. ("Everquest") and then launching an initial public offering ("IPO"). Bear Stearns was the underwriter for the planned IPO. Cioffi was the co-leader of Everquest. In May 2007, Everquest and Bear Stearns filed a preliminary S-1 registration statement with the SEC.

17.     Their Everquest plan collapsed along with the two BSAM funds in June 2007, however, amid outrage that Bear Stearns would take troubled assets from the two funds, package them as Everquest, and then attempt to foist investment in those shaky assets onto the public in an IPO. As a result of the defendants' actions, the Enhanced Fund still owned shares in Everquest into July 2007 and Barclays has been harmed by the faulty underlying Everquest investments.

18.     From at least May 2007, executives of Bear Stearns Companies also actively participated in BSAM's operation of the Enhanced Fund structure and made important decisions with regard to transactions involving the structure and purported efforts to stabilize it. As the Enhanced Fund's liquidity crisis deepened, Bear Stearns Companies' co-President at the time, Warren Spector, worked with BSAM to try to sell its operations to Cerberus. With other Company executives, he also made the decision in June 2007 that the parent company would provide financing to attempt to "save the less leveraged fund" – the High-Grade Fund – that

according to Spector had "better quality assets," but would "let the other fund collapse," as reported by the *Wall Street Journal*.

19.    This decision to sacrifice the Enhanced Fund structure led to further asset destruction in its portfolio, through even more urgent counterparty deals and fire-sales of the underlying assets, as described below.  The defendants instead could have avoided such fire-sales and abided by BSAM's commitments and duties to Barclays.

20.    By the beginning of August 2007, Spector was forced to resign because of his fault in the unraveling of the Enhanced Fund.  *The New York Times* explained that Spector's position became "untenable."  During the critical time period, "[n]ot only did [BSAM's] asset management business report to him but he also had direct responsibility over the risk controls that were in place there."

21.    Because of the wrongdoing pled in this Complaint, Barclays sues BSAM, Cioffi, and Tannin for fraud and misrepresentation; for fraudulent concealment and breach of their duties to disclose owed specifically to Barclays; and for gross negligence, negligence and breach of their fiduciary duties owed specifically to Barclays after the Enhanced Fund structure was established.  Barclays also sues BSAM for promissory estoppel; Bear Stearns for aiding or conspiring with the BSAM Defendants to hide the Enhanced Fund's failing performance and to serve interests other than Barclays'; and Bear Stearns Companies for aiding or conspiring with BSAM to hide material facts from and to breach its duties to Barclays, especially during May and June 2007, and for the Company's role in triggering the complete collapse of the Enhanced Fund in a manner that caused further losses uniquely to Barclays.

22.    While certain relevant structured-credit markets were turbulent during the first half of 2007, and a full-blown credit crisis exploded shortly after the BSAM funds' collapse,

Barclays' losses in this case were caused by the defendants' tortious actions. Each and every one of the defendants' intentional misrepresentations and gross failures to protect Barclays' interests in its foundational investment in BSAM's structure, alleged herein, brought about the harm.

23.     In March 2008, Bear Stearns Companies itself was on the brink of bankruptcy. JPMorgan Chase & Co. ("JPMorgan"), in a transaction partially orchestrated by the Federal Reserve, agreed to buy Bear Stearns Companies. That deal will reportedly close in this quarter. If and when it does, JPMorgan will assume the Company's, Bear Stearns' and BSAM's liabilities pled here.

## II.     THE PARTIES

24.     Plaintiff, Barclays Bank PLC, is a public limited company validly existing under the laws of England and Wales. Its principal place of business is 1 Churchill Place, London E14 5HP, England.

25.     Defendant Bear Stearns Asset Management Inc. is a corporation organized under the laws of the State of New York. Its principal place of business is 383 Madison Avenue, New York, New York 10179.

26.     Defendant Ralph Cioffi was, at times relevant to this action, a Senior Managing Director at Bear Stearns Asset Management Inc., a member of BSAM's Board of Directors, the Senior Portfolio Manager for the funds at issue in this case, and was until approximately June 2007 responsible for, *inter alia*, the composition of and risk management in those funds. Cioffi is a resident of the State of New Jersey.

27.     Defendant Matthew Tannin is a Senior Managing Director of Bear Stearns Asset Management Inc. At least until approximately June 2007, Tannin was the Chief Operating Officer of the Enhanced Fund and the other BSAM-managed funds relevant to this action. Tannin is a resident of the State of New York.

28.     The actions alleged herein by Cioffi and Tannin were taken as officers and employees of BSAM and (except Cioffi's personal insider trading in withdrawing his own money from the Enhanced Fund structure) were within the scope of their authority.  Such actions, except the personal trading, were taken on behalf of BSAM.

29.     Cioffi was Tannin's supervisor and closely oversaw Tannin's activities that are alleged in this Complaint.  Cioffi was aware of Tannin's actions, including his misrepresentations to and breaches of duties owed to Barclays.

30.     Defendant Bear, Stearns & Co. Inc. is a corporation organized under the laws of the State of Delaware.  It is an investment banking, securities trading, and brokerage firm.  Its principal place of business is 383 Madison Avenue, New York, New York 10179.

31.     Defendant The Bear Stearns Companies Inc. is a corporation organized under the laws of the State of Delaware, and is the parent of wholly-owned subsidiaries BSAM and Bear, Stearns & Co. Inc.  Its principal place of business is at 383 Madison Avenue, New York, New York 10179.

## III.   JURISDICTION AND VENUE

32.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332.  This action is between a citizen of the United Kingdom, as Plaintiff, and citizens of New York, Delaware and New Jersey, as Defendants, and the amount in controversy exceeds $75,000.

33.     Venue is proper in the Southern District of New York because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## IV.    BACKGROUND TO THE TRANSACTION

### A.    THE COMPANY'S EXPERIENCE IN FIXED-INCOME AND MORTGAGE-BACKED SECURITIES AND THE STRUCTURED CREDIT MARKETS

34.    Bear Stearns Companies, in 2006 and 2007, constituted a leading global investment banking, securities and derivatives trading, and financial services firm.  The publicly-traded umbrella firm Bear Stearns Companies is a holding company that houses and oversees numerous subsidiaries (collectively, the "Company"), including Bear, Stearns & Co., Inc., Bear, Stearns Securities Corp., Bear Stearns Asset Management, EMC Mortgage Corp., Bear Stearns Residential Mortgage Corp., and Bear Stearns Commercial Mortgage, Inc.

35.    As of 2006, the Company had long been known for its specialization and expertise in fixed-income securities, including mortgage-backed securities, and for its purportedly strict discipline in risk evaluation and management.

36.    *Euromoney* magazine reported that for North America as of July 2006, "Bear Stearns has emerged as best risk management house of the year."  It explained that "Bear Stearns is renowned as a leader in the rate risk management intensive mortgage business" and that it "also has a strong credit derivatives business and an innovative structured products group."

37.    The 2006 Annual Report recounts that Thomson Financial ranked the Company "No. 1" for "US Mortgage-Backed Securities, US Mortgage-Backed Securities-Residential, US Whole Loans, and US Adjustable Rate Mortgages."

38.    That report further explained:

> [The Company's] mortgage franchise continues to lead the industry.  We ranked number one for the third consecutive year in US mortgage-backed securities underwriting, secured the top spot in the securitization of adjustable-rate mortgages, and ranked in the top five in the global collateralized debt obligation (CDO) market.  …

> Our vertically integrated mortgage franchise allows us access
> to every step of the mortgage process, including origination,
> securitization, distribution and servicing.

39.     For 2006, the Company's global collateralized debt obligation ("CDO") business

grew by 50%.  According to the Company's report,

> Our success across all sectors of the CDO market and in both
> European and US issuance reflects our 10-year presence in this
> business, combined with strong overall market growth.  We are
> a leading underwriter of collateralized loan obligations,
> mezzanine asset-backed securitized debt obligations, and a
> range of types of CDOs, including those related to commercial
> mortgage-backed securities, trust preferred securities and
> CDOs of CDOs.

40.     Thus, by 2006, the Company was especially well-positioned to understand fully

what was happening in the CDO, mortgage-backed securities and other asset-backed securities

markets.  Moreover, its reach from retail and commercial mortgage originator, to servicer, to

securitizer and beyond gave the Company and its subsidiaries up-to-the-minute information

about the nature and quality of assets going into mortgage-backed securities and into CDOs that

included mortgage assets.

41.     BSAM is the asset management arm of Bear Stearns Companies and is an SEC-

registered investment advisor.

42.     Until the truth of BSAM's fraud, as detailed in this Complaint, was revealed,

BSAM was a market leader in the area of structured credit services and generally viewed as an

expert in managing the risks of structured credit assets.

43.     Cioffi, in particular, had special expertise and deep ties to the Company's

structured credit efforts.  He had been head of fixed income sales and the global product and

sales manager for high-grade credit products during his first decade at Bear Stearns (1985-94).

He was then involved in Bear Stearns' entry into structured credit work and was a principal force

behind Bear Stearns' gaining its position as a leading underwriter and secondary trader of structured finance securities, specifically CDOs and esoteric asset-backed securities. Cioffi created the High-Grade Fund in 2003 and built BSAM's High-Grade Structured Credit Strategies group.

44.      Like the Company as a whole, BSAM also strongly emphasized risk management. BSAM described its risk management approach as follows in a spring 2007 SEC filing:

> The proprietary and third-party surveillance systems used by BSAM were designed to ensure that all assets are reviewed real time and those showing signs of potential credit deterioration or poor performance are designated for further review. BSAM's surveillance systems track over 80,000 securities on a daily basis and monitor the performance of all of our CDO holdings as well as perform in-depth analysis on all the underlying collateral backing such holdings. … [This real-time system is] designed to be early warning in nature, as opposed to systems that provide alerts only after an asset begins to deteriorate.

45.      From at least 2003 through and including the spring of 2007, BSAM had a widespread reputation for this purported stringent risk management approach and for its (again, purported) uniquely-effective proprietary methods of portfolio management.

46.      At the inception of the Enhanced Fund structure in August 2006, as the *Financial Times* has reported, Cioffi "had a stellar reputation and Bear [was] a giant in the mortgage business. … The thinking was that if anyone could clean up on rising turmoil in the mortgage market, sparked by an increase in defaults by high-risk borrowers, it would be Bear Stearns and Mr. Cioffi."

47.      Bear Stearns Securities Corp. ("BSSC"), which operates the Company's prime brokerage, also was well known for its highly regarded services to hedge funds. The BSSC prime broker provides access to margin loans, pricing information, and risk management

services, in addition to holding and trading securities for its clients. BSAM used BSSC as the prime broker for the Enhanced Fund.

B.     THE HIGH GRADE FUND AND ITS HIDDEN PROBLEMS

48.     In March 2003, BSAM and Cioffi formed the High-Grade Fund as an investment fund that could be "compared to a specialty finance company." It would bring together a very large number of structured credit assets and produce returns for investors based on the payments that the fund received from those assets.

49.     The risks associated with structured credit assets vary according to asset class, credit rating, the nature and history of each underlying asset, and other factors.

50.     As BSAM explained to Barclays through BSAM's written materials and in the discussions between Barclays and Tannin described below, the High-Grade Fund's strategy – and a core feature of BSAM's overall structured credit strategies business model – was to select and monitor its portfolio assets in a highly informed and careful way that would manage, and hedge against, any significant risks associated with fluctuations in particular segments of the credit market, including in asset-backed securities based on sub-prime mortgages. BSAM portrayed itself, including in its eventual discussions with Barclays, as able (through its in-depth market connections and proprietary systems) to use up-to-the-minute information to contain risk and to profit from a diversified, complex array of asset-backed securities.

51.     In fact, the High-Grade Fund became the prime engine driving BSAM's revenues. The fund contributed approximately three-quarters of BSAM's annual revenues in 2004 and 2005, according to Derivative Fitch.

52.     By August 2006, the High-Grade Fund had reportedly enjoyed a return in excess of 36%. As of January 2007, it reportedly had experienced no decline in 40 months and earned a cumulative return of 50%.

53.    When BSAM approached Barclays to become a part of BSAM's new, "enhanced" fund structure in 2006, BSAM's experience and history with the High-Grade Fund formed a major part of its presentations to and analysis for Barclays.  As the discussions, outlined below, progressed, Tannin and others within the High-Grade Structured Credit Strategies (known within BSAM as "BSHG") team continued to highlight that group's experience and success in operating the High-Grade Fund to convince Barclays to join BSAM's new endeavor and to place trust in BSAM.  (All references in this complaint to the BSHG team are to BSAM officers and employees – *i.e.*, a subset of BSAM acting on its behalf.  Cioffi and Tannin were the leaders of that team.)

54.    Since suffering the large losses in 2007 that triggered this suit, however, Barclays has learned that BSAM, Cioffi, and Tannin were hiding problems and disarray in the High-Grade Fund from Barclays at the time in 2006 when the Barclays' proposed participation in the Enhanced Fund structure was being negotiated.  The BSAM Defendants then continued to hide those damning facts about the High-Grade Fund and BSAM as Barclays contributed leverage and liquidity throughout the eventual, short life of the Enhanced Fund structure.

55.    The High-Grade Fund's problems were multi-faceted.  *First*, in 2004, 2005 and 2006 Cioffi and his BSHG team were failing, on a widespread basis, to secure the directors' approvals that they had promised to secure in the High-Grade Fund's offering materials before engaging in "principal trades" between the High-Grade Fund and other Bear Stearns entities or Bear Stearns clients – trades that posed conflict of interest issues.  The Investment Advisers Act of 1940 required such consents (so-called "Principal Trade Letters" or "PTLs") and prohibited principal transactions without them.

56.     By the summer of 2006, the failure to secure timely PTLs had reached crisis proportions within BSAM. BSAM had been neglecting this necessary step in over 50% of its principal transactions in 2005, over 75% in 2006, and had persisted in this compliance failure despite repeated warnings that it must improve. In July of 2006, for example, BSAM staff were attempting impermissibly to secure retroactive approval for dozens of transactions that had already occurred between January and July. As Cioffi admitted in an email to another member of the BSHG team, Joanmarie Pusateri, on August 9, 2006, "… two people did not do their jobs on PTLs and BSAM did not have a process to catch the late PTL's. There is this whole uproar over PTL's and they want to make it into a big story about how we are not organized."

57.     *Second*, in or about August 2006, Bear Stearns was so concerned about BSAM's failure to follow the proper procedures to secure directors' approval, and thereby protect investors against conflicts of interest, that it cut off trading between Bear Stearns and BSAM. Bear Stearns placed a moratorium on any such related-party transactions.

58.     On September 7, 2006, a member of the BSAM compliance staff, Alexander Reynolds, explained to Pusateri by email: "our administrator gave us approval on the SAMI deal that we did with Bear. However, after we received approval the head of Bear Stearns compliance squashed it." Reynolds went on to state, "until further notice … no trading with Bear again."

59.     Nonetheless, Cioffi still resisted the Bear Stearns' edict. On November 9, 2006, Pusateri emphasized to Cioffi: "I don't like to argue with you but I was told that we are definitely not allowed any repos with Bear (PTL or not)."

60.     A moratorium on transactions with Bear Stearns lasted well into 2007.

15

61.  *Third*, this moratorium on transactions between the BSHG funds (including both the High-Grade and the Enhanced Funds) and Bear Stearns was imposed at a time when the High-Grade Fund was already straining with regard to liquidity – all unbeknownst to Barclays. The moratorium greatly worsened the High-Grade Fund's liquidity situation.  Thus, the BSAM Defendants were scrambling to keep ahead of liquidity needs and were scheming, in private, to use the Enhanced Fund structure and Barclays to relieve some of the pressure on the High-Grade Fund.

62.  The moratorium on transactions with Bear Stearns hurt the BSHG funds, and in particular the funds' liquidity, in multiple ways.  As Raymond McGarrigal, a Senior Managing Director at BSAM who worked closely with Cioffi and Tannin on the BSHG team, spelled out in a September 19, 2006, email to Cioffi, Tannin and Pusateri, the termination of the Bear Stearns relationship "hurts our investors as it eliminates a repo counterparty (reducing liquidity) and eliminates a source of trading secondary CDOS," which also had implications for liquidity.  In addition, McGarrigal noted that Bear Stearns is "#1 in MBS [mortgage-backed securities] and in the top 5 of CDO issuers.  All bad for our investors" when a moratorium is in place.  BSAM caused itself to be cut off from transactions with and liquidity from a leader – its own affiliate – in markets important to its funds, because BSAM simply would not comply with important approval processes necessary to protect its investors against conflicts of interest.

63.  "Liquidity" here essentially means access to cash to meet the many cash needs of these types of hedge funds.  The funds aim to generate their return by securing a greater cash flow each month from the asset portfolio than the fund owes in interest and other borrowing costs to create such a portfolio. The funds use various kinds of borrowing, including repurchase or "repo" agreements, to invest in total assets that are far greater than the money directly

contributed by investors.  The funds constantly need cash to pay interest, to meet margin requests by repo counterparties or other lenders, to pay expenses, to satisfy any investor redemptions, and to adjust the investment portfolio through new investments.

64.    A repurchase or "repo" agreement is the sale of securities coupled with an agreement by the initial holder to repurchase them at a later date.  It is similar to a secured loan with the securities as collateral to protect against default, except that in a repo arrangement legal title to the securities actually passes to the lender.  Thus, under certain margin call or default circumstances, the lender has the power to liquidate the assets and close out the agreement.

65.    Because Bear Stearns traded CDOs and most other asset-backed securities on the secondary market (though CDOs were not widely traded after issuance), Bear Stearns was an important counterparty option for sales of assets to raise cash.  In addition, repo agreements are short-term lending agreements and have to be "rolled over" or replaced frequently.  If a repo lender to a fund declines to renew the agreement or establishes a moratorium, as Bear Stearns did, the fund must find another lender or lenders to replace the liquidity that had been provided by that lender.

66.    In mid-September, in the midst of these problems, Cioffi and Tannin exchanged numerous emails discussing a "liquidity game plan."  Cioffi told Tannin in a September 17, 2006, email, "[w]hat we need to figure out is how to get the majority of our [High-Grade Fund investors] into the enhanced fund.  That will take some time but once we do that **we have an easy liquidity source and that's Barclays**."  (Emphasis added.)

67.    Tannin responded:

> I've been working on that too.
> There are three ways to **roll our investors into Barclays** …
> 1. Force them (I'm not really serious)

2. A sell out and sell in.  This is sticky because it forces us to raise liquidity in [the High-Grade Fund] – and over time would increase the more illiquid investments.
3. We do an in-kind exchange.  **The issue here is that we have to get a "real" mark on all the assets.**  I will speak to Jerry again about this.

(Emphasis added.)

68.     In addition to targeting Barclays as a perceived remedy for BSAM's failure to have appropriate liquidity options for and management in the High-Grade Fund, Tannin's email shows that BSAM was not using truthful, accurate or real marks (*i.e.*, values) for its portfolio assets as a matter of course and indicates that marks used to transfer assets between the High-Grade Fund and the Enhanced Fund would not be truthful, accurate or real marks.

69.     By September, the difficulties that had been building in the High-Grade Fund over the summer, especially its liquidity crunch, were so severe that Cioffi proposed to Tannin the idea of closing the High-Grade Fund altogether.  On September 17, 2006, Cioffi wrote Tannin in an email:  "What I was thinking was to build up 6 [months] of returns [in the Enhanced Fund] then send a letter to all the remaining investors and tell them we are closing the HGS [High-Grade] fund and ask everyone to convert to EHGS [the Enhanced Leverage Fund]."  In short, BSAM, Cioffi and Tannin were struggling behind the scenes to keep one step ahead of liquidity constraints.

70.     Against this internal backdrop, BSAM, Cioffi and Tannin formed the second, spin-off master-feeder fund structure.  The new Enhanced Fund structure, according to the BSAM Defendants' statements to Barclays discussed in more detail below, would employ the same purported BSAM expertise, proprietary analytics, and risk controls, and be managed in a similar fashion to the High-Grade Fund, but would utilize greater leverage.

71.     But all of this turmoil in the High-Grade Fund was purposefully concealed from Barclays by BSAM, Cioffi, and Tannin.  It was occurring around the time when the transaction with Barclays closed – August 1, 2006 – and BSAM desperately needed that transaction to proceed, as explained more fully below.  The High-Grade Fund's difficulties also continued to persist when Barclays, from September 2006 through March 2007, was increasing its financial stake in the Enhanced Fund structure at BSAM's request.  Yet Barclays was told neither that the High-Grade Fund was failing, nor that the BSHG team had such systemic problems that Bear Stearns had halted transacting with it.

## IV.    BARCLAYS' LEVERAGE INSTRUMENT AND HEDGE TRANSACTION

72.     Bear Stearns' or BSAM's clients seeking exposure to the master Enhanced Fund's portfolio of investments could purchase interests in two new BSAM "feeder funds," the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund, L.P. and the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd. (collectively, the "Feeder Funds").

73.     The "enhanced leverage" for investors in the Feeder Funds came in significant part from total return swaps for which Barclays served as the counterparty.  Barclays was positioned between the Feeder Funds and the master fund in the "enhanced leverage" structure.  A structural diagram is attached to and incorporated in this Complaint as Exhibit A.

74.     Barclays entered into a total return swap with each Feeder Fund, memorialized in Confirmation Nos. BL15089 and BL15090.  The swaps were constructed so that Barclays would return to each Feeder Fund the total net asset value (plus any cash) achieved by a reference portfolio based on the Enhanced Fund *as if* both the Feeder Fund's investor assets and the notional dollar amount from Barclays had been invested in the Enhanced Fund, minus (a) the notional amount and (b) accreted interest and spread (Barclays' fee for the leverage) that would

be retained by Barclays as a payment from each Feeder Fund.  On the closing and effective date of the transaction, August 1, 2006, the total notional or leverage amount for the two Feeder Funds from Barclays was $50,000,000.

75.    For Feeder Fund investors, the anticipated benefit of the total return swap was that if the Enhanced Fund assets increased in value, the Feeder Fund investors would receive from their counterparty, Barclays, their initial investment *plus* the total return on the Enhanced Fund assets as augmented by Barclays' leverage amount (and minus their fee to Barclays).

76.    The swaps were for a three-year period; but could be terminated by Barclays throughout that period based on various termination events in the confirmation agreements and in an annexed and incorporated list of Additional Termination Events.

77.    Each swap Confirmation further provided that on its initial effective date Barclays must own shares in the Enhanced Fund equal, in their aggregate value, to the Initial Reference Portfolio Value.  The Initial Reference Portfolio Value consisted of (i) the initial aggregate investment in the swap from the Feeder Fund plus (ii) the initial notional amount committed by Barclays.

78.    To establish the new "enhanced leverage" fund structure, BSAM offered its investors in the High-Grade Fund's feeder funds the option of moving to the Enhanced Fund structure.  Indeed, in keeping with the BSAM Defendants' undisclosed strategies, BSAM, Cioffi and Tannin strongly encouraged High-Grade feeder fund investors to do so, both at inception and in the months after inception of the "enhanced" structure.

79.    Assets were transferred from the High-Grade Fund to the Enhanced Fund in proportion to the indirect interest therein of the investors who decided to move to the Enhanced Fund structure.

80.     Barclays acquired its initial shares in the Enhanced Fund because the Feeder Funds were deemed to have contributed the initial portfolio to the Enhanced Fund on Barclays' behalf through the above process.  Barclays also acquired shares through its own subscription, equal to its notional amount.

81.     By owning shares in the Enhanced Fund (the reference fund under the swaps), Barclays hedged its obligations to the Feeder Funds under the total return swaps.  This hedge investment enabled Barclays to obtain the same rate of return that it would owe Feeder Fund investors if the Enhanced Fund increased in value.

82.     The hedge by Barclays was also critical to BSAM because it made it possible for the Enhanced Leverage structure to serve BSAM's purposes.  Only by subscribing to shares in the master fund, including for the notional amount, did Barclays inject actual liquidity into the structure.  Its shares equal to the notional amount reflected cash received by the Enhanced Fund.

83.     Similarly, Barclays' ownership of its participating shares in the master fund enabled that fund to hold and own all of the assets of the Enhanced Fund portfolio.  If Barclays had redeemed those shares after the closing and not held them throughout the transaction, the fund would have been forced to pay Barclays tens or hundreds of millions of dollars by selling assets, depending on when Barclays ceased maintaining the share ownership and hedge.

84.     The Confirmations provide that when the swaps and hedge were both in place, the notional amount is treated for U.S. federal income tax purposes as "a loan from Party A [Barclays] to Party B [each Feeder Fund]."  This status of the whole transaction being treated as a loan for U.S. tax purposes was also particularly important to BSAM, because it was advantageous to U.S. feeder fund investors.

85.    The Confirmations specifically required that Barclays have the hedge in place on the initial effective date of the swaps.  For all the reasons outlined above, both BSAM and Barclays discussed BSAM's capabilities and plans, negotiated the Investment Guidelines and the Reporting Requirements, and otherwise proceeded with the transaction contemplating that Barclays would continue to hedge its swap obligations with ownership of shares in the Enhanced Fund throughout the life of the deal.

86.    After closing the transaction and establishing the structure, BSAM served as investment manager for the Enhanced Fund, investment manager for the overseas Feeder Fund, and general partner for the U.S. Feeder Fund.

87.    BSAM also controlled the boards of directors of the overseas Feeder Fund and the master Enhanced Fund.  Three of the five directors of each were from BSAM.

88.    The Enhanced Fund is a Cayman Islands entity.  Barclays subscribed to shares from that Cayman Islands entity through a process that was devised solely for Barclays and that relied upon the fact that Barclays, as subscriber, was a non-United States entity.  Moreover, the Enhanced Fund, in the context of the subscription, specifically acknowledged that Barclays was subscribing to shares to the extent necessary to hedge and for the purpose of hedging the total return swaps.

89.    Barclays could not profit from an increase in the value of the Enhanced Fund. Any increase in the Enhanced Fund (also the swap reference fund) would be owed correspondingly to the Feeder Fund investors.  Barclays' fee for the entire transaction came from the floating interest rate option (USD-LIBOR-LIBO) plus a spread specified in the Confirmations.  The spread was 1.00% per annum if the leverage ratio was less than 2.5 and 1.20% per annum if it was greater than 2.5.

90.     When and if Barclays withdrew from the structure or the transaction unwound, Barclays' investment and fees would come to it first, as the money flowed out of the Enhanced Fund back through Barclays (with Barclays retaining what it was owed) and then, provided additional money remained, on to the Feeder Funds.

91.     Barclays' structural hedge through ownership of shares is distinguished from the hedging activities, as discussed below, by BSAM, Cioffi and Tannin, as investment managers, within the Enhanced Fund portfolio itself.

## V.     THE BSAM DEFENDANTS' REPRESENTATIONS TO BARCLAYS PRIOR TO CLOSING

### A.     INITIAL REPRESENTATIONS ABOUT BSAM'S CAPABILITIES

92.     Barclays' participation in the two Feeder Fund swaps and the corresponding hedge came about after negotiations over approximately four months with BSAM.

93.     In or about early March 2006, BSAM proposed to Barclays that Barclays provide the leverage for the planned new "enhanced leverage" fund structure.

94.     Tannin invited Ram Rao and Edward Ware of Barclays to visit with him at BSAM's offices in the Bear Stearns Companies' building and have lunch.

95.     At that lunch meeting on or about March 6, 2006, Tannin described the planned new fund and the need for a leverage counterparty.

96.     Tannin emphasized to Rao and Ware that BSAM's specialties were risk management for this kind of structured credit investment fund and the assessment of the value in particular structured credit assets.  Tannin gave Rao and Ware information about the High-Grade Fund and about BSAM's overall approach to structured credit investment, and later forwarded to them detailed written reports and spreadsheets on the High-Grade Fund.  Tannin claimed that BSAM and "Bear Stearns" generally were the best in the field.

97.     Tannin told Rao and Ware at the initial meeting – and throughout the negotiation of the transaction – that BSAM wanted Barclays to have comfort in entering into a leverage counterparty role, and stressed that what was to become the Enhanced Fund would be constructed and operated with transparency to Barclays.

98.     On or about March 22, 2006, Rao, Ware, Richard Ho, Carlo Panzeri, and Frank Gerhard from Barclays met with Tannin and other members of BSAM's risk management and operations staff for a lengthy due diligence meeting at BSAM.  Ho, Panzeri and Gerhard came from London, where they are based, to New York for this meeting.  The Barclays employees also spoke with Cioffi at the meeting.

99.     Other due diligence calls with BSAM, from its New York City offices, and further exchange of information from BSAM to Barclays occurred in the months after this meeting.  Barclays' team thoroughly vetted the transaction before entering into it, and gathered all of the information from BSAM that BSAM would make available to it.

100.    During Barclays' initial investigation of the proposed structure, BSAM gave Barclays a PowerPoint presentation that set forth "Bear Stearns High-Grade Structured Credit Strategies" and BSAM's claimed capabilities in managing structured credit funds.  Tannin and BSAM explained that the Enhanced Fund would be managed with the same BSHG team and the same, then-existing methods of "investment process" and "surveillance process" discussed in the PowerPoint slides – including the same proprietary analytics and portfolio system.

101.    In the PowerPoint presentation, in statements made to Barclays at the March 22 due diligence meeting, and in other subsequent conversations involving Tannin before Barclays entered into the total return swaps and related hedge, BSAM emphasized its proprietary

"Surveillance, Portfolio Evaluation, Analysis and Risk System" for structured credits and their underlying portfolios.

102.    According to BSAM, that system aggregated information from multiple sources and applied analytics, including Bear Stearns BondStudio and proprietary models, to keep BSAM informed about each asset's performance and stability.  In BSAM's system, BSAM and Tannin told Barclays in the PowerPoint, in the March 22 meeting, and in other communications, "Alerts and Collateral Management reports are generated every day based upon updated data from the data providers."  BSAM, and in particular Tannin and the BSHG team, further stated to Barclays in those communications that this proprietary system allowed its credit portfolio managers "to quickly identify and sell any suspect assets before credit deterioration begins or ratings downgrades occur."

103.    During the March 22 due diligence meeting, BSAM's surveillance staff demonstrated the surveillance system to Panzeri and the rest of the group from Barclays by showing them selected screens produced by the system.

104.    In describing the proposed transaction to Barclays in March and April, BSAM and Tannin repeatedly referred to "Bear Stearns" and the entire Company's expertise and information.  They told Barclays' representatives, including Ware and Panzeri, that BSAM would have access to and be backed up by the entire Company's expertise and knowledge, particularly with regard to asset pricing and risk management.  BSAM and Tannin portrayed all of these connections that the Enhanced Fund structure would have as strengths for the structure, and told Barclays those connections would benefit it.

105.    For example, Tannin told Panzeri that BSAM and "Bear Stearns" shared compliance oversight and that BSAM would operate the structure according to the Company's

standards.  Similarly, Tannin told Ware that BSAM would employ and Barclays would be

protected by all of the Company's expertise as "the" mortgage trading house.  In addition, the

PowerPoint presented research attributed to "Bear Stearns" and to "Bear Stearns CMBS

[Commercial Mortgage-Backed Securities] and CDO Research."

106.    In addition, BSAM represented in the PowerPoint and in other statements to

Barclays, including by Tannin to Ware and Panzeri, that its investment process "prioritize[d]

clean, new issue quality assets" and "filter[ed] out assets based upon collateral quality test

performance, concentration limitations, payment frequency, maturity as well as weighted

average life, and ratings."

107.    Tannin and BSAM, in the PowerPoint, in documents provided to Barclays that

showed the High-Grade Fund's performance and statistics, and in discussions, emphasized the

BSHG team's success with the High-Grade Fund and its stability to justify why Barclays should

place confidence in BSAM.  The PowerPoint stated that, "[a]s experienced participants in this

market, the portfolio managers have the knowledge, experience and resources to identify suitable

assets and monitor the credit risk inherent in these assets."

108.    BSAM gave Barclays a report on the liquidity stress-testing of the High-Grade

Fund as part of the information package on which Barclays' decision to participate in the

Enhanced Fund structure should be based.  That document appeared to show that the High-Grade

Fund responded very well and remained stable under various scenarios involving liquidity

pressure.

109.    Tannin told Ware and others from Barclays in the spring and summer 2006

negotiations that the Enhanced Leverage fund planned to apply Barclays' additional leverage to

even higher quality assets, by increasing the proportion of the highest rated assets in the Enhanced Fund's portfolio, than were held by the High-Grade Fund.

110.    Tannin told Ware early on in the negotiations (in March or April), and on several occasions before Barclays entered into the transaction, that BSAM's then-existing investment system allowed it, in Tannin's words, to avoid "freaked-out repo counterparty risk."  BSAM's ability to avoid and control repo counterparty risk, according to Tannin in these conversations, added stability and reduced liquidity pressures on the BSHG portfolios.  As Tannin represented to Barclays, BSAM took particular care and had innovative, BSAM-designed solutions to maintain appropriate liquidity in its BSHG portfolios.

111.    BSAM's representations to Barclays, including the PowerPoint presentation and the statements made in the initial due diligence meeting, also emphasized that BSAM used credit derivatives and "long protection" positions to hedge the underlying portfolio.  Indeed, BSAM and Tannin represented to Ware, Panzeri and others at Barclays during the negotiations that its vast access to information and analytics allowed it to be particularly adept at hedging, including with regard to credit fluctuations affecting the mortgage securities markets.

112.    In a March 28, 2006, e-mail to Rao and Ware, Tannin further explained BSAM's portfolio approach and the protections it specifically would provide Barclays in the Enhanced Fund.  He explained that the BSAM team uses two forms of leverage:

> We have "internal" leverage assets and "external" leverage assets.  Internal leverage assets are structurings or repackagings that we do where we take the high quality assets and fund them from within a structure.  This gives us pure cash flow leverage which does not have first order mark-to-market volatility.  We also use more traditional repo and TRS [total-return-swap] leverage.
>
> . . .  We plan to use the leverage provided by you guys to increase the proportion of EXTERNAL leverage assets.  We plan to do this because this will give you guys the comfort that

27

> you need that **we will always be able to maintain a level of liquidity that will allow us to "dial" up and down the leverage based upon market price volatility when necessary.**

(Emphasis added.)

113.    The "increase[d] proportion" of externally leveraged assets would, according to Tannin and BSAM, be the highest quality assets.

114.    Again on April 6, 2006, Tannin emphasized BSAM's transparent information flows and its ability to manage risk in the Enhanced Fund in an e-mail to Rao and Ware at Barclays:

> We are more than happy to discuss with you credit and portfolio limits for the underlying portfolios as well. This way if there is measurable CREDIT deterioration we can factor this in and reduce the leverage.
>
> **I don't want to sound like a broken record but the value of this transaction lies in the transparency of credit information on high underlying credit quality assets.** We have a lot of it and you can have it as often as you want. We'll even chew it up for you and give you customized reports. Look at the stability of the ratings in these portfolios[.]

(Emphasis added.)

115.    Based on BSAM's apparent extant expertise, capabilities, and practices, Barclays decided to proceed toward becoming the leverage counterparty and to negotiate further details of the planned transaction. Barclays relied on the above representations and commitments from BSAM and Tannin in later closing the deal, in increasing Barclays' contributions to the structure from September 2006 through March 2007, and in participating in the structure into July 2007.

116.    Before entering into the transaction, however, Panzeri and others at Barclays not only questioned BSAM and continued to engage in due diligence, but also investigated BSAM

and its stated capabilities through third party inquiries and sources. All of the indications were that BSAM was accurately representing its capabilities and processes.

   B.    THE INVESTMENT GUIDELINES AND REPORTING REQUIREMENTS

117.    Barclays' ultimate participation in the deal was contingent upon (among other things) its obtaining unique and specific commitments from BSAM about its operation of the Enhanced Fund as investment manager. These commitments by BSAM to Barclays were designed explicitly to be greater than BSAM's commitments to the Feeder Funds' investors, and greater than BSAM's general obligations to the Enhanced Fund itself. Thus, BSAM and Barclays continued their one-on-one discussions and negotiations also to develop these additional commitments to Barclays, as the swap counterparty and sole participating shareholder in the Enhanced Fund.

118.    From late March through July 2006, Barclays and BSAM negotiated specific investment limitations ("Investment Guidelines") and reporting commitments ("Reporting Requirements"), with which BSAM promised to comply for Barclays' unique benefit.

119.    Although Tannin was Barclays' primary contact at BSAM, he consulted with Cioffi and McGarrigal during the negotiations. Indeed, Cioffi negotiated the leverage transaction's pricing – the details and amount of the spread over LIBOR – with Barclays.

120.    Ho at Barclays in London had primary responsibility for the transaction, which became part of Barclays' London business. Rao and Ware, in New York, were at times the immediate points of contact for Barclays with Tannin and BSAM during the ongoing discussions. Panzeri, in London, reviewed and assisted in the negotiation of the investment limitations and reporting commitments for Barclays.

121.    Tannin, on behalf of BSAM, approved the final version of the Investment Guidelines on or about July 31, 2006, the day before the closing of the deal.

122.     Each specification in the five-page Investment Guidelines, which were annexed to the Confirmations and are attached hereto as Exhibit B, was a representation and commitment by BSAM, as investment manager of the master fund and operator of the structure, that it "will operate the [Enhanced] Fund in accordance with" that specification for the benefit of Barclays.

123.     These specially-negotiated terms of the Investment Guidelines were representations and commitments regarding non-discretionary requirements that BSAM made specifically to Barclays.  These special terms were in addition to and separate from any representations made to the Feeder Fund investors or any representations made to the Enhanced Fund itself.  They specifically pertained to BSAM's role in managing and operating the Enhanced Fund structure while Barclays served as the leverage counterparty and hedged its risk through shares in the Enhanced Fund.

124.     Barclays relied on all of the representations and commitments by BSAM in Exhibit B in deciding to undertake the swaps and their hedge, in committing additional funds after the initial closing, and in continuing to participate in the transaction into July 2007.  BSAM, Cioffi, and Tannin knew that Barclays was relying on those representations and commitments, and intended that Barclays do so.

125.     In addition, each specification of the Reporting Requirements, which also were annexed to the Confirmations and are attached hereto as Exhibit C, was a representation and commitment by BSAM, as investment manager and operator of the structure, that it "will provide Barclays" with (or will cause the Enhanced Fund's administrator to provide Barclays with) the listed reports and notices.

126.     The specially-negotiated terms of the Reporting Requirements were representations and commitments regarding non-discretionary requirements that BSAM made

specifically to Barclays.  These special terms were in addition to and separate from any representations made to the Feeder Fund investors or any representations made to the Enhanced Fund itself.  They specifically pertained to BSAM's role in managing and operating the Enhanced Fund structure while Barclays served as the leverage counterparty and hedged its risk through shares in the Enhanced Fund.

127.    Tannin and BSAM also confirmed BSAM's approval of the Reporting Requirements to Ware and others at Barclays shortly before the deal closed on August 1, 2006. Indeed, Tannin represented to Panzeri and others during conversations in mid-2006 that the Reporting Requirements for the Enhanced Fund closely reflected BSAM's then-existing, internal reporting with respect to its original High-Grade Fund and thus would simply continue BSAM's current practices.  Documents, including sample reports, that BSAM and Tannin provided to Panzeri and Barclays at the time seemed to corroborate those representations.  Again, BSAM agreed to these reporting requirements to provide Barclays with personal protections greater than it provided to others.

128.    Barclays relied on all of the representations and commitments by BSAM in Exhibit C in deciding to undertake the swaps and their hedge, in contributing additional funds after the initial closing, and in continuing to participate in the transaction into July 2007.  BSAM, Cioffi, and Tannin knew that Barclays was relying on those representations and commitments, and intended that Barclays do so.

129.    High quality assets, limitations on permitted investments, and adherence to portfolio diversification requirements for the Enhanced Fund were critical to Barclays in establishing the basis for its participation in the transaction.  The permitted investments and their concentration limitations were specifically defined in the Investment Guidelines.  In addition,

Barclays' negotiations focused on ensuring that especially hard-to-price assets would be excluded from the portfolio.

130.    For example, under the Barclays-specific Investment Guidelines that BSAM represented it would follow, "[i]nstruments where there is no official public price available are only eligible if the Reference Fund Administrator is able to obtain independent pricings of the instrument on a regular basis from financial counterparties."

131.    Based on, *inter alia*, BSAM's roles in the structure, apparent expertise, vast access to relevant non-public information, purportedly effective proprietary analytic systems, and its promises of transparency, Barclays was relying on BSAM continuously to mark the portfolio assets prudently and fairly, and to do so with accurate, timely reporting to Barclays.  Various transaction documents, discussed below, also memorialized BSAM's obligation to mark the assets fairly and reasonably.  The required ability of the Reference Fund Administrator, a third-party institution, under the Investment Guidelines to price assets independently on a daily or at least regular basis was negotiated by Barclays to provide even more assurance that assets in the portfolio could and would be priced fairly on an ongoing basis, both by BSAM and the fund administrator.

132.    CDOs are issued by special purpose entities organized to buy debt collateral.  The special purpose entities bundle together and structure a portfolio of collateral – various debt assets – and then issue tranches (or groups of securities organized by class) of "CDOs" that in the higher tranches are rated by the major credit rating agencies, but in the junior tranches are unrated "equity."  CDOs often include mortgage assets in their collateral.

133.    Under the Barclays-specific Investment Guidelines, CDOs were a permitted investment, defined to include not only plain CDOs, but also Synthetic CDOs, High Grade and

High Yield CDOs.  But CDOs were not defined to include CDO-squared investments, which are CDOs in which some or all of the underlying instruments are in turn other CDOs.  CDOs, as described and limited in the Investment Guidelines, were restricted to an upper limit of 60% of the portfolio assets.

134.    The Investment Guidelines required that from 75% to 100% of the total portfolio assets had to carry a AAA to AA- rating.  Below BBB- or not-rated assets could comprise at most 3.5% of the total assets.  A single issue rated below A- or unrated could not amount to more than 0.1% of total assets or more than 2% of NAV.

135.    Tannin described these "AA/AAA assets" as having "very very low volatility" in a May 1, 2006, e-mail to Ware, Rao, and Panzeri at Barclays.

136.    In that same e-mail, Tannin described to Barclays that the new "enhanced" structure would "continue to operate [as did the High-Grade Fund] in the best parts of the capital structure"; "concentrate the ultimate exposure in the highest rated floating rate kinds of assets" and "[g]enerate a prudent return for our investors which allows our portfolio managers and structuring team to concentrate on the areas in the market where there is the greatest liquidity and greatest value."

137.    The Investment Guidelines also included a list of the permitted counterparties that BSAM represented it would use to trade repo and over-the-counter ("OTC") products.  Bear Stearns was on that list.

138.    As above, Barclays relied on each of the representations and commitments described in paragraphs 129-37 in deciding to proceed initially and in continuing to participate in the transaction, without terminating, into July 2007.  BSAM, Cioffi and Tannin knew that

Barclays was relying on those representations and commitments from them, and intended that Barclays do so.

139.    Transparency in the portfolio's operations and in the pricing of its assets also was critical to Barclays.  The Reporting Requirements specified timely, detailed reporting of various types to Barclays on a daily, weekly, and monthly basis.

140.    BSAM agreed in the Reporting Requirements, for example, to provide to Barclays "[r]eports comparing the Reference Fund portfolio with the Investment Guidelines on a weekly basis"; "[f]ull investment positions reports on a weekly basis"; and "[n]otice as soon as reasonably possible of any change in circumstances, which might cause the final monthly NAV of the [Enhanced Fund] to show a loss in value equal to or more than 10%[.]"

141.    BSAM further agreed that the Enhanced Fund's administrator would provide Barclays with estimated monthly NAV values "no later than twelve Business Days following the end of each calendar month."

142.    The Confirmations with the Feeder Funds provided that the fund administrator was obligated to report final NAVs to Barclays on the fifteenth day following a relevant "dealing date."  This dealing date under the initial Confirmations was the first day of each month; by the end of March, 2007, the dealing dates had been amended to be the third and fifteenth days of each month, with the final NAV expected on the fifteenth day following the first dealing date (*i.e.*, the third day) of the month.

143.    Again, Barclays relied on each of these representations and commitments, pled in paragraphs 139-41, in deciding to proceed initially and in continuing to participate in the transaction.  BSAM, Cioffi, and Tannin knew and intended that Barclays would do so.

144.    At closing, all of Barclays' information supported and Barclays reasonably believed BSAM's portrayal of itself as extremely proficient and data-rich in structured credit markets; as having proprietary models and systems that did and would continue to assess accurately portfolio values, and thus protect Barclays' financial exposure; as committed to fairness and openness in pricing and about its operations; and as being able – indeed, obligated – to warn Barclays should any significant increased risk or downward movement arise, with time for Barclays to scale down its commitment or exit the structure completely and thereby avoid loss.

C.    BARCLAYS' RELIANCE ON BSAM'S MISREPRESENTATIONS IN THE CONTEXT OF THE ENHANCED FUND TRANSACTION

145.    BSAM's, Cioffi's and Tannin's many representations to Barclays for purposes of securing Barclays' participation in the transaction, alleged above, related to the whole of the transaction – the swaps and the hedge.  Both BSAM and Barclays understood and intended that BSAM's representations constituted a necessary predicate before Barclays would participate in any part of the single, unified transaction that those two parties were discussing.

146.    The first leg of the transaction, the swaps, would not have occurred without BSAM's many representations to Barclays, including the Investment Guidelines and Reporting Requirements.  And BSAM intended Barclays to rely upon all the representations alleged above when it decided to enter into the overall transaction.  As such, the Investment Guidelines and Reporting Requirements are annexed to the Confirmations even though the specific content of those promises applies to the second leg of the transaction, namely BSAM's management and operation of the Enhanced Fund and Barclays' position as sole participating shareholder in the Enhanced Fund.

147.    BSAM's unique, foundational commitments to Barclays also are reflected in and corroborated by other documentation that relates to the structure.

148.    For example, BSAM and its counsel drafted the offering memoranda for the Feeder Funds, each of which were distributed with BSAM's name as well as the Feeder Fund's name on the cover.  BSAM gave each memorandum to Barclays for its review and intended that Barclays rely upon the memoranda to the extent that their contents applied to Barclays.  Barclays did so rely in closing the deal.

149.    The Feeder Fund offering memoranda repeatedly refer to the "investment restrictions" and "limitations" that have been negotiated separately between Barclays, the leverage counterparty, and BSAM.  Those offering memoranda reiterate that "the Investment Manager intends to adhere to such guidelines in managing the assets of the Master Fund, thereby limiting its discretion."  They also refer to Barclays' entitlement, given its special role in the transaction, to more reports on the status and performance of the master fund, and more favorable liquidity rights than Feeder Fund investors.

150.    At the same time, the memoranda make clear that there is no obligation running from BSAM to the Feeder Fund investors to comply with the special transaction terms and commitments negotiated uniquely with Barclays.  Indeed, the Feeder Fund offering memoranda describe vast discretion in the management of the Enhanced Fund and in permitted investments *vis a vis* investors other than Barclays.

151.    Similarly, BSAM represented and promised a Barclays-specific overlay of conditions and limitations to the more general Memorandum & Articles of Association ("Articles") of the Enhanced Fund that was adopted by the master fund's board of directors (a body that was in turn controlled by its three BSAM members).

152.    For example, the Barclays-specific Investment Guidelines limit permitted investments, so long as the transaction with Barclays is in place, in the Enhanced Fund to instruments that can be "independently priced daily" or at least, if there is no official public price available, to instruments where "independent pricings of the instrument on a regular basis from financial counterparties" are available.  (The Klio residual interests are the one exception.)  This "permitted instruments" provision and all the other Investment Guidelines limit the Enhanced Fund's discretion, *vis a vis* only Barclays, in ways that the Articles do not.

153.    Generally, the Articles specify that BSAM shall value the portfolio's assets "upon consultation with independent pricing services and/or using the quotes of recognized market dealers where available."  The Articles further reflect that BSAM has an obligation to use a prudent method of valuation and to provide fair values in BSAM's reports of asset valuations.

154.    Consistent with the overall, interconnected nature of the transaction, the subscription agreement between the Enhanced Fund and Barclays for the participating shares states that the "Master Fund understands, acknowledges and accepts that the Investor has entered into total return swap transactions with each of [the Feeder Funds] … and that the Investor is subscribing for Shares in order to hedge its risk" in the swaps.

155.    In addition, although the subscription agreement pertains to the narrow relationship between the master Enhanced Fund itself and Barclays, that agreement contemplates BSAM's overarching orchestration of the structure and its role as Investment Manager.  The subscription agreement explicitly references BSAM as a source of information and assurances for Barclays prior to its participation in the transaction.  That agreement specifically recounts that "the Investment Manager has answered all inquiries that the Investor has put to it relating

[to]" the "Master Fund, the Investment Manager, the actual operations of each of the foregoing, … and any other related matters."

156.    As set forth above, the Feeder Fund offering memoranda describe BSAM's intention to adhere to the Investment Guidelines and Reporting Requirements that BSAM separately negotiated with Barclays.  The offering memoranda also make numerous other representations about BSAM's operation of the structure and its conduct as investment manager of the Enhanced Fund that corroborate and parallel representations made directly from BSAM to Barclays.

157.    For example:

a.  the offering memoranda state that BSAM "will use its structuring and research experience to identify structured finance securities with fundamentally strong credit risk profiles that are priced attractively."

b.  the offering memoranda represent that the "primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund."

c.  the offering memoranda further explain that "[b]ecause each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way." The memoranda represent that BSAM will employ models, valuation tools, and analytical systems, including its own "internally constructed" systems, to carry out such quantitative monitoring of credit and other risks.

d.  according to the offering memoranda, principal trades sought to be undertaken by BSAM, as manager of the master Enhanced Fund, with BSAM, one of its Company affiliates, or

a client for which a Company affiliate was acting as broker, required examination and approval before they could take place by "the independent [Enhanced Fund] Directors" or some other advisory party established for that purpose. (No other advisory party was established.) The subscription agreement between Barclays and the master fund also required director pre-approval of principal transactions (or approval from some separate advisory party that, in fact, never existed).

e.  the offering memoranda represent that funding for the operation of the Enhanced Fund, through "margin, bank lines and the repurchase markets," "may be provided by Bear Stearns [*i.e.*, Bear Stearns & Co., Inc.] or by or through an affiliate thereof." In addition, the memoranda outline that various other types of transactions may occur with Bear Stearns, including transactions that involve its underwriting or a Bear Stearns' equity or participation interest.

## VI.  DUTIES CREATED BETWEEN BSAM AND BARCLAYS

### A.    THE BSAM DEFENDANTS' FIDUCIARY RELATIONSHIP WITH BARCLAYS

158.    In bringing Barclays into the structure, BSAM solicited Barclays to enter into an ongoing, dependent relationship of trust and confidence.

159.    Barclays depended on BSAM to operate successfully the entire structure into which Barclays' ongoing role was imbedded. BSAM created each piece of the structure, drafted the offering memoranda and sought investors (with Bear Stearns), managed the feeder funds, controlled the board of directors of the feeder funds, managed the Enhanced Fund (in part through delegation to Bear Stearns Securities Corp., the prime broker, and PFPC Inc. ("PFPC"), the master fund administrator), and controlled the board of directors of the Enhanced Fund.

160.    Barclays' ability to reap its promised payments from the structure, and potentially to increase those payments through an expansion of the structure and thus a greater notional amount, depended on BSAM's use of its superior position, BSAM's sole access to its and other Bear Stearns entities' proprietary systems, the unique knowledge available from the Company's integrated mortgage and mortgage-backed securities franchise, and its operation of the entire structure in good faith, throughout the ongoing relationship.

161.    BSAM, through, among other things, Tannin's assurances and the BSHG team's emphasis on BSAM's and the Company's purported extraordinary expertise and risk management controls during the negotiations with Barclays alleged above, specifically aimed to gain Barclays' trust and confidence.  BSAM sought to convince Barclays to become enmeshed, as a continuing and dependent player, in BSAM's overall structure.  BSAM assumed responsibility at every level of the structure, and wanted Barclays to repose its confidence in BSAM.

162.    The fiduciary relationship that BSAM created with Barclays differed from other fiduciary relationships that might exist within the structure, and gave rise to Barclays-specific duties that were specifically owed to it.  These Barclays-specific duties differed from any duties BSAM owed to the funds or to other investors in the structure.

163.    For example, BSAM exercised discretion in its management of the Enhanced Fund portfolio, of which Barclays was the sole participating shareholder; and BSAM controlled the information that Barclays was given about that portfolio's composition and performance.

164.    In order to gain Barclays' trust and participation in the structure, BSAM made unique promises to Barclays about how it would manage the portfolio.  BSAM explicitly memorialized to Barclays and the Feeder Fund investors that Barclays was protected by more

limiting investment restrictions to narrow BSAM's discretion than were the Feeder Fund investors.

165.    In addition, BSAM, through the written materials, statements by Tannin, and other representations outlined above, repeatedly reassured Barclays that BSAM would have day-to-day control over the portfolio and its risks such that at any point in time leverage could be "dialed down" and at least Barclays' first-out stake protected.  Through the PowerPoint presentation, Tannin's and other members of the BSHG team's representations, and the features of the transaction, BSAM misled Barclays into believing that Barclays' special and necessary investment in the structure would be protected by an early warning system.

166.    BSAM, through Tannin and others, also told Barclays that it would benefit from BSAM's connections, information sources, and expert resources throughout the Company, and that BSAM's position within the larger Company would help – not harm – the Enhanced Fund structure.

167.    Likewise, in its subscription of shares in the Enhanced Fund, Barclays was protected in its special role in the structure in ways that other Enhanced Fund shareholders, or even Barclays, if it invested beyond the notional amount, would not be.  This was due to the Barclays-specific protections offered and put in place by BSAM.

168.    For example, the Enhanced Fund's Articles gave its directors (controlled by BSAM) broad powers to suspend redemptions of shares; but the Barclays-specific subscription to shares came with the representation that "[n]otwithstanding anything to the contrary contained in the Articles," Barclays "shall be able to redeem all or any portion of its Shares as of any Dealing Date … coincident with, decreases in the notional amount of the Leverage Instrument."  In contrast, a "request … [for] redemption of Shares that is not made in connection with the

Investor's hedging activities under the Leverage Instrument will be subject to the terms of the Articles, including all conditions and restrictions."

169.    Similarly, BSAM made unique commitments to Barclays, through the Reporting Requirements and many other representations pled above, that Barclays would have more access to information than any other party in the structure and that it would be informed about what was taking place within the structure contemporaneously.

170.    When BSAM provided reports to Barclays on the portfolio or performance of the Enhanced Fund, those reports were sent solely to Barclays and came directly from BSAM.  They reflected BSAM's clear understanding that Barclays was entitled to special reporting from it, and that Barclays would rely upon that reporting in assessing its continued participation in the structure.  (In contrast, less frequent and less detailed reports came from PFPC, the fund administrator, to Barclays.  Even with regard to those reports, however, as detailed below, BSAM in fact controlled when PFPC would release the reports and what PFPC would say.)

171.    In addition, the type of asset portfolio and hedge fund that formed the basis for the Enhanced Fund structure made Barclays dependent upon BSAM's expertise, its superior knowledge of the particular assets and positions in the fund, and its superior access to information about those holdings and the fund's strategies.  Extensive non-public information that BSAM possessed, its proprietary investment systems and trading details, and the terms of its private repurchase agreements and other agreements with counterparties, all had to be brought to bear in order to determine and understand in detail the fund's status in terms of liquidity and performance – and all of that information in BSAM's possession was not readily accessible to Barclays.

172.    For both the High-Grade Fund and the Enhanced Fund, confidential or proprietary information about BSAM's systems and strategies, or about its private agreements or relationships with other parties, was not available to Barclays.

173.    Once established, moreover, the Enhanced Fund portfolio – like the High-Grade portfolio – always included **over 1,000 different positions** (and often over 2,000 different positions at any given time).  Of the long investment positions, only approximately one-fourth of those positions correspond to security "cusip" numbers that are referenced in the Bloomberg information system.  Even for those securities that are available in Bloomberg, only summary information and a lack of real-time pricing characterizes those Bloomberg listings.  The issuance and trading of such positions generates no or very little accessible information available to the marketplace at large.  In addition, most of the long positions in the portfolio constitute CDOs and other asset-backed securities that are each created out of a large basket of underlying assets.

174.    There is no public exchange or daily active market that provides prices for most CDOs and other similar assets.  Accordingly, these positions must be priced through individual inquiries to financial counterparties or dealers, and/or through the application of complex models (which often require knowledge of the underlying assets and their performance).

175.    Each asset-backed security's valuation depends upon the status and value of its underlying assets.  Thus, as BSAM stated that its practices and systems did, all those underlying assets would have to be monitored by BSAM to manage the credit risk and liquidity needs of each asset-backed security in the portfolio and accurately assess its performance.  Given the nature of the Enhanced Fund portfolio, thousands upon thousands of assets needed to be monitored through BSAM's purportedly especially wide-ranging sources of information and sophisticated proprietary systems.

176.    In addition, a portfolio list of positions in the Enhanced Fund structure did not reveal the details or strategies of BSAM's multiple hedging and management techniques.  BSAM stated that it employed interest rate and credit hedges and other complex risk management tools; but only BSAM knew the specifics of its strategies as they were occurring.  As BSAM said in the Feeder Fund offering memoranda, "[t]he specific details of [its] investment program are proprietary."  Consequently, Barclays, the Feeder Fund investors and other outsiders would "not be able to determine the full details of those methods, or whether those methods are being followed."

177.    Indeed, it is the very nature of a hedge fund that its strategies and systems are closely guarded secrets, and that the creators of a hedge fund structure such as the BSHG team would not reveal enough to enable an investor like Barclays or another outsider to duplicate or understand its formulas, strategies or trading methods.

178.    Because both Barclays and BSAM understood that Barclays would be dependent on BSAM to carry out the discretionary portfolio management and the intensive monitoring described above, they agreed to Barclays-specific parameters for the portfolio that would limit, but not remove, that discretion and to various types of overview reporting that would go specially to Barclays.

179.    Both BSAM and Barclays well understood, however, from the massive and specialized nature of the undertaking, that neither Barclays nor any other sophisticated bank that might have played the role of leverage counterparty, given that limited role, had the information, resources, or particular proprietary systems available to duplicate BSAM's efforts as the creator, operator and manager of this particular investment structure.  Barclays was necessarily in a dependent position to BSAM in this transaction and ongoing structure (though in a preferential

position *vis a vis* Feeder Fund investors).  BSAM sought Barclays' trust and confidence for that reason.

180.    Cioffi and Tannin had knowledge of every detail of the Enhanced Fund structure and orchestrated Barclays place in it.  They were at all times aware of Barclays' subordinate position that necessarily placed trust in BSAM.

181.    Based on the many factual details and nature of the relationship between BSAM and Barclays outlined above, BSAM and its managers Cioffi and Tannin owed Barclays fiduciary duties of care, fairness, good faith, and loyalty in managing the structure and portfolio consistent with Barclays' interests.  BSAM, Cioffi and Tannin also owed Barclays fiduciary duties of disclosure, honesty, and accuracy in keeping Barclays apprised of the status and performance of the portfolio, its assets, and the structure as a whole.

B.    THE BSAM DEFENDANTS' DUTIES TO DISCLOSE, TO UPDATE AND TO CORRECT

182.    Because of their fiduciary relationship with Barclays, the BSAM Defendants owed Barclays duties of disclosure, on an ongoing basis.

183.    In addition, the BSAM Defendants owed Barclays duties of disclosure because BSAM, through its documents and reports and through Tannin's statements, provided half-truths, partial and ambiguous statements, and other statements that required clarification – in addition to the BSAM Defendants' wholly false representations.  BSAM, Cioffi and Tannin used these misleading statements to conceal from Barclays material, compromising information about their actions with regard to the Enhanced Fund structure.

184.    For example, the BSAM Defendants used the High-Grade Fund and their experience with it as a selling point for Barclays, and highlighted in particular their experience with risk management and a strict compliance approach.  BSAM provided detailed

representations about protections and procedures with regard to principal transactions, telling Barclays that it would have the same review process and the same board of directors as reviewers that were supposedly operating in the High-Grade Fund. Yet the BSAM Defendants failed to disclose that Cioffi, Tannin and the other members of the BSHG team had failed to seek and obtain the required pre-approval for principal, self-dealing transactions from the High-Grade Fund's board of directors for hundreds of transactions over a span of years. They failed to disclose this even though each knew Barclays was relying on their supposed risk management and compliance expertise to execute the transaction and then to increase Barclays' financial commitment to the structure.

185.    BSAM, Cioffi and Tannin also had described their team as especially attuned to liquidity issues, including the risks associated with repo agreements, and had maintained throughout the negotiations for the Enhanced Fund transaction with Barclays that the BSHG methods produced very stable and prudent funds, including with regard to liquidity management. The BSAM Defendants knew this was important for Barclays, but they failed to notify Barclays of or explain the developing liquidity squeeze in the High-Grade Fund.

186.    Likewise, the Investment Guidelines negotiated with Barclays listed Bear Stearns as a permitted counterparty for repo agreements and OTC products. But Bear Stearns could not be a counterparty when the Enhanced Fund structure began operations, because Bear Stearns had imposed a moratorium on transactions with the BSHG team. BSAM, Cioffi and Tannin made no mention of that moratorium – a result of their extreme failures of proper procedure – to Barclays, despite their own knowledge at the time that the moratorium was material and harmful to both of the BSHG fund structures.

187.    Additional examples of partial disclosures that triggered an obligation of full disclosure on the part of each of the BSAM Defendants are alleged below, in sections IX and XI.

188.    BSAM also had duties of disclosure to Barclays based on BSAM's superior access to and knowledge of material information, together with BSAM's awareness that Barclays was relying on information that excluded the material information.

189.    For example, as Barclays' participation in the Enhanced Fund structure was being negotiated, the BSAM Defendants knew that Barclays was unaware that the Enhanced Fund was part of their "liquidity game plan" to remedy the High-Grade Fund's liquidity problems.  BSAM, Cioffi and Tannin consistently portrayed the High-Grade Fund to Barclays as a stable and consistent success that would continue.  The BSAM Defendants failed to tell Barclays of their need to transition investors out of the High-Grade Fund.

190.    Other examples of failures to disclose superior and material knowledge on the part of each of the BSAM Defendants are alleged below, in sections IX through XI.

191.    Furthermore, BSAM had duties to update information that it gave to Barclays and that became misleading as events progressed.  BSAM, through Tannin, Cioffi and the BSHG team, knew that Barclays was relying on its statements and reports to make ongoing decisions with regard to the structure and to monitor its stake in the structure.  Yet BSAM failed to correct statements that might arguably have been accurate, or at least partially accurate, when made, but that quickly became misleading and were rendered false.  Examples of the failure to update are also included below.

192.    If Barclays had known about the significant compliance and management difficulties within the High-Grade Fund and the BSAM Defendants' ulterior motive – *i.e.*, save the High-Grade Fund and use Barclays' "easy" liquidity to do so – for establishing and then

increasing Barclays' leverage commitment to the Enhanced Fund, Barclays would not have initially entered into the transaction or continued to invest in the structure.  As the transaction progressed, Barclays would have terminated its participation if BSAM had revealed that it could not actually manage the liquidity needs in the BSHG funds and was instead simply seeking more and more lending to attempt to keep ahead of liquidity pressures – a Ponzi-like strategy.

## VII.    THE ENHANCED FUND STRUCTURE DURING ITS FIRST SIX MONTHS

### A.    BSAM REASSURES BARCLAYS DURING "RAMPING UP" PERIOD

193.    After the total return swaps closed on August 1, 2006, and Barclays simultaneously subscribed to shares, BSAM did not institute reporting that complied with its representations and commitments.  Barclays repeatedly requested BSAM to do so.

194.    BSAM, Tannin and Robert Ervin, another BSAM employee, continually affirmed to Barclays during the ensuing months that BSAM remained committed to meeting all the Reporting Requirements and to providing "whatever" (in the words of Tannin to Ware and others) Barclays needed with regard to portfolio information.

195.    Panzeri and Angus McIsaac of Barclays' risk-management department in London began a long process of attempting to get adequate reports, repeatedly following up with BSAM to work toward the proper reporting and to obtain what Barclays had been promised from BSAM.

196.    Panzeri and McIsaac gradually extracted more reporting from BSAM, after an initial "ramping up" period, but continued to push for more adequate compliance with the Reporting Requirements as 2007 began.  (Likewise, in 2007 the types and frequency of reporting improved to some degree; and further assurances were given by Tannin to Panzeri, McIsaac and others at Barclays that BSAM remained intent on satisfying its reporting and other obligations.)

B.    BARCLAYS' EXPANDING FINANCIAL COMMITMENT
       THROUGH JANUARY 2007

197.    When the transaction closed on August 1, 2006, and the Enhanced Fund structure began functioning, Barclays' total notional amount, by adding that specified in both Confirmations, was $50,000,000.  The maximum notional amount was $100,000,000.  Barclays' committed notional amount was "50% of the Maximum Notional Amount, subject to a minimum at all times" of $50,000,000.

198.    BSAM and Barclays entered into the transaction anticipating that the maximum notional or leverage amount would increase periodically, subject to Barclays' approval at the time BSAM requested an increase.  Any increase in the maximum amount of leverage from Barclays would then be reflected in amendments to the Confirmations.  Likewise, the committed notional amount could be and was amended periodically through the same process.

199.    On September 15, 2006, at BSAM's request, Barclays and the Feeder Funds signed amendments to the Confirmations that raised the maximum notional amount to $150,000,000.  The amendments changed the committed notional amount to a minimum of $75,000,000.  At the same time, BSAM caused the structure to draw down an additional $25,000,000 to increase Barclays' notional total and actual financial investment by that amount, reaching $75,000,000.

200.    On October 24, 2006, at BSAM's request, Barclays and the Feeder Funds signed amendments to the Confirmations that raised the maximum notional amount to $300,000,000.  The amendments changed the committed notional amount to a minimum of $150,000,000.  At the same time, BSAM caused the structure to draw down an additional $75,000,000 to increase Barclays' notional total and actual financial investment by that amount, reaching $150,000,000.

201.    On December 1, 2006, at BSAM's request, Barclays and the Feeder Funds signed amendments to the Confirmations that raised the maximum notional amount to $550,000,000. The amendments changed the committed notional amount to a minimum of $275,000,000.  At the same time, the structure drew down an additional $125,000,000 to increase Barclays' notional total and actual financial investment by that amount, reaching $275,000,000.

202.    On January 16, 2007, BSAM and the Feeder Funds reduced the notional total and Barclays' stake by $75,000,000, apparently as a temporary measure to attempt to reduce briefly the carrying cost of the leverage.

203.    Thus, as of the beginning of February 2007, BSAM had secured an investment of $200,000,000 from Barclays for leverage and liquidity in the structure.  In addition, the monthly interest owed to Barclays had accumulated to a total of approximately $4,670,000.  The maximum notional amount continued to stand at $550,000,000.

C.      THE SCIENTER OF EACH OF THE BSAM DEFENDANTS PRIOR TO CLOSING THROUGH JANUARY 2007

204.    The necessary scienter for fraud on the part of each of the BSAM Defendants is apparent in this case both from facts that establish motive and opportunity, and from facts that show conscious misbehavior or deception.

205.    BSAM, Cioffi and Tannin had multiple motives to mislead Barclays as BSAM solicited Barclays' participation in the structure and then built up its leverage from Barclays over the first months of the structure's existence.

206.    *First*, as described in detail above, the BSHG team was being squeezed by the liquidity needs of the High-Grade Fund, especially after the Bear Stearns trading moratorium became a possibility and then a reality.  Each of the BSAM Defendants were motivated to mislead Barclays through all the misrepresentations and failures of disclosure specified above

because they needed the Enhanced Fund transaction to close, Barclays' liquidity to pour in, and their difficulties in the High-Grade Fund to remain secret. The Enhanced Fund, through BSAM's movement of assets and investors into that structure and the addition of Barclays, was critical to the BSAM Defendants' "game plan" for the temporary revival and then eventual closure of the High-Grade Fund.

207. *Second*, BSAM, Cioffi and Tannin had been heralding the coming "enhanced" fund structure to potential Feeder Fund investors and other market participants for many months. When BSAM first approached Barclays, BSAM had wanted the transaction to close in April. By June, BSAM was distributing Feeder Fund offering memoranda that made detailed representations about Barclays serving as the leverage instrument counterparty, even though the final details of the transaction had not yet been agreed upon. (After discussing the potential transaction with a number of banks, Barclays had emerged as BSAM's strongest prospect for the deal.)

208. As the summer of 2006 progressed, BSAM, Cioffi, and Tannin became more anxious to make good on their promises in the marketplace of an "enhanced" structure with Barclays as an important participant. The Enhanced Fund was to accomplish a doubling of BSAM's "marquee" structured credit strategies fund franchise and further burnish BSAM's reputation. The opposite would occur if the Enhanced Fund failed to launch. A failure to launch also would increase the risk that the High-Grade Fund's problems quickly would be exposed.

209. *Third*, BSAM stood to gain financially from moving investors in the High-Grade Fund to the Enhanced Fund. For investors who bought shares in the High-Grade feeder funds in 2003 and most of 2004, the Advisory Fee paid to BSAM equaled approximately one percent of the net asset value per year, calculated monthly and paid quarterly. Investors in the Enhanced

Fund would pay two percent of the net asset value per year for this Advisory Fee, calculated in the same manner.  Thus, by moving the initial and other early investors in the High-Grade Fund to the Enhanced Fund, BSAM could double its advisory income for those investments.

210.    Cioffi and Tannin also stood to gain individually in their own prestige and compensation, and to preserve their reputations as successful managers.  By creating a new, cutting-edge fund to double their BSHG offerings and, at the same time, concealing their difficulties in the High-Grade Fund with Barclays' leverage and liquidity, Cioffi and Tannin would benefit tangibly themselves.  They would secure their jobs and rising financial rewards, rather than suffering the consequences of an unsuccessful new fund launch and exposure of the compliance and management failures on their individual parts in the High-Grade Fund.

211.    *Fourth*, BSAM needed to create the Enhanced Fund to have at its disposal a fund with liquidity – given the High-Grade Fund's lack thereof – to help BSAM appear to be successful in other aspects of its business, including as a CDO arranger and manager.  There was no moratorium on trades by the Enhanced Fund with BSAM itself (though the special approval provisions outlined in the offering memoranda applied to such transactions).  BSAM not only operated fund structures and managed funds, but also gathered assets for CDOs and became the manager of numerous CDOs once they were established.  To help consummate and sell all the tranches of CDO deals, BSAM often kept many of the securities created by the CDO on its own books by having a BSHG fund buy them.  With the High-Grade Fund strapped for liquidity, BSAM needed the Enhanced Fund and Barclays' infusion of cash to continue to help its CDO packaging and management business thrive.

212.    In addition, the scienter of BSAM, Cioffi and Tannin in deceiving Barclays was just the duplication of other clear and intentional deception occurring by the same defendants at

the same time.  Unbeknownst at that time to Barclays, the BSAM Defendants operated the High-Grade Fund structure by concealing broken commitments and liquidity problems from the directly interested parties there.  The BSHG team had become accustomed to proceeding in an untruthful fashion:  that is, by making certain important commitments ahead of time, such as the approval process to protect investors from conflicts of interest and unfavorable self-dealing, and then failing to meet those commitments when it served BSAM's and its managers' own interests, ambitions or purposes to do so.  Moreover, the Bear Stearns moratorium on trades and the fund's serious liquidity pressures were concealed from the High-Grade investors, even as BSAM pushed them to switch to the Enhanced Fund.

213.    Similarly, Tannin and Cioffi revealed the conscious deception undertaken by BSAM, Cioffi and Tannin in their operations in, for example, Tannin's email to Cioffi of September 17, 2006, excerpted above, and in their May 31, 2007, exchange quoted below.  From the beginning stages of the Enhanced Fund transaction through to the end, BSAM, Tannin and Cioffi were discussing and engaging in conscious deception of Barclays and others.

214.    The BSAM Defendants took advantage of the opportunity of soliciting Barclays' participation in the structure and the ensuing due diligence process to mislead Barclays in all of the misrepresentations and omissions of material facts pled above.  BSAM, Cioffi, and Tannin controlled the information that BSAM would show to Barclays or provide to it in response to Barclays' inquiries; and they allowed no hint of their management difficulties and deceptions to be conveyed to Barclays.

215.    Barclays carefully examined the transaction before it was finalized, including through myriad questions to BSAM and through the documents that BSAM allowed Barclays to review.  But it is now clear that the BSAM Defendants were intent upon concealing their failed

systems for managing liquidity, their principal-transaction compliance failures, and their improper approach to marking assets, among other things.

216.    Additional inquiries from or investigations by Barclays either before closing or as the Enhanced Fund transaction progressed would not have elicited from the BSAM Defendants the truth about any of the areas of deception described in this Complaint.

217.    Against this backdrop, BSAM, Tannin and Cioffi adopted the Investment Guidelines and Reporting Requirements to succeed in closing the deal.  But those defendants from the start did not intend to comply with the representations, limitations and requirements spelled out therein.

218.    In all their factual representations pled above, Tannin and BSAM intentionally deceived Barclays, or at a minimum made factual representations with recklessness, in order to bring their planned "enhanced" fund to fruition and to build up its funding by Barclays.  They did so with Cioffi's knowledge and under his direction.

**VIII.    EXPANDED DECEPTION IN FEBRUARY, MARCH AND APRIL TO CONVINCE BARCLAYS TO DOUBLE AND MAINTAIN ITS INVESTMENT**

A.    "OUR HEDGES ARE WORKING BEAUTIFULLY"

219.    BSAM's, Cioffi's, and Tannin's deception expanded further in February and March 2007, when they worked to convince Barclays to double its financial commitment to the structure.

220.    On or about January 22, 2007, Tannin met Ram Rao and Edward Ware of Barclays for a long-delayed closing dinner in New York.  Tannin told Rao and Ware that the new Enhanced Fund was performing well.  He used the word "great" and offered no caveats.  Tannin also raised the possibility of exploring additional business opportunities with Barclays.  (Indeed, Ware spoke by phone with Tannin on many occasions from the date of execution through the

spring of 2007, and "great" was consistently the synopsis of the Enhanced Fund's performance that Ware received from Tannin.)

221.    On or about February 19, 2007, McIsaac in London requested that Tannin send Barclays the latest Excel spreadsheet and "factsheet" for the Enhanced Fund.  Neither McIsaac nor anyone else at Barclays received the requested information.

222.    Instead, Tannin responded by e-mail to McIsaac on the same date with this representation about the Enhanced Fund's performance:  "**You will be happy to know that we are having our best month ever this February.  Our hedges are working beautifully.**  We were up 1.6% in January and are up 2% so far in February."  (Emphasis added.)

223.    On or about February 27, 2007, McIsaac again asked Tannin for reports on the Enhanced Fund portfolio.  Tannin, in an email response that same day to McIsaac and Ware, provided a position report, a portfolio list, and this summary of the fund's most recent performance:

> Here is the relevant information for Enhanced Leverage.
>
> **As you can see, despite the sell off in the sub-prime mortgage market -- our fund continues to do well, quite well, in fact.**
>
> Here are a few points I think you should be aware of:
>
> 1.  Our hedges are working just as we discussed.  Our hedges are lower quality than our assets - so in this market **we've experienced a significant mark to market gain so far this month.**
>
> 2.  Our term financed positions are not as sensitive to this market volatility - just as we've discussed
>
> 3.  We have been in touch with all of our repo counterparties - and they are uniformly very happy with all of our positions.
>
> In short, we are very pleased with our performance - but even more important than that we are pleased that our ideas about

> how to structure our risk and limit our volatility are once again
> proving to have been prudent.

(Emphasis added.)

224.    The first page of the attached portfolio report that Tannin sent to Barclays on February 27 to provide Barclays with "information for Enhanced Leveraged" showed BSAM's calculation of a 5.5% "gross return" and a 4.3% "net return" for the month (through February 23).

225.    Up through and including the February 27 e-mail, Tannin, Cioffi, and BSAM explicitly reassured Barclays about the Enhanced Fund's positive, "best month ever." This was at a time, February 2007, of extreme volatility and dropping prices in ABX indices that track the performance of bundles of asset-backed debt securities, particularly those tied to sub-prime mortgage debt.

226.    Tannin, Cioffi, and BSAM, with these February 2007 statements, thereby added to their prior misrepresentations about BSAM's stellar abilities to control risk, including repo counterparty and other financing-related risk, and to deploy portfolio hedges and other strategies to produce positive results, even when relevant structured credit markets were performing poorly.

227.    Tannin, Cioffi, and BSAM deceived Barclays about the Enhanced Fund's purported February performance to secure Barclays' increased financial commitment to the Enhanced Fund structure just days later, with one large installment at the beginning of March, and to secure another equal increase later in the month, as alleged below.

B.    BSAM'S MISMARKING OF AND FAILURE TO MARK ASSETS

228.    In fact, as revealed long afterward and explained below, the Enhanced Fund lost money, rather than having its "best month ever," in February. By February, Cioffi, Tannin and

the BSHG team was struggling with the Enhanced Fund portfolio and grasping for a successful strategy, just as it had struggled earlier behind the scenes in the High-Grade Fund.

229.    As the Enhanced Fund's performance began to suffer, Barclays would later learn, BSAM, Cioffi and Tannin adopted an approach to "smooth" its results and keep the total real price impacts that had occurred over each reporting period in the portfolio hidden from Barclays and others.  BSAM, Cioffi and Tannin apparently hoped that they could weather their fund's performance difficulties and that Barclays would never know this deception had occurred.

230.    BSAM, Cioffi, and Tannin intentionally or at least recklessly mis-priced the CDOs, CDO-squareds, other asset-backed securities.  The BSHG team, under Cioffi's and Tannin's direction, refrained from remarking securities at all or did so without fully reflecting the actual decreases in price and value that were becoming apparent to them.  Downward movements in price were indicated by their surveillance systems, other Company information, and input from financial counterparties, dealers, and other knowledgeable outsiders on a security by security basis.  BSAM, Cioffi and Tannin, and their subordinates on the BSHG team, however, muted those price effects by not fully and fairly reflecting current values in their portfolio reports and performance statistics.

231.    As shown by, *inter alia*, the later, retroactive "corrections" that were necessary to BSAM's portfolio numbers and performance statistics, BSAM, Cioffi, and Tannin were not fairly reflecting portfolio values from February forward.  These misrepresentations and omissions by the BSAM Defendants caused harm to Barclays.

232.    In particular, the BSHG team aimed to keep the prices of Company-related CDOs and other assets especially steady, and not to reflect actual downward variation in the prices of those securities, because keeping BSAM- or Bear Stearns-related CDOs at high values would

help BSAM and Bear Stearns in other ways. If the Enhanced Fund had marked those assets down to the prices that they should have, similar lower prices should then have followed in other Company contexts.

233.    During the spring of 2007, the Company wanted to keep selling its inventory of mortgages and mortgage-related securities at high prices, keep Bear Stearns' underwriting of those kinds of security offerings going, pave the way for the Everquest IPO, and stave off any market price disruption in this core, mortgage-backed securities area of the Company's business.

234.    Cioffi had deep ties to other affiliates within the Company, including the mortgage-backed securities underwriting, broker-dealer, and trading groups, due to his history at the Company since 1985.

235.    Thus, when it became "helpful" to refrain from remarking assets downward in the Enhanced Fund, he and his team made sure to include the Company-related assets in doing so. BSAM, Cioffi and Tannin also recognized that in all of their failures to re-price fully and fairly, even for assets unrelated to the Company, they would be helping to keep the overall market up and active for their colleagues.

236.    If BSAM, Cioffi and Tannin had disclosed to Barclays in February that they were not fairly and prudently marking the Enhanced Fund assets, and that they were providing Barclays with misleading reports of the portfolio's performance by ignoring asset losses, Barclays would have terminated its participation in the transaction at that time.

C.    BARCLAYS ADDS $200,000,000 AT BSAM'S REQUEST

237.    On or about February 26, Pusateri of BSAM requested that Barclays provide an additional $100,000,000 investment in the structure on March 1, 2007.

238.    Relying on all of the positive information and all of the representations it had received from Tannin and BSAM, as well as the failures to disclose negative material information alleged herein, Barclays did so on or about March 1.

239.    Tannin requested another, equally sizable $100,000,000 investment to be executed on March 15, 2007.  When BSAM requested from Barclays the additional March 15 commitment on March 8, Tannin represented that "**Despite dramatic volatility in the structured finance market our Fund has been extremely stable.**"  (Emphasis added.)

240.    Barclays also made this second additional commitment in March, with the money actually flowing at or about the end of March, to its swaps and the corresponding hedge of shares in the Enhanced Fund.  It did so in reliance on BSAM's most recent reports of extreme stability, as well as the earlier representations and failures to disclose from BSAM, Cioffi and Tannin outlined above.

241.    On or about March 27, 2007, Rao and Ware of Barclays attended a business dinner in New York with Cioffi, Tannin, and Raymond McGarrigal of BSAM.  There, Cioffi, Tannin, and McGarrigal expressly reported to Rao and Ware that their strategies for the Enhanced Fund continued to perform well, and that they were starting to see desired differentiation between the results for the leveraged Enhanced Fund and the High-Grade Fund.

242.    From at or about the end of March through the short subsequent history of the Enhanced Fund structure, Barclays' notional total and thus financial investment in the structure equaled $400,000,000.

### D.    CIOFFI'S DECISION BY MARCH TO SAVE HIS OWN MILLIONS

243.    By March, Cioffi had made a decision to extract $2,000,000 of his own investment from the Enhanced Fund structure.  As an insider, Cioffi could do so on the very next redemption date, at month end, without waiting the 40 days that Feeder Fund investors were

required to wait after their notice to their respective fund to redeem. Cioffi did not disclose his decision to withdraw that significant amount or his actual withdrawal to Barclays, to the Feeder Fund investors, or in any public manner.

244.    Indeed, as Barclays learned through the recent release of the transcript of an April 25, 2007, conference call, even later Cioffi was still claiming in statements to the Feeder Fund investors that he was optimistic and that, to the extent there were credit risks "in our portfolio, we feel comfortable that we have significantly hedged them and we have been hedging them." In this conference call with Feeder Fund investors, Cioffi repeatedly reassured, "our hedges did work. Our liquidity's there." Similarly, Cioffi asserted that the "repo market has been very solid and very liquid" and that BSAM had "been very careful, very cautious, very diligent" on the front of holding "good" assets and thus avoiding loss of or increased costs of financing, or forced asset sales.

245.    On the same April 25, 2007 Feeder Fund investor call, Tannin also emphasized his supposed view that there was no systemic breakdown and that, whatever was happening in the market, the Enhanced Fund structure was designed to weather it. According to Tannin,

> [T]he way we structured the fund was (a) to limit the downside, so it wouldn't be, again, the number that we've, we'd always spoken about was a 10% drawdown and more importantly that we would not be forced sellers. So the structure of the fund has performed exactly the way it was designed to perform.

246.    Cioffi and Tannin told investors on the April 25 call that the "estimated returns for April are minus .6 basis points for High Grade and negative .7 [.7 hundredths of one percent] for Enhanced." Yet BSAM conveyed to Barclays a report on the master Enhanced Fund through April 24 that gave a month to date return of -1.4% and a report through April 26 that gave a month to date return of -2.5%. If either of those numbers were accurate, the Feeder Fund

investors would have suffered an even greater loss, due to the effect of the leverage instrument through the total return swap that amplified their returns.  Cioffi, however, was telling the Feeder Fund investors on April 25 that their estimated loss for the month was less than one hundredth of one percent.

247.    In fact, none of those April performance numbers were correct.  As later disclosed, the master Enhanced Fund was dropping more than 10% in April.  BSAM, Cioffi and Tannin were giving different numbers to different audiences; but none of the numbers were accurate reflections of the deteriorating condition of the Enhanced Fund structure.

248.    As pled above, Cioffi is now being investigated by the SEC and U.S. Attorney's Office for insider trading based upon his withdrawal of his own millions while at the same time continuing for months to tell investors in the Enhanced Fund structure that there was no significant problem with the funds' performance and that the status of the fund's hedges, liquidity position, and overall portfolio was as expected.  Likewise, BSAM, Cioffi and Tannin continued to deceive Barclays through this period and failed to disclose what was truly happening in the structure.

249.    Many Feeder Fund investors have filed complaints against Cioffi, BSAM and other members of the BSHG team with the Financial Industry Regulatory Authority ("FINRA") or in court based on deception related to the Enhanced and High-Grade Funds.

250.    FINRA, under the heading "Employment Separation After Allegations," reports that on November 28, 2007, Cioffi was "permitted to resign" from employment at the Company.

E.    <u>IN MARCH AND APRIL THE BSHG TEAM FILLS THE FUND WITH COMPLEX CDO-SQUARED SECURITIES THAT CANNOT BE INDEPENDENTLY PRICED AND ARE ESPECIALLY ILLIQUID</u>

251.    As Bear Stearns Companies' public statements and actions in June 2007 indicated, and an after-the-fact comparison of the Enhanced Fund and High-Grade Fund

portfolios reveals, during the months prior to June 2007 the BSAM Defendants were funneling excessively risky or troubled assets at inflated prices into the Enhanced Fund. BSAM was collecting inappropriate risks and overstated marks in the Enhanced Fund, despite BSAM's professed surveillance strategies that applied equally to both funds and despite its special fiduciary duties to Barclays.

252.    In particular, it is now known that BSAM, Cioffi and Tannin loaded the Enhanced Fund portfolio with CDO-squared securities, particularly from the end of February through April. By May, BSAM had filled the fund with at least $2.5 billion in such CDO securities that were built from, in whole or in part, other CDO securities. These complex CDO-squared securities violated the Investment Guidelines both because CDO-squared securities were not a permitted investment category and because most, if not all, did not have regular independent pricing available. As CDOs were created out of other CDOs, the securities became especially difficult to mark and had very illiquid markets.

253.    BSAM, Cioffi and Tannin brought so many CDO-squared securities into the Enhanced Fund portfolio that it owned a significant percentage of all outstanding CDO-squared securities, which were relatively rare and a small percentage of the overall CDO market. An International Monetary Fund report, using Credit Suisse numbers, estimated that as of July 2007 all U.S. outstanding CDO-squared securities totaled $28 billion. In May of 2007, the Enhanced Fund owned at least approximately 9% of that total.

254.    As of mid-June, over 46% of the asset-backed CDO-related investments ("ABS CDOs") in the Enhanced Fund portfolio were in fact CDO-squared securities. In the High-Grade Fund, by contrast, that number was approximately 36%.

255.    At the same time BSAM, Cioffi and Tannin were filling the Enhanced Fund with CDO-squared securities, they were selling less complex, more liquid and stronger asset-backed investments from the portfolio.

256.    In or about March, the BSAM Defendants purchased $200,000,000 in unrated CDO-squared securities known as CLSVF 2007-3A A2 for the Enhanced Fund.  At the same time, the BSAM Defendants added $325,000,000 in CDO-squared securities from three lower tranches of the structure called TWOLF 2007-1A.  Also in March, BSAM, Cioffi and Tannin caused the fund to buy $90,000,000 in the CDO-squared security ADMSQ 2007-2A, as well as many other pieces of CDO-squared deals.  These are just a few examples, and do not include the purchases from BSAM-managed structures discussed in the next section.

257.    BSAM, Cioffi and Tannin kept their purchase of and focus on CDO-squared securities hidden from Barclays.  In the 1,000 or 2,000 securities that were periodically listed on reports to Barclays, for almost the entire life of the fund there was no category of "CDO-squared" in that portfolio list or in any summary provided to Barclays.  Moreover, the names of these securities do not indicate that they are CDO-squared securities, nor is that information provided on Bloomberg or other similar databases.  These securities are named in the same format as CDOs and other asset-backed securities, and information about their underlying composition is not readily available in the marketplace.

258.    Only with the May 31, 2007, report to Barclays, which reached Barclays in early June, and a conversation with Tannin at the same time, did the BSAM Defendants reveal to Barclays that such CDO-squared securities existed in the portfolio and alert Barclays that they were such a large part of it.  By that time, the dropping performance of the portfolio had begun to be clear and Tannin was claiming, in response to Barclays' questions, that the BSAM Defendants

would reverse course and bring down the exposure to the CDO-squared holdings (among other steps).

259.    Even once the BSAM Defendants listed CDO-squared securities in their reports to Barclays as such, they did not include all the CDO-squared securities in the portfolio under that heading, thereby continuing to mislead Barclays about the composition of the portfolio.

260.    The BSAM Defendants harmed Barclays by investing in and carrying very large amounts of CDO-squared securities in the Enhanced Fund portfolio through the spring of 2007, in violation of the Investment Guidelines and their duties to Barclays.  Because these securities were especially difficult to price and had very illiquid, if any, secondary markets, the securities made the portfolio very unstable and could not be easily sold to raise liquidity for the fund structure.

261.    The BSAM Defendants made especially heavy investments in CDO-squared securities from the end of February through April because by that time they apparently realized that their earlier strategies were not working.  They took on much more risk, without disclosure to Barclays of a change in risk profile of the Enhanced Fund.

F.    <u>MANY OF THE CDO-SQUARED SECURITIES WERE THE RESULT OF HARMFUL SEAL-DEALING WITH BSAM-MANAGED STRUCTURES</u>

262.    The BSAM Defendants were not only purchasing CDO-squared securities, they were purchasing many of those securities from structures that BSAM itself managed or deals that Bear Stearns underwrote.

263.    Indeed, BSAM, Cioffi, and Tannin caused the Enhanced Fund to buy **all** the securities in all except the highest tranche of an April 18, 2007, Tahoma 2007-3A CDO-squared offering that BSAM was managing – with a combined price for the five lower tranches that went completely into the Enhanced Fund of approximately $150 million.  This means that no

independent third-party market participant priced those securities or ascertained their fair market value; instead, BSAM caused the Enhanced Fund to purchase them all at non-arms-length prices.

264.    In addition, in the CDO markets, it is highly unusual for a CDO structure manager to retain in its own investment funds all but the highest tranche of an offering for which it will serve as the manager.  BSAM was serving its own interests by helping its CDO deals close and its management business appear to flourish, while at the same time filling the Enhanced Fund with impermissible assets with heightened risk.

265.    In March, the BSAM Defendants also had the Enhanced Fund purchase over $60,000,000 in two tranches of the Tahoma 2007-2A CDO-squared offering that BSAM managed.  In late October 2006, they had caused the fund to purchase over $250,000,000 in three tranches of a Tahoma 2006-1A CDO-squared offering that, again, BSAM managed.  BSAM was helping its ongoing business partner, Tahoma, to sell out its offerings, to the detriment of Barclays and the Enhanced Fund portfolio.

266.    Similarly, in late February or March 2007, the BSAM Defendants caused the Enhanced Fund to buy **all** of the securities in four tranches of a CDO-squared refinancing deal, Tricadia 2003-1AR, with a combined price of approximately $140 million, that was underwritten by Bear Stearns and a co-underwriter.  Because the moratorium on trading with Bear Stearns was apparently still in place, BSAM may have transacted with the co-underwriter.  Nonetheless, BSAM's purchase for the Enhanced Fund assisted Bear Stearns in succeeding with its underwriting business.

267.    Again, because the Enhanced Fund bought all the securities in many tranches, the prices for those securities were not determined by any independent third-party market participant.  BSAM and Bear Stearns therefore could cause the securities to come into the fund at

too high a price.  When the securities' value subsequently fell further, the Enhanced Fund realized an even greater loss.

268.    BSAM was accumulating illiquid assets in the Enhanced Fund that were sold into that fund in non-arms-length arrangements, in order to help BSAM and Bear Stearns succeed in other roles.  In the process, BSAM was collecting fees as the CDO arranger and manager, and collecting another set of fees from the Enhanced Fund structure.  BSAM also was violating its specific representations and commitments to Barclays.

G.      BY MARCH, ANY DISCERNABLE HEDGING STRATEGY EVAPORATES
        AND THE BSHG TEAM IS LEFT TO CHASE THE MARKET

269.    As explained above, the details of any credit hedging, trading, and risk management strategies that BSAM attempted in the Enhanced Fund were not apparent from the portfolio lists that Barclays periodically received or other information that it was given.  Those strategies were proprietary.

270.    Tannin had emphasized to Barclays in February that "[o]ur hedges are working beautifully" and that the portfolio was experiencing mark to market gains from its hedges. Tannin, for the BSAM Defendants, stressed how "we are pleased that our ideas about how to structure our risk and limit our volatility are once again proving to have been prudent."

271.    It is now apparent that Tannin's February statements were outright falsehoods or at best partial truths.  Barclays now knows that he failed to disclose to Barclays in the February reports the weaker asset prices that the BSAM Defendants were starting to see.  Moreover, the size of the Enhanced Fund's hedging positions that might have provided a credit risk hedge for significantly falling asset prices was inadequate.

272.    Tannin continued to represent in March that the Enhanced Fund's performance was "extremely stable."  In fact, Barclays now knows that by March, the Enhanced Fund started

losing money on its hedges at the same time as the assets to be hedged against were falling in value.

273.    Then, by April and May, it turns out that the BSAM Defendants even further diminished the potential effectiveness of their hedges.  Instead of correcting an already grossly inadequate effort to hedge against failing investment value, the BSAM Defendants appear to have entered into roughly offsetting positions in credit default securities.  In addition, Barclays later learned that to the extent they attempted to maintain hedges in the Enhanced Fund, BSAM, Cioffi and Tannin appear to have been merely reacting to movements in the ABX indices, not deploying any planned, before-the-fact hedging strategy for the portfolio.

274.    The BSAM Defendants revealed none of their hedging difficulties to Barclays as they were occurring, and never revised their February and March assurances that the hedges were working well until discussions with Barclays much later, in June.

275.    If BSAM, Cioffi and Tannin had revealed to Barclays their large purchases of impermissible CDO-squared securities for the portfolio, their harmful self-dealing transactions, their inadequate and failing hedges, their continued asset mis-marking, and Cioffi's own conclusion that the Enhanced Fund structure had become too risky, Barclays would have terminated its participation in the structure during March, or promptly after these facts were revealed.

H.    <u>BETWEEN MARCH AND MID-MAY, BSAM REVEALS NO CAUSE FOR CONCERN OR FAILURE IN ITS STRATEGIES AND REPORTS A CONSISTENT CUSHION OF ASSETS</u>

276.    From the end of March 2007 into mid-May, the Barclays' risk management staff in London received periodic reports of the month-to-date from Tannin and BSAM that showed small declines in the overall value of the Enhanced Fund portfolio, ranging from -1.4% to -2.5%. Those small declines did not raise a concern for Barclays regarding its position in the Enhanced

Fund structure, for they occurred against the backdrop of Tannin's and BSAM's statements about their successful hedging and other strict risk management strategies, as pled above.

277.    The decline in the ABX indices that had occurred in January and February 2007 had turned around as of later in March and April.  Based on BSAM's representations, Barclays believed the Enhanced Fund had apparently weathered well a volatile period.

278.    In addition, BSAM consistently and repeatedly reported to Barclays a total NAV of close to or over a billion dollars for the Enhanced Fund, which meant that the fund would have to suffer massive losses before Barclays' priority (first-out) stake of less than half that amount would be at risk.  Because of the BSAM Defendants' misrepresentations and omissions, Barclays reasonably believed that the Enhanced Fund portfolio was performing very well, BSAM had a firm grip on risk and liquidity, and BSAM was paving the way for even more success.

I.    BSAM'S CONTINUAL DELAYS OF THE ADMINISTRATOR'S MONTHLY REPORTS

279.    Throughout the Enhanced Fund's existence in 2007, there was another facet to BSAM's concealment of the true performance facts and unstable nature of the portfolio in the Enhanced Fund from Barclays, as well as BSAM's breach of its fiduciary and other duties to Barclays.

280.    For the months of December 2006 through June 2007, the fund administrator's required monthly or semi-monthly NAVs for the Enhanced Fund each were long delayed or never came at all.  (Semi-monthly NAVs were required under the Confirmations, as amended, between December 2006 and March 2007.)  Under the Investment Guidelines, the Reporting Requirements and the Confirmations, the Enhanced Fund administrator PFPC was to deliver NAVs to Barclays based on independent pricing shortly after each relevant dealing date.  PFPC,

however, took its direction from BSAM, and eventually explained to Barclays that the delays were the fault of BSAM, as outlined below.

281.    The Confirmations call for the NAVs from the fund administrator to issue at least on a monthly basis and by the fifteenth day following a relevant "dealing date."  (The operative dealing date at the beginning of the transaction was the first of the month, then became the first and fifteenth of the month; and after a Confirmation amendment in late March 2007 was the third of each month.)

282.    The report from PFPC for the month of December (triggered by the dealing date on January 1), however, was not released until late February, long after the fifteen-day deadline. That report showed a 1.60% increase in the fund for the month of December.  PFPC later revised that result to show a 1.76% increase.

283.    Simran Sethi of Barclays in London regularly followed up by e-mail and by phone with PFPC and BSAM for the administrator's NAV reports.  PFPC initially reported that the delay in the December report was due to year-end processing issues; but the delay in December was repeated in the subsequent months.

284.    When Sethi spoke with Tannin in early 2007 about the lack of timely reports from the fund administrator, Tannin said that Barclays should rely on the numbers that BSAM was directly providing to Barclays for periods when the administrator report was not available.

285.    Sethi and Barclays, however, sought reports from the administrator as well.  They did so because the administrator was supposed to be obtaining independent pricing of the portfolio instruments, under the terms of the Investment Guidelines, and because administrator NAVs were required under the Confirmations.

286.    On or about April 2, 2007, for example, after many previous calls and emails about the delayed administrator reporting, Sethi wrote her contacts at PFPC and copied Tannin:

> I would really appreciate if you could reply to my mail below [dated March 29]. Even the February NAVs are overdue now and we are still waiting for January NAVs.
>
> Could you please let us k[n]ow the reason for delay each month and what we can do to resolve this ASAP.

287.    Neil Rosen of PFPC responded that the January NAV was still being calculated and that the delay resulted from "waiting for pricing on one of the underlying securities."

288.    Sethi followed up with numerous emails and calls to PFPC and Tannin to try to resolve the slow reporting by proposing that PFPC set a cut-off date and use an estimate or the previous month's valuation for one or two missing prices by that date. Tannin's approval was necessary for PFPC to proceed in that way.

289.    Tannin repeatedly communicated that he was happy to work out a more timely arrangement, and that Sethi had a "great idea;" but when Sethi subsequently followed up with either Tannin or PFPC, she could not get a resolution. Barclays now realizes that Sethi was being intentionally ignored and manipulated by Tannin, Cioffi and BSAM – given the ultimate discrepancies in the February through May reporting of the portfolio's performance.

290.    Sethi continued to seek the appropriate, timely fund administrator reporting. On May 8, 2007, a managing director and vice president of PFPC, Ellen Corson, addressed the situation in an e-mail to Sethi:

> Currently, the Bear Stearn [sic] (BS) fund that you are requesting information on holds an investment that due to its complexity is taking a very long time to obtain a valuation. Each month, BS requires PFPC to wait until the value for the particular investment has been calculated and approved. Unfortunately, the process to value that particular investment has been delayed greatly. PFPC is not involved in the valuation of the investment and are instructed to wait for the

> price from the advisor.  In addition, BS has not instructed
> PFPC to value the BS fund with an estimate price.  Also, due
> to the nature of this investment, BS is very much aware of the
> issues surrounding the valuation.  The delays you are
> expecting [sic] are not the result of PFPC service issues.
>
> As of today, PFPC is waiting for approval from BS for
> February's final numbers.  In addition, final valuations for the
> investment in question has not been finalized for March and
> April.
>
> I have previously requested that BS reach out to their
> Barclay's [sic] contact and explain to them the issues.  . . .

291.    On or about May 9, 2007, Sethi and Panzeri of Barclays called Tannin and did not

reach him.  Sethi followed up with an e-mail to Tannin that asked "what this 'investment' is

which takes more than three months to value."

292.    Sethi followed up with Corson at PFPC to ask her which asset supposedly caused

the delay in pricing each month.  Corson responded that she was not sure.

293.    Tannin never identified a specific asset that was delaying the administrator's

pricing in response to Barclays' inquiries.

294.    Instead, more than a week later, on or about May 17, 2007, Tannin responded by

claiming that "**We do not have ANY assets that take 3 months to value**.  The volitility [sic] in

the market created a problem with the dealers getting us marks.  We can give PFPC our

estimated NAV promptly – within 5 business days of the end of the month.  I believe they are

happy to pass this on to you."  (Emphasis added.)  Tannin thus contradicted PFPC's stated reason

for the delay and made a new representation about BSAM's supposed ability to timely value its

assets.  In any event, timely NAVs from PFPC were never forthcoming.

295.    In addition, it was only through further discussions with PFPC on or about June 1

that Sethi and others at Barclays discovered that the Enhanced Fund administrator apparently had

been relying on BSAM for pricing on a major portion of the assets in the Enhanced Fund all

along. They discovered that PFPC had not been independently pricing those assets, as required by the Investment Guidelines, or even spot-checking them for purposes of calculating the fund administrator's NAV reports.

296. Immediately after that discovery, Sethi called Mark Mannion, another managing director at PFPC, and stressed that the administrator's job was to provide independent pricing. She stressed that even for estimates that might come before final numbers from PFPC, PFPC should do random checks of those estimates, and that for final NAV pricing there had to be much less of a time lag than currently was occurring.

297. Tannin, Cioffi, and BSAM, in breach of BSAM's duties to disclose and fiduciary duties to Barclays, failed to reveal BSAM's direction of PFPC's pricing and BSAM's efforts to delay the administrator's NAV reports to Barclays. They did so to hide from Barclays the Enhanced Fund portfolio's actual performance and the BSAM Defendants' and other Company-affiliated actors' improper actions, as alleged herein.

J.    IN MAY, BSAM'S FEBRUARY CLAIM OF A 5.5% RETURN IS REDUCED TO BELOW ZERO

298. After BSAM's interference and delay, the fund administrator on May 10, 2007, finally released its NAV for February. That report showed that the Enhanced Fund's return in February had actually been -.30% – far less than the report of a 5.5% gross or 4.3% net increase that Tannin and BSAM had conveyed to Barclays on February 27.

299. As set forth above, February had been the month in which BSAM's deceived Barclays to induce it to double its financial investment in the structure in March.

K.    IN JUNE, APRIL NAV RESULTS OF -11.3% ARE DISCLOSED

300. On June 7, PFPC released the final April NAV to Barclays. The administrator's report revealed **a drop of more than 11%** in the Enhanced Fund. This was more than four

times greater a loss than BSAM's worst report of the fund's performance to Barclays up to that time – *i.e.*, -2.5%. On June 7, PFPC also released its revised March results of -3.6%.

301.    BSAM had failed to abide by its representations and commitments, leaving Barclays to learn from PFPC long after the fact about a drop in the NAV of more than 10%. Under the Reporting Requirements, BSAM was required to notify Barclays as soon as it reasonably could of "any change in circumstances, which **might** cause the final monthly NAV of the Reference Fund to show a loss in value equal to or more than 10%." (Emphasis added.) Instead, BSAM, Cioffi and Tannin engaged in deliberate deception to hide the Enhanced Fund's falling NAV for as long as possible.

302.    BSAM knew well before **June 7** of a "change in circumstances" that might – and actually did – significantly affect **April**'s results. BSAM was supposedly engaged in daily surveillance of the portfolio and it had ongoing interactions with the administrator with regard to pricing. Cioffi made up his own mind to sell his stake in the Feeder Fund and, without disclosure, contained his personal risk by the end of March. By May at the latest, BSAM, Cioffi and Tannin were devising (again, undisclosed) plans to sell their whole operation because the Enhanced Leverage and High-Grade Funds were collapsing. Thus, as alleged in further detail below, BSAM, Cioffi and Tannin clearly knew earlier than June that the Enhanced Fund's value was dropping and its viability ending as a result of liquidity pressures and other operational failures. Yet Barclays heard of this 11.3% drop in April only through PFPC's June 7 correspondence to Barclays.

L.    THE BSAM DEFENDANTS DECEIVED BARCLAYS TO OBTAIN AN INJECTION OF LIQUIDITY AND KEEP BARCLAYS IN THE STRUCTURE

303.    In all the ways alleged in this section IX, BSAM, Cioffi and Tannin intentionally or at a minimum recklessly acted to deceive Barclays, specifically, because its continued

participation in the Enhanced Fund structure was critical.  Without Barclays, the BSHG team would not have the liquidity source to attempt to stabilize both the High-Grade Fund and the Enhanced Fund.  If Barclays withdrew, moreover, BSAM's supposed "enhanced leverage" feature of the Enhanced Fund structure would collapse, and ownership of the assets would devolve to the Feeder Funds themselves.  And with Barclays' withdrawal and that transfer, an obligation would arise to provide complete and accurate pricing, which the BSAM Defendants did not want to do because it would expose their prior over-marking and jeopardize BSAM and other Company interests.

304.    Barclays was promised an early warning and the ability to terminate its participation in the structure to save its capital and fees.  But if Barclays exercised that option in the context of the BSHG team's declining performance, struggles with liquidity, and back-firing hedges, the BSHG team's deceptions would be revealed to all investors and the markets at large. BSAM, Cioffi and Tannin throughout February, March, April and May concealed material problems in the High-Grade and Enhanced Fund structures, and their distortion of asset values and performance numbers, to prevent that from happening.

305.    Moreover, the BSAM Defendants wanted to keep their deception going in order to give themselves more time to try to remedy the problems in their fund structures.  BSAM, Cioffi and Tannin apparently believed that they could turn the performance of the Enhanced Fund around and then no one would ever need to know about, for example, their failure to re-mark assets or their marking of them erroneously high during a difficult period.  BSAM, Cioffi and Tannin kept concocting more complex and far-fetched "plans" to save their operations, and took more and more risks, while keeping Barclays misinformed and unaware of BSAM's hidden activities.

306.    In addition, BSAM's compensation for its operation of the Enhanced Fund structure and management of all the pieces in that structure came through two percent advisory fees and, if BSAM was eligible during the period, 20% incentive or profit-sharing payments from the Feeder Funds and their investors.  (No compensation came from the Enhanced Fund or Barclays.)  The calculation of BSAM's compensation from the Feeder Funds turned on various formulas related to the NAVs of the Feeder Funds, which, in turn, were derived from the NAV of the Enhanced Fund.  A growing NAV in the Enhanced Fund would lead to greater compensation, whereas a falling NAV would decrease BSAM's two percent advisory fees and could completely foreclose the 20% incentive or profit-sharing payments because of the "high water mark" method used to calculate the incentive payments.  Thus, the BSAM Defendants also deceived Barclays with erroneously high NAV reports to attempt to preserve and maximize BSAM's compensation.

307.    Cioffi's and Tannin's compensation and reputations also turned on the success of their funds.  BSAM had a practice of splitting advisory and incentive fees from its funds with the funds' managers to reward well-performing managers.  Thus, a higher NAV would translate into larger advisory and incentive fees for the managers as well.  (In addition, BSAM awarded its successful managers Bear Stearns stock as a form of deferred compensation.  Cioffi and Tannin also stood to gain greater stock awards with better Enhanced Fund performance numbers, and through their stock ownership had interests that aligned with other Company affiliates and the Company as a whole.)

308.    Moreover, Cioffi's name was synonymous with the BSHG team's funds.  Similarly, Tannin was the COO of and a high profile spokesperson for the funds.  Each manager's success in the business community was inextricably tied to the funds' fates.

309.    The BSAM Defendants also wanted to use Barclays and its role in the Enhanced Fund structure to serve interests outside that structure.  For example, BSAM, Cioffi and Tannin wanted to build up a record of success in the Enhanced Fund so that they could convince all their High-Grade investors to move to the Enhanced Fund, and thus never reveal the liquidity and other management problems in the High-Grade Fund.  Those liquidity problems continued after the Enhanced Fund's creation, because the moratorium on Bear Stearns' transactions continued and the BSHG team did not have a workable liquidity strategy for the High-Grade Fund.

310.    Likewise, the BSAM Defendants wanted the Enhanced Fund to survive long enough to get the Everquest IPO completed, as discussed below.  Cioffi also said during late 2006 through the spring of 2007 that he believed, however improbably, that Everquest would help save the BSHG funds' performance by creating an increase in the market value of the large amount of Everquest shares that the funds held.  As it turned out, the Everquest IPO had to be cancelled and the shares created a large loss for the Enhanced Fund and for Barclays; but Everquest provided to the very end a motivation to try to keep the BSHG funds afloat.

311.    Similarly, the BSAM Defendants formulated other large transactions that they apparently believed might resurrect the Enhanced Fund or that were beneficial to BSAM or the Company in other ways, as detailed below, and thus tried to keep the structure going to complete those transactions or plans.  In the meantime, however, they did not expose any of the Enhanced Fund's or their difficulties to Barclays.  For all these reasons, BSAM, Cioffi and Tannin deceived Barclays.

IX.    **THE BSHG TEAM REPEATEDLY FAILS TO WARN BARCLAYS DESPITE DECLINES IN NAV OF MORE THAN TEN PERCENT IN APRIL AND MAY**

A.    <u>NO EARLY WARNING FOR BARCLAYS</u>

312.    As explained above, Barclays would not benefit from any gains in the Enhanced Fund portfolio.  In addition, Barclays' investment would be first out of the Enhanced Fund as the fund assets passed through Barclays on their way down to any final payments due Feeder Fund investors.  Throughout the life of the Enhanced Fund structure to April 2007, Barclays was being told by BSAM that the value of the assets in the fund was well over twice Barclays' stake; thus Barclays had a cushion of hundreds of millions of dollars protecting its ability to receive the return of its investment and its fees, as promised, if and when the fund unwound.

313.    Therefore, Barclays' primary concern with regard to the actual performance of the portfolio was hearing promptly about a significant downward movement.  Getting a warning about a significant downturn would enable Barclays to terminate and withdraw its money and fees before those were at any substantial risk of loss.

314.    Accordingly, Barclays built into the Reporting Requirements the warning system whereby BSAM was obligated to alert it "as soon as reasonably possible" of any change that "might" cause the monthly net asset value of the fund to lose 10% or more.

315.    BSAM, however, did not alert Barclays in February, March, April or May of the growing crisis in the Enhanced Fund.  It did not do so because Cioffi and Tannin knew that disclosure of an anticipated or actual drop of 10% or more, and the further disclosures that would be necessary to explain that unusual movement, would likely cause Barclays to terminate its role in the structure, create chaos for BSAM and the Feeder Funds, and expose BSAM's inability to operate effectively its Enhanced Fund structure.

316.    If BSAM had revealed to Barclays in February or March that the Enhanced Fund would soon experience a 10% or greater monthly drop in value, and/or explained how BSAM's actions had led to such an impending drop, Barclays would have terminated its participation in the structure during those months.

317.    If BSAM had revealed in April that the Enhanced Fund was experiencing a 10% or greater drop that month – and/or had told Barclays the truth about BSAM's struggles to operate the structure in the then-prevailing credit environment and myriad deceptions pled above – Barclays would have withdrawn from the structure by terminating the swaps and redeeming its shares in the master fund on the next dealing date of April 15 or May 3.

318.    With a Barclays termination triggered in February, March or April, even based on the later, post-hoc valuations of the net asset value in the Enhanced Fund by PFPC, Barclays would have received the return of its full investment and its full fees, and not suffered any damages.

B.    BEAR STEARNS KNEW OF BSAM'S DIFFICULTIES, PROVIDED AN EMERGENCY BRIDGE LOAN, AND AIDED IN MISLEADING BARCLAYS

319.    The BSAM Defendants did reveal their mounting difficulties in managing the Enhanced Fund and its liquidity to Bear Stearns.  BSAM, Cioffi and Tannin did so in part because BSAM had to turn to Bear Stearns for urgently needed financing.  By April, BSAM was apparently having a harder time "rolling over" its repo agreements when they matured and was experiencing requests from its repo counterparties for a larger "haircut" in the terms of the repo lending.  The repo counterparties would provide less lending on the same assets, and required BSAM, on behalf of the Enhanced Fund, to provide more assets or cash as added margin on specific repo agreements.

320.    In or about April, Bear Stearns ended its moratorium on transactions with the fund. That month, at BSAM's request, Bear Stearns entered into a bridge repo loan with the Enhanced Fund of approximately $290,000,000 for a little more than one month to help it temporarily weather its expanding liquidity crunch.

321.    This bridge loan helped the BSAM Defendants to stave off liquidity pressures through April, despite the portfolio's falling asset prices – which were still hidden from Barclays.

322.    Bear Stearns provided the temporary lending in part to allow the BSAM Defendants to close an even larger financing deal, discussed below. As soon as the larger deal closed, Bear Stearns again withdrew as a repo counterparty to the fund. Bear Stearns did not have any repo exposure to the Enhanced Fund as the structure entered June and ultimately failed.

### C.    IN MAY, BSAM CLOSES THE HUGE BSAG 2007-1A TRANSACTION AS IT CONTINUES TO REPLACE STRONGER ASSETS WITH WEAKER ONES

323.    On or about May 24, BSAM closed a deal that was underwritten by Bank of America and that created a structure to be managed by BSAM. This transaction replaced some of the Enhanced Fund's and the High-Grade Fund's repo financing with a different and complex form of financing devised by BSAM that involved commercial paper and a new CDO structure, BSAG 2007-1A.

324.    BSAM sold approximately $2.5 billion in assets from the Enhanced Fund, which had carried approximately $1.95 billion in repo financing, and additional assets from the High-Grade Fund, into the BSAG structure. The assets sold from the Enhanced Fund included collateralized loan obligations (CLOs) as well as securities from higher-rated CDO tranches and residential mortgage-backed securities. These transactions repaid, *inter alia*, Bear Stearns' bridge repo loan.

325.    The Enhanced Fund portfolio then purchased approximately $486,000,000 of complex CDO-squared securities, designated as different tranches of BSAG 2007-1A, and approximately $26 million in "preference shares" issued by the BSAG structure.

326.    The Enhanced and High-Grade funds were the only purchasers of these new BSAG 2007-1A securities and preference shares.  (Other investors purchased the commercial paper, which was separately backed by protection from Bank of America.)   As with purchases of other BSAM-managed CDO-squareds by the Enhanced Fund pled above, no independent third-party market participant priced these securities or ascertained their fair market value; instead BSAM caused the Enhanced Fund to purchase them at non-arms length prices.

327.    The Bank of America/BSAG 2007-1A offering was the largest CDO-related offering of 2007.  BSAM, Cioffi and Tannin were continuing to try to give themselves more time to escape the performance and liquidity problems in their funds.

328.    This transaction did not, however, turn the Enhanced Fund's downward trajectory around.  It emptied the Enhanced Fund of many of its better assets, while replacing them with illiquid CDO-squared securities and preference shares of unknown value.  It momentarily provided some relief to the massive liquidity pressures that were bearing down on the Enhanced Fund, still unknown to Barclays, by diminishing repo borrowing, but it replaced that borrowing with other financing.

329.    As it turned out, of course, the portfolio's NAV dropped by 38% in May.  The BSAG transaction contributed to this enormous loss.

D.    BSAM HIDES ITS PLAN TO SELL THE FUNDS

330.    In May, even as they proceeded to close the BSAG transaction, Tannin and Cioffi were again sending emails back and forth about the "building of the plan" to cope with their

funds' severe troubles.  Neither those troubles nor any plans, however, had been revealed to Barclays.

331.    By May 26, Tannin was well along in sketching out a plan to sell the Enhanced Fund and the High-Grade Fund, and along with them all of the BSHG team's operations, to Cerberus Capital Management ("Cerberus") or some other similar entity.  Tannin was getting ready to present that plan to Cerberus, Spector, Marin, and others.  Spector and the leaders of the BSHG team clearly had been consulted about the "building of the plan" earlier and, according to a lengthy May 26 Tannin email to Cioffi and McGarrigal, Spector was focused on simplicity and "insisting on a 7th grade level presentation."

332.    In his lengthy May 26 email, Tannin listed what BSAM had to sell, beginning with "2 hedge funds (1.5 billion on capital) **that are in danger of a wipe out because of a lack of liquidity**" and ending his list with the BSHG team having "almost the necessary systems" to run their operations.  Tannin's comment on the latter was:  "we have the knowledge of what that system is and we are on the road to a solution (this may not sound great – but I believe there is NO ONE out there who has put it all together")."

333.    Tannin also went on to list the types of assets in the High-Grade and Enhanced Funds and to assess which could be "monitized" [sic].  He admitted that at that point, for example, CDO-squared securities and single name hedges did not have "a value and liquidity profile."  Tannin commented, "This is the problem.  There is simply no market.  Too many variables."

E.    THE BSHG TEAM INTENTIONALLY MANEUVERS TO KEEP BARCLAYS IN PLACE, EVEN AS IT KNOWS THAT A "WIPE OUT" IS IMMINENT

334.    On May 31, Cioffi and Tannin were exchanging further emails on how to execute a rescue – a sale – for the funds.  Cioffi emailed Tannin and others at BSAM about getting performance numbers to an outside party in the midst of their search for help.

335.    Tannin emailed Cioffi back on May 31, explaining that the "issue is – **do we give them the -6.5 april or the larger down april?"**

336.    Cioffi then understood that BSAM's deceptions were at issue, and he responded to Tannin, "Ah that's correct I think that one deserves a phone call," indicating that he did not want to discuss the degree of deception necessary in this instance via the written record of email.

337.    Tannin, later that same night, debated via email with Cioffi on how much information to show about "where the losses have come from."  Tannin wrote, "On the one hand it focuses attention on how bad these bonds have become – and will cast doubt upon our initial strategy where we leveraged these bonds so much – but on the other hand – it might explain the large loss – that it was the result of what amounts to a single very bad decision …."

338.    While all these May last-chance sale efforts, admission of a "very bad decision" and "large losses," discussion of the "danger of a wipe out because of a lack of liquidity," and acknowledgement of an inadequate system to run their BSHG operations were occurring within BSAM, BSAM, Cioffi and Tannin kept Barclays from knowing what was really occurring within the Enhanced Fund structure.  Barclays still had not been told even of the greater than 10% loss that occurred in the Enhanced Fund in April.

339.    Nor was Barclays getting accurate reports of May's performance or any warning in May that the month would result in an over 10% downturn.  BSAM provided a mid-month

report that showed a decline of just 2%, and then by June 8 sent a report to Barclays that claimed that May in fact had a 2.7% positive return.

340.    Subsequent disclosures by BSAM and PFPC – once the collapse of the funds was public in mid-July – showed that the Enhanced Fund, in reality, had lost more than 38% of its NAV in May.

341.    If BSAM had revealed to Barclays in May that the Enhanced Fund had already experienced a more than 11% drop in April, was headed for another 10% or greater drop in May, and/or that BSAM was taking all kinds of impermissible and harmful steps in its operation of the structure, as alleged in detail above, Barclays would have withdrawn from the structure by terminating the swaps and redeeming its shares in the master fund on the earliest next dealing date of May 15 or June 3.

342.    In doing so, even based on the later, post-hoc valuations of the net asset value in the Enhanced Fund by PFPC, Barclays would have received the return of its full investment and its full fees or very close to those amounts, and not suffered the same large damages.

343.    BSAM continued to process redemption payments to investors that would come out of the Enhanced Fund through early June.  For Feeder Fund investors, requests for such redemptions required 40-days notice to BSAM; and thus requests for redemptions that would occur at the beginning of June were dated prior to late April.  Approximately $25 million in such redemptions occurred in early June (corresponding to a Feeder Fund dealing date of May 31).

344.    Barclays, under the terms of its transaction, needed only to provide two business days notice prior to one of its dealing dates to terminate the swaps and redeem its hedge.

345.    In April or May, or at any earlier point in time when the BSAM Defendants might have revealed their damaging actions and the serious problems with the Enhanced Fund's

performance instead of concealing them, Barclays would have had multiple "termination events" for the swaps and hedge to rely upon in triggering an unwind of its participation in the structure in as little as two business days.  For example, Barclays could terminate upon any material change in the risk profile of the Enhanced Fund without its consent; any failure to receive daily informational data on the portfolio for five consecutive days; any breach of the Reporting Requirements; or any breach of the Investment Guidelines that lacked an approved plan to cure. The BSAM Defendants' misrepresentations and omissions were designed to keep Barclays from doing so.

## X.    THE JUNE MELTDOWN OCCURS AFTER BSAM FAILS TO MANAGE LIQUIDITY AND EXPANDS RISK RATHER THAN ADDRESSING CREDIT DETERIORATION

### A.    BSAM ATTEMPTS TO MAINTAIN MISREPRESENTATIONS INTO JUNE

346.    Despite their own panic that the Enhanced Fund was on the verge of failure, BSAM, Cioffi, and Tannin continued to work hard to conceal the Enhanced Fund's true performance from Barclays through false reports of successful hedging and positive returns on the portfolio.

347.    At or about the beginning of June 2007, Tannin called Barclays' Ware to tell him about an imminent publication in *Hedge Fund Alert*.  Tannin told Ware that an article was about to come out that said that BSAM had "gated" (*i.e.*, suspended) investor redemptions from the Feeder Funds.

348.    Tannin represented to Ware that this statement about gating was untrue.  He stated that BSAM was considering gating, but had not done so.

349.    On or about June 6, 2007, the BSHG team's Pusateri called one of her contacts at Barclays in the Bond Finance department with a similar message:  "She [Pusateri] said there may be an article released about current redemptions and weak performance in the funds.  She

maiantained [sic] the fund is operating business as usual and that her managers are open to any questions …. She said they have sufficient liquidity and are able to meet all margin calls."

350.    Between approximately June 8 and June 12, Panzeri and Ware spoke further with Tannin at least twice. Tannin spoke of the recent April and other smaller negative performance reports to Barclays as reflecting a "pricing anomaly" in CDO-squared securities in which BSAM had been invested. Tannin said "there has not been any material deterioration in the underlying credit quality." According to Tannin, "the market is stabilizing."

351.    Tannin also claimed in early June, again, that the portfolio's hedges were working. He told Panzeri and Ware that there had been a slight lag in response; but now the portfolio had bounced, the hedges were catching up, and the Enhanced Fund was again performing well.

352.    As Barclays considered all the unfolding revelations and developments, Panzeri emphasized to Tannin that BSAM had to take all steps necessary to bring the portfolio within the Investment Guidelines and had to make sure that Barclays was getting timely NAVs.

353.    Tannin told Panzeri and Ware that he was working to bring down exposure to CDO-squared securities specifically, and CDOs generally, and to divert investment to structured credits with physical underlying assets.

354.    On or about June 13, however, Panzeri emailed Tannin to follow-up on Panzeri's hearing that "one of the repo counterparties dealing with your fund is apparently about to pull its line; I am sure this is just one of the rumours that spread at a time like this, but would like to confirm that this is just it, in order to avoid any sense of unease spreading." As soon became clear, the word of counterparty unrest was unfortunately not a false rumor.

355.    Yet Tannin, Cioffi and BSAM were still intentionally, or at a minimum recklessly, misstating the portfolio's status as of June 2007 to Barclays for all of the reasons outlined above.  Indeed, as noted above, Robert Ervin of BSAM, on or about June 8, emailed Angus McIsaac of Barclays with another positive report.  BSAM reported to Barclays in that June 8 transmittal that the **returns on the portfolio for the month of May supposedly were up 2.7%.**

356.    In fact the portfolio declined by 38% in May, which BSAM and PFPC revealed only in July.  This kind of **retroactive 40% negative swing** in the portfolio's valuation amounts to an unheard of level of re-pricing **months after-the-fact**.  It is many times larger than what might be acceptable as variation and imprecision in pricing, and does not reflect even a minimal level of fairness or competence in marking the assets.  Instead – like BSAM's distorted February and April results – it reflects both BSAM's bad faith, deception and manifest error in valuing the portfolio and reporting on its performance to Barclays.  It should also be distinguished from sharp, contemporaneous declines in assets' values and markdowns on that basis, for this was a massive **retroactive retelling** of history.

B.    A LIQUIDITY CRISIS FINALLY REVEALS ITSELF BY MID-JUNE 2007

357.    On or about **June 14**, still another positive report came from Ervin of BSAM in an email to McIsaac of Barclays, with Tannin copied.  Ervin, couching results for the first time as "internal estimates," sent Barclays a **BSAM spreadsheet that showed gains through June 12 of almost 6%.**  It also showed a total NAV of more than $950,000,000.

358.    On or about June 14, however, BSAM was also hosting a meeting of "repo" agreement counterparties with claims on certain portfolio assets to try to negotiate grace.  Barclays then confirmed that the rumors Panzeri had heard a day earlier were true, and therefore knew that serious liquidity issues had emerged.

359.    Because the value of the collateral – the Enhanced Fund portfolio assets – that had been given to the repo counterparties was falling (though the falling values had not been reflected in the portfolio reports to Barclays), the counterparties had apparently demanded the posting of more collateral or more payments from the fund to diminish the size of their loans. BSAM, however, had nearly reached the end of its possibilities in trying to stay ahead of its ongoing liquidity crunch, and did not have the cash or liquid assets to meet the counterparties' demands.

360.    By June 14, the repo counterparties in the meeting with BSAM were in a position to threaten the sale of the assets BSAM had previously posted as collateral in order to repay the repo loans and to extract themselves from their arrangements with the Enhanced Fund.

361.    When repo counterparties resort to a sale of the collateral assets, their only interest is in getting paid a price that would repay their loan.  Any price above that would bring in excess monies that would have to be paid back, under the terms of the agreement, to the Enhanced Fund.  Thus, the repo counterparties have no incentive to hold out for a price that is above the level they need to be made whole, even if they could achieve such a price.

362.    With the Enhanced Fund's enormous troubles finally coming to the ultimate crisis point, it is amazing that BSAM, Cioffi, and Tannin continued to assert contemporaneously to Barclays and others that the Enhanced Fund portfolio was increasing significantly in value.

363.    Because BSAM had let the fund's situation deteriorate to this point, Barclays was immediately concerned about whether BSAM would take all appropriate steps to stabilize the Enhanced Fund, would avoid rushed asset sales or other rushed dispositions, and would work with critical parties such as Barclays to proceed in an orderly and fair fashion.  Barclays was also focused on getting up-to-the-minute and full information from BSAM, and made innumerable

requests to do so.  Furthermore, Barclays expected BSAM to act in accordance with BSAM's special duties to it and to do everything in its power to preserve value in the Enhanced Fund structure.

364.    During the ensuing crisis, BSAM and other Company representatives admitted on a June 18 conference call "that the CDO^2 [CDO-squared] positions were most problematic in finding liquidity in addition to retained positions [BSAM held] from deals they manage."

C.    BSAM, CIOFFI AND BEAR STEARNS PURSUED THE EVERQUEST IPO TO PASS RISK TO THE PUBLIC, BUT INSTEAD HARMED BARCLAYS

365.    As BSAM's massive hidden failures in the Enhanced Fund started to come to light in mid-June, the role of Bear Stearns and Bear Stearns Companies in the funds' demise also started to become apparent.

366.    For example, in June 2007 Bear Stearns, Cioffi and BSAM were on the brink of the IPO they had long planned for Everquest.

367.    BSAM and Cioffi knew that they needed to keep moving certain bad assets to avoid the eventual impact of their very limited value – they spread them first from the High-Grade Fund into the Enhanced Fund, then moved them into Everquest.  BSAM and Cioffi next wanted to sell public shares in Everquest to spread the ownership and risk of these assets even farther outward.

368.    Similarly, Bear Stearns was the underwriter of the planned IPO and thus had studied the nature of the offering in detail, including the illiquid and extraordinarily risky nature of its assets.

369.    Everquest had been formed in September 2006 and was jointly run by BSAM and Stone Tower LLC.  Cioffi, in addition to his many other roles at BSAM, was the co-chief executive of Everquest.

370.    Cioffi had argued in early September 2006 to Tannin and others within BSAM that they should form an entity like Everquest because initially it would produce a "reduction in CDO equity positions" while increasing liquidity.  He also noted in his September 6 email to Tannin and McGarrigal that "we will have an easier time marking Rampart [which apparently later became Everquest] than we do marking all the different positions."

371.    Longer term, Cioffi asserted that the eventual IPO would create "[s]ignificant upside" in "the form of liquidity and mark to market gain.  The bankers [at Bear Stearns] estimate a 1.2-1.3X on the IPO based upon a dividend yield of 10% this could add 4-5% net to our yr."

372.    Tannin worried, however, also in a September 6 email to Cioffi and McGarrigal, "[d]o we know if there are any special disclosure rules we'd have to make were we to want to sell shares?  I am worried that any selling by us would raise questions in the minds of other shareholders and create the potential for price volatility."  Cioffi, BSAM and Bear Stearns proceeded anyway.

373.    As Everquest's May 9, 2007, Form S-1 disclosed, most of the assets (valued by Everquest and BSAM at $548.8 million) in Everquest's approximately $720 million portfolio were purchased in September 2006 from the High-Grade Fund and the Enhanced Fund.  In return, the funds received 16 million shares of Everquest (valued by Everquest and BSAM, which were obviously not independent and unbiased, at $25 per share) and $148.8 million in cash.  As of the date of the S-1, that filing reported that the funds retained their 16 million shares in Everquest.

374.    The S-1 further revealed that the largest transfer from the BSAM Enhanced and High-Grade Funds to Everquest involved the lowest (*i.e.*, riskiest) tranches of Parapet, a BSAM-

managed vehicle that created CDOs out of CDO-squared and other CDO securities, many of which were also from other vehicles managed by BSAM.

375.    The Everquest S-1 listed Cioffi as the "beneficial owner" of Everquest shares.  In addition, Everquest disclosed that, upon the IPO, BSAM and Stone Tower each would receive new share grants representing 2.5% of Everquest's outstanding shares for the managers and/or employees, which included Cioffi.  Therefore, Cioffi stood to benefit personally from the IPO.

376.    BSAM also benefited from the Everquest arrangement because it was entitled to management and incentive fees from Everquest, in addition to its fees associated with the Enhanced Fund structure.  Likewise, Bear Stearns would benefit from an Everquest IPO through its underwriting fees.

377.    Everquest's S-1 – like BSAM's direct reports to Barclays on the Enhanced Fund from the same period – omitted critical disclosures that would have had a significant adverse effect on the amount Bear Stearns, Cioffi, and BSAM could realize from an IPO.  Neither Everquest's filing nor BSAM's reports on the Enhanced Fund to Barclays through May 2007 disclosed, for example, that the Enhanced Fund had suffered significant losses in April 2007 as the Everquest and other similarly shaky assets lost value.

378.    Shares in Everquest are not a permitted investment under the Investment Guidelines; indeed such shares never appeared on the portfolio reports for the Enhanced Fund given to Barclays by BSAM, despite the disclosure of the funds' share ownership in an official filing with the SEC.  In addition, as a large unrated investment in a single stock issue, the Enhanced Fund's apparent ownership stake in Everquest far exceeded allocation limitations set by the Investment Guidelines.

379.    Even Bear Stearns' managing directors viewed Everquest with great skepticism by mid-June 2007.  During a "town hall" meeting for Bear Stearns' managing directors on or about June 22, one of those managing directors reported that the overall sense among the attendees at the meeting was extreme skepticism regarding Everquest's construct and purpose. According to this managing director, many of them expressed the belief that BSAM was trying improperly to dispose of poor quality CDOs through the Everquest IPO.  The June 22 meeting attendees also openly questioned whether the BSAM portfolios in general were "dumping grounds" for toxic assets, including many Bear Stearns or BSAM-related assets.

380.    Others at the June 22 "town hall" opined instead that BSAM and its funds would have been fine if BSAM had been able earlier "to offload its risk to the public" through the Everquest IPO.

381.    On or about June 25, 2007, amid an onslaught of negative press reports surrounding the deteriorating High-Grade and Enhanced Funds and the terrible quality of the assets that had been dumped into Everquest, Everquest withdrew its planned offering.

382.    Indeed, press reports described the finally-aborted Everquest IPO as "an unprecedented attempt by a Wall Street house to dump its mortgage bets."  *See* Matthew Goldstein, *Bear Stearns Subprime IPO: Everquest Financial is Going Public with Risky Mortgage Bets Purchased from Its Underwriter's Hedge Funds,* www.BusinessWeek.com, May 11, 2007; *see also* Carolyn Sargent, *Behind Bear's Big Fall*, www.absolutereturn.net, September 2007 ("Bear allowed [Cioffi] . . . to stuff his funds with Bear-originated collateralized debt obligations that he allegedly helped form.  Bear even helped Cioffi set up a company to purchase shaky securities from the funds when the market began to crack."); Alistair Barr, *Everquest IPO Tied to Troubled Bear Hedge Fund: Cioffi's Fund Transferred Risky Mortgage*

*Derivatives to Firm He Helps Run*, www.MarketWatch.com, June 15, 2007 (one CDO expert

quoted as saying, "If the stories are correct about the problems at the fund, it sounds like they

off-loaded the riskiest positions to Everquest[.]")

383.    With no IPO, no Everquest shares left the Enhanced Fund.  Thus, the fund

remained indirectly invested in the worst tranches of the Parapet CDO of CDOs and other

troubled assets into at least July 2007, to Barclays' detriment.  Cioffi, BSAM and Bear Stearns

had pursued the ill-fated Everquest gambit for their own interests – to earn fees or other income,

to dispose of some of Cioffi's and BSAM's worst investments, to seek mark to market gains

from at least a temporarily rising stock price after the IPO, and to make the marking of assets in

the Enhanced Fund  "easier."  Everquest and its assets contributed significantly to Barclays'

losses.

    D.    <u>BSAM AND BEAR STEARNS COMPANIES ABANDON BARCLAYS'
        INTERESTS AND TRIGGER A FIRE-SALE OF THE PORTFOLIO'S ASSETS</u>

384.    Bear Stearns Companies also started to reveal its participation in the Enhanced

Fund's collapse through the Company's own statements and actions in June 2007.

385.    At some earlier point and at least by May 2007, officers of the Company had

joined with BSAM, Cioffi and Tannin behind the scenes in making important decisions about the

Enhanced Fund structure and portfolio.

386.    For example, Spector, the Company's then co-President, participated in BSAM's

efforts in May to sell the BSHG team's entire business to Cerberus or some other entity before

the BSHG team's operations crashed completely.  At that time, Spector was fully informed about

the failures that BSAM, Cioffi and Tannin were concealing from Barclays and he, on behalf of

the Company, tried to help BSAM dispose of the BSHG operations before those failures became

public or "wiped out" the funds.

387.    After that failed attempt, Spector and others at the Company made many of the major strategy choices for the Enhanced Fund structure in June's crisis of insufficient liquidity and unsatisfied counterparties.  Spector and other members of the Company's executive committee (including Cayne, Samuel Molinaro, and Alan Schwartz) were kept apprised of the Enhanced and High-Grade Fund situations and helped determine their fate by specific decisions made at the Company level.

388.    Spector and the other Company officers also knew of Barclays' special position in the Enhanced Fund structure and BSAM's fiduciary duties towards it, yet refused to work toward preserving Barclays' investment and instead dissipated the assets that should have gone toward paying Barclays.

389.    The Company and BSAM brought in The Blackstone Group to assist them with the June crisis.  In addition, at some point in June, the Company temporarily moved Thomas Marano from his position at Bear Stearns to take over trading for the funds on behalf of the Company.  Bear Stearns Companies also increased the day-to-day risk management supervision of BSAM and especially the BSHG team by Michael Alix, the parent company's chief risk officer.

390.    From June 14 onward, Barclays was in daily contact with BSAM and the others who, on behalf of the Company, were purportedly trying to stabilize the Enhanced Fund structure.  Ho spoke with Tannin on June 15 and 16.  From on or about June 17, John Mahon and Mark Manski of Barclays took the lead in trying to get more information from and to work with BSAM and Blackstone to deal with the counterparty and liquidity pressure.  Mahon spoke with Richard Marin, then still the BSAM chief executive, approximately six times.  Calls or meetings took place with Blackstone that included Manski and/or other Barclays representatives

concerned with the fate of the Enhanced Fund structure on every day from June 18 through at least June 22. Tim Coleman of Blackstone was the primary contact for Barclays on the Blackstone team.

391.    The Company and BSAM, through their Blackstone representatives, at times outlined various possible courses of action to Barclays and to other banks that reflected that Bear Stearns Companies was the entity responsible throughout this period for the ultimate decisions about what occurred. Those outlines repeatedly included a component of Company financing, and clearly had been vetted with Company executives. Bear Stearns Companies kept changing its position, however; and neither the Company nor BSAM would provide up-to-date information to Barclays, or to others. As a result of the Company's handling of the situation, none of the proposals that would have addressed the problems in both the Enhanced Fund and the High-Grade Fund ever came to fruition.

392.    The Company reflected its knowledge of Barclays' unique role in the Enhanced Fund structure and Barclays' substantial stake as sole participating shareholder in the Enhanced Fund by generally proposing plans that referred to Barclays and might have included Barclays providing additional leverage or other financing to help the structure survive the crisis. Despite daily efforts, however, Barclays could not get accurate information and thus did not even have the predicate for any assistance.

393.    On or about June 17, Barclays received its last portfolio spreadsheet of the Enhanced Fund's assets from BSAM, dated June 15. This portfolio report, as underscored by Marin's subsequent statements in the coming days and later by PFPC's reports in July, vastly overstated the mid-June asset values in the Enhanced Fund.

394.    On June 18, BSAM and Blackstone still were representing to Barclays that the equity in the Enhanced Fund would be sufficient to make Barclays whole.  On June 21, Barclays was being told there was a chance it would be made whole.  By June 25, however, Marin told Mahon that there might be only $150 million value left in the Enhanced Fund.  By June 26, Marin revealed that yet more losses probably had occurred, saying that the $150 million had been book value, not actual value.

395.    Indeed, at one point Marin admitted to Mahon during a phone conversation that BSAM did not know how to value various CDO equity positions in the Enhanced Fund portfolio.

396.    Despite all of the affirmative efforts by Barclays to obtain information, and despite BSAM's obligations under its prior commitments to Barclays, Barclays never succeeded in obtaining even basic confirmation of what was occurring during this critical mid- to late-June 2007 period with the Enhanced Fund.  Marin and others would profess to Barclays BSAM's willingness to provide ongoing information, and Marin made specific promises to Barclays' Mahon that BSAM would do so.  But vital information, including an accurate NAV, was never forthcoming.

397.    For example, Mahon asked Marin for a list of the Enhanced Fund's unencumbered assets.  Marin promised to provide that list, but never did.  As the crisis continued, Mahon also asked for specific information on the initial deals that BSAM had made with counterparties and for the marks on assets that had been included in those deals.  Again, Barclays never received that information.

398.    Finally, on June 22 Mahon sent a letter to BSAM, again asking for up-to-date information about the NAV of the Enhanced Fund, unencumbered assets, deals that had already

been concluded, and any "issues hampering reaching agreements with other counterparties." BSAM was not forthcoming.

399.    Throughout this period, Ho, Mahon and Manski emphasized in their conversations with Tannin, Mahon, Blackstone, and other Company representatives that they should do everything possible to avoid counterparty banks breaking ranks to sell their assets hurriedly, which could cause a downward spiral.  BSAM and the Company did not do so.

400.    Spector was the Company's senior negotiator with the most significant repo counterparties.

401.    Spector, the Company and BSAM did not adequately, competently, or in good faith manage events in mid-June to stabilize the position of all the repo counterparties with regard to the Enhanced Fund, to Barclays' special detriment.  Especially once they believed that the Feeder Fund investors' stakes in the Enhanced Fund could not be saved, the Company and BSAM abandoned Barclays' interests and simply let the losses mount, for only Barclays would suffer them.

402.    In particular, the Company and BSAM mismanaged the relationship with Merrill Lynch, one of the larger repo counterparties.  Merrill Lynch ultimately began to sell assets on the open market, despite the Bear Stearns entities and Merrill being only a small amount apart in their negotiations to avoid such an outcome.  The Company and BSAM knew this would likely trigger many further asset sales by repo counterparties and other harmful effects; but they took inadequate steps to avert it.

403.    On or about June 21, the Bear Stearns Companies executive committee was meeting to consider all its options with regard to the Enhanced and the High-Grade Fund structures.  In having that meeting, the executive committee delayed further progress and

meetings with the repo counterparties until it could determine the Company's then-current position; and the Company was clearly in charge of the overall situation.

404.    On or about June 22, Bear Stearns Companies announced that it would make $3.2 billion in financing available to the High-Grade Fund.  Yet, at the same time, the Company publicly made clear, through statements by Spector and others, that it would allow the Enhanced Fund to fail.  These decisions were made by Spector and other members of the executive committee of the Company.

405.    The Company later reduced its financing offer for the High-Grade Fund to $1.6 billion; and, in fact, only a small amount of that financing was used.  Apparently the Company simply used a repo agreement to gain control of some of the High-Grade Fund's better assets.  The High-Grade Fund soon collapsed along with the Enhanced Fund.

406.    After the Merrill actions, which could have been avoided by the defendants, and the Bear Stearns Companies' announcement that it was turning its back on the Enhanced Fund, Barclays' financial stake effectively was left to the mercy of a fire-sale market.  Indeed, there was a rush to the door by the repo counterparties in selling assets quickly rather than negotiating for price.

407.    For example, a Cantor Fitzgerald trader trying to unload repo agreement assets told a trader from another firm that Cantor simply wanted bids, and did not care what they were.

408.    The rushed sale of some assets from the Enhanced Fund drove market prices generally down further, and helped trigger a greater downward trend in market conditions.  The counterparties' flooding of the market with bid lists also contributed to panic and to an evaporation of trading interest, all to the detriment of preserving value in the Enhanced Fund.  If

the Company and BSAM had acted differently, more value could have been preserved for Barclays to recover from the structure.

409.    The actions by Bear Stearns Companies and BSAM in allowing the Enhanced Fund to fail, and allowing asset sales in a manner that further destabilized the structure and did not preserve value for Barclays, breached BSAM's fiduciary duties that were specific to Barclays.  Bear Stearns Companies knowingly aided in that breach.

410.    The nature of the actions alleged above indicates that other individuals, yet to be specifically identified, at Bear Stearns Companies or Bear Stearns also were likely involved in knowingly assisting and implementing the breach of BSAM's fiduciary duties during this period, and perpetuating Bear Stearns Companies' and Bear Stearns' harm to Barclays.

E.    "NO VALUE LEFT"

411.    BSAM stated in late June that a final NAV for May would not be released until July 16, 2007, one month late and well past this critical June period for the Enhanced Fund.

412.    On July 17, BSAM released a May NAV for the Feeder Funds and an estimated June NAV for those funds, and in doing so, explicitly confirmed the devastating news that there was "effectively no value left" for the Feeder Fund investors.

413.    In a letter dated July 17, but sent by email to Simran Sethi of Barclays late on the night of July 18, PFPC reported to Barclays that the Enhanced Fund had declined 38.27% in May.  Neither PFPC nor BSAM provided a report to Barclays for June's results and month-end NAV.

414.    On or about July 23, Barclays hand delivered to BSAM the appropriate notice to terminate the swaps and redeem its hedge of shares in the Enhanced Fund simultaneously on the next dealing date, August 3, 2007.

415.    On July 31, 2007, the Enhanced Fund applied to the Grand Court of the Cayman Islands for the appointment of joint provisional liquidators and commenced an insolvency proceeding.

416.    After their appointment, those joint provisional liquidators then appeared *ex parte* on July 31 in the U.S. Bankruptcy Court in the Southern District of New York to seek various forms of temporary relief for the fund.

417.    The July 31 papers filed by the Enhanced Fund's joint provisional liquidators in the U.S. Bankruptcy Court recounted that "the Foreign Petition states that Enhanced Fund is insolvent and unable to pay its debts as they come due."

418.    On August 2, 2007, BSAM, on behalf of the Enhanced Fund, faxed to Barclays a letter stating that the Enhanced Fund Board of Directors purportedly declared a suspension of the redemption of shares in the Enhanced Fund on July 25, 2007, that allegedly applied to Barclays and informed Barclays of the Cayman Islands' appointment of the joint provisional liquidators.

419.    Based on the insolvency filing and subsequent reports regarding assets and liabilities from the now official liquidators, either all or almost all the value in the Enhanced Fund portfolio is gone.  Thus, all or almost all of Barclays' $400,000,000 financial commitment to the structure has disappeared.  By the beginning of June, Barclays was owed fees of almost $12,000,000, which were also to be paid from the Enhanced Fund assets.

## XI.    THE BSAM DEFENDANTS MISLED BARCLAYS WITH MISSTATEMENTS AND OMISSIONS AND THAT DECEPTION CAUSED LOSSES TO BARCLAYS

420.    As alleged above, BSAM and Tannin made numerous misstatements regarding BSAM's actions and capabilities with regard to managing liquidity and they did so intentionally or at a minimum recklessly to deceive Barclays.  The many specific representations pled above concerning BSAM's ability to maintain liquidity such that Barclays' leverage could be "dialed"

up or down at any time, its ability to avoid "freaked-out repo counterparty risk," and its ability to invest in assets with the "greatest liquidity" and "greatest value," all proved to be false statements.

421.    The Enhanced Fund structure ended up collapsing because BSAM, Cioffi and Tannin had not managed liquidity effectively, triggered "freaked-out repo counterparties," and had filled the portfolio with especially illiquid assets rather than those structured credit assets with the "greatest liquidity" and "greatest value."

422.    Moreover, BSAM, Cioffi and Tannin falsely described BSAM's capabilities, while at the same time intentionally or recklessly omitting any disclosure to Barclays of the liquidity problems in the High-Grade Fund at the time of the Enhanced Fund's spin-off, the continuation of those liquidity problems, or of the later, mounting liquidity issues in the Enhanced Fund itself.

423.    BSAM, Cioffi and Tannin, for example, represented that all the Enhanced Fund repo counterparties were "very happy" in February and that the fund structure remained "very stable" in March; and they never disclosed the truth about the repo counterparties and the fund's liquidity stresses to Barclays until the repo counterparties had reached the end of escalating steps to protect themselves amidst instability and had themselves demanded a meeting in June.  The months of deception by BSAM, Cioffi and Tannin with regard to the Enhanced Fund structure's liquidity caused losses to Barclays.

424.    Likewise, BSAM's and Tannin's repeated statements that their proprietary risk management system used voluminous information to ensure contemporaneous, rigorous and quantitative credit monitoring, that BSAM's system provided an early warning and could "quickly identify and sell suspect assets before credit deterioration," and that those capabilities

would be employed to warn Barclays and protect Barclays' interests, all also proved to be false. BSAM's supposedly "prudent" approach and its descriptions of especially tight risk management were false representations about BSAM's operations when those statements were made; and they continued to be false as the Enhanced Fund descended into trouble.  As with all the other alleged misrepresentations alleged herein, those statements were made intentionally or at a minimum recklessly to deceive Barclays.

425.    In addition, BSAM failed in at least April, May and June to comply with the explicit warning provision in the Reporting Requirements that required BSAM to make Barclays aware of any month that might result in a greater than 10% loss in the Enhanced Fund's value.

426.    BSAM's, Cioffi's and Tannin's misrepresentations about BSAM's risk management capabilities and approach caused Barclays losses because Barclays did not receive early warning, BSAM did not identify and sell suspect assets before credit deterioration, and the risk in the Enhanced Fund portfolio ballooned out of control, rather than being managed and contained as the relevant credit markets became more difficult.

427.    In fact, BSAM, Cioffi and Tannin intentionally took on more risk, with less or non-existent analysis or management of that risk, as the performance in the Enhanced Fund declined, in a reckless effort to "double down" and regain some of the portfolio's losses.  That increased risk caused even more losses to Barclays.

428.    In particular, BSAM, Cioffi and Tannin misrepresented and failed to disclose and update material information about the Enhanced Fund's strategy for hedging credit risk, or lack thereof.

429.    BSAM and Tannin only provided partial information, at times when they wanted to claim hedging success, without informing Barclays that the degree of hedging was grossly

inadequate actually to hedge or even significantly to mitigate losses on the portfolio's long asset-backed securities positions.  In addition, when even the minimal and insufficient hedging failed dramatically, at junctures throughout the spring, BSAM and Tannin failed to update or correct their prior representations to Barclays that their hedges were working "beautifully," that they were producing gains for the Enhanced Fund, and that the BSHG team was particularly adept and succeeding at hedging.

430.    The BSAM Defendants' inadequate and ineffective hedging caused losses to Barclays, as did their failure to alert Barclays to the breakdown of whatever hedging strategy the BSAM Defendants did have.

431.    If BSAM, Cioffi and Tannin had disclosed to Barclays in February, March, April or May that BSAM's hedges were inadequate and back-firing, that the BSAM Defendants were recklessly taking on new levels of risk to try to regain losses, and/or that those defendants were about to succumb to a liquidity crisis, Barclays would have terminated its participation in the Enhanced Fund structure at the earliest dealing date.  Instead, Barclays was reassured and repeatedly given erroneous performance information.

432.    The statements pled above that relate to accurate and fair marking of the Enhanced Fund assets on an ongoing basis, the restriction on portfolio assets to those that had independent pricing available, thus excluding especially hard-to-price assets, and to transparency in pricing all also turned out to be false.

433.    BSAM, Cioffi and Tannin claimed that they could mark and report the full portfolio results within days; yet BSAM held up the PFPC reports and accurate, real portfolio performance numbers for months.  BSAM, Cioffi and Tannin never disclosed to Barclays that they were not using and reporting truthful, accurate and real marks on the assets.

434.    Moreover, BSAM's reports to Barclays, which came less frequently and with less detail than promised, intentionally or at least recklessly failed to re-mark many of the long positions in asset-backed securities that in fact had lost value in February, March, April, May and June.  BSAM misrepresented the marks, by leaving them higher than a prudent and fair pricing would, and in particular left assets related in some way to the Company marked at an inaccurately high level.

435.    BSAM's false marking and the BSAM Defendants' failure to disclose their deceptive approach to marking caused Barclays losses by misleading Barclays about the Enhanced Fund structure's performance and about the cushion that existed to protect Barclays' stake.

436.    If BSAM, Cioffi or Tannin had disclosed to Barclays that BSAM was engaging in significant marking and performance deception, and thus that the Enhanced Fund was performing worse than BSAM led Barclays to believe, Barclays would have terminated its participation as leverage and liquidity provider and severed its ties to the structure at the earliest dealing date.  Moreover, BSAM, Cioffi and Tannin used repeated, erroneous reports about the NAV to hide the many underlying failures and deficiencies in their operation of the structure.

437.    BSAM, Cioffi and Tannin also misrepresented their capabilities and their intent to follow the Investment Guidelines and Reporting Requirements.  If BSAM had complied with the promised Investment Guidelines, for example in excluding difficult-to-price assets without regularly available independent prices, excluding CDO-squared investments, excluding the Everquest Financial shares, and limiting other categories and ratings of assets as specified in the Investment Guidelines, Barclays would not have suffered the losses that it, in fact, did.

438.    As BSAM and Tannin admitted in statements alleged above, the CDO-squared securities and the securities that BSAM had retained in the Enhanced Fund from CDO deals that it managed proved to be especially difficult to sell.  Those caused significant losses to Barclays. In addition, BSAM caused losses to Barclays with securities that were backed by the very mortgage debt in which BSAM and the Company specialized and about which BSAM should have had the most accurate information.

## XII.    THE BSAM DEFENDANTS BREACHED THE FIDUCIARY AND OTHER DUTIES THEY OWED BARCLAYS AND THOSE BREACHES CAUSED LOSSES TO BARCLAYS

439.    Once the transaction had closed and Barclays was a dependent part of the Enhanced Fund structure, the BSAM Defendants breached their fiduciary duties to Barclays and operated and managed the structure with gross negligence toward Barclays.

440.    The BSAM Defendants operated the structure, managed the Enhanced Fund and breached their fiduciary duties and other commitments specific to Barclays from their offices in New York City.

441.    BSAM owed Barclays duties of care, fairness, good faith and loyalty, yet operated the Enhanced Fund structure and managed the Enhanced Fund portfolio (a) in bad faith and without loyalty to Barclays' unique and important position in BSAM's structure and to preservation of Barclays' capital; (b) in BSAM's and other affiliates of the Company's self-interest; and (c) with a lack of fairness and care in selecting, monitoring, and marking the Enhanced Fund's assets (with disregard for the Investment Guidelines and Reporting Requirements), in employing (or not employing) its hedges, and in managing its liquidity needs. These breaches of fiduciary duty and gross negligence caused Barclays losses by diminishing and eventually dissipating the value of the portfolio after Barclays had been convinced by BSAM to trust and have comfort in BSAM protecting its interests in the transaction.

During the life of the structure, BSAM also owed Barclays duties of disclosure, honesty, and accuracy in keeping Barclays informed about the status and performance of the portfolio, its assets, and the structure as a whole.  As explained above, BSAM and Tannin instead failed to disclose, misrepresented, and inaccurately presented material facts throughout the transaction's history, deceiving Barclays into staying in the structure longer than it otherwise would have and causing it to suffer harms and consequences that BSAM had claimed Barclays, with BSAM's protection, could and would avoid.  BSAM's failures of disclosure, erroneous reports, and dishonesty caused Barclays losses.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

(Fraud and Deceit – as to Defendants BSAM, Tannin and Cioffi)

442.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

443.    As detailed above, BSAM and Tannin made material misrepresentations of fact in connection with Barclays' participation in the leverage counterparty and hedge transaction, Barclays' commitment of additional funds to the structure from September 2006 through March 2007, and its continued participation in the transaction into July 2007.

444.    In the pre-closing period, BSAM and Tannin made numerous misstatements of material fact, as well as representations about their future planned actions that they knew at the time did not reflect their true intentions.  After the transaction commenced, they made further misrepresentations of material fact and reiterated the same representations about planned actions, again knowing that the statements about their plans did not reflect their true intentions.

445.    BSAM and Tannin did so initially to convince Barclays to close the transaction, and thus to enable the whole structure and the Feeder Funds to begin operation, for all the underlying reasons alleged above.  BSAM and Tannin did so subsequently to keep Barclays in the structure and to hide the Enhanced Fund's difficulties for as long as possible.

446.    BSAM and Tannin knew that their statements of fact and of intended actions were false and misleading, or at a minimum were reckless in not knowing whether the statements of fact were true, when the statements were made.  BSAM and Tannin made the statements with the intent and expectation that Barclays would rely on them.

447.    Cioffi had actual knowledge of the misrepresentations of fact and of intentions made by defendants BSAM and Tannin, based on ongoing briefing of and consultation with Cioffi by Tannin and others on the BSHG team.  BSAM and Tannin were at all times making those misrepresentations on behalf of BSAM, and Cioffi was then an officer and director of BSAM.  Cioffi was also Tannin's supervisor and the individual in charge of all of the BSHG team's activities for BSAM.

448.    Cioffi had the intent and expectation that Barclays would rely upon BSAM's and Tannin's false statements.

449.    Barclays reasonably relied on each of the pre-closing representations of defendants BSAM and Tannin alleged above, which, in fact, were misrepresentations.

450.    Barclays also reasonably relied on each of the representations (which, in fact, were misrepresentations) of defendants BSAM and Tannin as Barclays increased its financial contributions to the structure from September 2006 through March 2007 and in participating in the structure into July 2007.

451.    The material misrepresentations were within the peculiar knowledge of BSAM, Tannin and Cioffi; and those defendants actively concealed the truth such that Barclays could not gain access to it.

452.    Without the material misrepresentations before closing, Barclays would not have entered into the transaction.  Without the later material misrepresentations, Barclays would have terminated its participation in the transaction.

453.    BSAM's, Tannin's and Cioffi's fraudulent conduct was willful, malicious and without regard to Barclay's rights and interest.

454.    As a direct, proximate and foreseeable result of BSAM's, Tannin's and Cioffi's conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of BSAM's, Tannin's and Cioffi's conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

<u>SECOND CAUSE OF ACTION</u>

(Fraudulent Concealment – as to Defendants BSAM, Tannin and Cioffi)

455.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

456.    As detailed above, defendants BSAM, Tannin and Cioffi failed to disclose material facts in connection with Barclays' participation in the leverage counterparty and hedge transaction, Barclays' commitment of additional funds to the structure from September 2006 through March 2007, and its continued participation in the transaction into July 2007.

457.    BSAM, Tannin and Cioffi owed Barclays a duty to disclose based on (a) their superior knowledge of facts, not readily available to Barclays, when each knew that Barclays

was acting on the basis of mistaken information; (b) their fiduciary and special relationship with Barclays; and/or (c) partial or ambiguous statements that triggered such a duty.

458.    In addition and in the alternative, BSAM, Tannin and Cioffi had a duty to correct and/or to update information that BSAM had provided to Barclays.  To the extent that some of BSAM's or Tannin's statements were correct when made but then became misleading, BSAM, Tannin and Cioffi had a duty to update.  BSAM, Tannin and Cioffi knew or should have known that their prior statements had become misleading.  To the extent that some of BSAM's or Tannin's statements were not known to be false at the time they were made but came to be known by BSAM, Tannin or Cioffi to be false when made, BSAM, Tannin and Cioffi had a duty to correct.

459.    In the pre-closing period, BSAM, Tannin and Cioffi failed to disclose material facts to Barclays that each had a duty to disclose.  Failures to disclose and failures to update or correct continued after the transaction commenced and throughout Barclays' participation in it.

460.    BSAM, Tannin and Cioffi concealed material facts from Barclays initially to convince Barclays to close the transaction, and thus to enable the whole structure and the Feeder Funds to begin operation, for all the underlying reasons alleged above.  BSAM, Tannin and Cioffi did so subsequently to keep Barclays in the structure and to hide the Enhanced Fund's difficulties for as long as possible.

461.    BSAM, Tannin and Cioffi, *inter alia*, owed Barclays a duty to disclose the true facts about their capabilities and practices (or lack thereof); the nature, status and performance of the investment portfolio; the asset values in the Enhanced Fund; their schemes to use the Enhanced Fund to solve problems in the High-Grade Fund and, in the end, to sell all their operations; and their self-dealing and attendant misuse of the structure.

462.    BSAM, Tannin and Cioffi knew that Barclays was relying on erroneous and incomplete information when each of those defendants failed to comply with the duty to disclose or the duty to update or correct. Each of those defendants intended and expected that Barclays would rely on misleading, incomplete information, without the material information that should have been disclosed by those defendants.

463.    BSAM, Tannin and Cioffi deliberately or at least recklessly failed to disclose material facts to Barclays.

464.    Barclays reasonably relied on the misleading and incomplete information that it possessed to make its decisions about initial and continued participation in the transaction. BSAM, Tannin and Cioffi acted throughout the history of the transaction to limit the information available to Barclays, to deflect Barclays' requests for further information, and to conceal information through distortion and obfuscation. Barclays did not have access to the material information that BSAM, Tannin and Cioffi withheld and failed to disclose.

465.    If BSAM, Tannin and Cioffi had complied with those duties, Barclays would not have initially entered into the transaction or increased its financial contributions to the structure. Instead, Barclays would have terminated its participation in the transaction.

466.    BSAM's, Tannin's and Cioffi's fraudulent conduct, as alleged herein, was willful, malicious, and without regard to Barclay's rights and interest.

467.    As a direct, proximate and foreseeable result of BSAM's, Tannin's and Cioffi's conduct, Barclays has been damaged in an amount to be determined at trial. As a result of BSAM's, Tannin's and Cioffi's conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

<u>THIRD CAUSE OF ACTION</u>

(Aiding and Abetting Fraud and Fraudulent Concealment—as to Defendant Bear Stearns)

468.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

469.    As shown above, defendants BSAM, Cioffi and Tannin committed fraud and fraudulent concealment to deceive Barclays.

470.    By virtue of, *inter alia*, Bear Stearns' participation in the initial creation of the Enhanced Fund structure as placement agent for investors in the Feeder Funds, Bear Stearns' principal-trade compliance monitoring and the moratorium it placed on trades with the High-Grade Fund and Enhanced Fund, its emergency bridge loan to assist the Enhanced Fund in temporarily staving off liquidity pressures in April 2007, and its role as underwriter on the Everquest IPO and in other transactions that involved BSAM and the Enhanced Fund, Bear Stearns knew that BSAM and its managers, Cioffi and Tannin, were deceiving Barclays.

471.    For example, Bear Stearns knew that BSAM, Cioffi and Tannin were not disclosing the principal trade approval failures in the High-Grade Fund and the resulting Bear Stearns moratorium on trades prior to closing the Enhanced Fund transaction or prior to Barclays increased funding of the structure.  Bear Stearns also knew that BSAM, Cioffi and Tannin were not disclosing to Barclays the liquidity issues hurting the Enhanced Fund in or about April 2007 or the diminishing asset values that were affecting both Everquest and the Enhanced Fund that spring.

472.    Bear Stearns substantially assisted the BSAM Defendants' fraud and fraudulent concealment by not disclosing to Barclays or others Bear Stearns' moratorium on trades or BSAM's history of failing to secure the necessary principal-trade approvals; by serving as underwriter on the Everquest IPO and not disclosing performance problems with the Everquest

assets, BSAM, or the Enhanced Fund in the Everquest S-1 or through other means; and by providing the bridge repo loan to help BSAM, Cioffi and Tannin keep hiding the Enhanced Fund's liquidity issues, hedging failures and falling asset values.

473.    Bear Stearns stood to gain financially – and aimed to guard its reputation – by concealing the High-Grade Fund's failures, helping to conceal the performance problems in the Enhanced Fund, continuing the Enhanced Fund's operations, and continuing the Bear Stearns underwriting and placement agent activities that related to that fund.

474.    Bear Stearns was a critical participant and knowingly provided its substantial assistance in the BSAM Defendants' fraud and fraudulent concealment.  Bear Stearns took actions itself to keep Barclays and others from receiving truthful, material information with regard to the Enhanced Fund structure and its transactions, and in doing so caused harm to Barclays.

475.    Bear Stearns' conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

476.    As a direct, proximate and foreseeable result of Bear Stearns' conduct, in aiding and abetting BSAM, Cioffi, and Tannin in their fraud and fraudulent concealment, Barclays has been damaged in an amount to be determined at trial.  As a result of Bear Stearns' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

<u>FOURTH CAUSE OF ACTION</u>

(Aiding and Abetting Fraud and Fraudulent Concealment—as to Defendant

Bear Stearns Companies)

477.    Barclays repeats and realleges the foregoing allegations as though fully set forth

herein.

478.    As shown above, defendants BSAM, Cioffi and Tannin committed fraud and

fraudulent concealment to deceive Barclays.

479.    By virtue of, *inter alia*, Spector's responsibility for supervising BSAM and, in

particular, the risk controls in place at BSAM at all times relevant to this action, Spector's

involvement in the efforts of BSAM, Cioffi and Tannin to sell the BSHG operations (including

specifically the Enhanced Fund) or find some other "solution" to the BSHG funds' declining

performance and liquidity crisis in the spring of 2007, and Spector's and the entire Executive

Committee's decision-making with regard to the Enhanced Fund in June 2007,  Bear Stearns

Companies knew that BSAM and its managers, Cioffi and Tannin, were deceiving Barclays.

480.    For example, Spector and others within Bear Stearns Companies knew by May

that BSAM, Cioffi and Tannin were not disclosing to Barclays that BSAM did not have the

necessary systems to operate the Enhanced Fund, that the Enhanced Fund was on the brink of a

"wipe out" because of liquidity pressures, that its CDO-squared securities did not have any

"value and liquidity profile," and that BSAM was working to find a sale or other rescue before

the Enhanced Fund collapsed.  In addition, Spector and others at the Bear Stearns Companies

knew in May and early June that the remaining asset value in the Enhanced Fund was lower than

BSAM, Cioffi and Tannin were reporting to Barclays, and knew that the Enhanced Fund's

performance had not stabilized, contrary to Tannin's and BSAM's representations to Barclays.

481.    Bear Stearns Companies substantially assisted the BSAM Defendants' fraud and fraudulent concealment by not disclosing to Barclays or others the mounting troubles in the Enhanced Fund, the plan to sell or otherwise dispose of the BSHG operations before the troubles were discovered, and the further diminishing value and viability of the Enhanced Fund in May and June 2007. In addition, Spector, others at the Company, and Blackstone at the Company's direction made numerous decisions in June 2007 to continue to withhold information from Barclays until the complete collapse of the Enhanced Fund. Spector also affirmatively assisted BSAM, Cioffi and Tannin in pursuing a sale and other strategies with regard to the Enhanced Fund, beginning in May or earlier, to the exclusion of accurate and required disclosure to Barclays.

482.    Spector and Bear Stearns Companies aimed to guard their reputations by helping to conceal the performance problems in the Enhanced Fund, continuing the Enhanced Fund's operation, and seeking some exit strategy that might conceal forever the fraud and the failures by BSAM, Cioffi and Tannin. Later, Bear Stearns Companies focused on the possibility of retaining assets for itself, for investors in the High-Grade Fund, or for Feeder Fund investors in the Enhanced Fund structure, and continued to conceal information from and forsake the interests of Barclays.

483.    Bear Stearns Companies was a critical participant and knowingly provided its substantial assistance in the BSAM Defendants' fraud and fraudulent concealment. Bear Stearns Companies took actions itself to keep Barclays and others from receiving truthful, material information with regard to the Enhanced Fund structure, and in doing so caused harm to Barclays.

484.    Bear Stearns Companies' conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

485.    As a direct, proximate and foreseeable result of Bear Stearns Companies' conduct, in aiding and abetting BSAM, Cioffi, and Tannin in their fraud and fraudulent concealment, Barclays has been damaged in an amount to be determined at trial.  As a result of Bear Stearns Companies' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

<u>FIFTH CAUSE OF ACTION</u>

(Civil Conspiracy to Commit Fraud and Fraudulent Concealment—as to Defendants BSAM, Tannin, and Cioffi)

486.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

487.    In the alternative and to the extent that Cioffi is not directly liable for fraud and/or fraudulent concealment, he is liable for conspiracy to commit fraud and fraudulent concealment with BSAM, Tannin and others.

488.    Defendants BSAM, Cioffi and Tannin, acting together, and with others at times, planned and agreed to deceive Barclays in the manner described above.  These defendants knew and understood at the time of their agreements that Barclays would be injured by their wrongful conduct.

489.    Cioffi's conscious agreement to act in concert with Tannin and BSAM is apparent from his email correspondence with Tannin and others at BSAM, samples of which are alleged in this Complaint, and his detailed and close supervision of Tannin, on behalf of BSAM, including in the fraud and fraudulent concealment perpetuated by BSAM and Tannin against

Barclays.  Cioffi took no actions to stop the fraud and fraudulent concealment because he agreed with that deception; instead he conspired with and encouraged Tannin and BSAM in their direct fraud and fraudulent concealment.

490.    BSAM, Tannin and Cioffi had the common objective of misleading Barclays and withholding the true facts from Barclays to persuade it to commit initially to the Enhanced Fund structure and then to keep Barclays in the structure and to hide the Enhanced Fund's difficulties for as long as possible.  They also sought to conceal the High-Grade Fund's troubles from its own investors, and from Barclays and other participants in the Enhanced Fund structure.  And they wanted to accomplish the Everquest IPO and other self-interested or harmful transactions involving the Enhanced Fund while still retaining Barclays in its position.

491.    In furtherance of the conspiracy, BSAM and Tannin affirmatively deceived and concealed material facts from Barclays, committing fraud and fraudulent concealment, with Cioffi's and all the BSAM Defendants' knowledge.  BSAM, Tannin, and Cioffi intentionally participated in the conspiracy.

492.    BSAM's, Tannin's, and Cioffi's fraudulent conduct, as alleged herein, was willful, malicious, and without regard to Barclays' rights and interests.

493.    As a direct, proximate and foreseeable result of these defendants' conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of defendants' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

<u>SIXTH CAUSE OF ACTION</u>

(Civil Conspiracy to Commit Fraud and Fraudulent Concealment—as to Defendants BSAM,

Tannin, Cioffi, and Bear Stearns)

494.    Barclays repeats and realleges the foregoing allegations as though fully set forth

herein.

495.    In the alternative and to the extent that Bear Stearns is not liable for aiding and

abetting the BSAM Defendants' fraud and/or fraudulent concealment through Bear Stearns' own

substantial assistance, Bear Stearns is liable for conspiracy to commit fraud and fraudulent

concealment with BSAM, Tannin, Cioffi, and others.

496.    Defendants BSAM, Cioffi, Tannin, and Bear Stearns acting together, and with

others at times, planned and agreed to deceive Barclays in the manner described above.  These

defendants knew and understood at the time of their agreements that Barclays would be injured

by their wrongful conduct.

497.    Bear Stearns' conscious agreement to act in concert with BSAM and its managers

is apparent from Bear Stearns' taking on the role of placement agent for the Feeder Funds despite

its knowledge of Barclays' unique position in the structure, that the Bear Stearns moratorium on

trades (and its cause) was not being revealed to Barclays or potential Feeder Fund investors, and

that instead those interested parties were being told that Enhanced Fund principal trades with

Bear Stearns could take place and that they would be reviewed and approved ahead of time by

independent directors.  Bear Stearns' conscious participation in the conspiracy continued

throughout the life of the Enhanced Fund, including in particular when Bear Stearns served as

underwriter on Everquest and agreed with BSAM and Cioffi not to disclose falling asset values

or any of the performance failures within BSAM in the Everquest S-1.

498.    BSAM, Tannin, Cioffi, and Bear Stearns had the common objective of misleading Barclays and withholding the true facts from Barclays to close the Enhanced Fund transaction, to keep Barclays in the Enhanced Fund structure, and to hide the BSAM Defendants' difficulties in operating and managing that structure for as long as possible.  Bear Stearns shared this objective with the BSAM Defendants at the outset of the Enhanced Fund, for example, so that it could receive its compensation as placement agent, and during the time when Bear Stearns provided a temporary bridge repo loan so that the Bear Stearns loan would be repaid before any problems within the Enhanced Fund became known.  BSAM, Tannin, Cioffi, and Bear Stearns also wanted to conceal material adverse information from Barclays and others, including potential Everquest investors, so that the Everquest IPO and other transactions involving Bear Stearns as underwriter could close.

499.    In furtherance of the conspiracy, BSAM and Tannin affirmatively deceived and concealed material facts from Barclays, committing fraud and fraudulent concealment, with Cioffi's and all the BSAM Defendants' knowledge.  In furtherance of the conspiracy, as alleged above, Bear Stearns also had knowledge of that fraud and fraudulent concealment.  BSAM, Tannin, Cioffi, and Bear Stearns intentionally participated in the conspiracy.

500.    BSAM's, Tannin's, Cioffi's, and Bear Stearns' fraudulent conduct, as alleged herein, was willful, malicious, and without regard to Barclays' rights and interests.

501.    As a direct, proximate and foreseeable result of these defendants' conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of defendants' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

<u>SEVENTH CAUSE OF ACTION</u>

(Civil Conspiracy to Commit Fraud and Fraudulent Concealment—as to Defendants BSAM,

Tannin, Cioffi, and Bear Stearns Companies)

502.    Barclays repeats and realleges the foregoing allegations as though fully set forth

herein.

503.    In the alternative and to the extent that Bear Stearns Companies is not liable for

aiding and abetting the BSAM Defendants' fraud and/or fraudulent concealment through Bear

Stearns Companies' own substantial assistance, Bear Stearns Companies is liable for conspiracy

to commit fraud and fraudulent concealment with BSAM, Tannin, Cioffi, and others.

504.    Defendants BSAM, Cioffi, Tannin, and Bear Stearns Companies acting together,

and with others at times, planned and agreed to deceive Barclays in the manner described above.

These defendants knew and understood at the time of their agreements that Barclays would be

injured by their wrongful conduct.

505.    Bear Stearns Companies' conscious agreement to act in concert with BSAM and

its managers is apparent from Spector's work with BSAM, Cioffi and Tannin.  Spector was

briefed on the dismal condition of the Enhanced Fund and the High-Grade Fund, understood

those structures, and agreed to work with BSAM to attempt to sell all of the BSHG operations,

rather than to disclose to Barclays the performance and other information to which it was

entitled.  Similarly, Bear Stearns Companies and BSAM agreed to work together and did work

together, including through Blackstone, to keep Barclays uninformed while Bear Stearns

Companies and BSAM pursued their own goals in the June 2007 crisis.

506.    BSAM, Tannin, Cioffi, and Bear Stearns Companies had the common objective of

misleading Barclays and withholding the true facts from Barclays from at least May into the

summer of 2007 to keep Barclays in the Enhanced Fund structure and to hide the rapidly

118

deteriorating status of the Enhanced Fund portfolio. These defendants sought to hide the status

of the portfolio and BSAM's lack of a system that could manage that portfolio, so that they could

pursue efforts to sell the BSHG funds or come up with other drastic steps to attempt to save the

reputations of BSAM, Tannin, Cioffi, and the Bear Stearns Companies. When that became

impossible, Bear Stearns Companies, with the BSAM Defendants, aimed to preserve at least

some valuable assets from the High-Grade Fund for the Company, while continuing to support

the deception of Barclays until the end and allowing Barclays' losses to mount.

507. In furtherance of the conspiracy, BSAM and Tannin affirmatively deceived and

concealed material facts from Barclays, committing fraud and fraudulent concealment, with

Cioffi's and all the BSAM Defendants' knowledge. In furtherance of the conspiracy, as alleged

above, Bear Stearns Companies also had knowledge of that fraud and fraudulent concealment.

BSAM, Tannin, Cioffi, and the Company intentionally participated in the conspiracy.

508. BSAM's, Tannin's, Cioffi's, and Bear Stearns Companies' fraudulent conduct, as

alleged herein, was willful, malicious, and without regard to Barclays' rights and interests.

509. As a direct, proximate and foreseeable result of these defendants' conduct,

Barclays has been damaged in an amount to be determined at trial. As a result of defendants'

conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as

well as interest at the statutory rate.

EIGHTH CAUSE OF ACTION

(Negligent Misrepresentation—as to Defendants BSAM and Tannin)

510.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

511.    At the time BSAM or Tannin made the material misrepresentations to secure Barclays' initial participation in the transaction or to increase its financial commitment to the structure, described above, defendants BSAM and Tannin knew, or at a minimum were negligent in not knowing, that those statements were false and misleading.  At a minimum, BSAM and Tannin should have known that the statements were incorrect.

512.    BSAM devised the idea for the "enhanced leverage" structure and came to Barclays seeking its participation in that new structure.

513.    BSAM and Tannin held themselves out as having a unique market position and special expertise with regard to the proposed transaction.  The transaction proposed by BSAM and Tannin was allegedly built on their experience with the High-Grade Fund and their proprietary risk management and analysis tools, as well as BSAM's and the Company's experience with structured credit products.

514.    BSAM and Tannin, moreover, were uniquely situated to explain the details, attributes, and conditions of the transaction and of BSAM's structured credit investment practices and surveillance capabilities, because BSAM was involved in and had significant control over every aspect of the planned structure and BSAM had the best and only access to information about:  BSAM's proprietary systems; BSAM's access to and the quality of information from other Company affiliates; whether BSAM's internal systems and procedures actually functioned; and other non-public information.

515.    BSAM and Tannin explicitly aimed with their representations to provide "comfort" to Barclays and thereby to convince Barclays to enter into the transaction and, subsequently, to increase its commitment to the structure.  BSAM and Tannin also carefully controlled the information that was released, or even hinted at, to Barclays.

516.    BSAM and Tannin made numerous and detailed representations personal to Barclays upon which they intended Barclays to rely.  BSAM and Tannin were aware, at the time of their misrepresentations, that the information they were conveying was critical to Barclays' decision-making.

517.    BSAM and Tannin entered into a special relationship so close as to approach privity with Barclays.  Defendants BSAM and Tannin knew that Barclays was uniquely and specially relying on BSAM's and Tannin's representations in deciding whether to participate in the structure and/or in deciding whether to increase its financial commitment to the structure.  BSAM and Tannin thus owed a duty to Barclays to give Barclays accurate information and representations.

518.    Barclays reasonably relied on the representations of defendants BSAM and Tannin, which, in fact, were misrepresentations.  Without those material misrepresentations, Barclays would not have entered into the transaction or increased its commitment to the structure.

519.    As a direct, proximate and foreseeable result of defendants BSAM's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial, as well as interest at the statutory rate.

<u>NINTH CAUSE OF ACTION</u>

(Negligent Misrepresentation—as to Defendants BSAM and Tannin During Management and

Operation of the Structure)

520.    Barclays repeats and realleges the foregoing allegations as though fully set forth

herein.

521.    Once the "enhanced leverage" structure came into being, BSAM took on all of its

various roles, and Barclays became one part of BSAM's overall structure, BSAM and Tannin

made myriad personal and material misrepresentations to Barclays about the performance,

composition, and status of the Enhanced Fund or the pricing of its assets, as detailed above.

522.    At the time BSAM or Tannin made those material misrepresentations, defendants

BSAM and Tannin knew, or at a minimum were negligent in not knowing, that they were false

and misleading.  At a minimum, BSAM and Tannin should have known that the statements were

incorrect.

523.    Defendants BSAM and Tannin were acting as the investment manager for the

Enhanced Fund, and as operators of the entire "enhanced" structure, with their claimed and

apparent special expertise in surveillance, marking, and management of liquidity in this

particular type of hedge fund structure, as alleged more fully above.  The BSAM Defendants,

who were part of the larger Company and its additional expertise, claimed to be and seemed

uniquely qualified to operate this "high-grade" structured credit investment structure.  BSAM

was the only entity with the unique and complete knowledge of the Enhanced Fund's portfolio,

hedging, and trading details, strategies and performance, including proprietary information, once

it was operating.

524.    In addition, based on all the facts alleged herein, BSAM and Tannin stood in a special relationship of trust and confidence to Barclays.  BSAM and Tannin established and proceeded in a special relationship so close as to approach privity with Barclays.

525.    Barclays, as the leverage counterparty and sole participating shareholder in the Enhanced Fund, was the only target and recipient of BSAM's reports and representations to Barclays about the performance, status, and value of the Enhanced Fund alleged above.

526.    Defendants BSAM and Tannin knew that Barclays was relying on their representations, and expected Barclays to do so.  BSAM and Tannin were aware, at the time of their misrepresentations, that the information they were conveying was material to Barclays' decision-making, including with regard to staying in the structure or mandating actions to protect its financial stake.

527.    BSAM and Tannin owed a duty to give Barclays ongoing accurate information regarding the Enhanced Fund's performance, status, and value.

528.    Barclays reasonably relied on the representations of defendants BSAM and Tannin, which, in fact, were misrepresentations.  Without those material representations, Barclays would not have continued in the structure.

529.    As a direct, proximate and foreseeable result of defendants BSAM's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial, as well as interest at the statutory rate.

<u>TENTH CAUSE OF ACTION</u>

(Promissory Estoppel—as to Defendant BSAM)

530.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

531.    BSAM made clear and unambiguous promises to Barclays in the Investment Guidelines and the Reporting Requirements, which were the result of months of personal negotiations between BSAM and Barclays.

532.    BSAM's promises to Barclays were memorialized in writing for the benefit of Barclays.

533.    The Investment Guidelines and Reporting Requirements preceded and exist separately from the Confirmations, though they are referenced therein and annexed thereto, for BSAM – the entity making those promises to Barclays – is not a party to the Confirmations and those promises concern BSAM's conduct in managing the Enhanced Fund and operating the overall structure for the benefit of Barclays.

534.    BSAM, in addition, reiterated and reaffirmed those promises to Barclays throughout the history of the transaction.

535.    Barclays reasonably and foreseeably relied on BSAM's promises to Barclays by entering into the transaction.

536.    Barclays further reasonably and foreseeably relied on BSAM's promises to Barclays by increasing its financial commitment to the structure and by continuing to participate in the transaction into July 2007.

537.    BSAM did not abide by, fulfill or keep its promises to Barclays, as detailed above.

538.    BSAM's conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

539.    As a direct, proximate and foreseeable result of Barclays' reliance on BSAM's promises and BSAM's subsequent failure to keep those promises, Barclays has been damaged in

an amount to be determined at trial. As a result of BSAM's conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

ELEVENTH CAUSE OF ACTION

(Breach of Fiduciary Duties Owed to Barclays—as to Defendants BSAM, Cioffi and Tannin During Management and Operation of the Structure)

540.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

541.    As set forth above, BSAM created a fiduciary relationship between itself – and its managers Cioffi and Tannin – and Barclays. As a result of that fiduciary relationship, BSAM, Cioffi and Tannin owed Barclays duties of care, diligence, fairness, good faith and loyalty.

542.    In addition, as a result of that fiduciary relationship, BSAM, Cioffi and Tannin owed Barclays duties of full and candid disclosure, honesty, and accuracy in keeping Barclays apprised of the status and performance of the portfolio, its assets and the structure as a whole.

543.    Barclays made its financial commitment to the structure and the Enhanced Fund after personal negotiations with BSAM, Cioffi and Tannin about the practices and care they would use in managing the Enhanced Fund, including but not limited to the Investment Guidelines and Reporting Requirements. BSAM specifically tailored its investment portfolio parameters to Barclays' requirements and repeatedly stated to Barclays that BSAM would be protecting Barclays' financial interests. Because Barclays effectively ceded to these defendants control over and discretion with regard to Barclays' financial exposure to the Enhanced Fund, subject to the Investment Guidelines and Reporting Requirements, and participated in the "enhanced" structure only because of BSAM's specific representations to Barclays, these defendants were obligated to ensure that they invested in accordance with their commitments to

125

Barclays, that they placed Barclays' interests ahead of their own, and that they did not engage in any fraudulent, grossly negligent, negligent, excessively risky, or imprudent investment practices to the detriment of Barclays.

544.    Barclays justifiably placed trust and confidence in BSAM, Cioffi, and Tannin to do so, and to comply fully with all of the BSAM Defendants' fiduciary duties.

545.    By engaging in the conduct alleged herein, BSAM, Cioffi, and Tannin breached the fiduciary duties owed to Barclays.  Cioffi and Tannin, as officers of BSAM and in their roles with respect to the Enhanced Fund and related structures, knew of each breach of fiduciary duty owed to Barclays and participated in each.  They were the officers and employees of BSAM who made the decisions and acted on behalf of BSAM to accomplish the breaches of fiduciary duty.

546.    BSAM, Cioffi and Tannin breached their duties of care, diligence, fairness, good faith and loyalty including, but not limited to, by taking on excessive and unpermitted risk, failing to undertake and use for Barclays' benefit the type of surveillance and monitoring they had purported to provide, failing to manage liquidity, and putting their own or other Company affiliates' interests ahead of Barclays.

547.    BSAM, Cioffi and Tannin breached their duties of full and candid disclosure, honesty, and accuracy including, but not limited to, by failing to report the actual performance, status and value of the Enhanced Fund portfolio to Barclays on a contemporaneous basis, mismarking individual asset values, failing to inform Barclays of their inadequate hedges and failures of their hedging strategy, and failure to inform Barclays of their efforts to sell or otherwise dispose of the Enhanced Fund because of its severe problems and systemic inadequacies.

548.    BSAM's, Cioffi's and Tannin's conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

549.    As a direct, proximate and foreseeable result of BSAM's, Cioffi's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of BSAM's, Cioffi's and Tannin's conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

TWELFTH CAUSE OF ACTION

(Aiding and Abetting Breach of Fiduciary Duties Owed to Barclays—as to Defendant Bear Stearns)

550.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

551.    As shown above, under the circumstances of this case, defendants BSAM, Cioffi and Tannin owed fiduciary duties specifically to Barclays.

552.    In engaging in the conduct alleged herein, BSAM, Cioffi and Tannin repeatedly breached those fiduciary duties to Barclays.

553.    Bear Stearns knew that BSAM, including through its officers and top managers, Cioffi and Tannin, owed specific fiduciary duties to Barclays and understood Barclays' unique position in the structure.  Bear Stearns had this knowledge from the outset, and gained the knowledge through and related to its role as placement agent for Feeder Fund investors in the Enhanced Fund structure.

554.    Bear Stearns served as placement agent for the Feeder Funds, provided a one-month bridge repo loan to the Enhanced Fund, served as underwriter on the planned Everquest IPO, and served as underwriter on offerings of assets that were sold into the Enhanced Fund.  In

each of these capacities, Bear Stearns stood to gain financially – and aimed to guard its reputation – by hiding the performance problems of the Enhanced Fund, continuing the Enhanced Fund's operations (particularly until the bridge loan was repaid), and continuing the Bear Stearns underwriting activities that related to that fund.

555.    Bear Stearns was a knowing and essential participant in the BSAM Defendants' Everquest maneuvers, which breached their fiduciary duties to Barclays.  As underwriter on Everquest, Bear Stearns aided those defendants in concealing performance problems at the Enhanced Fund and dropping asset values in the Everquest assets.

556.    Similarly, Bear Stearns aided BSAM, Cioffi and Tannin in continuing to take on inappropriate risk, failing to manage liquidity, and failing to undertake the surveillance and hedging the BSAM Defendants should have undertaken by providing the April 2007 emergency bridge loan and assisting in the cover-up of the Enhanced Fund's escalating troubles.

557.    Bear Stearns substantially aided and abetted BSAM and its managers, Cioffi and Tannin, in their breach of fiduciary duties to Barclays.  Indeed, Bear Stearns itself took actions and made decisions that caused harm to Barclays.

558.    Bear Stearns knowingly provided its substantial assistance in the breach of the fiduciary duties owed to Barclays.

559.    Bear Stearns' conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

560.    As a direct, proximate and foreseeable result of Bear Stearns' conduct, in aiding and abetting BSAM, Cioffi, and Tannin in the breach of the fiduciary duties owed to Barclays, Barclays has been damaged in an amount to be determined at trial.  As a result of Bear Stearns'

conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

## THIRTEENTH CAUSE OF ACTION

(Aiding and Abetting Breach of Fiduciary Duties Owed to Barclays—as to Defendant

Bear Stearns Companies)

561.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

562.    As shown above, under the circumstances of this case, defendants BSAM, Cioffi and Tannin owed fiduciary duties specifically to Barclays.

563.    In engaging in the conduct alleged herein, BSAM, Cioffi and Tannin repeatedly breached those fiduciary duties to Barclays.

564.    Bear Stearns Companies knew that BSAM, including through its officers and top managers, Cioffi and Tannin, owed specific fiduciary duties to Barclays and understood Barclays' unique position in the structure.  Bear Stearns Companies had that knowledge as a result of Spector's ongoing role in overseeing BSAM's operations and, in particular, its operation of the Enhanced Fund structure.  In addition, as the crisis developed, by May and June at the latest, other Bear Stearns Companies executives were briefed in detail about the Enhanced Fund structure and the parties whose financial commitments to that structure were at stake, including Barclays.

565.    Spector and Bear Stearns Companies aimed to guard their reputations by helping to conceal the performance problems in the Enhanced Fund, continuing the Enhanced Fund's operation, and seeking some exit strategy that might conceal forever the fraud and the failures by BSAM, Cioffi and Tannin.  Later, Bear Stearns Companies focused on the possibility of

retaining assets for itself, for investors in the High-Grade Fund, or for Feeder Fund investors in the Enhanced Fund structure, and continued to conceal information from and forsake the interests of Barclays.

566.    In overseeing and directing the conduct of BSAM, especially in May and June 2007 and later, Bearn Stearns Companies substantially aided and abetted BSAM and its managers, Cioffi and Tannin, in their breach of fiduciary duties to Barclays.  Indeed, Bear Stearns Companies itself took actions and made decisions that caused harm to Barclays.

567.    Bear Stearns Companies knowingly provided its substantial assistance in the breach of the fiduciary duties owed to Barclays.

568.    Bear Stearns Companies' conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

569.    As a direct, proximate and foreseeable result of Bear Stearns Companies' conduct, in aiding and abetting BSAM, Cioffi, and Tannin in the breach of the fiduciary duties owed to Barclays, Barclays has been damaged in an amount to be determined at trial.  As a result of Bear Stearns Companies' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

FOURTEENTH CAUSE OF ACTION

(Gross Negligence and Negligence With Regard to Barclays—as to Defendants BSAM, Cioffi, and Tannin During Management and Operation of the Structure)

570.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

571.    Defendants BSAM, Cioffi and Tannin were acting as the investment manager for the Enhanced Fund portfolio and as operators of the entire "enhanced" structure, with their

claimed professional expertise and experience. In particular, they had committed to manage the portfolio within the constraints of the Investment Guidelines and Reporting Requirements and their other representations to Barclays. Barclays, pursuant to BSAM's plan and intent, was the sole participating shareholder in the Enhanced Fund and thus had the sole direct stake in the portfolio.

572.    The particular factual circumstances of this case, as alleged in detail above, give rise to a fiduciary and special relationship between BSAM, and its managers Cioffi and Tannin, and Barclays. The relationship between BSAM and Barclays in the Enhanced Fund structure and based on all the surrounding facts is one so close as to touch the bounds of privity.

573.    BSAM, Cioffi and Tannin owed duties of care, including professional duties of care, to Barclays by virtue of BSAM's relationship with Barclays. The BSAM Defendants knew that Barclays was uniquely and specially relying on them for their expertise, their care and diligence, and their specific commitments to Barclays in managing and operating the Enhanced Fund and the "enhanced" structure, and expected Barclays to do so.

574.    BSAM, Cioffi and Tannin breached their duties of care, including, but not limited to, by taking on excessive and unpermitted risk, failing to undertake and use for Barclays' benefit the type of surveillance and monitoring they had purported to provide, failing to manage liquidity, and putting their own or other Company affiliates' interests ahead of Barclays.

575.    BSAM, Cioffi and Tannin also breached their duties of care, including, but not limited to, by failing to report the actual performance, status and value of the Enhanced Fund portfolio to Barclays on a contemporaneous basis, mismarking individual asset values, failing to inform Barclays of their inadequate hedges and failures of their hedging strategy, and failure to

inform Barclays of their efforts to sell or otherwise dispose of the Enhanced Fund because of its severe problems and systemic inadequacies.

576.    The BSAM Defendants were grossly negligent, or at a minimum negligent, toward Barclays in doing so.

577.    BSAM's, Cioffi's and Tannin's conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

578.    As a direct, proximate and foreseeable result of BSAM's, Cioffi's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of BSAM's, Cioffi's and Tannin's gross negligence, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.


## PRAYER FOR RELIEF

WHEREFORE, Barclays demands judgment and permanent relief against Defendants as follows:

(a) awarding Barclays compensatory and punitive damages in amounts to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

(b) awarding Barclays its reasonable costs and expenses incurred in this action, including, to the extent applicable, counsel fees; and

(c) awarding Barclays all such other relief as the Court deems just and proper.

## JURY DEMAND

Barclays hereby demands a trial by jury.

Dated:    April 22, 2008
          New York, New York

_____
Lawrence Byrne
Lance Croffoot-Suede
Ruth E. Harlow
Brenda D. DiLuigi
LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
(212) 903-9000 (phone)
(212) 903-9100 (fax)

Attorneys for Plaintiff, Barclays Bank PLC

**EXHIBIT A**

.



**EXHIBIT B**

Annex 2
Investment Guidelines

**Bear Stearns High-Grade Structured Credit Strategies Enhanced
Leverage Master Fund, Ltd. (the "Fund")**

1.    **General**

The Investment Manager will operate the Fund in accordance with the limits and restrictions below.

The Investment Manager will provide Barclays with risk reports of a format to be agreed; including dv01 and Net Asset Value (NAV) and leverage calculations.

The Reference Fund Administrator will provide Barclays with the necessary information to monitor these guidelines and will detail on request how this information was compiled and will assist in the verification of the information.

2.    **Investment Objectives and Strategy**

The Fund aims to seek high current income and capital appreciation relative to LIBOR.  The Fund intends to achieve its investment objective primarily through leveraged investments in investment-grade structured finance securities, although the Fund intends to seek investment opportunities beyond the structured finance asset category.  As part of its strategy, the Fund intends to gain exposure, on a non-recourse leveraged basis, to investment-grade structured finance securities by means of the purchase of the equity securities and other securities issued by structured vehicles (such as CDOs) that invest, on a leveraged or unleveraged basis, primarily in investment-grade structured finance securities, The Fund invests in floating rate assets so does not does not intend to incur any Interest Rates exposure.  The Fund does not intend to take on FX exposure.

3.    **Permitted instruments**

In order to pursue its investment strategies the Investment Manager will invest exclusively in instruments detailed below and obey all the restrictions detailed.

a)    Overriding all other criteria, instruments, which cannot be independently priced daily by the Reference Fund Administrator, are not eligible as a permitted instrument. Instruments where there is no official public price available are only eligible if the Reference Fund Administrator is able to obtain independent pricings of the instrument on a regular basis from financial counterparties.  The Investment Manager does use an internally approved pricing committee to price the Klio residual interests as discussed in the Fund's offering materials.  The Investment Manager will share the data and the assumptions with Barcap.  The Investment Manager will also provide Barcap with the underlying trustee reports for the Klio investment vehicle.

b)    Long positions in USD denominated, floating rate structured finance securities, with a particular focus on:

1)    Collateralised Debt Obligations (CDO), this includes Synthetic CDO, High Grade and High Yield CDO,

2)    Asset Backed Securities (ABS),

3)    Mortgage Backed Securities (MBS), both Commercial and Residential (CMBS and RMBS respectively),

4)    Collateralised Loan Obligations (CLO),

5)    Adjustable Rate Mortgages (ARMS),

6)    Corporate Bonds

with minimum ratings breakdowns subject to the limits detailed in Table 1, 1a, and 1b.

c)      Long positions in obligations of the United States of America, or any state thereof,

d)      Long and short positions in Credit Default Swaps (CDS) and options on CDS on securities listed in point b) above and on individual credits and (for hedging purposes) on Indices with Counterparties listed in Table 3.

e)      On an ancillary basis and for hedging purposes only, long and short positions in exchange traded Equity, Warrants and exchange traded Options on Equity Indices and Variance Swaps on Equities and Equity Indices.

f)      For hedging purposes only, long and short positions on OTC and exchange-traded Interest Rate Futures, as detailed in Table 2, with Permitted Counterparties as detailed in Table 3.

g)      For hedging purposes only, long positions in OTC and exchange-traded Options and Caps on Interest Rates Futures as detailed in Table 2, with Permitted Counterparties as detailed in Table 3.

## 4.    Leverage and exposure

a)      The overall Net Leverage of the Fund shall be no greater than 2850% of the Fund's Net Asset Value, subject to the provisions detailed in Table 1 and Table 1a below;

b)      Provided that KLIO Equity Tranches represents over 10% of NAV, then the maximum overall Net Leverage will be reduced to a maximum of 2000% of the Fund's Net Asset Value irrespective of the portfolio composition, should the KLIO Notes in the Fund's portfolio be in breach of any of the Overcollateralization Tests, as detailed in the Trustee monthly report (as detailed in Annex x "Reporting Requirements").

c)       The Fund shall not exceed interest rate risk exposure of 0.5% of the Fund's NAV.

d)      The Weighted Average Life (WAL) of the portfolio must at all times be less than 6.0 years .

e)      The Fund will only enter in Repo transactions with Permitted Repo Counterparties as detailed in Table 3 below.

## 5.    Diversification

a)      The Fund will be well diversified at all times, with a minimum of two hundred (200) positions in different issues each representing at least TBD% of the Fund's Total Assets.

b)      Maximum concentration by ratings as a % of the Fund's Total Assets as detailed in Table 1 and 1a will apply.

c)      Maximum concentration per issue as a % of the Fund's Total Assets as detailed in Table 1b will apply.

d)      The following concentration limits by asset classes will apply with respect to the assets of the Fund:

1.      CDO up to 60% of Total Assets,

2.      Synthetic corporate CDO up to 15% of Total Assets (only AAA rated issues),

3.      RMBS up to 60% of Total Assets.

4.      Synthetic ABS up to 20% of Total Assets

5.      Corporate Bonds up to 10%

## 6.    Remediation

Limits and restrictions specified in these Investment Guidelines are to be observed by the Investment Manager at all times.

Unless explicitly agreed by Barclays in advance, upon notice from Barclays to the Investment Manager any breach of any of these limits or restrictions must be remedied by the Investment Manager. Failure to initiate appropriate action to rectify the breaches within the remediation period set out below shall

constitute a Close Out Event and/or a change in the multiplier, as per the Risk Advisory Guidelines at the sole discretion of Barclays.  During such remediation periods all contractual rights and obligations of the parties remain unaffected.

The remediation period shall be five (5) calendar days from the date of notice from Barclays.

**7.     NAV Reduction Management**

Based on the daily Investment Manager estimated profit and loss, if the Fund's NAV decreases by 10% during any Observation Period, the Investment Manager will provide a detailed action plan to reduce the risk profile of the portfolio.  Any failure to do so within one business day will constitute a breach of the investment guidelines and necessitate remediation in accordance with Section 6 ("Remediation").

For the purposes of the above, "**Observation Period**" means the period, measured on any day, from the latest redemption date in the Fund to the next available redemption date in the Fund.

**Further Definitions**

"**Asset-Backed Security**" or "**ABS**" means a security that entitles the holder thereof to receive payments that depend primarily on the cash flow from, the market value of, or the credit exposure to, a specified pool of financial assets, either fixed or revolving, that by its terms convert into cash within a finite time period, together with rights or other assets designed to assure the servicing or timely distribution of proceeds to the holder of the security.

"**Adjustable Rate Mortgage Securities** " or "**ARMS**" means Mortgage-Backed Securities backed by mortgages that features predetermined adjustments of the loan interest rate at regular intervals based on an established index. The interest rate is adjusted at each interval to a rate equivalent to the index value plus a predetermined spread, or margin, over the index, usually subject to per-interval and to life-of-loan interest rate and/or payment rate caps.

"**Auto Loans**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from balances outstanding under automobile loans.

"**CMBS**" means Asset-Backed Securities (that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of commercial mortgage loans.

"**Collateralised Debt Obligation**" or "**CDO**" means an Asset-Backed Security that securitizes a diverse pool of debt assets into multiple classes of notes from the cash flows generated by such assets.

"**Credit Spread Risk**" – Definition and on-going, regular monthly information on portfolio Spread Risk to be provided by Investment Manager in the form of Manager calculated DV01 reports..

"**KLIO Notes / KLIO Equity Tranches":** CDO's issued by KLIO Funding Corp (I, II and III) where Bear Stearns Asset Management is Investment Advisor. With KLIO Equity Tranches we refer specifically to KLIO Notes which are either not rated or rated below BBB- by Standard and Poor's or equivalent.

"**NAV**" means Net Asset Value of the Fund, and is equivalent to investors' equity.

"**Net Leverage**" is defined as the total market value of the Fund's investments less the notional value of the Fund's credit default swap hedges divided by the Net Asset Value of the Fund. Short CDS are considered as long Credit positions.

"**Other ABS**" means Asset-Backed Securities other than RMBS, CMBS, CDOs, Synthetic CDOs, Credit-Card Receivables or ABS Leasing Securities.

"**Residential Mortgage Securities**" or "**RMBS**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the

servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from residential mortgage loans secured (on a first priority basis, subject to permitted liens, easements and other encumbrances) by residential real estate (single or multi-family properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used).

"**Synthetic ABS**" means short protection (long risk) Credit Derivative positions where the reference obligation is a single name Asset Backed Security.

"**Synthetic CDO**" means an Asset-Backed Security that securitizes a diverse pool of debt assets into multiple classes of notes from the cash flows generated by such assets, but which uses credit derivatives to transfer the credit risk of the reference assets from the issuer to the CDO vehicle without selling those assets.

"**Total Assets**" are defined as the total market value of the Fund's investments less the notional value of the Fund's credit default swap hedges. In order to calculate the Total Assets, short CDS positions are taken with a positive sign

 "**WAL**" means weighted average life.

**Table 1**: Maximum Net Leverage as % of NAV by ratings breakdown:

| Max Net Leverage of | Up to 2000% of NAV | Up to 2500% of NAV | Up to 2850% of NAV |
|---|---|---|---|
| Max allocation to paper rated less than BBB- (as % of NAV) | 35% | 25% | 20% |
| Minimum allocation to KLIO Equity tranches (as % of NAV) | 15% | 15% | 10% |

**Table 1a**: Minimum / Maximum aggregate exposure by Ratings as % of Total Assets

| | Limits for Maximum Net Leverage up to 2000% of NAV | | Limits for Maximum Net Leverage up to 2500% of NAV | | Limits for Maximum Net Leverage up to 2850% of NAV | |
|---|---|---|---|---|---|---|
| Ratings | Minimum % of Total Assets | Maximum % of Total Assets | Minimum % of Total Assets | Maximum % of Total Assets | Minimum % of Total Assets | Maximum % of Total Assets |
| AAA through to AA- | 75% | 100% | 85% | 100% | 95% | 100% |
| A+ through to BBB- | - | 20% | - | 15% | | 5% |
| Below BBB- or not rated | - | 3.5% | - | 2% | | 0% |

**Table 1b**: Maximum exposure to single issue by Issue Ratings

| Ratings | Max % of Total Assets | Max % as NAV |
|---|---|---|
| AAA Super Senior | 2.5% | 20% |
| AAA | 2% | 15% |

- 21 -

| AA | 1% | 5% |
| A | 0.5% | 3.75% |
| Below A- | 0.1% | 2% |

**Table 2:** Permitted Derivatives Products (Please specify which Bond Futures, and on which exchanges they are traded)

| Derivative Products | Symbol | Exchange |
| --- | --- | --- |
| UST Futures | USA,TYA,FVA etc | **CBOT** |
| CDS | ABX CMBX, IG HYVOL HYBOX Tranches off of INDEX Single Name EM Index and Single Country CDS. | OTC |
| | | |

**Table 3:** Permitted Counterparties for Repo / OTC trading (Please provide a list of the Counterparties you will trade Repos / OTC products with)

| |
| --- |
| Bear Stearns |
| Goldman Sachs |
| Banc of America |
| Cantor Fitzgerald |
| Lehman Brothers |
| Deutsche Bank |
| Merrill Lynch |
| Morgan Stanley |
| West LB |
| HSBC |
| Countrywide Securities |
| Citigroup |
| ING |
| UBS |
| Barclays Bank |
| CSFB |
| Dresdner Bank |
| Greenwich Capital |

**EXHIBIT C**

**Annex 3**
**Reporting Requirements**

1.  The Investment Manager agrees to accommodate on-site renewals of the initial due diligence of the Reference Fund and verification of the reports provided to Barclays, upon five Business Days notice of such proposed on-site due diligence.

2.  In addition the Investment Manager will provide Barclays (by email sent to funds.monitor@barcap.com) with:

    a.  Estimated daily trading profit & loss no later than one Business Day after the end of the respective trading day for the Reference Fund;

    b.  Notice as soon as reasonably possible of any change in circumstances, which might cause the final monthly NAV of the Reference Fund to show a loss in value equal to or more than 10%;

    c.  Monthly Trustee Reports on any Asset Backed product Bear Stearns Asset Management Inc. acts as Investment Advisor included in the Reference Fund, including portfolio profile test summary;

    d.  Reports comparing the Reference Fund portfolio with the Investment Guidelines on a weekly basis; and

    e.  Full investment positions reports on a weekly basis in Microsoft EXCEL format.

    f.  Weekly pricing sheets detailing the sources of the marks of the various underlying products.

3.  In addition the Reference Fund Administrator will provide Barclays with:

    a.  Estimated monthly net asset values for the Reference Fund no later than twelve Business Days following the end of each calendar month.  If the Final Report is not ready by the 15th Business Day, the Investment Manager will highlight the missing marks and will report the reason for the missing marks.

## CERTIFICATE OF SERVICE

I, Brenda D. DiLuigi, an attorney duly admitted to practice law before this Court, certify under penalty of perjury that on April 22, 2008, I caused a true copy of the foregoing Amended Complaint to be served via First Class mail upon each of the following attorneys:

Charles C. Platt
Robert Trenchard
Anne Small
WILMER CUTLER PICKERING HALE AND DORR LLP
399 Park Avenue
New York, New York 10022

Nina Beattie
Theresa Trzaskoma
BRUNE & RICHARD LLP
80 Broad Street, 30th Floor
New York, New York 10004

Edward J. M. Little
Jason A. Masimore
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004

Dated: April 22, 2008
        New York, New York

_____
Brenda D. DiLuigi