**OFFICE COPY**

Lawrence Byrne
Lance Croffoot-Suede
Ruth E. Harlow
Brenda D. DiLuigi
LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
Tel: (212) 903-9000
Fax: (212) 903-9100

Attorneys for Plaintiff, Barclays Bank PLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



----------------------------------------x

BARCLAYS BANK PLC,

                Plaintiff,

         v.

BEAR STEARNS ASSET MANAGEMENT INC.,
RALPH CIOFFI, MATTHEW TANNIN, BEAR,
STEARNS & CO. INC., and THE BEAR
STEARNS COMPANIES INC.,

                Defendants.

----------------------------------------x

Case No. 07 Civ. 11400 (LAP)

JURY TRIAL DEMANDED

### THIRD AMENDED COMPLAINT

Plaintiff, Barclays Bank PLC ("Barclays"), brings this action against Bear Stearns Asset

Management Inc. ("BSAM"), Ralph Cioffi, Matthew Tannin (collectively, the three "BSAM

Defendants"), Bear, Stearns & Co. Inc. ("Bear Stearns"), and The Bear Stearns Companies Inc.

("Bear Stearns Companies" or the "Company").

## I.    SUMMARY OF THE ACTION

1.    This action arises from one of the most high-profile and shocking hedge fund

failures in the last decade: In a matter of days in June 2007, Bear Stearns Companies' and

BSAM's reputation as one of the premier credit investment franchises on Wall Street collapsed along with two BSAM hedge funds that at one time held approximately $20 billion in assets.

2.    The then-chief executive of Bear Stearns Companies, James Cayne, admitted that with the funds' demise the Company's carefully-honed reputation for sound risk management and prudent investing suffered a "body blow of massive proportion."

3.    At BSAM's request, Barclays had played a unique role in the structure that BSAM created to house and operate one of those funds, the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. (the "Enhanced Fund").  Barclays provided leverage and liquidity to the structure and became the sole participating shareholder in – and thus had the sole direct economic exposure to – the master Enhanced Fund.  Through the wrongdoing alleged herein, the defendants caused Barclays to lose hundreds of millions of dollars.

4.    Defendant BSAM not only established the structure at issue but also served as the investment manager for the Enhanced Fund, among many other roles described below. Defendants Ralph Cioffi, the Senior Portfolio Manager who led BSAM's High-Grade Structured Credit Strategies group, and Matthew Tannin, that group's Chief Operating Officer, were responsible for BSAM's creation and operation of the structure, its management of the Enhanced Fund, and its negotiations and communications with Barclays.

5.    Barclays now knows that from March 2006 into at least mid-June 2007, the BSAM Defendants deceived Barclays through a series of targeted misrepresentations *first*, to secure Barclays' provision of its initial leverage for and then its growing financial stake in the "enhanced" fund structure; *second*, to secure a doubling of Barclays' economic commitment to the structure in March 2007; and *third*, to deceive Barclays – and keep it in place as the critical

leverage counterparty and sole participating shareholder – with ongoing positive reports about the Enhanced Fund's performance, even into mid-June 2007, until Barclays' losses had snowballed. While BSAM and Tannin were typically the direct communicators with Barclays, Cioffi knew of all their deception; he directed and approved their statements and conduct toward Barclays. The BSAM Defendants continued their misrepresentations until the Enhanced Fund had entirely collapsed.

6.     The BSAM Defendants' misstatements and failures of disclosure included hiding their cavalier and illegal approach to self-dealing transactions; knowingly mis-marking assets and net asset value ("NAV") of the Enhanced Fund; misrepresenting their supposed capabilities to monitor the risks in the structure and then calibrate Barclays' exposure accordingly; and misrepresenting the investment restrictions and reporting obligations that BSAM supposedly intended to follow solely for Barclays' benefit. Perhaps most harmfully, the BSAM Defendants' hid the failures of their complex, proprietary investment and hedging strategies from Barclays for months, and hid their inability to manage liquidity pressures in the BSAM high-grade structured credit investment structures from Barclays even longer.

7.     If the BSAM Defendants had not made numerous material misrepresentations to secure Barclays' participation in the structure, Barclays never would have played the role it did. If, as required, the BSAM Defendants had later disclosed the real values, real performance, impermissible portfolio composition, and failing strategies of the Enhanced Fund structure to Barclays as they occurred, Barclays would have avoided the losses caused by the defendants by terminating its participation in the structure.

8.     The deceptions by BSAM, Cioffi, and Tannin were so extreme as to include these examples:

i. BSAM reported the Enhanced Fund's performance for certain months as positive or slightly negative, and long hid from Barclays that in reality the fund's value had instead diminished by 11% or **38%** during those months. BSAM failed to provide Barclays, as required, with advance warning so that it could react to any anticipated decrease of more than 10% by terminating its participation in the structure.

ii. BSAM continued to supply positive performance reports to Barclays and engage in transactions that increased risk in the fund at the same time Cioffi and Tannin were admitting internally that their systems did not work, discussing the impending "wipe out" of the fund, and trying to deceive an outside buyer (one candidate was the private equity firm Cerberus) to come in and buy all of their operations before the "wipe out" occurred.

iii. Cioffi extracted his personal $2,000,000 investment from the Enhanced Fund structure in March 2007 – at the same time that the BSAM Defendants convinced Barclays to double its investment – due to the performance problems that were not revealed to Barclays or other outsiders until much later.

9.    Moreover, once the Enhanced Fund structure was established and Barclays had undertaken its dependent role within BSAM's structure, the BSAM Defendants owed fiduciary and other special duties to Barclays. But instead of satisfying those duties and protecting Barclays' interests, BSAM, Cioffi and Tannin acted to serve their own goals and, together with Bear Stearns and Bear Stearns Companies, abandoned the BSAM Defendants' obligations to Barclays.

10.    In late June 2007, the Securities and Exchange Commission ("SEC") opened an inquiry into BSAM's long-after-the-fact revisions to the Enhanced Fund's performance reports, Cioffi's and Tannin's pricing practices, and their other fraudulent practices. By October, federal prosecutors in the Eastern District of New York had opened a criminal investigation into the collapse of both BSAM hedge funds. (The other collapsed master fund was the Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (the "High-Grade Fund").)

11.    On June 18, 2008, a grand jury empanelled in the Eastern District returned a criminal indictment against Cioffi and Tannin, charging them with securities fraud, wire fraud,

4

and conspiracy to commit securities fraud and wire fraud in connection with their work on the Enhanced Fund and the High-Grade Fund. The indictment describes Cioffi and Tannin, for months' prior to the funds' demise, intentionally concealing the funds' extreme performance and liquidity problems in order to deceive investors to contribute more capital to the funds and simultaneously forestall investor withdrawals.

12.     The grand jury also charged Cioffi with insider trading, based on his undisclosed $2,000,000 withdrawal of his own investment in the Enhanced Fund, at the same time as Cioffi and Tannin were urging others – including Barclays – to commit more money to that fund. The indictment also details Tannin's contemporaneous misrepresentations to investors that he was personally adding to his stake in the Enhanced Fund.

13.     The indictment reflects a finding of probable cause by the grand jury for the charges against Cioffi and Tannin, based on the presentation of witnesses and other evidence to that jury. A certified copy of the indictment is attached hereto as Exhibit D and incorporated by reference herein.

14.     The federal prosecution is ongoing, and *Business Week* reports that superseding indictments, charging additional instances of criminal fraud, also may issue.

15.     On June 19, 2008, the SEC filed its complaint in the Eastern District, setting forth detailed allegations of securities fraud against Cioffi and Tannin. A certified copy of the SEC complaint is attached hereto as Exhibit E and incorporated by reference herein.

16.     The SEC, as a result of its year-long investigation, charges that, among other wrongdoing, Cioffi and Tannin, without notifying investors, (i) took on more and indiscriminate risk in the Enhanced Fund and the High-Grade Fund; (ii) hid from investors the extent of the funds' sub-prime mortgage exposure by their use of misleading asset categories and erroneous

fund reports; (iii) deceived Barclays (referred to as "Bank No. 1") and others about the Enhanced

Fund's February 2007 performance and the effectiveness of its hedging strategy in order to

convince Barclays and others to commit more cash to the fund in March; (iv) repeatedly

misrepresented fund performance and NAV, in part by relying on stale marks for individual

assets; and (v) failed to disclose to investors their concerns that the Enhanced Fund should be

liquidated and was in danger of collapse.

17.     Like the criminal indictment, the SEC complaint juxtaposes Cioffi's and Tannin's

positive statements to investors – including Barclays – with their negative statements within

BSAM about their failures and the funds' troubles to evidence their array of deceptions of

investors while operating the Enhanced Fund and High-Grade Fund structures.

18.     The SEC complaint and the indictment also note that Cioffi's and Tannin's

records from the most critical phase of the fraud were not turned over to the SEC in response to

its June 2007 request for the production of relevant documents.  As the SEC recounts, Cioffi

used notebooks to record work concerning the funds, but his notebooks from January 2007

through mid-June 2007 have not been produced.  Similarly, Tannin used a "TabletPC" to record

his notes during that period (which was never synchronized with any computer at BSAM), and

the TabletPC is now missing.

19.     A number of state agencies also have initiated investigations into and/or actions

regarding the funds' collapse and the BSAM Defendants' conduct.  On November 14, 2007, the

Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts (the

"Massachusetts Securities Division") filed an administrative complaint, Docket No. E-2007-

0064 (the "Massachusetts Complaint"), against BSAM alleging violations of the Massachusetts

Uniform Securities Act.  The Massachusetts Complaint recounts BSAM's failure to obtain

approval from unaffiliated directors for numerous related-party transactions; its violation, therefore, of Section 206(3) of the federal Investment Advisers Act of 1940 and of representations in fund offering materials; and BSAM's failure to disclose to investors in both the High-Grade and the Enhanced Fund structures that it was not seeking and would not obtain the required approval.

20.     The Massachusetts Complaint attaches documents which establish that hundreds of related-party "principal transactions" were processed without prior approval.  According to the complaint and those documents, 78.95% of 342 principal transactions that took place in 2006 were not properly approved by unaffiliated directors.

21.     But the fraud in this case was not limited to the BSAM Defendants.  In addition, in certain important instances, the BSAM Defendants combined forces with Bear Stearns to prolong the cover-up of the BSAM funds' performance problems and then to pass risks, and especially risky assets, on to others.  When Bear Stearns aided BSAM in these instances, Bear Stearns knew of the Enhanced Fund's struggling operations and falling asset values, Barclays' unique role in the Enhanced Fund structure, and the BSAM Defendants' duties toward Barclays.

22.     For example, BSAM, Cioffi, and Bear Stearns worked together to make more money for themselves, pass along risk to new groups of investors, and raise the Enhanced Fund's and the High-Grade Fund's supposed "marked to market" value by establishing Everquest Financial Ltd. ("Everquest") and then launching an initial public offering ("IPO").  Bear Stearns was the underwriter for the planned IPO.  Cioffi was the co-leader of Everquest.  In May 2007, Everquest and Bear Stearns filed a preliminary S-1 registration statement with the SEC.

23.     Their Everquest plan collapsed along with the two BSAM funds in June 2007, however, amid outrage that Bear Stearns would take troubled assets from the two funds, package

them as Everquest, and then attempt to foist investment in those shaky assets onto the public in an IPO. As a result of the defendants' actions, the Enhanced Fund still owned shares in Everquest into July 2007 and Barclays has been harmed by the faulty underlying Everquest investments.

24.     From at least May 2007, executives of Bear Stearns Companies also actively participated in BSAM's operation of the Enhanced Fund structure and made important decisions with regard to transactions involving the structure and purported efforts to stabilize it. As the Enhanced Fund's liquidity crisis deepened, Bear Stearns Companies' co-President at the time, Warren Spector, worked with BSAM to try to sell its operations to Cerberus. With other Company executives, he also made the decision in June 2007 that the parent company would provide financing to attempt to "save the less leveraged fund" – the High-Grade Fund – that according to Spector had "better quality assets," but would "let the other fund collapse," as reported by the *Wall Street Journal*.

25.     This decision to sacrifice the Enhanced Fund structure led to further asset destruction in its portfolio, through even more urgent counterparty deals and fire-sales of the underlying assets, as described below. The defendants instead could have avoided such fire-sales and abided by BSAM's commitments and duties to Barclays.

26.     By the beginning of August 2007, Spector was forced to resign because of his fault in the unraveling of the Enhanced Fund. *The New York Times* explained that Spector's position became "untenable." During the critical time period, "[n]ot only did [BSAM's] asset management business report to him but he also had direct responsibility over the risk controls that were in place there."

27.    Because of the wrongdoing pled in this Complaint, Barclays sues BSAM, Cioffi, and Tannin for fraud and misrepresentation; for fraudulent concealment and breach of their duties to disclose owed specifically to Barclays; and for gross negligence, negligence and breach of their fiduciary duties owed specifically to Barclays after the Enhanced Fund structure was established.  Barclays also sues BSAM for promissory estoppel; Bear Stearns for aiding or conspiring with the BSAM Defendants to hide the Enhanced Fund's failing performance and for aiding BSAM to serve interests other than Barclays'; and Bear Stearns Companies for aiding or conspiring with BSAM to hide material facts from Barclays, and for aiding BSAM in its breach of duties to Barclays, especially during May and June 2007, including the Company's role in triggering the complete collapse of the Enhanced Fund in a manner that caused further losses uniquely to Barclays.

28.    While certain relevant structured-credit markets were turbulent during the first half of 2007, and a full-blown credit crisis exploded shortly after the BSAM funds' collapse, Barclays' losses in this case were caused by the defendants' tortious actions.  Each and every one of the defendants' material misrepresentations and gross failures to protect Barclays' interests in its foundational investment in BSAM's structure, alleged herein, brought about the harm.

29.    In March 2008, Bear Stearns Companies itself was on the brink of bankruptcy. JPMorgan Chase & Co. ("JPMorgan"), in a transaction partially orchestrated by the Federal Reserve, agreed to buy Bear Stearns Companies.

30.    On May 29, 2008, Bear Stearns Companies' shareholders approved the deal with JPMorgan.  On May 30, the transaction closed.  Thus, through a merger, Bear Stearns Companies became a wholly owned subsidiary of JPMorgan, ending the Company's 85 years as an independent institution.

## II.    THE PARTIES

31.    Plaintiff, Barclays Bank PLC, is a public limited company validly existing under the laws of England and Wales.  Its principal place of business is 1 Churchill Place, London E14 5HP, England.

32.    Defendant Bear Stearns Asset Management Inc. is a corporation organized under the laws of the State of New York.  Its principal place of business is 383 Madison Avenue, New York, New York 10179.

33.    Defendant Ralph Cioffi was, at times relevant to this action, a Senior Managing Director at Bear Stearns Asset Management Inc., a member of BSAM's Board of Directors, and the Senior Portfolio Manager for the funds at issue in this case.  He was until approximately June 2007 responsible for, *inter alia*, the composition of and risk management in those funds.  Cioffi is a resident of the State of New Jersey.

34.    Defendant Matthew Tannin was, at times relevant to this action, a Senior Managing Director of Bear Stearns Asset Management Inc.  At least until approximately June 2007, Tannin was the Chief Operating Officer of the Enhanced Fund and the other BSAM-managed funds relevant to this action.  Tannin is a resident of the State of New York.

35.    The actions alleged herein by Cioffi and Tannin were taken as officers and employees of BSAM and (except Cioffi's personal insider trading in withdrawing his own money from the Enhanced Fund structure) were within the scope of their authority.  Such actions, except the personal trading, were taken on behalf of BSAM.

36.    Cioffi was Tannin's supervisor and closely oversaw Tannin's activities that are alleged in this Complaint.  Cioffi was aware of, approved of, and directed Tannin's actions, including his misrepresentations to and breaches of duties owed to Barclays.

10

37.    Defendant Bear, Stearns & Co. Inc. is a corporation organized under the laws of the State of Delaware.  It is an investment banking, securities trading, and brokerage firm.  Its principal place of business is 383 Madison Avenue, New York, New York 10179.

38.    Cioffi was registered as a broker through Bear, Stearns & Co. from August 1985 until December 2007.

39.    Tannin was registered as a broker through Bear, Stearns & Co. from August 1994 until March 2008.

40.    Defendant The Bear Stearns Companies Inc. is a corporation organized under the laws of the State of Delaware, and is the parent of wholly-owned subsidiaries BSAM and Bear, Stearns & Co. Inc.  Its principal place of business is at 383 Madison Avenue, New York, New York 10179.

41.    As of the May 30, 2008, merger, the Certificate of Merger provides that The Bear Stearns Companies Inc., now a wholly-owned subsidiary of JPMorgan, is retaining its previous name.

42.    On July 14, 2008, Plaintiff confirmed with defendant entities' counsel that The Bear Stearns Companies Inc., Bear Stearns Asset Management Inc., and Bear, Stearns & Co. Inc. each continue as a separate corporation, with BSAM and Bear Stearns remaining wholly-owned subsidiaries of Bear Stearns Companies.

43.    In addition, other than the Certificate of Merger filed with regard to Bear Stearns Companies, neither the Company, BSAM, nor Bear Stearns had filed, as of June 14, 2008, a certificate or other document with the appropriate secretary of state in the state in which the entity was incorporated to reflect a change in or dissolution of the entity's corporate structure.

## III.    JURISDICTION AND VENUE

44.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

§ 1332.  This action is between a citizen of the United Kingdom, as Plaintiff, and citizens of New

York, Delaware and New Jersey, as Defendants, and the amount in controversy exceeds $75,000.

45.    Venue is proper in the Southern District of New York because a substantial part

of the events or omissions giving rise to the claims occurred in this district.

## IV.    BACKGROUND TO THE TRANSACTION

### A.    THE COMPANY'S EXPERIENCE IN FIXED-INCOME AND MORTGAGE-BACKED SECURITIES AND THE STRUCTURED CREDIT MARKETS

46.    Bear Stearns Companies, in 2006 and 2007, constituted a leading global

investment banking, securities and derivatives trading, and financial services firm.  The umbrella

firm Bear Stearns Companies is a holding company that houses and oversees numerous

subsidiaries (collectively, the "Company"), including Bear, Stearns & Co., Inc., Bear, Stearns

Securities Corp., Bear Stearns Asset Management, EMC Mortgage Corp., Bear Stearns

Residential Mortgage Corp., and Bear Stearns Commercial Mortgage, Inc.

47.    As of 2006, the Company had long been known for its specialization and

expertise in fixed-income securities, including mortgage-backed securities, and for its

purportedly strict discipline in risk evaluation and management.

48.    *Euromoney* magazine reported that for North America as of July 2006, "Bear

Stearns has emerged as best risk management house of the year."  It explained that "Bear Stearns

is renowned as a leader in the rate risk management intensive mortgage business" and that it

"also has a strong credit derivatives business and an innovative structured products group."

49.    The 2006 Annual Report recounts that Thomson Financial ranked the Company "No. 1" for "US Mortgage-Backed Securities, US Mortgage-Backed Securities-Residential, US Whole Loans, and US Adjustable Rate Mortgages."

50.    That report further explained:

> [The Company's] mortgage franchise continues to lead the industry. We ranked number one for the third consecutive year in US mortgage-backed securities underwriting, secured the top spot in the securitization of adjustable-rate mortgages, and ranked in the top five in the global collateralized debt obligation (CDO) market. …
>
> Our vertically integrated mortgage franchise allows us access to every step of the mortgage process, including origination, securitization, distribution and servicing.

51.    For 2006, the Company's global collateralized debt obligation ("CDO") business grew by 50%. According to the Company's report,

> Our success across all sectors of the CDO market and in both European and US issuance reflects our 10-year presence in this business, combined with strong overall market growth. We are a leading underwriter of collateralized loan obligations, mezzanine asset-backed securitized debt obligations, and a range of types of CDOs, including those related to commercial mortgage-backed securities, trust preferred securities and CDOs of CDOs.

52.    Thus, by 2006, the Company was especially well-positioned to understand fully what was happening in the CDO, mortgage-backed securities and other asset-backed securities markets. Moreover, its reach from retail and commercial mortgage originator, to servicer, to securitizer and beyond gave the Company and its subsidiaries up-to-the-minute information about the nature and quality of assets going into mortgage-backed securities and into CDOs that included mortgage assets.

53.    BSAM is the asset management arm of Bear Stearns Companies and is an SEC-registered investment advisor.

54.     Until the truth of BSAM's fraud, as detailed in this Complaint, was revealed, BSAM was a market leader in the area of structured credit services and generally viewed as an expert in managing the risks of structured credit assets.

55.     Cioffi, in particular, had special expertise and deep ties to the Company's structured credit efforts.  He had been head of fixed income sales and the global product and sales manager for high-grade credit products during his first decade at Bear Stearns (1985-94). He was then involved in Bear Stearns' entry into structured credit work and was a principal force behind Bear Stearns' gaining its position as a leading underwriter and secondary trader of structured finance securities, specifically CDOs and esoteric asset-backed securities.  Cioffi created the High-Grade Fund in 2003 and built BSAM's High-Grade Structured Credit Strategies group.

56.     Like the Company as a whole, BSAM also strongly emphasized risk management. BSAM described its risk management approach as follows in a spring 2007 SEC filing:

> The proprietary and third-party surveillance systems used by BSAM were designed to ensure that all assets are reviewed real time and those showing signs of potential credit deterioration or poor performance are designated for further review.  BSAM's surveillance systems track over 80,000 securities on a daily basis and monitor the performance of all of our CDO holdings as well as perform in-depth analysis on all the underlying collateral backing such holdings.  … [This real-time system is] designed to be early warning in nature, as opposed to systems that provide alerts only after an asset begins to deteriorate.

57.     From at least 2003 through and including the spring of 2007, BSAM had a widespread reputation for this purported stringent risk management approach and for its (again, purported) uniquely-effective proprietary methods of portfolio management.

58.     At the inception of the Enhanced Fund structure in August 2006, as the *Financial Times* has reported, Cioffi "had a stellar reputation and Bear [was] a giant in the mortgage

business. … The thinking was that if anyone could clean up on rising turmoil in the mortgage market, sparked by an increase in defaults by high-risk borrowers, it would be Bear Stearns and Mr. Cioffi."

59.    Bear Stearns Securities Corp. ("BSSC"), which operates the Company's prime brokerage, also was well known for its highly regarded services to hedge funds. The BSSC prime broker provides access to margin loans, pricing information, and risk management services, in addition to holding and trading securities for its clients. BSAM used BSSC as the prime broker for the Enhanced Fund.

B.    <u>THE HIGH GRADE FUND AND ITS HIDDEN PROBLEMS</u>

60.    In March 2003, BSAM and Cioffi formed the High-Grade Fund as an investment fund that could be "compared to a specialty finance company." It would bring together a very large number of structured credit assets and produce returns for investors based on the payments that the fund received from those assets.

61.    The risks associated with structured credit assets vary according to asset class, credit rating, the nature and history of each underlying asset, and other factors.

62.    As BSAM explained to Barclays through BSAM's written materials and in the discussions between Barclays and Tannin described below, the High-Grade Fund's strategy – and a core feature of BSAM's overall structured credit strategies business model – was to select and monitor its portfolio assets in a highly informed and careful way that would manage, and hedge against, any significant risks associated with fluctuations in particular segments of the credit market, including in asset-backed securities based on sub-prime mortgages. BSAM portrayed itself, including in its eventual discussions with Barclays, as able (through its in-depth market connections and proprietary systems) to use up-to-the-minute information to contain risk and to profit from a diversified, complex array of asset-backed securities.

63.     In fact, after its 2003 inception, the High-Grade Fund became the prime engine driving BSAM's revenues.  The fund contributed approximately three-quarters of BSAM's annual revenues in 2004 and 2005, according to Derivative Fitch.

64.     By August 2006, the High-Grade Fund had reportedly enjoyed a return in excess of 36%.  As of January 2007, it reportedly had experienced no decline in 40 months and earned a cumulative return of 50%.

65.     When BSAM approached Barclays to become a part of BSAM's new, "enhanced" fund structure in 2006, BSAM's experience and history with the High-Grade Fund formed a major part of its presentations to and analysis for Barclays.  As the discussions, outlined below, progressed, Tannin and others within the High-Grade Structured Credit Strategies (known within BSAM as "BSHG") team continued to highlight that group's experience and success in operating the High-Grade Fund to convince Barclays to join BSAM's new endeavor and to place trust in BSAM.  (All references in this complaint to the BSHG team are to BSAM officers and employees – *i.e.*, a subset of BSAM acting on its behalf.  Cioffi and Tannin were the leaders of that team.)

66.     Since suffering the large losses in 2007 that triggered this suit, however, Barclays has learned that BSAM, Cioffi, and Tannin were hiding problems and disarray in the High-Grade Fund from Barclays at the time in 2006 when the Barclays' proposed participation in the Enhanced Fund structure was being negotiated.  The BSAM Defendants then continued to hide those damning facts about the High-Grade Fund and BSAM as Barclays contributed leverage and liquidity throughout the eventual, short life of the Enhanced Fund structure.

67.     The High-Grade Fund's problems were multi-faceted.  *First*, in 2004, 2005 and 2006 Cioffi and his BSHG team were failing, on a widespread basis, to secure the directors'

approvals that they had promised to secure in the High-Grade Fund's offering materials before engaging in "principal trades" between the High-Grade Fund and other Bear Stearns entities or Bear Stearns clients – trades that posed conflict of interest issues.  The Investment Advisers Act of 1940 required such consents (so-called "Principal Trade Letters" or "PTLs") and prohibited principal transactions without them.

68.     By the summer of 2006, the failure to secure timely PTLs had reached crisis proportions within BSAM.  BSAM had been neglecting this necessary step in over 50% of its principal transactions in 2005, over 75% in 2006, and had persisted in this compliance failure despite repeated warnings that it must improve.  In July of 2006, for example, BSAM staff were attempting impermissibly to secure retroactive approval for dozens of transactions that had already occurred between January and July.  As Cioffi admitted in an email to another member of the BSHG team, Joanmarie Pusateri, on August 9, 2006, "… two people did not do their jobs on PTLs and BSAM did not have a process to catch the late PTL's.  There is this whole uproar over PTL's and they want to make it into a big story about how we are not organized."

69.     *Second*, in or about July or August 2006, Bear Stearns was so concerned about BSAM's failure to follow the proper procedures to secure directors' approval, and thereby protect investors against conflicts of interest, that it cut off trading between Bear Stearns and BSAM.  Bear Stearns placed a moratorium on any such related-party transactions.

70.     On September 7, 2006, a member of the BSAM compliance staff, Alexander Reynolds, explained to Pusateri by email:  "our administrator gave us approval on the SAMI deal that we did with Bear.  However, after we received approval the head of Bear Stearns compliance squashed it."  Reynolds went on to state, "until further notice … no trading with Bear again."

71.     Nonetheless, Cioffi still resisted the Bear Stearns' edict.  On November 9, 2006, Pusateri emphasized to Cioffi:  "I don't like to argue with you but I was told that we are definitely not allowed any repos with Bear (PTL or not)."

72.     A moratorium on transactions with Bear Stearns lasted well into 2007.

73.     *Third*, this moratorium on transactions between the BSHG funds (including both the High-Grade and the Enhanced Funds) and Bear Stearns was imposed at a time when the High-Grade Fund was already straining with regard to liquidity – all unbeknownst to Barclays.  The moratorium greatly worsened the High-Grade Fund's liquidity situation.  Thus, the BSAM Defendants were scrambling to keep ahead of liquidity needs and were scheming, in private, to use the Enhanced Fund structure and Barclays to relieve some of the pressure on the High-Grade Fund.

74.     The moratorium on transactions with Bear Stearns hurt the BSHG funds, and in particular the funds' liquidity, in multiple ways.  As Raymond McGarrigal, a Senior Managing Director at BSAM who worked closely with Cioffi and Tannin on the BSHG team, spelled out in a September 19, 2006, email to Cioffi, Tannin and Pusateri, the termination of the Bear Stearns relationship "hurts our investors as it eliminates a repo counterparty (reducing liquidity) and eliminates a source of trading secondary CDOS," which also had implications for liquidity.  In addition, McGarrigal noted that Bear Stearns is "#1 in MBS [mortgage-backed securities] and in the top 5 of CDO issuers.  All bad for our investors" when a moratorium is in place.  BSAM caused itself to be cut off from transactions with and liquidity from a leader – its own affiliate – in markets important to its funds, because BSAM simply would not comply with important approval processes necessary to protect its investors against conflicts of interest.

75.     "Liquidity" here essentially means access to cash to meet the many cash needs of these types of hedge funds.  The funds aim to generate their return by securing a greater cash flow each month from the asset portfolio than the fund owes in interest and other borrowing costs to create such a portfolio. The funds use various kinds of borrowing, including repurchase or "repo" agreements, to invest in total assets that are far greater than the money directly contributed by investors.  The funds constantly need cash to pay interest, to meet margin requests by repo counterparties or other lenders, to pay expenses, to satisfy any investor redemptions, and to adjust the investment portfolio through new investments.

76.     A repurchase or "repo" agreement is the sale of securities coupled with an agreement by the initial holder to repurchase them at a later date.  It is similar to a secured loan with the securities as collateral to protect against default, except that in a repo arrangement legal title to the securities actually passes to the lender.  Thus, under certain margin call or default circumstances, the lender has the power to liquidate the assets and close out the agreement.

77.     Because Bear Stearns traded CDOs and most other asset-backed securities on the secondary market (though CDOs were not widely traded after issuance), Bear Stearns was an important counterparty option for sales of assets to raise cash.  In addition, repo agreements are short-term lending agreements and have to be "rolled over" or replaced frequently.  If a repo lender to a fund declines to renew the agreement or establishes a moratorium, as Bear Stearns did, the fund must find another lender or lenders to replace the liquidity that had been provided by that lender.

78.     In mid-September, in the midst of these problems, Cioffi and Tannin exchanged numerous emails discussing a "liquidity game plan."  Cioffi told Tannin in a September 17, 2006, email, "[w]hat we need to figure out is how to get the majority of our [High-Grade Fund

investors] into the enhanced fund.  That will take some time but once we do that **we have an easy liquidity source and that's Barclays**."  (Emphasis added.)

79.    Tannin responded:

> I've been working on that too.
> There are three ways to **roll our investors into Barclays** …
> 1. Force them (I'm not really serious)
> 2. A sell out and sell in.  This is sticky because it forces us to raise liquidity in [the High-Grade Fund] – and over time would increase the more illiquid investments.
> 3. We do an in-kind exchange. **The issue here is that we have to get a "real" mark on all the assets.**  I will speak to Jerry again about this.

(Emphasis added.)

80.    In addition to targeting Barclays as a perceived remedy for BSAM's failure to have appropriate liquidity options for and management in the High-Grade Fund, Tannin's email shows that BSAM was not using truthful, accurate or real marks (*i.e.*, values) for its portfolio assets as a matter of course and indicates that marks used to transfer assets between the High-Grade Fund and the Enhanced Fund would not be truthful, accurate or real marks.

81.    By September, the difficulties that had been building in the High-Grade Fund over the summer, especially its liquidity crunch, were so severe that Cioffi proposed to Tannin the idea of closing the High-Grade Fund altogether.  On September 17, 2006, Cioffi wrote Tannin in an email:  "What I was thinking was to build up 6 [months] of returns [in the Enhanced Fund] then send a letter to all the remaining investors and tell them we are closing the HGS [High-Grade] fund and ask everyone to convert to EHGS [the Enhanced Leverage Fund]."  In short, BSAM, Cioffi and Tannin were struggling behind the scenes to keep one step ahead of liquidity constraints.

82.    Against this internal backdrop, BSAM, Cioffi and Tannin formed the second, spin-off master-feeder fund structure.  The new Enhanced Fund structure, according to the

BSAM Defendants' statements to Barclays discussed in more detail below, would employ the same purported BSAM expertise, proprietary analytics, and risk controls, and be managed in a similar fashion to the High-Grade Fund, but would utilize greater leverage.

83.     But all of this turmoil in the High-Grade Fund was purposefully concealed from Barclays by BSAM, Cioffi, and Tannin.  It was occurring around the time when the transaction with Barclays closed – August 1, 2006 – and BSAM desperately needed that transaction to proceed, as explained more fully below.  The High-Grade Fund's difficulties also continued to persist when Barclays, from September 2006 through March 2007, was increasing its financial stake in the Enhanced Fund structure at BSAM's request.  Yet Barclays was told neither that the High-Grade Fund was failing, nor that the BSHG team had such systemic problems that Bear Stearns had halted transacting with it.

## V.      BARCLAYS' LEVERAGE INSTRUMENT AND HEDGE TRANSACTION

84.     Bear Stearns' or BSAM's clients seeking exposure to the master Enhanced Fund's portfolio of investments could purchase interests in two new BSAM "feeder funds," the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund, L.P. and the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage (Overseas) Ltd. (collectively, the "Feeder Funds").

85.     The "enhanced leverage" for investors in the Feeder Funds came in significant part from total return swaps for which Barclays served as the counterparty.  Barclays was positioned between the Feeder Funds and the master fund in the "enhanced leverage" structure. A structural diagram is attached to and incorporated in this Complaint as Exhibit A.

86.     Barclays entered into a total return swap with each Feeder Fund, memorialized in Confirmation Nos. BL15089 and BL15090.  The swaps were constructed so that Barclays would return to each Feeder Fund the total net asset value (plus any cash) achieved by a reference

portfolio based on the Enhanced Fund *as if* both the Feeder Fund's investor assets and the notional dollar amount from Barclays had been invested in the Enhanced Fund, minus (a) the notional amount and (b) accreted interest and spread (Barclays' fee for the leverage) that would be retained by Barclays as a payment from each Feeder Fund.  On the closing and effective date of the transaction, August 1, 2006, the total notional or leverage amount for the two Feeder Funds from Barclays was $50,000,000.

87.    For Feeder Fund investors, the anticipated benefit of the total return swap was that if the Enhanced Fund assets increased in value, the Feeder Fund investors would receive from their counterparty, Barclays, their initial investment *plus* the total return on the Enhanced Fund assets as augmented by Barclays' leverage amount (and minus their fee to Barclays).

88.    The swaps were for a three-year period; but they could be terminated by Barclays throughout that period based on various termination events in the confirmation agreements and in an annexed and incorporated list of Additional Termination Events.

89.    Each swap Confirmation further provided that on its initial effective date Barclays must own shares in the Enhanced Fund equal, in their aggregate value, to the Initial Reference Portfolio Value.  The Initial Reference Portfolio Value consisted of (i) the initial aggregate investment in the swap from the Feeder Fund plus (ii) the initial notional amount committed by Barclays.

90.    To establish the new "enhanced leverage" fund structure, BSAM offered its investors in the High-Grade Fund's feeder funds the option of moving to the Enhanced Fund structure.  Indeed, in keeping with the BSAM Defendants' undisclosed strategies, BSAM, Cioffi and Tannin strongly encouraged High-Grade feeder fund investors to do so, both at inception and in the months after inception of the "enhanced" structure.

91.    Assets were transferred from the High-Grade Fund to the Enhanced Fund in proportion to the indirect interest therein of the investors who decided to move to the Enhanced Fund structure.

92.    Barclays acquired its initial shares in the Enhanced Fund because the Feeder Funds were deemed to have contributed the initial portfolio to the Enhanced Fund on Barclays' behalf through the above process.  Barclays also acquired shares through its own subscription, equal to its notional amount.

93.    By owning shares in the Enhanced Fund (the reference fund under the swaps), Barclays hedged its obligations to the Feeder Funds under the total return swaps.  This hedge investment enabled Barclays to obtain the same rate of return that it would owe Feeder Fund investors if the Enhanced Fund increased in value.

94.    The hedge by Barclays was also critical to BSAM because it made it possible for the Enhanced Leverage structure to serve BSAM's purposes.  Only by subscribing to shares in the master fund, including for the notional amount, did Barclays inject actual liquidity into the structure.  Its shares equal to the notional amount reflected cash received by the Enhanced Fund.

95.    Similarly, Barclays' ownership of its participating shares in the master fund enabled that fund to hold and own all of the assets of the Enhanced Fund portfolio.  If Barclays had redeemed those shares after the closing and not held them throughout the transaction, the fund would have been forced to pay Barclays tens or hundreds of millions of dollars by selling assets, depending on when Barclays ceased maintaining the share ownership and hedge.

96.    The Confirmations provide that when the swaps and hedge were both in place, the notional amount is treated for U.S. federal income tax purposes as "a loan from Party A [Barclays] to Party B [each Feeder Fund]."  This status of the whole transaction being treated as

a loan for U.S. tax purposes was also particularly important to BSAM, because it was advantageous to U.S. feeder fund investors.

97.     The Confirmations specifically required that Barclays have the hedge in place on the initial effective date of the swaps.  For all the reasons outlined above, both BSAM and Barclays discussed BSAM's capabilities and plans, negotiated the Investment Guidelines and the Reporting Requirements, and otherwise proceeded with the transaction contemplating that Barclays would continue to hedge its swap obligations with ownership of shares in the Enhanced Fund throughout the life of the deal.

98.     After closing the transaction and establishing the structure, BSAM served as investment manager for the Enhanced Fund, investment manager for the overseas Feeder Fund, and general partner for the U.S. Feeder Fund.

99.     BSAM also controlled the boards of directors of the overseas Feeder Fund and the master Enhanced Fund.  Three of the five directors of each were from BSAM.

100.     The Enhanced Fund is a Cayman Islands entity.  Barclays subscribed to shares from that Cayman Islands entity through a process that was devised solely for Barclays and that relied upon the fact that Barclays, as subscriber, was a non-United States entity.  Moreover, the Enhanced Fund, in the context of the subscription, specifically acknowledged that Barclays was subscribing to shares to the extent necessary to hedge and for the purpose of hedging the total return swaps.

101.     Barclays could not profit from an increase in the value of the Enhanced Fund.  Any increase in the Enhanced Fund (also the swap reference fund) would be owed correspondingly to the Feeder Fund investors.  Barclays' fee for the entire transaction came from the floating interest rate option (USD-LIBOR-LIBO) plus a spread specified in the

Confirmations.  The spread was 1.00% per annum if the leverage ratio was less than 2.5 and 1.20% per annum if it was greater than 2.5.

102.    When and if Barclays withdrew from the structure or the transaction unwound, Barclays' investment and fees would come to it first, as the money flowed out of the Enhanced Fund back through Barclays (with Barclays retaining what it was owed) and then, provided additional money remained, on to the Feeder Funds.

103.    Barclays' structural hedge through ownership of shares is distinguished from the hedging activities, as discussed below, by BSAM, Cioffi and Tannin, as investment managers, within the Enhanced Fund portfolio itself.

## VI.    THE BSAM DEFENDANTS' REPRESENTATIONS TO BARCLAYS PRIOR TO CLOSING

### A.    INITIAL REPRESENTATIONS ABOUT BSAM'S CAPABILITIES

104.    Barclays' participation in the two Feeder Fund swaps and the corresponding hedge came about after negotiations over approximately four months with BSAM.

105.    In or about early March 2006, BSAM proposed to Barclays that Barclays provide the leverage for the planned new "enhanced leverage" fund structure.

106.    Tannin invited Ram Rao and Edward Ware of Barclays to visit with him at BSAM's offices in the Bear Stearns Companies' building and have lunch.

107.    At that lunch meeting on or about March 6, 2006, Tannin described the planned new fund and the need for a leverage counterparty.

108.    Tannin emphasized to Rao and Ware that BSAM's specialties were risk management for this kind of structured credit investment fund and the assessment of the value in particular structured credit assets.  Tannin gave Rao and Ware information about the High-Grade Fund and about BSAM's overall approach to structured credit investment, and later forwarded to

them detailed written reports and spreadsheets on the High-Grade Fund.  Tannin claimed that

BSAM and "Bear Stearns" generally were the best in the field.

109.    Tannin told Rao and Ware at the initial meeting – and throughout the negotiation

of the transaction – that BSAM wanted Barclays to have comfort in entering into a leverage

counterparty role, and stressed that what was to become the Enhanced Fund would be

constructed and operated with transparency to Barclays.

110.    On or about March 22, 2006, Rao, Ware, Richard Ho, Carlo Panzeri, and Frank

Gerhard from Barclays met with Tannin and other members of BSAM's risk management and

operations staff for a lengthy due diligence meeting at BSAM.  Ho, Panzeri and Gerhard came

from London, where they are based, to New York for this meeting.  The Barclays employees also

spoke with Cioffi at the meeting.

111.    Other due diligence calls with BSAM, from its New York City offices, and

further exchange of information from BSAM to Barclays occurred in the months after this

meeting.  Barclays' team thoroughly vetted the transaction before entering into it, and gathered

all of the information from BSAM that BSAM would make available to it.

112.    During Barclays' initial investigation of the proposed structure, BSAM gave

Barclays a PowerPoint presentation that set forth "Bear Stearns High-Grade Structured Credit

Strategies" and BSAM's claimed capabilities in managing structured credit funds.  Tannin and

BSAM explained that the Enhanced Fund would be managed with the same BSHG team and the

same, then-existing methods of "investment process" and "surveillance process" discussed in the

PowerPoint slides – including the same proprietary analytics and portfolio system.

113.    In the PowerPoint presentation, in statements made to Barclays at the March 22

due diligence meeting, and in other subsequent conversations involving Tannin before Barclays

entered into the total return swaps and related hedge, BSAM emphasized its proprietary "Surveillance, Portfolio Evaluation, Analysis and Risk System" for structured credits and their underlying portfolios.

114.    According to BSAM, that system aggregated information from multiple sources and applied analytics, including Bear Stearns BondStudio and proprietary models, to keep BSAM informed about each asset's performance and stability.  In BSAM's system, BSAM and Tannin told Barclays in the PowerPoint, in the March 22 meeting, and in other communications, "Alerts and Collateral Management reports are generated every day based upon updated data from the data providers."  BSAM, and in particular Tannin and the BSHG team, further stated to Barclays in those communications that this proprietary system allowed its credit portfolio managers "to quickly identify and sell any suspect assets before credit deterioration begins or ratings downgrades occur."

115.    During the March 22 due diligence meeting, BSAM's surveillance staff demonstrated the surveillance system to Panzeri and the rest of the group from Barclays by showing them selected screens produced by the system.

116.    In describing the proposed transaction to Barclays in March and April, BSAM and Tannin repeatedly referred to "Bear Stearns" and the entire Company's expertise and information.  They told Barclays' representatives, including Ware and Panzeri, that BSAM would have access to and be backed up by the entire Company's expertise and knowledge, particularly with regard to asset pricing and risk management.  BSAM and Tannin portrayed all of these connections that the Enhanced Fund structure would have as strengths for the structure, and told Barclays those connections would benefit it.

117.    For example, Tannin told Panzeri that BSAM and "Bear Stearns" shared compliance oversight and that BSAM would operate the structure according to the Company's standards.  Similarly, Tannin told Ware that BSAM would employ and Barclays would be protected by all of the Company's expertise as "the" mortgage trading house.  In addition, the PowerPoint presented research attributed to "Bear Stearns" and to "Bear Stearns CMBS [Commercial Mortgage-Backed Securities] and CDO Research."

118.    In addition, BSAM represented in the PowerPoint and in other statements to Barclays, including by Tannin to Ware and Panzeri, that its investment process "prioritize[d] clean, new issue quality assets" and "filter[ed] out assets based upon collateral quality test performance, concentration limitations, payment frequency, maturity as well as weighted average life, and ratings."

119.    Tannin and BSAM, in the PowerPoint, in documents provided to Barclays that showed the High-Grade Fund's performance and statistics, and in discussions, emphasized the BSHG team's success with the High-Grade Fund and its stability to justify why Barclays should place confidence in BSAM.  The PowerPoint stated that, "[a]s experienced participants in this market, the portfolio managers have the knowledge, experience and resources to identify suitable assets and monitor the credit risk inherent in these assets."

120.    BSAM gave Barclays a report on the liquidity stress-testing of the High-Grade Fund as part of the information package on which Barclays' decision to participate in the Enhanced Fund structure should be based.  That document appeared to show that the High-Grade Fund responded very well and remained stable under various scenarios involving liquidity pressure.

121.    Tannin told Ware and others from Barclays in the spring and summer 2006 negotiations that the Enhanced Leverage fund planned to apply Barclays' additional leverage to even higher quality assets, by increasing the proportion of the highest rated assets in the Enhanced Fund's portfolio, than were held by the High-Grade Fund.

122.    Tannin told Ware early on in the negotiations (in March or April), and on several occasions before Barclays entered into the transaction, that BSAM's then-existing investment system allowed it, in Tannin's words, to avoid "freaked-out repo counterparty risk."  BSAM's ability to avoid and control repo counterparty risk, according to Tannin in these conversations, added stability and reduced liquidity pressures on the BSHG portfolios.  As Tannin represented to Barclays, BSAM took particular care and had innovative, BSAM-designed solutions to maintain appropriate liquidity in its BSHG portfolios.

123.    BSAM's representations to Barclays, including the PowerPoint presentation and the statements made in the initial due diligence meeting, also emphasized that BSAM used credit derivatives and "long protection" positions to hedge the underlying portfolio.  Indeed, BSAM and Tannin represented to Ware, Panzeri and others at Barclays during the negotiations that its vast access to information and analytics allowed it to be particularly adept at hedging, including with regard to credit fluctuations affecting the mortgage securities markets.

124.    In a March 28, 2006, e-mail to Rao and Ware, Tannin further explained BSAM's portfolio approach and the protections it specifically would provide Barclays in the Enhanced Fund.  He explained that the BSAM team uses two forms of leverage:

> We have "internal" leverage assets and "external" leverage assets.  Internal leverage assets are structurings or repackagings that we do where we take the high quality assets and fund them from within a structure.  This gives us pure cash flow leverage which does not have first order mark-to-market

volatility.  We also use more traditional repo and TRS [total-return-swap] leverage.

. . .  We plan to use the leverage provided by you guys to increase the proportion of EXTERNAL leverage assets.  We plan to do this because this will give you guys the comfort that you need that **we will always be able to maintain a level of liquidity that will allow us to "dial" up and down the leverage based upon market price volatility when necessary.**

(Emphasis added.)

125.    The "increase[d] proportion" of externally leveraged assets would, according to Tannin and BSAM, be the highest quality assets.

126.    Again on April 6, 2006, Tannin emphasized BSAM's transparent information flows and its ability to manage risk in the Enhanced Fund in an e-mail to Rao and Ware at Barclays:

We are more than happy to discuss with you credit and portfolio limits for the underlying portfolios as well.  This way if there is measurable CREDIT deterioration we can factor this in and reduce the leverage.

**I don't want to sound like a broken record but the value of this transaction lies in the transparency of credit information on high underlying credit quality assets.**  We have a lot of it and you can have it as often as you want.  We'll even chew it up for you and give you customized reports.  Look at the stability of the ratings in these portfolios[.]

(Emphasis added.)

127.    Based on BSAM's apparent extant expertise, capabilities, and practices, Barclays decided to proceed toward becoming the leverage counterparty and to negotiate further details of the planned transaction.  Barclays relied on the above representations and commitments from BSAM and Tannin in later closing the deal, in increasing Barclays' contributions to the structure from September 2006 through March 2007, and in participating in the structure into July 2007.

128.    Before entering into the transaction, however, Panzeri and others at Barclays not only questioned BSAM and continued to engage in due diligence, but also investigated BSAM and its stated capabilities through third party inquiries and sources.  All of the indications were that BSAM was accurately representing its capabilities and processes.

B.    THE INVESTMENT GUIDELINES AND REPORTING REQUIREMENTS

129.    Barclays' ultimate participation in the deal was contingent upon (among other things) its obtaining unique and specific commitments from BSAM about its operation of the Enhanced Fund as investment manager.  These commitments by BSAM to Barclays were designed explicitly to be greater than BSAM's commitments to the Feeder Funds' investors, and greater than BSAM's general obligations to the Enhanced Fund itself.  Thus, BSAM and Barclays continued their one-on-one discussions and negotiations also to develop these additional commitments to Barclays, as the swap counterparty and sole participating shareholder in the Enhanced Fund.

130.    From late March through July 2006, Barclays and BSAM negotiated specific investment limitations ("Investment Guidelines") and reporting commitments ("Reporting Requirements"), with which BSAM promised to comply for Barclays' unique benefit.

131.    Although Tannin was Barclays' primary contact at BSAM, he consulted with Cioffi and McGarrigal during the negotiations.  Indeed, Cioffi negotiated the leverage transaction's pricing – the details and amount of the spread over LIBOR – with Barclays.

132.    Ho at Barclays in London had primary responsibility for the transaction, which became part of Barclays' London business.  Rao and Ware, in New York, were at times the immediate points of contact for Barclays with Tannin and BSAM during the ongoing discussions.  Panzeri, in London, reviewed and assisted in the negotiation of the investment limitations and reporting commitments for Barclays.

31

133.    Tannin, on behalf of BSAM, approved the final version of the Investment Guidelines on or about July 31, 2006, the day before the closing of the deal.

134.    Each specification in the five-page Investment Guidelines, which were annexed to the Confirmations and are attached hereto as Exhibit B, was a representation and commitment by BSAM, as investment manager of the master fund and operator of the structure, that it "will operate the [Enhanced] Fund in accordance with" that specification for the benefit of Barclays.

135.    These specially-negotiated terms of the Investment Guidelines were representations and commitments regarding non-discretionary requirements that BSAM made specifically to Barclays.  These special terms were in addition to and separate from any representations made to the Feeder Fund investors or any representations made to the Enhanced Fund itself.  They specifically pertained to BSAM's role in managing and operating the Enhanced Fund structure while Barclays served as the leverage counterparty and hedged its risk through shares in the Enhanced Fund.

136.    Barclays relied on all of the representations and commitments by BSAM in Exhibit B in deciding to undertake the swaps and their hedge, in committing additional funds after the initial closing, and in continuing to participate in the transaction into July 2007.  BSAM, Cioffi, and Tannin knew that Barclays was relying on those representations and commitments, and intended that Barclays do so.

137.    In addition, each specification of the Reporting Requirements, which also were annexed to the Confirmations and are attached hereto as Exhibit C, was a representation and commitment by BSAM, as investment manager and operator of the structure, that it "will provide Barclays" with (or will cause the Enhanced Fund's administrator to provide Barclays with) the listed reports and notices.

138.    The specially-negotiated terms of the Reporting Requirements were representations and commitments regarding non-discretionary requirements that BSAM made specifically to Barclays.  These special terms were in addition to and separate from any representations made to the Feeder Fund investors or any representations made to the Enhanced Fund itself.  They specifically pertained to BSAM's role in managing and operating the Enhanced Fund structure while Barclays served as the leverage counterparty and hedged its risk through shares in the Enhanced Fund.

139.    Tannin and BSAM also confirmed BSAM's approval of the Reporting Requirements to Ware and others at Barclays shortly before the deal closed on August 1, 2006.  Indeed, Tannin represented to Panzeri and others during conversations in mid-2006 that the Reporting Requirements for the Enhanced Fund closely reflected BSAM's then-existing, internal reporting with respect to its original High-Grade Fund and thus would simply continue BSAM's current practices.  Documents, including sample reports, that BSAM and Tannin provided to Panzeri and Barclays at the time seemed to corroborate those representations.  Again, BSAM agreed to these reporting requirements to provide Barclays with personal protections greater than it provided to others.

140.    Barclays relied on all of the representations and commitments by BSAM in Exhibit C in deciding to undertake the swaps and their hedge, in contributing additional funds after the initial closing, and in continuing to participate in the transaction into July 2007.  BSAM, Cioffi, and Tannin knew that Barclays was relying on those representations and commitments, and intended that Barclays do so.

141.    High quality assets, limitations on permitted investments, and adherence to portfolio diversification requirements for the Enhanced Fund were critical to Barclays in

establishing the basis for its participation in the transaction.  The permitted investments and their concentration limitations were specifically defined in the Investment Guidelines.  In addition, Barclays' negotiations focused on ensuring that especially hard-to-price assets would be excluded from the portfolio.

142.     For example, under the Barclays-specific Investment Guidelines that BSAM represented it would follow, "[i]nstruments where there is no official public price available are only eligible if the Reference Fund Administrator is able to obtain independent pricings of the instrument on a regular basis from financial counterparties."

143.     Based on, *inter alia*, BSAM's roles in the structure, apparent expertise, vast access to relevant non-public information, purportedly effective proprietary analytic systems, and its promises of transparency, Barclays was relying on BSAM continuously to mark the portfolio assets prudently and fairly, and to do so with accurate, timely reporting to Barclays.  Various transaction documents, discussed below, also memorialized BSAM's obligation to mark the assets fairly and reasonably.  The required ability of the Reference Fund Administrator, a third-party institution, under the Investment Guidelines to price assets independently on a daily or at least regular basis was negotiated by Barclays to provide even more assurance that assets in the portfolio could and would be priced fairly on an ongoing basis, both by BSAM and the fund administrator.

144.     CDOs are issued by special purpose entities organized to buy debt collateral.  The special purpose entities bundle together and structure a portfolio of collateral – various debt assets – and then issue tranches (or groups of securities organized by class) of "CDOs" that in the higher tranches are rated by the major credit rating agencies, but in the junior tranches are unrated "equity."  CDOs often include mortgage assets in their collateral.

145.    Under the Barclays-specific Investment Guidelines, CDOs were a permitted investment, defined to include not only plain CDOs, but also Synthetic CDOs, High Grade and High Yield CDOs.  But CDOs were not defined to include CDO-squared investments, which are CDOs in which some or all of the underlying instruments are in turn other CDOs.  CDOs, as described and limited in the Investment Guidelines, were restricted to an upper limit of 60% of the portfolio assets.

146.    The Investment Guidelines required that from 75% to 100% of the total portfolio assets had to carry a AAA to AA- rating.  Below BBB- or not-rated assets could comprise at most 3.5% of the total assets.  A single issue rated below A- or unrated could not amount to more than 0.1% of total assets or more than 2% of NAV.

147.    Tannin described these "AA/AAA assets" as having "very very low volatility" in a May 1, 2006, e-mail to Ware, Rao, and Panzeri at Barclays.

148.    In that same e-mail, Tannin described to Barclays that the new "enhanced" structure would "continue to operate [as did the High-Grade Fund] in the best parts of the capital structure"; "concentrate the ultimate exposure in the highest rated floating rate kinds of assets" and "[g]enerate a prudent return for our investors which allows our portfolio managers and structuring team to concentrate on the areas in the market where there is the greatest liquidity and greatest value."

149.    The Investment Guidelines also included a list of the permitted counterparties that BSAM represented it would use to trade repo and over-the-counter ("OTC") products.  Bear Stearns was on that list.

150.    As above, Barclays relied on each of the representations and commitments described in paragraphs 141-149 in deciding to proceed initially and in continuing to participate

in the transaction, without terminating, into July 2007. BSAM, Cioffi and Tannin knew that Barclays was relying on those representations and commitments from them, and intended that Barclays do so.

151. Transparency in the portfolio's operations and in the pricing of its assets also was critical to Barclays. The Reporting Requirements specified timely, detailed reporting of various types to Barclays on a daily, weekly, and monthly basis.

152. BSAM agreed in the Reporting Requirements, for example, to provide to Barclays "[r]eports comparing the Reference Fund portfolio with the Investment Guidelines on a weekly basis"; "[f]ull investment positions reports on a weekly basis"; and "[n]otice as soon as reasonably possible of any change in circumstances, which might cause the final monthly NAV of the [Enhanced Fund] to show a loss in value equal to or more than 10%[.]"

153. BSAM further agreed that the Enhanced Fund's administrator would provide Barclays with estimated monthly NAV values "no later than twelve Business Days following the end of each calendar month."

154. The Confirmations with the Feeder Funds provided that the fund administrator was obligated to report final NAVs to Barclays on the fifteenth day following a relevant "dealing date." This dealing date under the initial Confirmations was the first day of each month; by the end of March, 2007, the dealing dates had been amended to be the third and fifteenth days of each month, with the final NAV expected on the fifteenth day following the first dealing date (*i.e.*, the third day) of the month.

155. Again, Barclays relied on each of these representations and commitments, pled in paragraphs 151-153, in deciding to proceed initially and in continuing to participate in the transaction. BSAM, Cioffi, and Tannin knew and intended that Barclays would do so.

156.    At closing, all of Barclays' information supported and Barclays reasonably believed BSAM's portrayal of itself as extremely proficient and data-rich in structured credit markets; as having proprietary models and systems that did and would continue to assess accurately portfolio values, and thus protect Barclays' financial exposure; as committed to fairness and openness in pricing and about its operations; and as being able – indeed, obligated – to warn Barclays should any significant increased risk or downward movement arise, with time for Barclays to scale down its commitment or exit the structure completely and thereby avoid loss.

C.    BARCLAYS' RELIANCE ON BSAM'S MISREPRESENTATIONS IN THE CONTEXT OF THE ENHANCED FUND TRANSACTION

157.    BSAM's, Cioffi's and Tannin's many representations to Barclays for purposes of securing Barclays' participation in the transaction, alleged above, related to the whole of the transaction – the swaps and the hedge.  Both BSAM and Barclays understood and intended that BSAM's representations constituted a necessary predicate before Barclays would participate in any part of the single, unified transaction that those two parties were discussing.

158.    The first leg of the transaction, the swaps, would not have occurred without BSAM's many representations to Barclays, including the Investment Guidelines and Reporting Requirements.  And BSAM intended Barclays to rely upon all the representations alleged above when it decided to enter into the overall transaction.  As such, the Investment Guidelines and Reporting Requirements are annexed to the Confirmations even though the specific content of those promises applies to the second leg of the transaction, namely BSAM's management and operation of the Enhanced Fund and Barclays' position as sole participating shareholder in the Enhanced Fund.

159.    BSAM's unique, foundational commitments to Barclays also are reflected in and corroborated by other documentation that relates to the structure.

160.    For example, BSAM and its counsel drafted the offering memoranda for the Feeder Funds, each of which were distributed with BSAM's name as well as the Feeder Fund's name on the cover.  BSAM gave each memorandum to Barclays for its review and intended that Barclays rely upon the memoranda to the extent that their contents applied to Barclays.  Barclays did so rely in closing the deal.

161.    The Feeder Fund offering memoranda repeatedly refer to the "investment restrictions" and "limitations" that have been negotiated separately between Barclays, the leverage counterparty, and BSAM.  Those offering memoranda reiterate that "the Investment Manager intends to adhere to such guidelines in managing the assets of the Master Fund, thereby limiting its discretion."  They also refer to Barclays' entitlement, given its special role in the transaction, to more reports on the status and performance of the master fund, and more favorable liquidity rights than Feeder Fund investors.

162.    At the same time, the memoranda make clear that there is no obligation running from BSAM to the Feeder Fund investors to comply with the special transaction terms and commitments negotiated uniquely with Barclays.  Indeed, the Feeder Fund offering memoranda describe vast discretion in the management of the Enhanced Fund and in permitted investments *vis a vis* investors other than Barclays.

163.    Similarly, BSAM represented and promised a Barclays-specific overlay of conditions and limitations to the more general Memorandum & Articles of Association ("Articles") of the Enhanced Fund that was adopted by the master fund's board of directors (a body that was in turn controlled by its three BSAM members).

164.    For example, the Barclays-specific Investment Guidelines limit permitted investments, so long as the transaction with Barclays is in place, in the Enhanced Fund to instruments that can be "independently priced daily" or at least, if there is no official public price available, to instruments where "independent pricings of the instrument on a regular basis from financial counterparties" are available.  (The Klio residual interests are the one exception.)  This "permitted instruments" provision and all the other Investment Guidelines limit the Enhanced Fund's discretion, *vis a vis* only Barclays, in ways that the Articles do not.

165.    Generally, the Articles specify that BSAM shall value the portfolio's assets "upon consultation with independent pricing services and/or using the quotes of recognized market dealers where available."  The Articles further reflect that BSAM has an obligation to use a prudent method of valuation and to provide fair values in BSAM's reports of asset valuations.

166.    Consistent with the overall, interconnected nature of the transaction, the subscription agreement between the Enhanced Fund and Barclays for the participating shares states that the "Master Fund understands, acknowledges and accepts that the Investor has entered into total return swap transactions with each of [the Feeder Funds] … and that the Investor is subscribing for Shares in order to hedge its risk" in the swaps.

167.    In addition, although the subscription agreement pertains to the narrow relationship between the master Enhanced Fund itself and Barclays, that agreement contemplates BSAM's overarching orchestration of the structure and its role as Investment Manager.  The subscription agreement explicitly references BSAM as a source of information and assurances for Barclays prior to its participation in the transaction.  That agreement specifically recounts that "the Investment Manager has answered all inquiries that the Investor has put to it relating

[to]" the "Master Fund, the Investment Manager, the actual operations of each of the foregoing, … and any other related matters."

168.    As set forth above, the Feeder Fund offering memoranda describe BSAM's intention to adhere to the Investment Guidelines and Reporting Requirements that BSAM separately negotiated with Barclays.  The offering memoranda also make numerous other representations about BSAM's operation of the structure and its conduct as investment manager of the Enhanced Fund that corroborate and parallel representations made directly from BSAM to Barclays.

169.    For example:

a.  the offering memoranda state that BSAM "will use its structuring and research experience to identify structured finance securities with fundamentally strong credit risk profiles that are priced attractively."

b.  the offering memoranda represent that the "primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund."

c.  the offering memoranda further explain that "[b]ecause each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way." The memoranda represent that BSAM will employ models, valuation tools, and analytical systems, including its own "internally constructed" systems, to carry out such quantitative monitoring of credit and other risks.

d.  according to the offering memoranda, principal trades sought to be undertaken by BSAM, as manager of the master Enhanced Fund, with BSAM, one of its Company affiliates, or

a client for which a Company affiliate was acting as broker, required examination and approval before they could take place by "the independent [Enhanced Fund] Directors" or some other advisory party established for that purpose. (No other advisory party was established.) The subscription agreement between Barclays and the master fund also required director pre-approval of principal transactions (or approval from some separate advisory party that, in fact, never existed).

e. the offering memoranda represent that funding for the operation of the Enhanced Fund, through "margin, bank lines and the repurchase markets," "may be provided by Bear Stearns [*i.e.*, Bear Stearns & Co., Inc.] or by or through an affiliate thereof." In addition, the memoranda outline that various other types of transactions may occur with Bear Stearns, including transactions that involve its underwriting or a Bear Stearns' equity or participation interest.

## VII.    DUTIES CREATED BETWEEN BSAM AND BARCLAYS

### A.    THE BSAM DEFENDANTS' FIDUCIARY RELATIONSHIP WITH BARCLAYS

170.    In bringing Barclays into the structure, BSAM solicited Barclays to enter into an ongoing, dependent relationship of trust and confidence.

171.    Barclays depended on BSAM to operate successfully the entire structure into which Barclays' ongoing role was imbedded. BSAM created each piece of the structure, drafted the offering memoranda and sought investors (with Bear Stearns), managed the Feeder Funds, controlled the board of directors of the Feeder Funds, managed the Enhanced Fund (in part through delegation to Bear Stearns Securities Corp., the prime broker, and PFPC Inc. ("PFPC"), the master fund administrator), and controlled the board of directors of the Enhanced Fund.

172.     Barclays' ability to reap its promised payments from the structure, and potentially to increase those payments through an expansion of the structure and thus a greater notional amount, depended on BSAM's use of its superior position, BSAM's sole access to its and other Bear Stearns entities' proprietary systems, the unique knowledge available from the Company's integrated mortgage and mortgage-backed securities franchise, and its operation of the entire structure in good faith, throughout the ongoing relationship.

173.     BSAM, through, among other things, Tannin's assurances and the BSHG team's emphasis on BSAM's and the Company's purported extraordinary expertise and risk management controls during the negotiations with Barclays alleged above, specifically aimed to gain Barclays' trust and confidence.  BSAM sought to convince Barclays to become enmeshed, as a continuing and dependent player, in BSAM's overall structure.  BSAM assumed responsibility at every level of the structure, and wanted Barclays to repose its confidence in BSAM.

174.     The fiduciary relationship that BSAM created with Barclays differed from other fiduciary relationships that might exist within the structure, and gave rise to Barclays-specific duties that were specifically owed to it.  These Barclays-specific duties differed from any duties BSAM owed to the funds or to other investors in the structure.

175.     For example, BSAM exercised discretion in its management of the Enhanced Fund portfolio, of which Barclays was the sole participating shareholder; and BSAM controlled the information that Barclays was given about that portfolio's composition and performance.

176.     In order to gain Barclays' trust and participation in the structure, BSAM made unique promises to Barclays about how it would manage the portfolio.  BSAM explicitly memorialized to Barclays and the Feeder Fund investors that Barclays was protected by more

limiting investment restrictions to narrow BSAM's discretion than were the Feeder Fund investors.

177.    In addition, BSAM, through the written materials, statements by Tannin, and other representations outlined above, repeatedly reassured Barclays that BSAM would have day-to-day control over the portfolio and its risks such that at any point in time leverage could be "dialed down" and at least Barclays' first-out stake protected.  Through the PowerPoint presentation, Tannin's and other members of the BSHG team's representations, and the features of the transaction, BSAM misled Barclays into believing that Barclays' special and necessary investment in the structure would be protected by an early warning system.

178.    BSAM, through Tannin and others, also told Barclays that it would benefit from BSAM's connections, information sources, and expert resources throughout the Company, and that BSAM's position within the larger Company would help – not harm – the Enhanced Fund structure.

179.    Likewise, in its subscription of shares in the Enhanced Fund, Barclays was protected in its special role in the structure in ways that other Enhanced Fund shareholders, or even Barclays, if it invested beyond the notional amount, would not be.  This was due to the Barclays-specific protections offered and put in place by BSAM.

180.    For example, the Enhanced Fund's Articles gave its directors (controlled by BSAM) broad powers to suspend redemptions of shares; but the Barclays-specific subscription to shares came with the representation that "[n]otwithstanding anything to the contrary contained in the Articles," Barclays "shall be able to redeem all or any portion of its Shares as of any Dealing Date … coincident with, decreases in the notional amount of the Leverage Instrument."  In contrast, a "request … [for] redemption of Shares that is not made in connection with the

Investor's hedging activities under the Leverage Instrument will be subject to the terms of the Articles, including all conditions and restrictions."

181.    Similarly, BSAM made unique commitments to Barclays, through the Reporting Requirements and many other representations pled above, that Barclays would have more access to information than any other party in the structure and that it would be informed about what was taking place within the structure contemporaneously.

182.    When BSAM provided reports to Barclays on the portfolio or performance of the Enhanced Fund, those reports were sent solely to Barclays and came directly from BSAM.  They reflected BSAM's clear understanding that Barclays was entitled to special reporting from it, and that Barclays would rely upon that reporting in assessing its continued participation in the structure.  (In contrast, less frequent and less detailed reports came from PFPC, the fund administrator, to Barclays.  Even with regard to those reports, however, as detailed below, BSAM in fact controlled when PFPC would release the reports and what PFPC would say.)

183.    In addition, the type of asset portfolio and hedge fund that formed the basis for the Enhanced Fund structure made Barclays dependent upon BSAM's expertise, its superior knowledge of the particular assets and positions in the fund, and its superior access to information about those holdings and the fund's strategies.  Extensive non-public information that BSAM possessed, its proprietary investment systems and trading details, and the terms of its private repurchase agreements and other agreements with counterparties, all had to be brought to bear in order to determine and understand in detail the fund's status in terms of liquidity and performance – and all of that information in BSAM's possession was not readily accessible to Barclays.

184.    For both the High-Grade Fund and the Enhanced Fund, confidential or proprietary information about BSAM's systems and strategies, or about its private agreements or relationships with other parties, was not available to Barclays.

185.    Once established, moreover, the Enhanced Fund portfolio – like the High-Grade portfolio – always included **over 1,000 different positions** (and often over 2,000 different positions at any given time).  Of the long investment positions, only approximately one-fourth of those positions correspond to security "cusip" numbers that are referenced in the Bloomberg information system.  Even for those securities that are available in Bloomberg, only summary information and a lack of real-time pricing characterizes those Bloomberg listings.  The issuance and trading of such positions generates no or very little accessible information available to the marketplace at large.  In addition, most of the long positions in the portfolio constitute CDOs and other asset-backed securities that are each created out of a large basket of underlying assets.

186.    There is no public exchange or daily active market that provides prices for most CDOs and other similar assets.  Accordingly, these positions must be priced through individual inquiries to financial counterparties or dealers, and/or through the application of complex models (which often require knowledge of the underlying assets and their performance).

187.    Each asset-backed security's valuation depends upon the status and value of its underlying assets.  Thus, as BSAM stated that its practices and systems did, all those underlying assets would have to be monitored by BSAM to manage the credit risk and liquidity needs of each asset-backed security in the portfolio and accurately assess its performance.  Given the nature of the Enhanced Fund portfolio, thousands upon thousands of assets needed to be monitored through BSAM's purportedly especially wide-ranging sources of information and sophisticated proprietary systems.

188.    In addition, a portfolio list of positions in the Enhanced Fund structure did not reveal the details or strategies of BSAM's multiple hedging and management techniques.  BSAM stated that it employed interest rate and credit hedges and other complex risk management tools; but only BSAM knew the specifics of its strategies as they were occurring.  As BSAM said in the Feeder Fund offering memoranda, "[t]he specific details of [its] investment program are proprietary."  Consequently, Barclays, the Feeder Fund investors and other outsiders would "not be able to determine the full details of those methods, or whether those methods are being followed."

189.    Indeed, it is the very nature of a hedge fund that its strategies and systems are closely guarded secrets, and that the creators of a hedge fund structure such as the BSHG team would not reveal enough to enable an investor like Barclays or another outsider to duplicate or understand its formulas, strategies or trading methods.

190.    Because both Barclays and BSAM understood that Barclays would be dependent on BSAM to carry out the discretionary portfolio management and the intensive monitoring described above, they agreed to Barclays-specific parameters for the portfolio that would limit, but not remove, that discretion and to various types of overview reporting that would go specially to Barclays.

191.    Both BSAM and Barclays well understood, however, from the massive and specialized nature of the undertaking, that neither Barclays nor any other sophisticated bank that might have played the role of leverage counterparty, given that limited role, had the information, resources, or particular proprietary systems available to duplicate BSAM's efforts as the creator, operator and manager of this particular investment structure.  Barclays was necessarily in a dependent position to BSAM in this transaction and ongoing structure (though in a preferential

position *vis a vis* Feeder Fund investors).  BSAM sought Barclays' trust and confidence for that reason.

192.    Cioffi and Tannin had knowledge of every detail of the Enhanced Fund structure and orchestrated Barclays place in it.  They were at all times aware of Barclays' subordinate position that necessarily placed trust in BSAM.

193.    Based on the many factual details and nature of the relationship between BSAM and Barclays outlined above, BSAM and its managers Cioffi and Tannin owed Barclays fiduciary duties of care, fairness, good faith, and loyalty in managing the structure and portfolio consistent with Barclays' interests.  BSAM, Cioffi and Tannin also owed Barclays fiduciary duties of disclosure, honesty, and accuracy in keeping Barclays apprised of the status and performance of the portfolio, its assets, and the structure as a whole.

B.    THE BSAM DEFENDANTS' DUTIES TO DISCLOSE, TO UPDATE AND TO CORRECT

194.    Because of their fiduciary relationship with Barclays, the BSAM Defendants owed Barclays duties of disclosure, on an ongoing basis.

195.    In addition, the BSAM Defendants owed Barclays duties of disclosure because BSAM, through its documents and reports and through Tannin's statements, provided half-truths, partial and ambiguous statements, and other statements that required clarification – in addition to the BSAM Defendants' wholly false representations.  BSAM, Cioffi and Tannin used these misleading statements to conceal from Barclays material, compromising information about their actions with regard to the Enhanced Fund structure.

196.    For example, the BSAM Defendants used the High-Grade Fund and their experience with it as a selling point for Barclays, and highlighted in particular their experience with risk management and a strict compliance approach.  BSAM provided detailed

representations about protections and procedures with regard to principal transactions, telling Barclays that it would have the same review process and the same board of directors as reviewers that were supposedly operating in the High-Grade Fund. Yet the BSAM Defendants failed to disclose that Cioffi, Tannin and the other members of the BSHG team had failed to seek and obtain the required pre-approval for principal, self-dealing transactions from the High-Grade Fund's board of directors for hundreds of transactions over a span of years. They failed to disclose this even though each knew Barclays was relying on their supposed risk management and compliance expertise to execute the transaction and then to increase Barclays' financial commitment to the structure.

197.    BSAM, Cioffi and Tannin also had described their team as especially attuned to liquidity issues, including the risks associated with repo agreements, and had maintained throughout the negotiations for the Enhanced Fund transaction with Barclays that the BSHG methods produced very stable and prudent funds, including with regard to liquidity management. The BSAM Defendants knew this was important for Barclays, but they failed to notify Barclays of or explain the developing liquidity squeeze in the High-Grade Fund.

198.    Likewise, the Investment Guidelines negotiated with Barclays listed Bear Stearns as a permitted counterparty for repo agreements and OTC products. But Bear Stearns could not be a counterparty when the Enhanced Fund structure began operations, because Bear Stearns had imposed a moratorium on transactions with the BSHG team. BSAM, Cioffi and Tannin made no mention of that moratorium – a result of their extreme failures of proper procedure – to Barclays, despite their own knowledge at the time that the moratorium was material and harmful to both of the BSHG fund structures.

199.    Additional examples of partial disclosures that triggered an obligation of full disclosure on the part of each of the BSAM Defendants are alleged throughout this complaint, including in sections IX and XI.

200.    BSAM also had duties of disclosure to Barclays based on BSAM's superior access to and knowledge of material information, together with BSAM's awareness that Barclays was relying on information that excluded the material information.

201.    For example, as Barclays' participation in the Enhanced Fund structure was being negotiated, the BSAM Defendants knew that Barclays was unaware that the Enhanced Fund was part of their "liquidity game plan" to remedy the High-Grade Fund's liquidity problems. BSAM, Cioffi and Tannin consistently portrayed the High-Grade Fund to Barclays as a stable and consistent success that would continue. The BSAM Defendants failed to tell Barclays of their need to transition investors out of the High-Grade Fund.

202.    Other examples of failures to disclose superior and material knowledge on the part of each of the BSAM Defendants are alleged throughout this complaint, including in sections IX through XI.

203.    Furthermore, BSAM had duties to update information that it gave to Barclays and that became misleading as events progressed. BSAM, through Tannin, Cioffi and the BSHG team, knew that Barclays was relying on its statements and reports to make ongoing decisions with regard to the structure and to monitor its stake in the structure. Yet BSAM failed to correct statements that might arguably have been accurate, or at least partially accurate, when made, but that quickly became misleading and were rendered false. Examples of the failure to update are also included below.

204.    If Barclays had known about the significant compliance and management difficulties within the High-Grade Fund and the BSAM Defendants' ulterior motive – *i.e.*, save the High-Grade Fund and use Barclays' "easy" liquidity to do so – for establishing and then increasing Barclays' leverage commitment to the Enhanced Fund, Barclays would not have initially entered into the transaction or continued to invest in the structure.  As the transaction progressed, Barclays would have terminated its participation if BSAM had revealed that it could not actually manage the liquidity needs in the BSHG funds and was instead simply seeking more and more lending or other sources of cash to attempt to keep ahead of liquidity pressures – a Ponzi-like strategy.

## VIII.    THE ENHANCED FUND STRUCTURE DURING ITS FIRST SIX MONTHS

### A.    BSAM REASSURED BARCLAYS DURING "RAMPING UP" PERIOD

205.    After the total return swaps closed on August 1, 2006, and Barclays simultaneously subscribed to shares, BSAM did not institute reporting that complied with its representations and commitments.  Barclays repeatedly requested BSAM to do so.

206.    BSAM, Tannin and Robert Ervin, another BSAM employee, continually affirmed to Barclays during the ensuing months that BSAM remained committed to meeting all the Reporting Requirements and to providing "whatever" (in the words of Tannin to Ware and others) Barclays needed with regard to portfolio information.

207.    Panzeri and Angus McIsaac of Barclays' risk-management department in London began a long process of attempting to get adequate reports, repeatedly following up with BSAM to work toward the proper reporting and to obtain what Barclays had been promised from BSAM.

208.    Panzeri and McIsaac gradually extracted more reporting from BSAM, after an initial "ramping up" period, but continued to push for more adequate compliance with the

Reporting Requirements as 2007 began.  (Likewise, in 2007 the types and frequency of reporting improved to some degree; and further assurances were given by Tannin to Panzeri, McIsaac and others at Barclays that BSAM remained intent on satisfying its reporting and other obligations.)

B.    BARCLAYS' EXPANDING FINANCIAL COMMITMENT
       THROUGH JANUARY 2007

209.    When the transaction closed on August 1, 2006, and the Enhanced Fund structure began functioning, Barclays' total notional amount, by adding that specified in both Confirmations, was $50,000,000.  The maximum notional amount was $100,000,000.  Barclays' committed notional amount was "50% of the Maximum Notional Amount, subject to a minimum at all times" of $50,000,000.

210.    BSAM and Barclays entered into the transaction anticipating that the maximum notional or leverage amount would increase periodically, subject to Barclays' approval at the time BSAM requested an increase.  Any increase in the maximum amount of leverage from Barclays would then be reflected in amendments to the Confirmations.  Likewise, the committed notional amount could be and was amended periodically through the same process.

211.    On September 15, 2006, at BSAM's request, Barclays and the Feeder Funds signed amendments to the Confirmations that raised the maximum notional amount to $150,000,000.  The amendments changed the committed notional amount to a minimum of $75,000,000.  At the same time, BSAM caused the structure to draw down an additional $25,000,000 to increase Barclays' notional total and actual financial investment by that amount, reaching $75,000,000.

212.    On October 24, 2006, at BSAM's request, Barclays and the Feeder Funds signed amendments to the Confirmations that raised the maximum notional amount to $300,000,000.  The amendments changed the committed notional amount to a minimum of $150,000,000.  At

the same time, BSAM caused the structure to draw down an additional $75,000,000 to increase Barclays' notional total and actual financial investment by that amount, reaching $150,000,000.

213.    On December 1, 2006, at BSAM's request, Barclays and the Feeder Funds signed amendments to the Confirmations that raised the maximum notional amount to $550,000,000. The amendments changed the committed notional amount to a minimum of $275,000,000.  At the same time, the structure drew down an additional $125,000,000 to increase Barclays' notional total and actual financial investment by that amount, reaching $275,000,000.

214.    On January 16, 2007, BSAM and the Feeder Funds reduced the notional total and Barclays' stake by $75,000,000, apparently as a temporary measure to attempt to reduce briefly the carrying cost of the leverage.

215.    Thus, as of the beginning of February 2007, BSAM had secured an investment of $200,000,000 from Barclays for leverage and liquidity in the structure.  In addition, the monthly interest owed to Barclays had accumulated to a total of approximately $4,670,000.  The maximum notional amount continued to stand at $550,000,000.

C.    THE SCIENTER OF EACH OF THE BSAM DEFENDANTS PRIOR TO CLOSING THROUGH JANUARY 2007

216.    The necessary scienter for fraud on the part of each of the BSAM Defendants is apparent in this case both from facts that establish motive and opportunity, and from facts that show conscious misbehavior or deception.

217.    BSAM, Cioffi and Tannin had multiple motives to mislead Barclays as BSAM solicited Barclays' participation in the structure and then built up its leverage from Barclays over the first months of the structure's existence.

218.    *First*, as described in detail above, the BSHG team was being squeezed by the liquidity needs of the High-Grade Fund, especially after the Bear Stearns trading moratorium

became a possibility and then a reality.  Each of the BSAM Defendants were motivated to mislead Barclays through all the misrepresentations and failures of disclosure specified above because they needed the Enhanced Fund transaction to close, Barclays' liquidity to pour in, and their difficulties in the High-Grade Fund to remain secret.  The Enhanced Fund, through BSAM's movement of assets and investors into that structure and the addition of Barclays, was critical to the BSAM Defendants' "game plan" for the temporary revival and then eventual closure of the High-Grade Fund.

219.    *Second*, BSAM, Cioffi and Tannin had been heralding the coming "enhanced" fund structure to potential Feeder Fund investors and other market participants for many months.  When BSAM first approached Barclays, BSAM had wanted the transaction to close in April.  By June, BSAM was distributing Feeder Fund offering memoranda that made detailed representations about Barclays serving as the leverage instrument counterparty, even though the final details of the transaction had not yet been agreed upon.  (After discussing the potential transaction with a number of banks, Barclays had emerged as BSAM's strongest prospect for the deal.)

220.    As the summer of 2006 progressed, BSAM, Cioffi, and Tannin became more anxious to make good on their promises in the marketplace of an "enhanced" structure with Barclays as an important participant.  The Enhanced Fund was to accomplish a doubling of BSAM's "marquee" structured credit strategies fund franchise and further burnish BSAM's reputation.  The opposite would occur if the Enhanced Fund failed to launch.  A failure to launch also would increase the risk that the High-Grade Fund's problems quickly would be exposed.

221.    *Third*, BSAM stood to gain financially from moving investors in the High-Grade Fund to the Enhanced Fund.  For investors who bought shares in the High-Grade feeder funds in

2003 and most of 2004, the Advisory Fee paid to BSAM equaled approximately one percent of the net asset value per year, calculated monthly and paid quarterly. Investors in the Enhanced Fund would pay two percent of the net asset value per year for this Advisory Fee, calculated in the same manner. Thus, by moving the initial and other early investors in the High-Grade Fund to the Enhanced Fund, BSAM could double its advisory income for those investments.

222.    Cioffi and Tannin also stood to gain individually in their own prestige and compensation, and to preserve their reputations as successful managers. As the SEC complaint explains, BSAM split the management or advisory fee and the incentive fee 50/50 with Cioffi; by increasing those fees through the formation of the Enhanced Fund, Cioffi would see his eight-figure annual bonuses increase. And Cioffi rewarded Tannin with his seven-figure bonus from the 50 percent of the fees that Cioffi received.

223.    By creating a new, cutting-edge fund to double their BSHG offerings and, at the same time, concealing their difficulties in the High-Grade Fund with Barclays' leverage and liquidity, Cioffi and Tannin would benefit tangibly themselves. They would secure their jobs and rising financial rewards, rather than suffering the consequences of an unsuccessful new fund launch and exposure of the compliance and management failures on their individual parts in the High-Grade Fund.

224.    *Fourth*, BSAM needed to create the Enhanced Fund to have at its disposal a fund with liquidity – given the High-Grade Fund's lack thereof – to help BSAM appear to be successful in other aspects of its business, including as a CDO arranger and manager. There was no moratorium on trades by the Enhanced Fund with BSAM itself (though the special approval provisions outlined in the offering memoranda applied to such transactions). BSAM not only operated fund structures and managed funds, but also gathered assets for CDOs and became the

manager of numerous CDOs once they were established.  To help consummate and sell all the tranches of CDO deals, BSAM often kept many of the securities created by the CDO on its own books by having a BSHG fund buy them.  With the High-Grade Fund strapped for liquidity, BSAM needed the Enhanced Fund and Barclays' infusion of cash to continue to help its CDO packaging and management business thrive.

225.    *In addition*, the scienter of BSAM, Cioffi and Tannin in deceiving Barclays was just the duplication of other clear and intentional deception occurring by the same defendants at the same time.  Unbeknownst at that time to Barclays, the BSAM Defendants operated the High-Grade Fund structure by concealing broken commitments and liquidity problems from the directly interested parties there.  The BSHG team had become accustomed to proceeding in an untruthful fashion:  that is, by making certain important commitments ahead of time, such as the approval process to protect investors from conflicts of interest and unfavorable self-dealing, and then failing to meet those commitments when it served BSAM's and its managers' own interests, ambitions or purposes to do so.  Moreover, the Bear Stearns moratorium on trades and the fund's serious liquidity pressures were concealed from the High-Grade investors, even as BSAM pushed them to switch to the Enhanced Fund.

226.    As the SEC complaint details, Tannin and Cioffi deceived Feeder Fund investors in the Enhanced Fund structure throughout the Enhanced Fund's existence by, for example, sending them asset-allocation bar charts in "Preliminary Performance Profiles" ("PPPs") that "were merely copied from the charts used for the High Grade Fund."  But the two fund portfolios included different holdings and different levels of various asset classes.  So by engaging in this exact copying, Tannin and Cioffi were blatantly misrepresenting the Enhanced Fund's

composition.  As the SEC discovered, drafts of the PPPs were regularly shared by BSAM staff with Tannin and Cioffi, and Tannin specifically approved each one.

227.    Similarly, Tannin and Cioffi revealed the conscious deception undertaken by BSAM, Cioffi and Tannin in their operations in, for example, Tannin's email to Cioffi of September 17, 2006, excerpted above, and in their May 31, 2007, exchange quoted below.  From the beginning stages of the Enhanced Fund transaction through to the end, BSAM, Tannin and Cioffi were discussing and engaging in conscious deception of Barclays and others.

228.    The BSAM Defendants took advantage of the opportunity of soliciting Barclays' participation in the structure and the ensuing due diligence process to mislead Barclays in all of the misrepresentations and omissions of material facts pled above.  BSAM, Cioffi, and Tannin controlled the information that BSAM would show to Barclays or provide to it in response to Barclays' inquiries; and they allowed no hint of their management difficulties and deceptions to be conveyed to Barclays.  The BSAM Defendants withheld or misrepresented material information that was peculiarly within their knowledge, knowing that Barclays did not have access to all material information.

229.    Barclays carefully examined the transaction before it was finalized, including through myriad questions to BSAM and through the documents that BSAM allowed Barclays to review.  But it is now clear that the BSAM Defendants were intent upon concealing their failed systems for managing liquidity, their principal-transaction compliance failures, and their improper approach to marking assets, among other things.

230.    Additional inquiries from or investigations by Barclays either before closing or as the Enhanced Fund transaction progressed would not have elicited from the BSAM Defendants the truth about any of the areas of deception described in this Third Amended Complaint.

231.    Against this backdrop, BSAM, Tannin and Cioffi adopted the Investment Guidelines and Reporting Requirements to succeed in closing the deal.  But those defendants from the start did not intend to comply with the representations, limitations and requirements spelled out therein.

232.    In all their factual representations pled above, Tannin and BSAM intentionally deceived Barclays, or at a minimum made factual representations with recklessness, in order to bring their planned "enhanced" fund to fruition and to build up its funding by Barclays.  They did so with Cioffi's knowledge and under his direction.

## IX.    EXPANDED DECEPTION IN FEBRUARY, MARCH AND APRIL TO CONVINCE BARCLAYS TO DOUBLE AND MAINTAIN ITS INVESTMENT

### A.    "OUR HEDGES ARE WORKING BEAUTIFULLY"

233.    BSAM's, Cioffi's, and Tannin's deception expanded further in February and March 2007, when they worked to convince Barclays to double its financial commitment to the structure.

234.    On or about January 22, 2007, Tannin met Ram Rao and Edward Ware of Barclays for a long-delayed closing dinner in New York.  Tannin told Rao and Ware that the new Enhanced Fund was performing well.  He used the word "great" and offered no caveats.  Tannin also raised the possibility of exploring additional business opportunities with Barclays.  (Indeed, Ware spoke by phone with Tannin on many occasions from the date of execution through the spring of 2007, and "great" was consistently the synopsis of the Enhanced Fund's performance that Ware received from Tannin.)

235.    On or about February 19, 2007, McIsaac in London requested that Tannin send Barclays the latest Excel spreadsheet and "factsheet" for the Enhanced Fund.  Neither McIsaac nor anyone else at Barclays received the requested information.

236.     Instead, Tannin responded by e-mail to McIsaac on the same date with this representation about the Enhanced Fund's performance:  "**You will be happy to know that we are having our best month ever this February.  Our hedges are working beautifully.**  We were up 1.6% in January and are up 2% so far in February."  (Emphasis added.)

237.     On or about February 27, 2007, McIsaac again asked Tannin for reports on the Enhanced Fund portfolio.  Tannin, in an email response that same day to McIsaac and Ware, provided a position report, a portfolio list, and this summary of the fund's most recent performance:

> Here is the relevant information for Enhanced Leverage.
>
> **As you can see, despite the sell off in the sub-prime mortgage market -- our fund continues to do well, quite well, in fact.**
>
> Here are a few points I think you should be aware of:
>
> 1.  Our hedges are working just as we discussed.  Our hedges are lower quality than our assets - so in this market **we've experienced a significant mark to market gain so far this month.**
>
> 2.  Our term financed positions are not as sensitive to this market volatility - just as we've discussed
>
> 3.  We have been in touch with all of our repo counterparties - and they are uniformly very happy with all of our positions.
>
> In short, we are very pleased with our performance - but even more important than that we are pleased that our ideas about how to structure our risk and limit our volatility are once again proving to have been prudent.

(Emphasis added.)

238.     The first page of the attached portfolio report that Tannin sent to Barclays on February 27 to provide Barclays with "information for Enhanced Leveraged" showed BSAM's

calculation of a 5.5% "gross return" and a 4.3% "net return" for the month (through February 23).

239.    Up through and including the February 27 e-mail, Tannin, Cioffi, and BSAM explicitly reassured Barclays about the Enhanced Fund's positive, "best month ever." This was at a time, February 2007, of extreme volatility and dropping prices in ABX indices that track the performance of bundles of asset-backed debt securities, particularly those tied to sub-prime mortgage debt.

240.    Tannin, Cioffi, and BSAM, with these February 2007 statements, thereby added to their prior misrepresentations about BSAM's stellar abilities to control risk, including repo counterparty and other financing-related risk, and to deploy portfolio hedges and other strategies to produce positive results, even when a relevant structured credit market was performing poorly.

241.    In sharp contrast to BSAM's representations to Barclays about the Enhanced Fund's supposed February performance and BSAM's successful and prudent strategies, the criminal indictment describes how Cioffi spoke internally about the "extremely difficult month the Funds had experienced in February, stated that the Funds had averted disaster and led a vodka toast to celebrate surviving the month."

242.    The SEC complaint reports that on March 1, 2007, Cioffi told a BSHG team economist, "**Don't talk about [the February results] to anyone or I'll shoot you … I can't believe anything has been this bad**." (Alterations in SEC complaint.)

243.    The indictment reports, similarly, that on March 2, 2007, at a meeting with Tannin and others, "Cioffi directed those present not to talk about the Funds' difficulties with others."

244.     On March 3, the indictment further recounts, Cioffi told Tannin that "at least '[w]e have our health and families … [w]e are not a 19 year old Marine in Iraq ….'"  Later that same day, Cioffi told Tannin, "'the worry for me is that sub prime losses will be far worse than any thing people have modeled….'"

245.     On March 15, the SEC complaint states that Cioffi further confessed to the team economist, "'As we discussed it may not be a melt down for the general economy but in our world it will be.  Wall Street will be hammered with law suits.  Dealers will lose millions and the cdo business will not be the same for years.'"

246.     Also on March 15, according to the indictment, Cioffi told Tannin and another team member that the "Funds 'have to be very light on the investment side and continue to raise cash in [the High Grade Fund] and maintain cash in [the Enhanced Fund],' primarily to meet margin calls."

247.     In contrast to their statements among themselves about the funds' difficulties, Tannin, Cioffi, and BSAM deceived Barclays about the Enhanced Fund's purported February performance and they did so for a specific reason.  They deceived Barclays' to secure its increased financial commitment to the Enhanced Fund structure, with one large installment at the beginning of March and another equal increase later in the month, as alleged below.

B.     BSAM'S MISMARKING OF AND FAILURE TO MARK ASSETS

248.     As the Enhanced Fund's performance began to suffer, Barclays would later learn, BSAM, Cioffi and Tannin also adopted an approach to "smooth" its results and keep the total real price impacts that had occurred over each reporting period in the portfolio hidden from Barclays and others.  BSAM, Cioffi and Tannin apparently hoped that they could weather their fund's performance difficulties and that Barclays would never know this deception had occurred.

249.     BSAM, Cioffi, and Tannin intentionally or at least recklessly mis-priced the CDOs, CDO-squareds, other asset-backed securities.  The BSHG team, under Cioffi's and Tannin's direction, refrained from remarking securities at all or did so without fully reflecting the actual decreases in price and value that were becoming apparent to them.  Downward movements in price were indicated by their surveillance systems, other Company information, and input from financial counterparties, dealers, and other knowledgeable outsiders on a security by security basis.  BSAM, Cioffi and Tannin, and their subordinates on the BSHG team, however, muted those price effects by not fully and fairly reflecting current values in their portfolio reports and performance statistics.

250.     As shown by, *inter alia*, the later, **retroactive** changes that were necessary to BSAM's contemporaneous portfolio numbers and performance statistics, to make them correspond with the actual asset values at the time, BSAM, Cioffi, and Tannin were not fairly reflecting portfolio values from February forward.  These misrepresentations and omissions by the BSAM Defendants caused harm to Barclays.

251.     In particular, the BSHG team aimed to keep the prices of Company-related CDOs and other assets especially steady, and not to reflect actual downward variation in the prices of those securities, because keeping BSAM- or Bear Stearns-related CDOs at high values would help BSAM and Bear Stearns in other ways.  If the Enhanced Fund had marked those assets down to the prices that they should have, similar lower prices should then have followed in other Company contexts.

252.     During the spring of 2007, the Company wanted to keep selling its inventory of mortgages and mortgage-related securities at high prices, keep Bear Stearns' underwriting of

those kinds of security offerings going, pave the way for the Everquest IPO, and stave off any market price disruption in this core, mortgage-backed securities area of the Company's business.

253.    Cioffi had deep ties to other affiliates within the Company, including the mortgage-backed securities underwriting, broker-dealer, and trading groups, due to his history at the Company since 1985.

254.    Thus, when it became "helpful" to refrain from remarking assets downward in the Enhanced Fund, he and his team made sure to include the Company-related assets when doing so.  BSAM, Cioffi and Tannin also recognized that in all of their failures to re-price fully and fairly, even for assets unrelated to the Company, they would be helping to keep the overall market up and active for their colleagues.

255.    If BSAM, Cioffi and Tannin had disclosed to Barclays in February that they were not fairly and prudently marking the Enhanced Fund assets, and that they were providing Barclays with misleading reports of the portfolio's performance by ignoring asset losses, Barclays would have terminated its participation in the transaction at that time.

256.    Instead, BSAM, Cioffi and Tannin continued to hide the "extremely difficult" situation in the Enhanced Fund.

C.    BARCLAYS ADDED $200,000,000 AT BSAM'S REQUEST IN MARCH AS A RESULT OF THE WIDE-RANGING DECEPTIONS

1.    BSAM's False Reports Secure More Cash From Barclays

257.    On or about February 26, Pusateri of BSAM requested that Barclays provide an additional $100,000,000 investment in the structure on March 1, 2007.

258.    Relying on all of the above positive information and representations that Barclays had received from Tannin and BSAM, as well as the BSAM Defendants' failure to disclose negative material information, as alleged herein, Barclays did so on or about March 1.

259.    Tannin requested another, equally sizable $100,000,000 investment for March 15, 2007.  When BSAM requested from Barclays the additional March 15 commitment on March 8, Tannin represented that "**Despite dramatic volatility in the structured finance market our Fund has been extremely stable.**  We are seeing the beginning of new asset opportunities and would like to take down additional cash."  (Emphasis added.)

260.    Barclays also made this second additional commitment in March, with the money actually flowing at or about the end of March, to its swaps and the corresponding hedge of shares in the Enhanced Fund.  It did so in reliance on BSAM's most recent reports of extreme stability, as well as on the earlier representations and failures to disclose from BSAM, Cioffi and Tannin outlined above.

### 2.    BSAM Employs The Same Deception With Others

261.    The indictment for fraud against Cioffi and Tannin shows the far-reaching pattern of conscious deception that was occurring at the same time.  While Cioffi and Tannin knew of losses and instability in the Enhanced Fund and High-Grade Fund, and viewed the funds' condition as extremely precarious, they kept that knowledge to themselves and made false statements to investors and others.  They "continued to tout the Funds throughout March 2007 in an effort to improve the Funds' liquidity positions by enticing more capital into the Funds and by staving off any potential redemptions."

262.    As the indictment specifies, Cioffi and Tannin "told, and caused others to tell, investors throughout March 2007 that the market presented a buying opportunity," despite their internal discussions that same month of the urgent need to preserve cash and "to be very light on the investment side" – and with no mention of the funds' already-existing difficulties.

263.    Barclays had been the BSAM Defendants' earliest and largest target for this deception with regard to the Enhanced Fund, because misleading Barclays could bring in very large infusions of cash and was critical to maintaining the "enhanced leverage" structure.  As the BSAM Defendants scrambled to deceive other constituencies and keep money flowing in from them as well, some of Cioffi's and Tannin's ongoing misrepresentations to Feeder Fund investors and lenders were the very same as Tannin's deceptive representations to Barclays.

264.    For example, the indictment summarizes that on March 7, Cioffi told a Bear Stearns broker who had more than 40 of his clients invested in the funds that Cioffi "believed the market was such that, 'we have an awesome opportunity.'"  On March 15, Tannin likewise told an investor, "'[w]e are seeing opportunities now and are excited about what is possible."  Tannin spoke or emailed about "tremendous 'buying opportunities'" to other investors as well.

265.    As the SEC complaint concludes, these "lies paid off.  On March 30, 2007, Tannin bragged to a key BSAM analyst, 'Believe it or not – I've been able to convince people to add more money ….'  On April 1, 2007, he transmitted the March subscription totals to the Third Manager and gloated, '[N]ot bad, eh?'  The Third Manager responded, 'That's an understatement.'"

266.    Another aspect of Tannin's plan to deceive in March was to report falsely to Feeder Fund investors and brokers that he was increasing his personal investment in the Enhanced Fund.  The SEC complaint states that Tannin told an investor on March 7, 2007, that "I am [putting] in additional capital – I think you guys should as well."  The indictment quotes a March 15, 2007, email from Tannin to an investor, saying "I am adding capital to the fund."  It also quotes a March 18 email from Tannin, claiming "Ralph and I each have about 40% of our non-real estate net worth in the fund.  I am adding more this month."  On March 21, the

indictment states that Tannin again told a broker that he was adding more of his own money to the Enhanced Fund.

267.    As the indictment and the SEC complaint conclude, these statements were misrepresentations designed to elicit new investments and thus cash infusion by others.  Tannin never, in fact, intended to or did add to his own stake.

3.    Cioffi Acted In March To Withdraw And Save His Own Millions

268.    By March, Cioffi also had made a decision to **extract** $2,000,000 of his own investment from the Enhanced Fund structure (which represented approximately half of his original investment in it).  As an insider, Cioffi could do so on the very next redemption date, at month end, without waiting the 40 days that Feeder Fund investors were required to wait after their notice to their respective fund to redeem.  Cioffi did not disclose his decision to withdraw the $2,000,000, or his actual withdrawal, to Barclays, the Feeder Fund investors, or in any public manner.

269.    In addition, in and after March 2007 Cioffi made affirmative misleading statements about his personal investment in the Enhanced Fund structure.  Even as late as mid-May, the indictment reports, Cioffi was telling a broker that his own investment in the Enhanced Fund was at the level that existed **before** he withdrew the $2,000,000 at the end of March.

270.    Cioffi's trading of his own shares in the domestic Feeder Fund while he and the other BSAM Defendants concealed important information from outsiders is the basis of the criminal insider trading charge against him.  The indictment, in that count, charges that Cioffi committed fraud when he "sold shares he owned in the Enhanced Fund while in possession of material non-public information regarding the Funds' liquidity, the Funds' redemptions and the Funds' prospects" as described throughout the indictment.

271.    Neither Cioffi's and Tannin's deceptions about their own investments nor their other, multiplying falsehoods in March were disclosed to Barclays.  Instead, their conscious plan to deceive Barclays continued.

272.    Indeed, on or about March 27, 2007, Rao and Ware of Barclays attended a business dinner in New York with Cioffi, Tannin, and Raymond McGarrigal of BSAM.  There, Cioffi and Tannin expressly reported to Rao and Ware that their strategies for the Enhanced Fund continued to perform well, and that they were starting to see desired differentiation between the results for the leveraged Enhanced Fund and the High-Grade Fund.

273.    From at or about the end of March through the short subsequent history of the Enhanced Fund structure, Barclays' notional total (excluding interest) and thus financial investment in the structure equaled $400,000,000.

 D.  WHILE THE DECEPTIONS CONTINUED, ANY HEDGING STRATEGY EVAPORATED AND BSAM FILLED THE FUND WITH HARMFUL SECURITIES THAT GREATLY INCREASED RISK

  1. BSAM's Actual Hedging Did Not Match Its Representations

274.    As explained above, the details of any credit hedging, trading, and risk management strategies that BSAM executed in the Enhanced Fund were not apparent from the portfolio lists that Barclays periodically received or other information that it was given.  Those strategies were proprietary.

275.    Tannin had emphasized to Barclays in February that "[o]ur hedges are working beautifully" and that the portfolio was experiencing mark to market gains from its hedges.  Tannin, for the BSAM Defendants, stressed how "we are pleased that our ideas about how to structure our risk and limit our volatility are once again proving to have been prudent."

276.    It is now apparent, however, that Tannin's February statements were outright falsehoods or at best partial truths.  Barclays now knows that he failed to disclose to Barclays in

the February reports the weaker asset values of which the BSAM Defendants were becoming

aware.  Moreover, the size of the Enhanced Fund's hedging positions were inadequate to provide

a credit risk hedge for significantly falling asset prices.

277.    The SEC complaint states that "[a]s early as January 2007, Cioffi had internally

recognized shortcomings with the funds' hedging strategy."  It also states that Cioffi "admitted in

e-mails that the loss [in February 2007] came about because the Enhanced Leveraged Fund had

failed to hedge substantial positions that it had recently entered into."

278.    BSAM, Cioffi and Tannin, however, did not disclose to Barclays that the

Enhanced Fund was failing to attempt to hedge substantial positions, that they had recognized

flaws in its hedging strategy, or that it was suffering losses as a result.

279.    Instead, Tannin continued to represent to Barclays in March that the Enhanced

Fund's performance was "extremely stable."

280.    Yet at that same time, in mid-March, Tannin was raising serious questions

internally about hedging decisions.  As the SEC complaint quotes, he wrote an email to the

"Third Manager" with the subject line '"?????????????????,'asking, 'Is Ralph doing what he

should be doing right now?'" with regard to hedging positions.

281.    Barclays now knows that for the month of March, the Enhanced Fund lost money

on its hedges at the same time as the assets to be hedged against were falling in value.  As above,

the BSAM Defendants knew of their hedging failures, but simply did not disclose those failures

to Barclays at the time.

282.    Then, by April and May, the BSAM Defendants had diminished further the

potential effectiveness of their hedges.  Instead of correcting an already grossly inadequate effort

to hedge against eroding investment value, the BSAM Defendants appear to have entered into roughly offsetting positions in credit default securities.

283.    In addition, Barclays later learned, to the extent that BSAM, Cioffi and Tannin attempted to maintain hedges in the Enhanced Fund, they appear to have been merely reacting after-the-fact to movements in the ABX indices, not deploying a planned hedging strategy for the portfolio.

284.    The BSAM Defendants revealed none of their hedging failures or the absence of an actual hedging strategy to Barclays contemporaneously, and did not revise their February and March assurances that the Enhanced Fund's hedges were working "beautifully," until June, when the sharply falling NAV and the serious problems in the Enhanced Fund had become apparent.

2.    BSAM Filled The Enhanced Fund With CDO-Squared Securities That Could Not Be Independently Priced And Were Especially Illiquid

285.    As Bear Stearns Companies' public statements and actions in June 2007 indicated, and an after-the-fact comparison of the Enhanced Fund and High-Grade Fund portfolios reveals, during many months prior to June 2007 the BSAM Defendants were funneling excessively risky or troubled assets at inflated prices into the Enhanced Fund.  BSAM was collecting inappropriate risks and overstated marks in the Enhanced Fund, despite BSAM's professed surveillance strategies that applied equally to both funds and despite its special fiduciary duties to Barclays.

286.    In particular, it is now known that over time BSAM, Cioffi and Tannin loaded the Enhanced Fund portfolio with CDO-squared securities.  By May, BSAM had filled the fund with at least $2.5 billion in such CDO securities that were built from, in whole or in part, other CDO securities.  These complex CDO-squared securities violated the Investment Guidelines both because CDO-squared securities were not a permitted investment category and because most, if

not all, did not have regular independent pricing available. As CDOs were created out of other CDOs, the securities became especially difficult to mark and had very illiquid markets.

287.    BSAM, Cioffi and Tannin brought so many CDO-squared securities into the Enhanced Fund portfolio that it eventually owned a significant percentage of all outstanding CDO-squared securities, which were relatively rare and a small percentage of the overall CDO market. An International Monetary Fund report, using Credit Suisse numbers, estimated that as of July 2007 all U.S. outstanding CDO-squared securities totaled $28 billion. In May of 2007, the Enhanced Fund owned at least approximately 9% of that total.

288.    As of mid-June, over 46% of the asset-backed CDO-related investments ("ABS CDOs") in the Enhanced Fund portfolio were in fact CDO-squared securities. In the High-Grade Fund, by contrast, that number was approximately 36%.

289.    At the same time BSAM, Cioffi and Tannin were filling the Enhanced Fund with CDO-squared securities, they were selling less complex, more liquid and stronger asset-backed investments from the portfolio.

290.    The SEC complaint describes:

> From late 2006 through June 2007, Cioffi became increasingly indiscriminate in the management of his funds. During that time, Cioffi started buying ever-more-risky investments such as ABS significantly backed by subprime securities rated BBB, as well as risk[i]er types of CDOs, and even less transparent, illiquid CDO[-squared]s. Tannin noted Cioffi's lack of buying discipline, in a February 5, 2007 e-mail to the Third Manager: "Unbelievable. He is unable to restrain himself."

291.    At the same time as Tannin made that comment about Cioffi, however, he himself believed drastic changes should occur within the funds. The indictment quotes an April 22, 2007, email message from Tannin to Cioffi and another manager in which Tannin confirms that "'**over the last few months**' he had **believed that the Funds should either be closed or 'get**

**very very aggressive**'" – even though such aggressiveness would mean abandoning the risk characteristics for the Enhanced Fund that the BSAM Defendants had represented to Barclays.

292.    Just as Barclays was not told of the BSAM Defendants' lack of hedging, or their inability to manage liquidity without ongoing infusions of cash and increased debt, BSAM, Cioffi and Tannin did not reveal to Barclays that the Enhanced Fund was indiscriminately buying ever-more-risky securities, including impermissible CDO-squared securities, and changing the risk profile of the Enhanced Fund in that way as well.  Nor was Barclays told that Tannin believed from early in 2007 that the only options were to close the fund completely (which he viewed as the correct choice in his more lucid moments), or to become very, very aggressive (which was yet another significant change from the purported approach of the BSHG team and the Enhanced Fund under the limitations and parameters initially promised and subsequently affirmed by the BSAM Defendants to Barclays).

293.    The BSAM Defendants made especially heavy investments in CDO-squared securities from the end of February through April.  In or about March, for example, the BSAM Defendants purchased $200,000,000 in unrated CDO-squared securities known as CLSVF 2007-3A A2 for the Enhanced Fund.  At the same time, the BSAM Defendants added $325,000,000 in CDO-squared securities from three lower tranches of the structure called TWOLF 2007-1A. Also in March, BSAM, Cioffi and Tannin caused the fund to buy $90,000,000 in the CDO-squared security ADMSQ 2007-2A, as well as many other pieces of CDO-squared deals.  These are just a few examples, and do not include the purchases from BSAM-managed structures discussed in the next section.

294.    BSAM, Cioffi and Tannin assiduously kept their purchase of and focus on CDO-squared securities hidden from Barclays.  In the 1,000 or 2,000 securities that were periodically

listed on reports to Barclays, for almost the entire life of the fund there was no category of "CDO-squared" in that portfolio list or in any summary provided to Barclays. Moreover, the names of these securities do not indicate that they are CDO-squared securities, nor is that information provided on Bloomberg or other similar databases. These securities are named in the same format as CDOs and other asset-backed securities, and information about their underlying composition is not readily available in the marketplace.

295.    Only with the May 31, 2007, report to Barclays, which reached Barclays in early June, and a conversation with Tannin at the same time, did the BSAM Defendants reveal to Barclays that such CDO-squared securities existed in the portfolio and alert Barclays that they were such a large part of it. By that time, the dropping performance of the portfolio had begun to be clear and Tannin was claiming, in response to Barclays' questions, that the BSAM Defendants would reverse course and bring down the exposure to the CDO-squared holdings (among other steps to be taken).

296.    Even once the BSAM Defendants listed CDO-squared securities in their reports to Barclays as such, they did not include all the CDO-squared securities in the portfolio under that heading, thereby continuing to mislead Barclays about the composition of the portfolio.

297.    Similarly, the SEC complaint describes how Cioffi and Tannin hid the actual proportion of assets in the Enhanced Fund backed by sub-prime mortgages by categorizing most such assets under the "catchall asset-backed security ('ABS') category." The SEC there is referring to reports to Feeder Fund investors. The same misleading categorization occurred in the BSAM Defendants' reports to Barclays.

298.    The BSAM Defendants harmed Barclays by investing in and carrying very large amounts of CDO-squared securities in the Enhanced Fund portfolio through the spring of 2007,

in violation of the Investment Guidelines and their duties to Barclays.  Because these securities

were especially difficult to price and had very illiquid, if any, secondary markets, the securities

made the portfolio very unstable and could not be sold easily to raise liquidity for the fund

structure.

299.    More broadly, the BSAM Defendants harmed Barclays by abandoning the

original risk characteristics for the Enhanced Fund, and taking on more and more risk through

indiscriminate purchases.

3.    Many of the CDO-Squared Securities Came From Harmful Self-Dealing
With BSAM-Managed Structures

300.    The BSAM Defendants were not only purchasing CDO-squared securities, they

were purchasing many of those securities from structures that BSAM itself managed or deals that

Bear Stearns underwrote.

301.    Indeed, BSAM, Cioffi, and Tannin caused the Enhanced Fund to buy **all** the

securities in all except the highest tranche of an April 18, 2007, Tahoma 2007-3A CDO-squared

offering that BSAM was managing – with a combined price for the five lower tranches that went

completely into the Enhanced Fund of approximately $150 million.  This means that no

independent third-party market participant priced those securities or ascertained their fair market

value; instead, BSAM caused the Enhanced Fund to purchase them all at non-arms-length prices.

302.    In addition, in the CDO markets, it is highly unusual for a CDO structure manager

to retain in its own investment funds all but the highest tranche of an offering for which it will

serve as the manager.  BSAM was serving its own interests by helping its CDO deals close and

its management business appear to flourish, while at the same time filling the Enhanced Fund

with impermissible assets with heightened risk.

303.    In March, the BSAM Defendants also had the Enhanced Fund purchase over $60,000,000 in two tranches of the Tahoma 2007-2A CDO-squared offering that BSAM managed.  In late October 2006, they had caused the fund to purchase over $250,000,000 in three tranches of a Tahoma 2006-1A CDO-squared offering that, again, BSAM managed.  BSAM was helping its ongoing business partner, Tahoma, to sell out its offerings, to the detriment of Barclays and the Enhanced Fund portfolio.

304.    Similarly, in late February or March 2007, the BSAM Defendants caused the Enhanced Fund to buy **all** of the securities in four tranches of a CDO-squared refinancing deal, Tricadia 2003-1AR, with a combined price of approximately $140 million, that was underwritten by Bear Stearns and a co-underwriter.  Because the moratorium on trading with Bear Stearns was apparently still in place, BSAM may have transacted with the co-underwriter.  Nonetheless, BSAM's purchase for the Enhanced Fund assisted Bear Stearns in succeeding with its underwriting business.

305.    Again, because the Enhanced Fund bought all the securities in many tranches, the prices for those securities were not determined by any independent third-party market participant.  BSAM and Bear Stearns therefore could cause the securities to come into the fund at too high a price.  When the securities' value subsequently fell further, the Enhanced Fund realized an even greater loss.

306.    BSAM was accumulating illiquid assets in the Enhanced Fund that were sold into that fund in non-arms-length arrangements, in order to help BSAM and Bear Stearns succeed in other roles.  In the process, BSAM was collecting fees as the CDO arranger and manager, and collecting another set of fees from the Enhanced Fund structure.  BSAM also was violating its specific representations and commitments to Barclays.

307.    If BSAM, Cioffi and Tannin had revealed to Barclays their large purchases of impermissible CDO-squared securities for the portfolio, their harmful self-dealing transactions, their inadequate and failing hedges, their continued asset mis-marking, and Cioffi's and Tannin's own conclusions that the Enhanced Fund structure had become too risky, Barclays would have terminated its participation in the structure during March, or promptly after these facts were revealed.

E.    FROM MARCH THROUGH MID-MAY, BSAM REVEALED NO CAUSE FOR CONCERN OR FAILURE IN ITS STRATEGIES AND REPORTED A CONSISTENT CUSHION OF ASSETS TO BARCLAYS

1.    According To BSAM's Reports, Barclays' Position Remained Secure

308.    Cioffi had withdrawn his own $2,000,000 and remarked internally, according to the indictment, that "'I'm sick to my stomach over our performance'" in March.  By March 15, as alleged above, he had concluded privately that there would be a "meltdown" in "our world." Yet he and the other members of the BSHG team continued to pretend to outsiders, including Barclays, that the funds were operating as expected.  They did so towards Barclays in the following ways, among others.

309.    From the end of March 2007 into mid-May, the Barclays' risk management staff in London received periodic reports of the month-to-date from Tannin and BSAM that showed small declines in the overall value of the Enhanced Fund portfolio, ranging from -1.4% to -2.5%. Those small declines did not raise a concern for Barclays regarding its position in the Enhanced Fund structure, for they occurred against the backdrop of Tannin's and BSAM's statements about their successful hedging and other strict risk management strategies, as pled above.

310.    The decline in the ABX indices that had occurred in January and February 2007 had turned around as of later in March and April.  Based on BSAM's representations, Barclays believed the Enhanced Fund had apparently weathered well a volatile period.

311.    In addition, BSAM consistently and repeatedly reported to Barclays a total NAV of close to or over a billion dollars for the Enhanced Fund, which meant that the fund would have to suffer massive losses before Barclays' priority (first-out) stake of less than half that amount would be at risk.  Because of the BSAM Defendants' misrepresentations and omissions, Barclays reasonably believed that the Enhanced Fund portfolio was performing well, that BSAM had a firm grip on risk and liquidity, and that BSAM was paving the way for even more success.

2.    Feeder Fund Investors Were Likewise Reassured With Falsehoods

312.    As Barclays learned through the 2008 release of the transcript of an April 25, 2007, Feeder Fund conference call, Cioffi was still claiming in lengthy statements to the Feeder Fund investors in late April that he was optimistic and that, to the extent there were credit risks "in our portfolio, we feel comfortable that we have significantly hedged them and we have been hedging them."  In this conference call, Cioffi repeatedly reassured, "our hedges did work.  Our liquidity's there."  Similarly, Cioffi asserted that the "repo market has been very solid and very liquid" and that BSAM had "been very careful, very cautious, very diligent" on the front of holding "good" assets and thus avoiding loss of or increased costs of financing, or forced asset sales.

313.    On the same April 25, 2007, Feeder Fund investor call, Tannin emphasized his view that there was no systemic breakdown and that, whatever was happening in the market, the Enhanced Fund structure was designed to weather it.  According to Tannin,

> [T]he way we structured the fund was (a) to limit the downside, so it wouldn't be, again, the number that we've, we'd always spoken about was a 10% drawdown and more importantly that we would not be forced sellers.  So the structure of the fund has performed exactly the way it was designed to perform.

314.    Tannin elaborated, "from an asset point of view, from a surveillance point of view, we're very comfortable with exactly where we are."  He stated, "it is really a matter of whether one believes that careful credit analysis makes a difference, or whether you think that this is just one big disaster.  And there's no basis for thinking this is one big disaster."

315.    Just three days before the call, however, Tannin had himself voiced the belief that "the subprime market looks pretty damn ugly" and that a recent internal BSHG CDO report showed that "the entire subprime market is toast."  He had urged that the Enhanced Fund and the High-Grade Fund be shut down.  Tannin stated that the only alternative to closure was a "very very aggressive" strategy, and he explicitly acknowledged the danger that investors would not stay with the funds if they knew of such a changed approach.  This April 22, 2007, email from Tannin to Cioffi is quoted at length in both the indictment and the SEC complaint.

316.    On April 22, Tannin also communicated with the Third BSHG Manager, and the SEC complaint recounts that the other team manager agreed that "'[i]t looks really bad' and stated that 'best way to get out of this risk [is] some form of a liquidating trust.'"  Tannin himself, according to the SEC, emphasized that day that "'we are just too long' and 'the distress hasn't even begun.'"

317.    By April 22, Tannin and Cioffi were intentionally circumventing the BSAM email system, with Tannin sending the April 22 email from his personal account to the personal account of Cioffi's wife, as the indictment recounts.  Tannin was also evidencing concern that they needed their own counsel, writing on that date (as quoted in the indictment):  "'Who do we talk to about this?  [BSAM's president]?  [Bear Stearns' co-president]?  Outside counsel?  (And here we have to be careful because our outside counsel is BSAM's counsel NOT our counsel – This is another very big issue we at least need to think about.[)]'"  This "very big issue" of with

whom to talk and what counsel they could trust likewise indicates that they were consciously

worried about their legal wrongdoing and potential liability.

> 3.    The BSAM Defendants Gave Different False Performance Numbers To
>       Different Stakeholders

318.    In addition, by late April 2007, Cioffi and Tannin were getting caught up in a

tangle of their own lies by reporting to different audiences different performance numbers (all of

them false).

319.    Cioffi told Feeder Fund investors on the April 25 conference call that the

"estimated returns for April are minus .6 basis points for High Grade and negative .7 for

Enhanced."  (A basis point is one one-hundredth of a percent.)

320.    Yet, at the same time, BSAM conveyed to Barclays a report on the master

Enhanced Fund through April 24 that gave a month to date return of -1.4% and a report through

April 26 that gave a month to date return of -2.5%.  If either of those numbers given to Barclays

were accurate, the Feeder Fund investors would have suffered an even greater loss than the

master Enhanced Fund, due to the effect of the leverage instrument through the total return swap

that amplified Feeder Fund returns.  (Most of the performance reports referred to in the

indictment and the SEC complaint are Feeder Fund performance numbers, rather than numbers

that correspond to the master Enhanced Fund.)  Cioffi, however, was telling the Feeder Fund

investors on April 25 that their estimated loss for the month was less than one hundredth of one

percent.

321.    In fact, none of those April performance numbers were correct.  As later

disclosed, the master Enhanced Fund was dropping more than 10% in April and the Feeder

Funds were dropping by an even greater amount.  BSAM, Cioffi and Tannin were giving

different false numbers to different investors, none of which were accurate reflections of the deteriorating condition of the Enhanced Fund structure.

322.    Many Feeder Fund investors have filed complaints against BSAM, Cioffi, Tannin and other members of the BSHG team, either in court or with FINRA, alleging deception and other misconduct related to the Enhanced and High-Grade Funds.  As with the criminal indictment and the SEC allegations, the misrepresentations that Cioffi and Tannin perpetuated during Feeder Fund investor calls figure prominently in those complaints.

323.    FINRA, under the heading "Employment Separation After Allegations," reports that on November 28, 2007, Cioffi was "permitted to resign" from employment at the Company.

F.    BSAM'S CONTINUAL DELAYS OF THE ADMINISTRATOR'S MONTHLY REPORTS ALSO SERVED TO HIDE THE MOUNTING PROBLEMS FROM BARCLAYS

324.    Throughout the Enhanced Fund's existence in 2007, there was another facet to BSAM's concealment of the true performance facts and unstable nature of the portfolio in the Enhanced Fund from Barclays, as well as BSAM's breach of its fiduciary and other duties to Barclays.

325.    For the months of December 2006 through June 2007, the fund administrator's required monthly or semi-monthly NAVs for the Enhanced Fund each were long delayed or never came at all.  (Semi-monthly NAVs were required under the Confirmations, as amended, between December 2006 and March 2007.)  Under the Investment Guidelines, the Reporting Requirements and the Confirmations, the Enhanced Fund administrator PFPC was to deliver NAVs to Barclays based on independent pricing shortly after each relevant dealing date.  PFPC, however, took its direction from BSAM, and eventually explained to Barclays that the delays were the fault of BSAM, as outlined below.

326.     The Confirmations call for the NAVs from the fund administrator to issue at least

on a monthly basis and by the fifteenth day following a relevant "dealing date." (The operative

dealing date at the beginning of the transaction was the first of the month, then became the first

and fifteenth of the month; and after a Confirmation amendment in late March 2007 was the third

of each month.)

327.     The report from PFPC for the month of December (triggered by the dealing date

on January 1), however, was not released until late February, long after the fifteen-day deadline.

That report showed a 1.60% increase in the fund for the month of December. PFPC later revised

that result to show a 1.76% increase.

328.     Simran Sethi of Barclays in London regularly followed up by e-mail and by

phone with PFPC and BSAM for the administrator's NAV reports. PFPC initially reported that

the delay in the December report was due to year-end processing issues; but the delay in

December was repeated in the subsequent months.

329.     When Sethi spoke with Tannin in early 2007 about the lack of timely reports from

the fund administrator, Tannin said that Barclays should rely on the numbers that BSAM was

directly providing to Barclays for periods when the administrator report was not available.

330.     Sethi and Barclays, however, sought reports from the administrator as well. They

did so because the administrator was supposed to be obtaining independent pricing of the

portfolio instruments, under the terms of the Investment Guidelines, and because administrator

NAVs were required under the Confirmations.

331.     On or about April 2, 2007, for example, after many previous calls and emails

about the delayed administrator reporting, Sethi wrote her contacts at PFPC and copied Tannin:

> I would really appreciate if you could reply to my mail below [dated March 29]. Even the February NAVs are overdue now and we are still waiting for January NAVs.
>
> Could you please let us k[n]ow the reason for delay each month and what we can do to resolve this ASAP.

332. Neil Rosen of PFPC responded that the January NAV was still being calculated and that the delay resulted from "waiting for pricing on one of the underlying securities."

333. Sethi followed up with numerous emails and calls to PFPC and Tannin to try to resolve the slow reporting by proposing that PFPC set a cut-off date and use an estimate or the previous month's valuation for one or two missing prices by that date. Tannin's approval was necessary for PFPC to proceed in that way.

334. Tannin repeatedly communicated that he was happy to work out a more timely arrangement, and that Sethi had a "great idea;" but when Sethi subsequently followed up with either Tannin or PFPC, she could not get a resolution. Barclays now realizes that Sethi was being intentionally ignored and manipulated by Tannin, Cioffi and BSAM – given the ultimate discrepancies in the February through May reporting of the portfolio's performance.

335. Sethi continued to seek the appropriate, timely fund administrator reporting. On May 8, 2007, a managing director and vice president of PFPC, Ellen Corson, addressed the situation in an e-mail to Sethi:

> Currently, the Bear Stearn [sic] (BS) fund that you are requesting information on holds an investment that due to its complexity is taking a very long time to obtain a valuation. Each month, BS requires PFPC to wait until the value for the particular investment has been calculated and approved. Unfortunately, the process to value that particular investment has been delayed greatly. PFPC is not involved in the valuation of the investment and are instructed to wait for the price from the advisor. In addition, BS has not instructed PFPC to value the BS fund with an estimate price. Also, due to the nature of this investment, BS is very much aware of the

issues surrounding the valuation.  The delays you are
expecting [sic] are not the result of PFPC service issues.

As of today, PFPC is waiting for approval from BS for
February's final numbers.  In addition, final valuations for the
investment in question has not been finalized for March and
April.

I have previously requested that BS reach out to their
Barclay's [sic] contact and explain to them the issues. . . .

336.    On or about May 9, 2007, Sethi and Panzeri of Barclays called Tannin and did not

reach him.  Sethi followed up with an e-mail to Tannin that asked "what this 'investment' is

which takes more than three months to value."

337.    Sethi followed up with Corson at PFPC to ask her which asset supposedly caused

the delay in pricing each month.  Corson responded that she was not sure.

338.    Tannin never identified a specific asset that was delaying the administrator's

pricing in response to Barclays' inquiries.

339.    Instead, more than a week later, on or about May 17, 2007, Tannin responded by

claiming that "**We do not have ANY assets that take 3 months to value**.  The volitility [sic] in

the market created a problem with the dealers getting us marks.  We can give PFPC our

estimated NAV promptly – within 5 business days of the end of the month.  I believe they are

happy to pass this on to you."  (Emphasis added.)  Tannin thus contradicted PFPC's stated reason

for the delay and made a new representation about BSAM's supposed ability to timely value its

assets.  In any event, timely NAVs from PFPC were never forthcoming.

340.    In addition, it was only through further discussions with PFPC on or about June 1

that Sethi and others at Barclays discovered that the Enhanced Fund administrator apparently had

been relying on BSAM for pricing on a major portion of the assets in the Enhanced Fund all

along.  They discovered that PFPC had not been independently pricing those assets, as required

81

by the Investment Guidelines, or even spot-checking them for purposes of calculating the fund administrator's NAV reports.

341.    Immediately after that discovery, Sethi called Mark Mannion, another managing director at PFPC, and stressed that the administrator's job was to provide independent pricing. She stressed that even for estimates that might come before final numbers from PFPC, PFPC should do random checks of those estimates, and that for final NAV pricing there had to be much less of a time lag than currently was occurring.

342.    Tannin, Cioffi, and BSAM, in breach of BSAM's duties to disclose and fiduciary duties to Barclays, failed to reveal BSAM's direction of PFPC's pricing and BSAM's efforts to delay the administrator's NAV reports to Barclays.  They did so to hide from Barclays the Enhanced Fund portfolio's actual performance and the BSAM Defendants' and other Company-affiliated actors' improper actions, as alleged herein.

> G.    THE DELAYED PFPC REPORTS BEGAN TO REVEAL BSAM'S EARLIER FALSEHOODS
>
>> 1.    BSAM's Claim Of A 5.5% Positive Return In February Is Reduced To Below Zero In May

343.    After BSAM's interference and delay, the fund administrator on May 10, 2007, finally released its NAV for February.  That report showed that the Enhanced Fund's return in February had actually been -.30% – far less than the report of a 5.5% gross or 4.3% net increase that Tannin and BSAM had conveyed to Barclays on February 27.

344.    As set forth above, February had been the month in which BSAM targeted Barclays for deception, and did deceive Barclays, to induce it to double its financial investment in the structure in March.

2.     April Results Of -11.3% Are Disclosed In June

345.     On June 7, PFPC released the final April NAV to Barclays.  The administrator's report revealed **a drop of more than 11%** in the Enhanced Fund.  This was more than four times greater a loss than BSAM's worst report of the fund's performance to Barclays up to that time – *i.e.*, -2.5%.  On June 7, PFPC also released its revised March results of -3.6%.

346.     BSAM had failed to abide by its representations and commitments, leaving Barclays to learn from PFPC long after the fact about a drop in the NAV of more than 10%.  Under the Reporting Requirements, BSAM was required to notify Barclays as soon as it reasonably could of "any change in circumstances, which **might** cause the final monthly NAV of the Reference Fund to show a loss in value equal to or more than 10%."  (Emphasis added.)  Instead, BSAM, Cioffi and Tannin engaged in deliberate deception to hide the Enhanced Fund's falling NAV for as long as possible.

347.     BSAM knew well before **June 7** of a "change in circumstances" that might – and actually did – significantly affect **April**'s results.  BSAM was supposedly engaged in daily surveillance of the portfolio and it had ongoing interactions with the administrator with regard to pricing.  Cioffi made up his own mind to sell his stake in the Feeder Fund and, without disclosure, contained his personal risk by the end of March.  By May at the latest, BSAM, Cioffi and Tannin were devising (again, undisclosed) plans to sell their whole operation because the Enhanced Leverage and High-Grade Funds were collapsing.  Thus, as alleged in further detail below, BSAM, Cioffi and Tannin clearly knew earlier than June that the Enhanced Fund's value was dropping significantly and its viability ending as a result of liquidity pressures and other operational failures.  Yet Barclays heard of this 11.3% drop in April only through PFPC's June 7 correspondence to Barclays.

H.    THE BSAM DEFENDANTS DECEIVED BARCLAYS TO OBTAIN
INJECTIONS OF LIQUIDITY AND KEEP BARCLAYS IN THE
STRUCTURE, IN ORDER TO SERVE DEFENDANTS' OWN PURPOSES

348.    In all the ways alleged in this section IX, BSAM, Cioffi and Tannin intentionally
or at a minimum recklessly acted to deceive Barclays, specifically, because Barclays' continued
participation in the Enhanced Fund structure was critical.  Without Barclays, the BSHG team
would not have the liquidity source to attempt to stabilize both the High-Grade Fund and the
Enhanced Fund.  If Barclays withdrew, moreover, BSAM's supposed "enhanced leverage"
feature of the Enhanced Fund structure would no longer exist, and ownership of the assets would
devolve to the Feeder Funds themselves.  And with Barclays' withdrawal and that transfer, the
BSAM Defendants would be forced to provide complete and accurate pricing, which they did not
want to do because it would expose their prior over-marking and jeopardize BSAM and other
Company interests.

349.    Moreover, Barclays was promised an early warning and the ability to terminate its
participation in the structure to save its capital and fees.  But if Barclays exercised that option in
the context of the BSHG team's declining performance, struggles with liquidity, and back-firing
hedges, the BSHG team's deceptions would be revealed to all investors and the markets at large.
BSAM, Cioffi and Tannin throughout February, March, April and May concealed material
problems in the High-Grade and Enhanced Fund structures, and their distortion of asset values
and performance numbers, to prevent that from happening.

350.    The BSAM Defendants also wanted to keep their deception going in order to give
themselves more time to try to remedy the problems in their fund structures.  BSAM, Cioffi and
Tannin apparently hoped that they could somehow turn the performance of the Enhanced Fund
around and then no one would ever need to know about, for example, their failure to re-mark
assets or their marking of them erroneously high during a difficult period.  BSAM, Cioffi and

Tannin kept concocting more complex and far-fetched "plans" to save their operations, and took more and more risks, while keeping Barclays misinformed and unaware of BSAM's hidden activities.

351. As the indictment recounts, Cioffi stubbornly held on to the view that he should continue the misrepresentations, saying, "'[i]f I can't [turn the Funds around] I've effectively washed a 30 year career down the drain.'"

352. In addition, BSAM's compensation for its operation of the Enhanced Fund structure and management of all the pieces in that structure came through two percent advisory fees and, if BSAM was eligible during the period, 20% incentive or profit-sharing payments from the Feeder Funds and their investors.  (No compensation came from the Enhanced Fund or Barclays.)  The calculation of BSAM's compensation from the Feeder Funds turned on various formulas related to the NAVs of the Feeder Funds, which, in turn, were derived from the NAV of the Enhanced Fund.  A growing NAV in the Enhanced Fund would lead to greater compensation, whereas a falling NAV would decrease BSAM's two percent advisory fees and could completely foreclose the 20% incentive or profit-sharing payments because of the "high water mark" method used to calculate the incentive payments.  Thus, the BSAM Defendants also deceived Barclays with erroneously high NAV reports to attempt to preserve and maximize BSAM's compensation.

353. Cioffi's and Tannin's compensation also turned on the success of their funds.  As alleged above, BSAM split the advisory and incentive fees from these funds with the funds' managers.  Thus, a higher NAV would translate into larger advisory and incentive fees for the managers as well.  (In addition, BSAM awarded its successful managers Bear Stearns stock as a form of deferred compensation.  Cioffi and Tannin also stood to gain greater stock awards with

better Enhanced Fund performance numbers, and through their stock ownership had interests that aligned with other Company affiliates and the Company as a whole.)

354.    Moreover, Cioffi's name was synonymous with the BSHG team's funds. Similarly, Tannin was the COO of and a high profile spokesperson for the funds. Each manager's success in the business community was inextricably tied to the funds' fates.

355.    The BSAM Defendants also wanted to use Barclays and its role in the Enhanced Fund structure to serve interests outside that structure. For example, BSAM, Cioffi and Tannin wanted to build up a record of success in the Enhanced Fund so that they could convince all their High-Grade investors to move to the Enhanced Fund, and thus never reveal the liquidity and other management problems in the High-Grade Fund. Those liquidity problems continued after the Enhanced Fund's creation, because the moratorium on Bear Stearns' transactions continued and the BSHG team did not have a workable liquidity strategy for the High-Grade Fund.

356.    Likewise, the BSAM Defendants wanted the Enhanced Fund to survive long enough to get the Everquest IPO completed, as discussed below. Cioffi also said during late 2006 through the spring of 2007 that he believed, however improbably, that Everquest would help save the BSHG funds' performance by creating an increase in the market value of the large amount of Everquest shares that the funds held. As it turned out, the Everquest IPO had to be cancelled and the shares created a large loss for the Enhanced Fund and for Barclays; but Everquest provided to the very end a motivation to try to keep the BSHG funds afloat.

357.    Similarly, the BSAM Defendants formulated other large transactions that they apparently believed might resurrect the Enhanced Fund or that were beneficial to BSAM or the Company in other ways, as detailed below, and thus tried to keep the structure going to complete those transactions or plans. In the meantime, however, they did not expose any of the Enhanced

Fund's or their difficulties to Barclays.  For all these reasons, BSAM, Cioffi and Tannin

deceived Barclays.

**X.  THE BSAM DEFENDANTS CONTINUED THEIR DECEPTION AND THEIR OTHER HARMFUL ACTIONS IN CONCERT WITH BEAR STEARNS TO KEEP BARCLAYS IN THE STRUCTURE AND TO MAKE IT APPEAR SOUND THROUGH MAY**

      A.    <u>NO EARLY WARNING FOR BARCLAYS</u>

358.    As explained above, Barclays would not benefit from any gains in the Enhanced

Fund portfolio.  In addition, Barclays' investment would be first out of the Enhanced Fund as the

fund assets passed through Barclays on their way down to any final payments due Feeder Fund

investors.  Throughout the life of the Enhanced Fund structure to April 2007, Barclays was being

told by BSAM that the value of the assets in the fund was well over twice Barclays' stake; thus

Barclays had a cushion of hundreds of millions of dollars protecting its ability to receive the

return of its investment and its fees, as promised, if and when the fund unwound.

359.    Therefore, Barclays' primary concern with regard to the actual performance of the

portfolio was hearing promptly about a significant downward movement.  Getting a warning

about a significant downturn would enable Barclays to terminate and withdraw its money and

fees before those were at any substantial risk of loss.

360.    Accordingly, Barclays built into the Reporting Requirements the warning system

whereby BSAM was obligated to alert it "as soon as reasonably possible" of any change that

"might" cause the monthly net asset value of the fund to lose 10% or more.

361.    BSAM, however, did not alert Barclays in February, March, April or May of the

growing crisis in the Enhanced Fund.  It did not do so because Cioffi and Tannin knew that

disclosure of an anticipated or actual drop of 10% or more, and the further disclosures that would

be necessary to explain that unusual movement, would likely cause Barclays to terminate its role

87

in the structure, create chaos for BSAM and the Feeder Funds, and expose BSAM's inability to operate effectively its Enhanced Fund structure.

362.    If BSAM had revealed to Barclays in February or March that the Enhanced Fund would soon experience a 10% or greater monthly drop in value, and/or explained how BSAM's actions had led to such an impending drop, Barclays would have terminated its participation in the structure during those months.

363.    If BSAM had revealed in April that the Enhanced Fund was experiencing a 10% or greater drop that month – and/or had told Barclays the truth about BSAM's struggles to operate the structure in the then-prevailing credit environment and myriad deceptions pled above – Barclays would have withdrawn from the structure by terminating the swaps and redeeming its shares in the master fund on the next dealing date of April 15 or May 3.

364.    With a Barclays termination triggered in February, March or April, even based on the later, retroactive valuations of the net asset value in the Enhanced Fund by PFPC, Barclays would have received the return of its full investment and its full fees, and not suffered any damages.

B.    BEAR STEARNS KNEW OF BSAM'S DIFFICULTIES, PROVIDED AN EMERGENCY BRIDGE LOAN, AND AIDED IN MISLEADING BARCLAYS

365.    The BSAM Defendants, however, did reveal their mounting difficulties in managing the Enhanced Fund and its liquidity to Bear Stearns.  BSAM, Cioffi and Tannin did so in part because BSAM had to turn to Bear Stearns for urgently needed financing.  By April, BSAM was apparently having a harder time "rolling over" its repo agreements when they matured and was experiencing requests from its repo counterparties for a larger "haircut" in the terms of the repo lending.  The repo counterparties would provide less lending on the same

assets, and required BSAM, on behalf of the Enhanced Fund, to provide more assets or cash as added margin on specific repo agreements.

366.    In or about April, Bear Stearns ended its moratorium on transactions with the fund.  That month, at BSAM's request, Bear Stearns entered into a bridge repo loan with the Enhanced Fund of approximately $290,000,000 for a little more than one month to help it temporarily weather its expanding liquidity crunch.

367.    This bridge loan helped the BSAM Defendants stave off liquidity pressures through April and into May, despite the portfolio's falling asset prices – which were still hidden from Barclays.

368.    Bear Stearns provided the temporary lending in part to allow the BSAM Defendants to close an even larger financing deal, discussed below.  As soon as the larger deal closed, Bear Stearns again withdrew as a repo counterparty to the fund.  **Bear Stearns did not have any repo exposure to the Enhanced Fund as the structure entered June and ultimately failed.**

369.    On May 13, 2007, the SEC complaint discloses, Cioffi "admitted to Tannin and the Third Manager:  'I think …the [Enhanced Leveraged Fund] has to be liquidated[.]"  No such admission or disclosure was made by BSAM, Cioffi or Tannin to Barclays.  Moreover, the BSAM Defendants continued to represent to Barclays that their Enhanced Fund business was operating as usual and as expected.

C.    <u>IN MAY, BSAM CLOSED THE HUGE BSAG 2007-1A TRANSACTION TO CONTINUE TO CONCEAL THE FUNDS' LIQUIDITY PROBLEMS AND  TO REPLACE STRONGER ASSETS WITH WEAKER ONES</u>

370.    On or about May 24, BSAM closed a deal that was underwritten by Bank of America and that created a structure to be managed by BSAM.  This transaction replaced some of the Enhanced Fund's and the High-Grade Fund's repo financing with a different and complex

form of financing devised by BSAM that involved commercial paper and a new CDO structure, BSAG 2007-1A.

371.    BSAM sold approximately $2.5 billion in assets from the Enhanced Fund, which had carried approximately $1.95 billion in repo financing, and additional assets from the High-Grade Fund, into the BSAG structure. The assets sold from the Enhanced Fund included collateralized loan obligations (CLOs) as well as securities from higher-rated CDO tranches and residential mortgage-backed securities.  These transactions repaid, *inter alia*, Bear Stearns' bridge repo loan.

372.    The Enhanced Fund portfolio then purchased approximately $486,000,000 of complex CDO-squared securities, designated as different tranches of BSAG 2007-1A, and approximately $26 million in "preference shares" issued by the BSAG structure.

373.    The Enhanced and High-Grade funds were the only purchasers of these new BSAG 2007-1A securities and preference shares.  (Other investors purchased the commercial paper, which was separately backed by protection from Bank of America.)   As with purchases of other BSAM-managed CDO-squareds by the Enhanced Fund pled above, no independent third-party market participant priced these securities or ascertained their fair market value; instead BSAM caused the Enhanced Fund to purchase them at non-arms length prices.

374.    The Bank of America/BSAG 2007-1A offering was the largest CDO-related offering of 2007.  BSAM, Cioffi and Tannin were continuing to try to give themselves more time to escape the performance and liquidity problems in their funds.

375.    This transaction did not, however, turn the Enhanced Fund's downward trajectory around.  It emptied the Enhanced Fund of many of its better assets, while replacing them with illiquid CDO-squared securities and preference shares of unknown value.  It momentarily

provided some relief to the massive liquidity pressures that were bearing down on the Enhanced Fund, still unknown to Barclays, by diminishing repo borrowing, but it replaced that borrowing with other financing.

376.    As it turned out, of course, the portfolio's NAV dropped by 38% in May.  The BSAG transaction contributed to this enormous loss.

D.        BSAM ALSO HID ITS PLAN TO SELL THE FUNDS

377.    In May, even as they proceeded to close the BSAG transaction, Tannin and Cioffi again were sending emails back and forth about the "building of the plan" to cope with their funds' severe troubles.  Neither those troubles nor any plans, however, had been revealed to Barclays.

378.    By May 26, Tannin was well along in sketching out a plan to sell the Enhanced Fund and the High-Grade Fund, and along with them all of the BSHG team's operations, to Cerberus Capital Management ("Cerberus") or some other similar entity.  Tannin was getting ready to present that plan to Cerberus, Spector, Marin, and others.  Spector and the leaders of the BSHG team clearly had been consulted about the "building of the plan" earlier and, according to a lengthy May 26 Tannin email to Cioffi and McGarrigal, Spector was focused on simplicity and "insisting on a 7th grade level presentation."

379.    In his lengthy May 26 email, Tannin listed what BSAM had to sell, beginning with "2 hedge funds (1.5 billion on capital) that are in danger of a wipe out because of a lack of liquidity" and ending his list with the BSHG team having "almost the necessary systems" to run their operations.  Tannin's comment on the latter was:  "we have the knowledge of what that system is and we are on the road to a solution (this may not sound great – but I believe there is NO ONE out there who has put it all together")".

380.    Tannin also went on to list the types of assets in the High-Grade and Enhanced Funds and to assess which could be "monitized" [sic].  He admitted that at that point, for example, CDO-squared securities and single name hedges did not have "a value and liquidity profile."  Tannin commented, "This is the problem.  There is simply no market.  Too many variables."

E.    THE BSHG TEAM MANEUVERED TO KEEP BARCLAYS IN PLACE, EVEN AS IT KNEW A "WIPE OUT" WAS IMMINENT

381.    On May 31, Cioffi and Tannin were focused on how to execute a rescue – a sale – for the funds and how to prevent withdrawals, especially by Barclays but also by the Feeder Fund investors.  Cioffi emailed Tannin and others at BSAM about getting performance numbers to an investor.

382.    Tannin emailed Cioffi back on May 31, explaining that the "issue is – **do we give them the -6.5 april or the larger down april?"**

383.    Cioffi then understood that the BSHG team's deceptions were at issue, and he responded to Tannin, "Ah that's correct I think that one deserves a phone call," indicating that he did not want to discuss that question via the written record of email.

384.    In fact, earlier that same day, BSAM's pricing committee had rejected Cioffi's pleas to use asset values that would lead to a -6.5% number for April.  Cioffi had made that request and persisted until May 31 in doing so despite the fact that, as the indictment concludes, "Cioffi was unable to produce any evidence supporting his alternative pricing method."

385.    Tannin, later that same night, debated via email with Cioffi on how much information to give about "where the losses have come from."  Tannin wrote, "On the one hand it focuses attention on how bad these bonds have become – and will cast doubt upon our initial

strategy where we leveraged these bonds so much – but on the other hand – it might explain the large loss – that it was the result of what amounts to a single very bad decision …."

386.    While all these May last-chance sale efforts, admission of a "very bad decision" and "large losses," discussion of the "danger of a wipe out because of a lack of liquidity," and acknowledgement of an inadequate system to run their BSHG operations were occurring within BSAM, BSAM, Cioffi and Tannin kept Barclays from knowing what was really occurring within the Enhanced Fund structure.  **Barclays still had not been told even of the greater than 10% loss that occurred in the Enhanced Fund in April.**

387.    Nor was Barclays getting accurate reports of May's performance or any warning in May that the month would result in an over 10% downturn.  BSAM provided a mid-month report that showed a decline of just 2%, and then by June 8 sent a report to Barclays that claimed that May in fact had a 2.7% positive return.

388.    Subsequent disclosures by BSAM and PFPC – once the collapse of the funds was public in mid-July – showed that the Enhanced Fund, in reality, had lost more than 38% of its NAV in May.

389.    If BSAM had revealed to Barclays in May that the Enhanced Fund had already experienced a more than 11% drop in April, was headed for another 10% or greater drop in May, and/or that BSAM was taking all kinds of impermissible and harmful steps in its operation of the structure, as alleged in detail above, Barclays would have withdrawn from the structure by terminating the swaps and redeeming its shares in the master fund on the earliest next dealing date of May 15 or June 3.

390.    In doing so, even based on the later, retroactive valuations of the net asset value in the Enhanced Fund by PFPC, Barclays would have received the return of its full investment and its full fees or very close to those amounts, and not suffered the same large damages.

391.    BSAM continued to process redemption payments to investors that would come out of the Enhanced Fund through early June.  For Feeder Fund investors, requests for such redemptions required 40-days notice to BSAM; and thus requests for redemptions that would occur at the beginning of June were dated prior to late April.  Approximately $25 million in such redemptions occurred in early June (corresponding to a Feeder Fund dealing date of May 31).

392.    Barclays, under the terms of its transaction, needed only to provide two business days notice prior to one of its dealing dates to terminate the swaps and redeem its hedge.

393.    In April or May, or at any earlier point in time when the BSAM Defendants might have revealed their damaging actions and the serious problems with the Enhanced Fund's performance instead of concealing them, Barclays would have had multiple "termination events" for the swaps and hedge to rely upon in triggering an unwind of its participation in the structure in as little as two business days.  For example, Barclays could terminate upon any material change in the risk profile of the Enhanced Fund without its consent; any failure to receive daily informational data on the portfolio for five consecutive days; any breach of the Reporting Requirements; or any breach of the Investment Guidelines that lacked an approved plan to cure. The BSAM Defendants' misrepresentations and omissions were designed to keep Barclays from doing so.

## XI. THE JUNE MELTDOWN OCCURRED AFTER BSAM FAILED TO MANAGE LIQUIDITY AND EXPANDED RISK, RATHER THAN ADDRESSING CREDIT DETERIORATION

### A. BSAM ATTEMPTED TO MAINTAIN MISREPRESENTATIONS INTO JUNE

394.     Despite their own panic that the Enhanced Fund was on the verge of failure, BSAM, Cioffi, and Tannin continued to work hard to conceal the Enhanced Fund's true performance from Barclays through false reports of successful hedging and positive returns on the portfolio.

395.     At or about the beginning of June 2007, Tannin called Barclays' Ware to tell him about an imminent publication in *Hedge Fund Alert*.  Tannin told Ware that an article was about to come out that said that BSAM had "gated" (*i.e.*, suspended) investor redemptions from the Feeder Funds.

396.     Tannin represented to Ware that this statement about gating was untrue.  He stated that BSAM was considering gating, but had not done so.

397.     On or about June 6, 2007, the BSHG team's Pusateri called one of her contacts at Barclays in the Bond Finance department with a similar message:  "She [Pusateri] said there may be an article released about current redemptions and weak performance in the funds.  She maiantained [sic] the fund is operating business as usual and that her managers are open to any questions …. She said they have sufficient liquidity and are able to meet all margin calls."

398.     Between approximately June 8 and June 12, Panzeri and Ware spoke further with Tannin at least twice.  Tannin spoke of the recent April and other smaller negative performance reports to Barclays as reflecting a "pricing anomaly" in CDO-squared securities in which BSAM had been invested.  Tannin said "there has not been any material deterioration in the underlying credit quality."  According to Tannin, "the market is stabilizing."

399.    Tannin also claimed in early June, again, that the portfolio's hedges were working.  He told Panzeri and Ware that there had been a slight lag in response; but now the portfolio had bounced, the hedges were catching up, and the Enhanced Fund was again performing well.

400.    As Barclays considered all the unfolding revelations and developments, Panzeri emphasized to Tannin that BSAM had to take all steps necessary to bring the portfolio within the Investment Guidelines and had to make sure that Barclays was getting timely NAVs.

401.    Tannin told Panzeri and Ware that he was working to bring down exposure to CDO-squared securities specifically, and CDOs generally, and to divert investment to structured credits with physical underlying assets.

402.    On or about June 13, however, Panzeri emailed Tannin to follow-up on Panzeri's hearing that "one of the repo counterparties dealing with your fund is apparently about to pull its line; I am sure this is just one of the rumours that spread at a time like this, but would like to confirm that this is just it, in order to avoid any sense of unease spreading."  As soon became clear, the word of counterparty unrest was unfortunately not a false rumor.

403.    Yet Tannin, Cioffi and BSAM were still intentionally, or at a minimum recklessly, misstating the portfolio's status as of June 2007 to Barclays for all of the reasons outlined above.  Indeed, as noted above, Robert Ervin of BSAM, on or about June 8, emailed Angus McIsaac of Barclays with another positive report.  BSAM reported to Barclays in that June 8 transmittal that the **returns on the portfolio for the month of May supposedly were up 2.7%.**

404.    In fact the portfolio declined by 38% in May, which BSAM and PFPC revealed only in July.  This kind of **retroactive 40% negative swing** in the portfolio's valuation amounts

to an unheard of level of re-pricing **months after-the-fact**.  It is many times larger than what might be acceptable as variation and imprecision in pricing, and does not reflect even a minimal level of fairness or competence in marking the assets.  Instead – like BSAM's distorted February and April results – it reflects BSAM's bad faith, deception and manifest error in valuing the portfolio and reporting on its performance to Barclays.  It also is distinguished from sharp, contemporaneous declines in assets' values and markdowns on that basis, for this was a massive **retroactive retelling** of history.

> B.    A LIQUIDITY CRISIS FINALLY REVEALED ITSELF BY MID-JUNE 2007

405.    On or about **June 14**, still another positive report came from Ervin of BSAM in an email to McIsaac of Barclays, with Tannin copied.  Ervin, couching results for the first time as "internal estimates," sent Barclays a **BSAM spreadsheet that showed gains through June 12 of almost 6%.**  It also showed a total NAV of more than $950,000,000.

406.    On or about June 14, however, BSAM was also hosting a meeting of "repo" agreement counterparties with claims on certain portfolio assets to try to negotiate grace.  Barclays then confirmed that the rumors Panzeri had heard a day earlier were true, and therefore knew that serious liquidity issues had emerged.

407.    Because the value of the collateral – the Enhanced Fund portfolio assets – that had been given to the repo counterparties was falling (though the falling values had not been reflected in the portfolio reports to Barclays), the counterparties had apparently demanded the posting of more collateral or more payments from the fund to diminish the size of their loans.  BSAM, however, nearly had reached the end of its possibilities in trying to stay ahead of its ongoing liquidity crunch, and did not have the cash or liquid assets to meet the counterparties' demands.

408.    By June 14, the repo counterparties in the meeting with BSAM were in a position to threaten the sale of the assets BSAM had previously posted as collateral in order to repay the repo loans and to extract themselves from their arrangements with the Enhanced Fund.

409.    When repo counterparties resort to a sale of the collateral assets, their only interest is in getting paid a price that would repay their loan.  Any price above that would bring in excess monies that would have to be paid back, under the terms of the agreement, to the Enhanced Fund.  Thus, the repo counterparties have no incentive to hold out for a price that is above the level they need to be made whole, even if they could achieve such a price.

410.    With the Enhanced Fund's enormous troubles finally coming to the ultimate crisis point, it is amazing that BSAM, Cioffi, and Tannin continued to assert contemporaneously to Barclays and others that the Enhanced Fund portfolio was increasing significantly in value.

411.    Because BSAM had let the fund's situation deteriorate to this point, Barclays was immediately concerned about whether BSAM would take all appropriate steps to stabilize the Enhanced Fund, would avoid rushed asset sales or other rushed dispositions, and would work with critical parties such as Barclays to proceed in an orderly and fair fashion.  Barclays also was focused on getting up-to-the-minute and full information from BSAM, and made innumerable requests to do so.  Furthermore, Barclays expected BSAM to act in accordance with BSAM's special duties to it and to do everything in its power to preserve value in the Enhanced Fund structure.

412.    During the ensuing crisis, BSAM and other Company representatives admitted on a June 18 conference call "that the CDO^2 [CDO-squared] positions were most problematic in finding liquidity in addition to retained positions [BSAM held] from deals they manage."

C.    BSAM, CIOFFI AND BEAR STEARNS PURSUED THE EVERQUEST IPO
       TO PASS RISK TO THE PUBLIC, BUT INSTEAD HARMED BARCLAYS

413.    As BSAM's massive hidden failures in the Enhanced Fund started to come to light in mid-June, the role of Bear Stearns and Bear Stearns Companies in the funds' demise also started to become apparent.

414.    For example, in June 2007 Bear Stearns, Cioffi and BSAM were on the brink of the IPO they had long planned for Everquest.

415.    BSAM and Cioffi knew that they needed to keep moving certain bad assets to avoid the eventual impact of their very limited value – they spread them first from the High-Grade Fund into the Enhanced Fund, then moved them into Everquest.  BSAM and Cioffi next wanted to sell public shares in Everquest to spread the ownership and risk of these assets even farther outward.

416.    Bear Stearns was the underwriter of the planned IPO and thus had studied the nature of the offering in detail, including the illiquid and extraordinarily risky nature of its assets.

417.    Everquest had been formed in September 2006 and was jointly run by BSAM and Stone Tower Debt Advisors LLC.  Cioffi, in addition to his many other roles at BSAM, was the co-chief executive of Everquest.

418.    Cioffi had argued in early September 2006 to Tannin and others within BSAM that they should form an entity like Everquest because initially it would produce a "reduction in CDO equity positions" while increasing liquidity.  He also noted in his September 6 email to Tannin and McGarrigal that "we will have an easier time marking Rampart [which apparently later became Everquest] than we do marking all the different positions."

419.    Longer term, Cioffi asserted that the eventual IPO would create "[s]ignificant upside" in "the form of liquidity and mark to market gain.  The bankers [at Bear Stearns]

estimate a 1.2-1.3X on the IPO based upon a dividend yield of 10% this could add 4-5% net to our yr."

420.     Tannin worried, however, also in a September 6 email to Cioffi and McGarrigal, "[d]o we know if there are any special disclosure rules we'd have to make were we to want to sell shares?  I am worried that any selling by us would raise questions in the minds of other shareholders and create the potential for price volatility."  Cioffi, BSAM and Bear Stearns proceeded anyway.

421.     As Everquest's May 9, 2007, Form S-1 disclosed, most of the assets (valued by Everquest and BSAM at $548.8 million) in Everquest's approximately $720 million portfolio were purchased in September 2006 from the High-Grade Fund and the Enhanced Fund.  In return, the funds received 16 million shares of Everquest (valued by Everquest and BSAM, which were obviously not independent and unbiased, at $25 per share) and $148.8 million in cash.  As of the date of the S-1, that filing reported that the funds retained their 16 million shares in Everquest.

422.     The S-1 further revealed that the largest transfer from the BSAM Enhanced and High-Grade Funds to Everquest involved the lowest (*i.e.*, riskiest) tranches of Parapet, a BSAM-managed vehicle that created CDOs out of CDO-squared and other CDO securities, many of which were also from other vehicles managed by BSAM.

423.     The Everquest S-1 listed Cioffi as the "beneficial owner" of Everquest shares.  In addition, Everquest disclosed that, upon the IPO, BSAM and Stone Tower each would receive new share grants representing 2.5% of Everquest's outstanding shares for the managers and/or employees, which included Cioffi.  Therefore, Cioffi stood to benefit personally from the IPO.

424.    BSAM also benefited from the Everquest arrangement because it was entitled to management and incentive fees from Everquest, in addition to its fees associated with the Enhanced Fund structure.  Likewise, Bear Stearns would benefit from an Everquest IPO through its underwriting fees.

425.    Everquest's S-1 – like BSAM's direct reports to Barclays on the Enhanced Fund from the same period – omitted critical disclosures that would have had a significant adverse effect on the amount Bear Stearns, Cioffi, and BSAM could realize from an IPO.  Neither Everquest's filing nor BSAM's reports on the Enhanced Fund to Barclays through May 2007 disclosed, for example, that the Enhanced Fund had suffered significant losses in April 2007 as the Everquest and other similarly shaky assets lost value.

426.    Shares in Everquest are not a permitted investment under the Investment Guidelines; indeed such shares never appeared on the portfolio reports for the Enhanced Fund given to Barclays by BSAM, despite the disclosure of the funds' share ownership in an official filing with the SEC.  In addition, as a large unrated investment in a single stock issue, the Enhanced Fund's apparent ownership stake in Everquest far exceeded allocation limitations set by the Investment Guidelines.

427.    Even Bear Stearns' managing directors viewed Everquest with great skepticism by mid-June 2007.  During a "town hall" meeting for Bear Stearns' managing directors on or about June 22, one of those managing directors reported that the overall sense among the attendees at the meeting was extreme skepticism regarding Everquest's construct and purpose.  According to this managing director, many of them expressed the belief that BSAM was trying improperly to dispose of poor quality CDOs through the Everquest IPO.  The June 22 meeting

attendees also openly questioned whether the BSAM portfolios in general were "dumping grounds" for toxic assets, including many Bear Stearns or BSAM-related assets.

428.    Others at the June 22 "town hall" opined instead that BSAM and its funds would have been fine if BSAM had been able earlier "to offload its risk to the public" through the Everquest IPO.

429.    On or about June 25, 2007, amid an onslaught of negative press reports surrounding the deteriorating High-Grade and Enhanced Funds and the terrible quality of the assets that had been dumped into Everquest, Everquest withdrew its planned offering.

430.    Indeed, press reports described the finally-aborted Everquest IPO as "an unprecedented attempt by a Wall Street house to dump its mortgage bets." *See* Matthew Goldstein, *Bear Stearns Subprime IPO: Everquest Financial is Going Public with Risky Mortgage Bets Purchased from Its Underwriter's Hedge Funds,* www.BusinessWeek.com, May 11, 2007; *see also* Carolyn Sargent, *Behind Bear's Big Fall*, www.absolutereturn.net, September 2007 ("Bear allowed [Cioffi] . . . to stuff his funds with Bear-originated collateralized debt obligations that he allegedly helped form.  Bear even helped Cioffi set up a company to purchase shaky securities from the funds when the market began to crack."); Alistair Barr, *Everquest IPO Tied to Troubled Bear Hedge Fund: Cioffi's Fund Transferred Risky Mortgage Derivatives to Firm He Helps Run*, www.MarketWatch.com, June 15, 2007 (one CDO expert quoted as saying, "If the stories are correct about the problems at the fund, it sounds like they off-loaded the riskiest positions to Everquest[.]")

431.    With no IPO, no Everquest shares left the Enhanced Fund.  Thus, the fund remained indirectly invested in the worst tranches of the Parapet CDO of CDOs and other troubled assets into at least July 2007, to Barclays' detriment.  Cioffi, BSAM and Bear Stearns

had pursued the ill-fated Everquest gambit for their own interests – to earn fees or other income, to dispose of some of Cioffi's and BSAM's worst investments, to seek mark to market gains from at least a temporarily rising stock price after the IPO, and to make the marking of assets in the Enhanced Fund "easier." Everquest and its assets contributed significantly to Barclays' losses.

      D.     <u>BSAM AND BEAR STEARNS COMPANIES ABANDONED BARCLAYS'
INTERESTS AND IGNITED A FIRE-SALE OF THE PORTFOLIO'S ASSETS</u>

      432.    Bear Stearns Companies also started to reveal its participation in the Enhanced Fund's collapse through the Company's own statements and actions in June 2007.

      433.    At some earlier point and at least by May 2007, officers of the Company had joined with BSAM, Cioffi and Tannin behind the scenes in making important decisions about the Enhanced Fund structure and portfolio.

      434.    For example, Spector, the Company's then co-President, participated in BSAM's efforts in May to sell the BSHG team's entire business to Cerberus or some other entity before the BSHG team's operations crashed completely. At that time, Spector was fully informed about the failures that BSAM, Cioffi and Tannin were concealing from Barclays and he, on behalf of the Company, tried to help BSAM dispose of the BSHG operations before those failures became public or "wiped out" the funds.

      435.    After that failed attempt, Spector and others at the Company made many of the major strategy choices for the Enhanced Fund structure in June's crisis of insufficient liquidity and unsatisfied counterparties. Spector and other members of the Company's executive committee (including Cayne, Samuel Molinaro, and Alan Schwartz) were kept apprised of the Enhanced and High-Grade Fund situations and helped determine their fate by specific decisions made at the Company level.

436.    Spector and the other Company officers also knew of Barclays' special position in the Enhanced Fund structure and BSAM's fiduciary duties towards it, yet refused to work toward preserving Barclays' investment and instead dissipated the assets that should have gone toward repaying Barclays.

437.    The Company and BSAM brought in The Blackstone Group to assist them with the June crisis.  In addition, at some point in June, the Company temporarily moved Thomas Marano from his position at Bear Stearns to take over trading for the funds on behalf of the Company.  Bear Stearns Companies also increased the day-to-day risk management supervision of BSAM and especially the BSHG team by Michael Alix, the parent company's chief risk officer.

438.    From June 14 onward, Barclays was in daily contact with BSAM and the others who, on behalf of the Company, were purportedly trying to stabilize the Enhanced Fund structure.  Ho spoke with Tannin on June 15 and 16.  From on or about June 17, John Mahon and Mark Manski of Barclays took the lead in trying to get more information from and to work with BSAM and Blackstone to deal with the counterparty and liquidity pressure.  Mahon spoke with Richard Marin, then still the BSAM chief executive, approximately six times.  Calls or meetings took place with Blackstone that included Manski and/or other Barclays representatives concerned with the fate of the Enhanced Fund structure on every day from June 18 through at least June 22.  Tim Coleman of Blackstone was the primary contact for Barclays on the Blackstone team.

439.    The Company and BSAM, through their Blackstone representatives, at times outlined various possible courses of action to Barclays and to other banks that reflected that Bear Stearns Companies was the entity responsible throughout this period for the ultimate decisions

about what occurred.  Those outlines repeatedly included a component of Company financing, and clearly had been vetted with Company executives.  Bear Stearns Companies kept changing its position, however; and neither the Company nor BSAM would provide up-to-date information to Barclays, or to others.  As a result of the Company's handling of the situation, none of the proposals that would have addressed the problems in both the Enhanced Fund and the High-Grade Fund ever came to fruition.

440.    The Company reflected its knowledge of Barclays' unique role in the Enhanced Fund structure and Barclays' substantial stake as sole participating shareholder in the Enhanced Fund by generally proposing plans that referred to Barclays and might have included Barclays providing additional leverage or other financing to help the structure survive the crisis.  Despite daily efforts, however, Barclays could not get accurate information and thus did not even have the predicate for any assistance.

441.    On or about June 17, Barclays received its last portfolio spreadsheet of the Enhanced Fund's assets from BSAM, dated June 15.  This portfolio report, as underscored by Marin's subsequent statements in the coming days and later by PFPC's reports in July, vastly overstated the mid-June asset values in the Enhanced Fund.

442.    On June 18, BSAM and Blackstone still were representing to Barclays that the equity in the Enhanced Fund would be sufficient to make Barclays whole.  On June 21, Barclays was being told there was a chance it would be made whole.  By June 25, however, Marin told Mahon that there might be only approximately $200 million in value left in the Enhanced Fund.  By June 26, Marin revealed that yet more losses probably had occurred, saying that the June 25 figure had been based on book value, not actual value.

443.    Indeed, at one point Marin admitted to Mahon during a phone conversation that BSAM did not know how to value various CDO equity positions in the Enhanced Fund portfolio.

444.    Despite all of the affirmative efforts by Barclays to obtain information, and despite BSAM's obligations under its prior commitments to Barclays, Barclays never succeeded in obtaining even basic confirmation of what was occurring during this critical mid- to late-June 2007 period with the Enhanced Fund. Marin and others would profess to Barclays BSAM's willingness to provide ongoing information, and Marin made specific promises to Barclays' Mahon that BSAM would do so. But vital information, including an accurate NAV, was never forthcoming.

445.    For example, Mahon asked Marin for a list of the Enhanced Fund's unencumbered assets. Marin promised to provide that list, but never did. As the crisis continued, Mahon also asked for specific information on the initial deals that BSAM had made with counterparties and for the marks on assets that had been included in those deals. Again, Barclays never received that information.

446.    Finally, on June 22 Mahon sent a letter to BSAM, again asking for up-to-date information about the NAV of the Enhanced Fund, unencumbered assets, deals that had already been concluded, and any "issues hampering reaching agreements with other counterparties." BSAM was not forthcoming.

447.    Throughout this period, Ho, Mahon and Manski emphasized in their conversations with Tannin, Mahon, Blackstone, and other Company representatives that they should do everything possible to avoid counterparty banks breaking ranks to sell their assets hurriedly, which could cause a downward spiral. BSAM and the Company did not do so.

448.    Spector was the Company's senior negotiator with the most significant repo counterparties.

449.    Spector, the Company and BSAM did not adequately, competently, or in good faith manage events in mid-June to stabilize the position of all the repo counterparties with regard to the Enhanced Fund, to Barclays' special detriment.  Especially once they believed that the Feeder Fund investors' stakes in the Enhanced Fund could not be saved, the Company and BSAM abandoned Barclays' interests and simply let the losses mount, for only Barclays would suffer them.

450.    In particular, the Company and BSAM mismanaged the relationship with Merrill Lynch, one of the larger repo counterparties.  Merrill Lynch ultimately began to sell assets on the open market, despite the Bear Stearns entities and Merrill being only a small amount apart in their negotiations to avoid such an outcome.  The Company and BSAM knew this would likely trigger many further asset sales by repo counterparties and other harmful effects; but they took inadequate steps to avert it.

451.    On or about June 21, the Bear Stearns Companies executive committee was meeting to consider all its options with regard to the Enhanced and the High-Grade Fund structures.  In having that meeting, the executive committee delayed further progress and meetings with the repo counterparties until it could determine the Company's then-current position; and the Company was clearly in charge of the overall situation.

452.    On or about June 22, Bear Stearns Companies announced that it would make $3.2 billion in financing available to the High-Grade Fund.  Yet, at the same time, the Company publicly made clear, through statements by Spector and others, that it would allow the Enhanced

Fund to fail.  These decisions were made by Spector and other members of the executive committee of the Company.

453.    The Company later reduced its financing offer for the High-Grade Fund to $1.6 billion; and, in fact, only a small amount of that financing was used.  Apparently the Company simply used a repo agreement to gain control of some of the High-Grade Fund's better assets. The High-Grade Fund soon collapsed along with the Enhanced Fund.

454.    After the Merrill actions, which could have been avoided by the defendants, and the Bear Stearns Companies' announcement that it was turning its back on the Enhanced Fund, Barclays' financial stake effectively was left to the mercy of a fire-sale market.  Indeed, there was a rush to the door by the repo counterparties in selling assets quickly rather than negotiating for price.

455.    For example, a Cantor Fitzgerald trader trying to unload repo agreement assets told a trader from another firm that Cantor simply wanted bids, and did not care what they were.

456.    The rushed sale of some assets from the Enhanced Fund drove market prices generally down further, and helped trigger a greater downward trend in market conditions.  The counterparties' flooding of the market with bid lists also contributed to panic and to an evaporation of trading interest, all to the detriment of preserving value in the Enhanced Fund.  If the Company and BSAM had acted differently, more value could have been preserved for Barclays to recover from the structure.

457.    The actions by Bear Stearns Companies and BSAM in allowing the Enhanced Fund to fail, and allowing asset sales in a manner that further destabilized the structure and did not preserve value for Barclays, breached BSAM's fiduciary duties that were specific to Barclays.  Bear Stearns Companies knowingly aided in that breach.

458.     The nature of the actions alleged above indicates that other individuals, yet to be specifically identified, at Bear Stearns Companies or Bear Stearns also were likely involved in knowingly assisting and implementing the breach of BSAM's fiduciary duties during this period, and perpetuating Bear Stearns Companies' and Bear Stearns' harm to Barclays.

E.     "NO VALUE LEFT"

459.     BSAM stated in late June that a final NAV for May would not be released until July 16, 2007, one month late and well past this critical June period for the Enhanced Fund.

460.     On July 17, BSAM released a May NAV for the Feeder Funds and an estimated June NAV for those funds, and in doing so, explicitly confirmed the devastating news that there was "effectively no value left" for the Feeder Fund investors.

461.     In a letter dated July 17, but sent by email to Simran Sethi of Barclays late on the night of July 18, PFPC reported to Barclays that the Enhanced Fund had declined 38.27% in May.  Neither PFPC nor BSAM provided a report to Barclays for June's results and month-end NAV.

462.     On or about July 23, Barclays hand delivered to BSAM the appropriate notice to terminate the swaps and redeem its hedge of shares in the Enhanced Fund simultaneously on the next dealing date, August 3, 2007.

463.     On July 31, 2007, the Enhanced Fund applied to the Grand Court of the Cayman Islands for the appointment of joint provisional liquidators and commenced an insolvency proceeding.

464.     After their appointment, those joint provisional liquidators then appeared *ex parte* on July 31 in the U.S. Bankruptcy Court in the Southern District of New York to seek various forms of temporary relief for the fund.

465.    The July 31 papers filed by the Enhanced Fund's joint provisional liquidators in the U.S. Bankruptcy Court recounted that "the Foreign Petition states that Enhanced Fund is insolvent and unable to pay its debts as they come due."

466.    On August 2, 2007, BSAM, on behalf of the Enhanced Fund, faxed to Barclays a letter stating that the Enhanced Fund Board of Directors purportedly declared a suspension of the redemption of shares in the Enhanced Fund on July 25, 2007, that allegedly applied to Barclays and informed Barclays of the Cayman Islands' appointment of the joint provisional liquidators.

467.    Based on the insolvency filing and subsequent reports regarding assets and liabilities from the now official liquidators, either all or almost all the value in the Enhanced Fund portfolio is gone.  Thus, all or almost all of Barclays' $400,000,000 financial commitment to the structure has disappeared.  By the beginning of June, Barclays was owed fees of almost $12,000,000, which were also to be paid from the Enhanced Fund assets.

## XII.    THE BSAM DEFENDANTS MISLED BARCLAYS WITH MISSTATEMENTS AND OMISSIONS AND THAT DECEPTION CAUSED LOSSES TO BARCLAYS

468.    As alleged above, BSAM and Tannin made numerous misstatements regarding BSAM's actions and capabilities with regard to managing liquidity and they did so intentionally or at a minimum recklessly to deceive Barclays.  The many specific representations pled above concerning BSAM's ability to maintain liquidity such that Barclays' leverage could be "dialed" up or down at any time, its ability to avoid "freaked-out repo counterparty risk," and its ability to invest in assets with the "greatest liquidity" and "greatest value," all proved to be false statements.

469.    The Enhanced Fund structure ended up collapsing because BSAM, Cioffi and Tannin had not managed liquidity effectively, triggered "freaked-out repo counterparties," and

had filled the portfolio with especially illiquid assets rather than those structured credit assets with the "greatest liquidity" and "greatest value."

470.    Moreover, BSAM, Cioffi and Tannin falsely described BSAM's capabilities, while at the same time intentionally or recklessly omitting any disclosure to Barclays of the liquidity problems in the High-Grade Fund at the time of the Enhanced Fund's spin-off, the continuation of those liquidity problems, or of the later, mounting liquidity issues in the Enhanced Fund itself.

471.    BSAM, Cioffi and Tannin, for example, represented that all the Enhanced Fund repo counterparties were "very happy" in February and that the fund structure remained "very stable" in March; and they never disclosed the truth about the repo counterparties and the fund's liquidity stresses to Barclays until the repo counterparties had reached the end of escalating steps to protect themselves amidst instability and had themselves demanded a meeting in June.  The months of deception by BSAM, Cioffi and Tannin with regard to the Enhanced Fund structure's liquidity caused losses to Barclays.

472.    Likewise, BSAM's and Tannin's repeated statements that their proprietary risk management system used voluminous information to ensure contemporaneous, rigorous and quantitative credit monitoring, that BSAM's system provided an early warning and could "quickly identify and sell suspect assets before credit deterioration," and that those capabilities would be employed to warn Barclays and protect Barclays' interests, all also proved to be false. BSAM's supposedly "prudent" approach and its descriptions of especially tight risk management were false representations about BSAM's operations when those statements were made; and they continued to be false as the Enhanced Fund descended into trouble.  As with all the other alleged

misrepresentations alleged herein, those statements were made intentionally or at a minimum recklessly to deceive Barclays.

473.    In addition, BSAM failed in at least April, May and June to comply with the explicit warning provision in the Reporting Requirements that required BSAM to make Barclays aware of any month that might result in a greater than 10% loss in the Enhanced Fund's value.

474.    BSAM's, Cioffi's and Tannin's misrepresentations about BSAM's risk management capabilities and approach caused Barclays losses because Barclays did not receive early warning, BSAM did not identify and sell suspect assets before credit deterioration, and the risk in the Enhanced Fund portfolio ballooned out of control, rather than being managed and contained as the relevant credit markets became more difficult.

475.    In fact, BSAM, Cioffi and Tannin intentionally took on more risk, with less or non-existent analysis or management of that risk, as the performance in the Enhanced Fund declined, apparently in an improper effort to "double down" and regain some of the portfolio's losses.  That increased risk caused even more losses to Barclays.

476.    In particular, BSAM, Cioffi and Tannin misrepresented and failed to disclose and update material information about the Enhanced Fund's strategy for hedging credit risk, or lack thereof.

477.    BSAM and Tannin only provided partial information, at times when they wanted to claim hedging success, without informing Barclays that the degree of hedging was grossly inadequate actually to hedge or even significantly to mitigate losses on the portfolio's long asset-backed securities positions.  In addition, when even the minimal and insufficient hedging failed dramatically, at junctures throughout the spring, BSAM and Tannin failed to update or correct their prior representations to Barclays that their hedges were working "beautifully," that they

were producing gains for the Enhanced Fund, and that the BSHG team was particularly adept and succeeding at hedging.

478.    The BSAM Defendants' inadequate and ineffective hedging caused losses to Barclays, as did their failure to alert Barclays to the breakdown of whatever hedging strategy the BSAM Defendants did have.

479.    If BSAM, Cioffi and Tannin had disclosed to Barclays in February, March, April or May that BSAM's hedges were inadequate and back-firing, that the BSAM Defendants were recklessly taking on new levels of risk to try to regain losses, and/or that those defendants were about to succumb to a liquidity crisis, Barclays would have terminated its participation in the Enhanced Fund structure at the earliest dealing date.  Instead, Barclays was reassured and repeatedly given erroneous performance information.

480.    The statements pled above that relate to accurate and fair marking of the Enhanced Fund assets on an ongoing basis, the restriction on portfolio assets to those that had independent pricing available, thus excluding especially hard-to-price assets, and to transparency in pricing all also turned out to be false.

481.    BSAM, Cioffi and Tannin claimed that they could mark and report the full portfolio results within days; yet BSAM held up the PFPC reports and accurate, real portfolio performance numbers for months.  BSAM, Cioffi and Tannin never disclosed to Barclays that they were not using and reporting truthful, accurate and real marks on the assets.

482.    Moreover, BSAM's reports to Barclays, which came less frequently and with less detail than promised, intentionally or at least recklessly failed to re-mark many of the long positions in asset-backed securities that in fact had lost value in February, March, April, May and June.  BSAM misrepresented the marks, by leaving them higher than a prudent and fair pricing

would, and in particular left assets related in some way to the Company marked at an inaccurately high level.

483.    BSAM's false marking and the BSAM Defendants' failure to disclose their deceptive approach to marking caused Barclays losses by misleading Barclays about the Enhanced Fund structure's performance and about the cushion that existed to protect Barclays' stake.

484.    If BSAM, Cioffi or Tannin had disclosed to Barclays that BSAM was engaging in significant marking and performance deception, and thus that the Enhanced Fund was performing worse than BSAM led Barclays to believe, Barclays would have terminated its participation as leverage and liquidity provider and severed its ties to the structure at the earliest dealing date.  Moreover, BSAM, Cioffi and Tannin used repeated, erroneous reports about the NAV to hide the many underlying failures and deficiencies in their operation of the structure.

485.    BSAM, Cioffi and Tannin also misrepresented their capabilities and their intent to follow the Investment Guidelines and Reporting Requirements.  If BSAM had complied with the promised Investment Guidelines, for example in excluding difficult-to-price assets without regularly available independent prices, excluding CDO-squared investments, excluding the Everquest Financial shares, and limiting other categories and ratings of assets as specified in the Investment Guidelines, Barclays would not have suffered the losses that it, in fact, did.

486.    As BSAM and Tannin admitted in statements alleged above, the CDO-squared securities and the securities that BSAM had retained in the Enhanced Fund from CDO deals that it managed proved to be especially difficult to sell.  Those caused significant losses to Barclays.  In addition, BSAM caused losses to Barclays with securities that were backed by the very

mortgage debt in which BSAM and the Company specialized and about which BSAM should have had the most accurate information.

## XIII.  THE BSAM DEFENDANTS BREACHED THE FIDUCIARY AND OTHER DUTIES THEY OWED BARCLAYS AND THOSE BREACHES CAUSED LOSSES TO BARCLAYS

487.    Once the transaction had closed and Barclays was a dependent part of the Enhanced Fund structure, the BSAM Defendants breached their fiduciary duties to Barclays and operated and managed the structure with gross negligence toward Barclays.

488.    The BSAM Defendants operated the structure, managed the Enhanced Fund and breached their fiduciary duties and other commitments specific to Barclays from their offices in New York City.

489.    BSAM owed Barclays duties of care, fairness, good faith and loyalty, yet operated the Enhanced Fund structure and managed the Enhanced Fund portfolio (a) in bad faith and without loyalty to Barclays' unique and important position in BSAM's structure and to preservation of Barclays' capital; (b) in BSAM's and other affiliates of the Company's self-interest; and (c) with a lack of fairness and care in selecting, monitoring, and marking the Enhanced Fund's assets (with disregard for the Investment Guidelines and Reporting Requirements), in employing (or not employing) its hedges, and in managing its liquidity needs. These breaches of fiduciary duty and gross negligence caused Barclays losses by diminishing and eventually dissipating the value of the portfolio after Barclays had been convinced by BSAM to trust and have comfort in BSAM protecting its interests in the transaction.

490.    During the life of the structure, BSAM also owed Barclays duties of disclosure, honesty, and accuracy in keeping Barclays informed about the status and performance of the portfolio, its assets, and the structure as a whole.  As explained above, BSAM and Tannin instead failed to disclose, misrepresented, and inaccurately presented material facts throughout the

transaction's history, deceiving Barclays into staying in the structure longer than it otherwise

would have and causing it to suffer harms and consequences that BSAM had claimed Barclays,

with BSAM's protection, could and would avoid.  BSAM's failures of disclosure, erroneous

reports, and dishonesty caused Barclays losses.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

(Fraud and Deceit – as to Defendants BSAM, Tannin and Cioffi)

491.    Barclays repeats and realleges the foregoing allegations as though fully set forth

herein.

492.    As detailed above, BSAM and Tannin made material misrepresentations of fact in

connection with Barclays' participation in the leverage counterparty and hedge transaction,

Barclays' commitment of additional funds to the structure from September 2006 through March

2007, and its continued participation in the transaction into July 2007.

493.    In the pre-closing period, BSAM and Tannin made numerous misstatements of

material fact, as well as representations about their future planned actions that they knew at the

time did not reflect their true intentions.  After the transaction commenced, they made further

misrepresentations of material fact and reiterated the same representations about planned actions,

again knowing that the statements about their plans did not reflect their true intentions.

494.    BSAM and Tannin did so initially to convince Barclays to close the transaction,

and thus to enable the whole structure and the Feeder Funds to begin operation, for all the

underlying reasons alleged above.  BSAM and Tannin did so subsequently to keep Barclays in

the structure and to hide the Enhanced Fund's difficulties for as long as possible.

495. BSAM and Tannin knew that their statements of fact and of intended actions were false and misleading, or at a minimum were reckless in not knowing whether the statements of fact were true, when the statements were made. BSAM and Tannin made the statements with the intent and expectation that Barclays would rely on them.

496. Cioffi had actual knowledge of the misrepresentations of fact and of intentions made by defendants BSAM and Tannin, based on ongoing briefing of and consultation with Cioffi by Tannin and others on the BSHG team. BSAM and Tannin were at all times making those misrepresentations on behalf of BSAM, and Cioffi was then an officer and director of BSAM. Cioffi was also Tannin's supervisor and the individual in charge of all of the BSHG team's activities for BSAM.

497. Cioffi had the intent and expectation that Barclays would rely upon BSAM's and Tannin's false statements.

498. Barclays reasonably relied on each of the pre-closing representations of defendants BSAM and Tannin alleged above, which, in fact, were misrepresentations.

499. Barclays also reasonably relied on each of the representations (which, in fact, were misrepresentations) of defendants BSAM and Tannin as Barclays increased its financial contributions to the structure from September 2006 through March 2007 and in participating in the structure into July 2007.

500. The material misrepresentations were within the peculiar knowledge of BSAM, Tannin and Cioffi; and those defendants actively concealed the truth such that Barclays could not gain access to it.

501.    Without the material misrepresentations before closing, Barclays would not have entered into the transaction.  Without the later material misrepresentations, Barclays would have terminated its participation in the transaction.

502.    BSAM's, Tannin's and Cioffi's fraudulent conduct was willful, malicious and without regard to Barclay's rights and interest.

503.    As a direct, proximate and foreseeable result of BSAM's, Tannin's and Cioffi's conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of BSAM's, Tannin's and Cioffi's conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

## SECOND CAUSE OF ACTION

(Fraudulent Concealment – as to Defendants BSAM, Tannin and Cioffi)

504.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

505.    As detailed above, defendants BSAM, Tannin and Cioffi failed to disclose material facts in connection with Barclays' participation in the leverage counterparty and hedge transaction, Barclays' commitment of additional funds to the structure from September 2006 through March 2007, and its continued participation in the transaction into July 2007.

506.    BSAM, Tannin and Cioffi owed Barclays a duty to disclose based on (a) their superior knowledge of facts, not readily available to Barclays, when each knew that Barclays was acting on the basis of mistaken information; (b) their fiduciary and special relationship with Barclays; and/or (c) partial or ambiguous statements that triggered such a duty.

507.    In addition and in the alternative, BSAM, Tannin and Cioffi had a duty to correct and/or to update information that BSAM had provided to Barclays.  To the extent that some of

BSAM's or Tannin's statements were correct when made but then became misleading, BSAM, Tannin and Cioffi had a duty to update. BSAM, Tannin and Cioffi knew or should have known that their prior statements had become misleading. To the extent that some of BSAM's or Tannin's statements were not known to be false at the time they were made but came to be known by BSAM, Tannin or Cioffi to be false when made, BSAM, Tannin and Cioffi had a duty to correct.

508.    In the pre-closing period, BSAM, Tannin and Cioffi failed to disclose material facts to Barclays that each had a duty to disclose. Failures to disclose and failures to update or correct continued after the transaction commenced and throughout Barclays' participation in it.

509.    BSAM, Tannin and Cioffi concealed material facts from Barclays initially to convince Barclays to close the transaction, and thus to enable the whole structure and the Feeder Funds to begin operation, for all the underlying reasons alleged above. BSAM, Tannin and Cioffi did so subsequently to keep Barclays in the structure and to hide the Enhanced Fund's difficulties for as long as possible.

510.    BSAM, Tannin and Cioffi, *inter alia*, owed Barclays a duty to disclose the true facts about their capabilities and practices (or lack thereof); the nature, status and performance of the investment portfolio; the asset values in the Enhanced Fund; their schemes to use the Enhanced Fund to solve problems in the High-Grade Fund and, in the end, to sell all their operations; and their self-dealing and attendant misuse of the structure.

511.    BSAM, Tannin and Cioffi knew that Barclays was relying on erroneous and incomplete information when each of those defendants failed to comply with the duty to disclose or the duty to update or correct. Each of those defendants intended and expected that Barclays

would rely on misleading, incomplete information, without the material information that should have been disclosed by those defendants.

512.    BSAM, Tannin and Cioffi deliberately or at least recklessly failed to disclose material facts to Barclays.

513.    Barclays reasonably relied on the misleading and incomplete information that it possessed to make its decisions about initial and continued participation in the transaction. BSAM, Tannin and Cioffi acted throughout the history of the transaction to limit the information available to Barclays, to deflect Barclays' requests for further information, and to conceal information through distortion and obfuscation.  Barclays did not have access to the material information that BSAM, Tannin and Cioffi withheld and failed to disclose.

514.    If BSAM, Tannin and Cioffi had complied with those duties, Barclays would not have initially entered into the transaction or increased its financial contributions to the structure. Instead, Barclays would have terminated its participation in the transaction.

515.    BSAM's, Tannin's and Cioffi's fraudulent conduct, as alleged herein, was willful, malicious, and without regard to Barclay's rights and interest.

516.    As a direct, proximate and foreseeable result of BSAM's, Tannin's and Cioffi's conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of BSAM's, Tannin's and Cioffi's conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

## THIRD CAUSE OF ACTION

(Aiding and Abetting Fraud and Fraudulent Concealment—as to Defendant Bear Stearns)

517.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

518.    As shown above, defendants BSAM, Cioffi and Tannin committed fraud and fraudulent concealment to deceive Barclays.

519.    By virtue of, *inter alia*, Bear Stearns' participation in the initial creation of the Enhanced Fund structure as placement agent for investors in the Feeder Funds, Bear Stearns' principal-trade compliance monitoring and the moratorium it placed on trades with the High-Grade Fund and Enhanced Fund, its emergency bridge loan to assist the Enhanced Fund in temporarily staving off liquidity pressures in April 2007, and its role as underwriter on the Everquest IPO and in other transactions that involved BSAM and the Enhanced Fund, Bear Stearns knew that BSAM and its managers, Cioffi and Tannin, were deceiving Barclays.

520.    For example, Bear Stearns knew that BSAM, Cioffi and Tannin were not disclosing the principal trade approval failures in the High-Grade Fund and the resulting Bear Stearns moratorium on trades prior to closing the Enhanced Fund transaction or prior to Barclays increased funding of the structure.  Bear Stearns also knew that BSAM, Cioffi and Tannin were not disclosing to Barclays the liquidity issues hurting the Enhanced Fund in or about April 2007 or the diminishing asset values that were affecting both Everquest and the Enhanced Fund that spring.

521.    Bear Stearns substantially assisted the BSAM Defendants' fraud and fraudulent concealment by not disclosing to Barclays or others Bear Stearns' moratorium on trades or BSAM's history of failing to secure the necessary principal-trade approvals; by serving as underwriter on the Everquest IPO and not disclosing performance problems with the Everquest assets, BSAM, or the Enhanced Fund in the Everquest S-1 or through other means; and by providing the bridge repo loan to help BSAM, Cioffi and Tannin keep hiding the Enhanced Fund's liquidity issues, hedging failures and falling asset values.

522.     Bear Stearns stood to gain financially – and aimed to guard its reputation – by concealing the High-Grade Fund's failures, helping to conceal the performance problems in the Enhanced Fund, continuing the Enhanced Fund's operations, and continuing the Bear Stearns underwriting and placement agent activities that related to that fund.

523.     Bear Stearns was a critical participant and knowingly provided its substantial assistance in the BSAM Defendants' fraud and fraudulent concealment.  Bear Stearns took actions itself to keep Barclays and others from receiving truthful, material information with regard to the Enhanced Fund structure and its transactions, and in doing so caused harm to Barclays.

524.     Bear Stearns' conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

525.     As a direct, proximate and foreseeable result of Bear Stearns' conduct, in aiding and abetting BSAM, Cioffi, and Tannin in their fraud and fraudulent concealment, Barclays has been damaged in an amount to be determined at trial.  As a result of Bear Stearns' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

<u>FOURTH CAUSE OF ACTION</u>

(Aiding and Abetting Fraud and Fraudulent Concealment—as to Defendant

Bear Stearns Companies)

526.     Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

527.     As shown above, defendants BSAM, Cioffi and Tannin committed fraud and fraudulent concealment to deceive Barclays.

528.    By virtue of, *inter alia*, Spector's responsibility for supervising BSAM and, in particular, the risk controls in place at BSAM at all times relevant to this action, Spector's involvement in the efforts of BSAM, Cioffi and Tannin to sell the BSHG operations (including specifically the Enhanced Fund) or find some other "solution" to the BSHG funds' declining performance and liquidity crisis in the spring of 2007, and Spector's and the entire Executive Committee's decision-making with regard to the Enhanced Fund in June 2007,  Bear Stearns Companies knew that BSAM and its managers, Cioffi and Tannin, were deceiving Barclays.

529.    For example, Spector and others within Bear Stearns Companies knew by May that BSAM, Cioffi and Tannin were not disclosing to Barclays that BSAM did not have the necessary systems to operate the Enhanced Fund, that the Enhanced Fund was on the brink of a "wipe out" because of liquidity pressures, that its CDO-squared securities did not have any "value and liquidity profile," and that BSAM was working to find a sale or other rescue before the Enhanced Fund collapsed.  In addition, Spector and others at the Bear Stearns Companies knew in May and early June that the remaining asset value in the Enhanced Fund was lower than BSAM, Cioffi and Tannin were reporting to Barclays, and knew that the Enhanced Fund's performance had not stabilized, contrary to Tannin's and BSAM's representations to Barclays.

530.    Bear Stearns Companies substantially assisted the BSAM Defendants' fraud and fraudulent concealment by not disclosing to Barclays or others the mounting troubles in the Enhanced Fund, the plan to sell or otherwise dispose of the BSHG operations before the troubles were discovered, and the further diminishing value and viability of the Enhanced Fund in May and June 2007.  In addition, Spector, others at the Company, and Blackstone at the Company's direction made numerous decisions in June 2007 to continue to withhold information from Barclays until the complete collapse of the Enhanced Fund.  Spector also affirmatively assisted

BSAM, Cioffi and Tannin in pursuing a sale and other strategies with regard to the Enhanced Fund, beginning in May or earlier, to the exclusion of accurate and required disclosure to Barclays.

531.    Spector and Bear Stearns Companies aimed to guard their reputations by helping to conceal the performance problems in the Enhanced Fund, continuing the Enhanced Fund's operation, and seeking some exit strategy that might conceal forever the fraud and the failures by BSAM, Cioffi and Tannin.  Later, Bear Stearns Companies focused on the possibility of retaining assets for itself, for investors in the High-Grade Fund, or for Feeder Fund investors in the Enhanced Fund structure, and continued to conceal information from and forsake the interests of Barclays.

532.    Bear Stearns Companies was a critical participant and knowingly provided its substantial assistance in the BSAM Defendants' fraud and fraudulent concealment.  Bear Stearns Companies took actions itself to keep Barclays and others from receiving truthful, material information with regard to the Enhanced Fund structure, and in doing so caused harm to Barclays.

533.    Bear Stearns Companies' conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

534.    As a direct, proximate and foreseeable result of Bear Stearns Companies' conduct, in aiding and abetting BSAM, Cioffi, and Tannin in their fraud and fraudulent concealment, Barclays has been damaged in an amount to be determined at trial.  As a result of Bear Stearns Companies' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

## FIFTH CAUSE OF ACTION

(Civil Conspiracy to Commit Fraud and Fraudulent Concealment—as to Defendants BSAM,

Tannin, and Cioffi)

535.    Barclays repeats and realleges the foregoing allegations as though fully set forth

herein.

536.    In the alternative and to the extent that Cioffi is not directly liable for fraud and/or

fraudulent concealment, he is liable for conspiracy to commit fraud and fraudulent concealment

with BSAM, Tannin and others.

537.    Defendants BSAM, Cioffi and Tannin, acting together, and with others at times,

planned and agreed to deceive Barclays in the manner described above.  These defendants knew

and understood at the time of their agreements that Barclays would be injured by their wrongful

conduct.

538.    Cioffi's conscious agreement to act in concert with Tannin and BSAM is apparent

from his email correspondence with Tannin and others at BSAM, samples of which are alleged

in this Complaint, and his detailed and close supervision of Tannin, on behalf of BSAM,

including in the fraud and fraudulent concealment perpetuated by BSAM and Tannin against

Barclays.  Cioffi took no actions to stop the fraud and fraudulent concealment because he agreed

with that deception; instead he conspired with and encouraged Tannin and BSAM in their direct

fraud and fraudulent concealment.

539.    BSAM, Tannin and Cioffi had the common objective of misleading Barclays and

withholding the true facts from Barclays to persuade it to commit initially to the Enhanced Fund

structure and then to keep Barclays in the structure and to hide the Enhanced Fund's difficulties

for as long as possible.  They also sought to conceal the High-Grade Fund's troubles from its

own investors, and from Barclays and other participants in the Enhanced Fund structure.  And

they wanted to accomplish the Everquest IPO and other self-interested or harmful transactions involving the Enhanced Fund while still retaining Barclays in its position.

540.    In furtherance of the conspiracy, BSAM and Tannin affirmatively deceived and concealed material facts from Barclays, committing fraud and fraudulent concealment, with Cioffi's and all the BSAM Defendants' knowledge.  BSAM, Tannin, and Cioffi intentionally participated in the conspiracy.

541.    BSAM's, Tannin's, and Cioffi's fraudulent conduct, as alleged herein, was willful, malicious, and without regard to Barclays' rights and interests.

542.    As a direct, proximate and foreseeable result of these defendants' conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of defendants' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

SIXTH CAUSE OF ACTION

(Civil Conspiracy to Commit Fraud and Fraudulent Concealment—as to Defendants BSAM, Tannin, Cioffi, and Bear Stearns)

543.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

544.    In the alternative and to the extent that Bear Stearns is not liable for aiding and abetting the BSAM Defendants' fraud and/or fraudulent concealment through Bear Stearns' own substantial assistance, Bear Stearns is liable for conspiracy to commit fraud and fraudulent concealment with BSAM, Tannin, Cioffi, and others.

545.    Defendants BSAM, Cioffi, Tannin, and Bear Stearns acting together, and with others at times, planned and agreed to deceive Barclays in the manner described above.  These

defendants knew and understood at the time of their agreements that Barclays would be injured by their wrongful conduct.

546. Bear Stearns' conscious agreement to act in concert with BSAM and its managers is apparent from Bear Stearns' taking on the role of placement agent for the Feeder Funds despite its knowledge of Barclays' unique position in the structure, that the Bear Stearns moratorium on trades (and its cause) was not being revealed to Barclays or potential Feeder Fund investors, and that instead those interested parties were being told that Enhanced Fund principal trades with Bear Stearns could take place and that they would be reviewed and approved ahead of time by independent directors. Bear Stearns' conscious participation in the conspiracy continued throughout the life of the Enhanced Fund, including in particular when Bear Stearns served as underwriter on Everquest and agreed with BSAM and Cioffi not to disclose falling asset values or any of the performance failures within BSAM in the Everquest S-1.

547. BSAM, Tannin, Cioffi, and Bear Stearns had the common objective of misleading Barclays and withholding the true facts from Barclays to close the Enhanced Fund transaction, to keep Barclays in the Enhanced Fund structure, and to hide the BSAM Defendants' difficulties in operating and managing that structure for as long as possible. Bear Stearns shared this objective with the BSAM Defendants at the outset of the Enhanced Fund, for example, so that it could receive its compensation as placement agent, and during the time when Bear Stearns provided a temporary bridge repo loan so that the Bear Stearns loan would be repaid before any problems within the Enhanced Fund became known. BSAM, Tannin, Cioffi, and Bear Stearns also wanted to conceal material adverse information from Barclays and others, including potential Everquest investors, so that the Everquest IPO and other transactions involving Bear Stearns as underwriter could close.

548.    In furtherance of the conspiracy, BSAM and Tannin affirmatively deceived and concealed material facts from Barclays, committing fraud and fraudulent concealment, with Cioffi's and all the BSAM Defendants' knowledge.  In furtherance of the conspiracy, as alleged above, Bear Stearns also had knowledge of that fraud and fraudulent concealment.  BSAM, Tannin, Cioffi, and Bear Stearns intentionally participated in the conspiracy.

549.    BSAM's, Tannin's, Cioffi's, and Bear Stearns' fraudulent conduct, as alleged herein, was willful, malicious, and without regard to Barclays' rights and interests.

550.    As a direct, proximate and foreseeable result of these defendants' conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of defendants' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

<u>SEVENTH CAUSE OF ACTION</u>

(Civil Conspiracy to Commit Fraud and Fraudulent Concealment—as to Defendants BSAM, Tannin, Cioffi, and Bear Stearns Companies)

551.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

552.    In the alternative and to the extent that Bear Stearns Companies is not liable for aiding and abetting the BSAM Defendants' fraud and/or fraudulent concealment through Bear Stearns Companies' own substantial assistance, Bear Stearns Companies is liable for conspiracy to commit fraud and fraudulent concealment with BSAM, Tannin, Cioffi, and others.

553.    Defendants BSAM, Cioffi, Tannin, and Bear Stearns Companies acting together, and with others at times, planned and agreed to deceive Barclays in the manner described above.

These defendants knew and understood at the time of their agreements that Barclays would be injured by their wrongful conduct.

554.    Bear Stearns Companies' conscious agreement to act in concert with BSAM and its managers is apparent from Spector's work with BSAM, Cioffi and Tannin.  Spector was briefed on the dismal condition of the Enhanced Fund and the High-Grade Fund, understood those structures, and agreed to work with BSAM to attempt to sell all of the BSHG operations, rather than to disclose to Barclays the performance and other information to which it was entitled.  Similarly, Bear Stearns Companies and BSAM agreed to work together and did work together, including through Blackstone, to keep Barclays uninformed while Bear Stearns Companies and BSAM pursued their own goals in the June 2007 crisis.

555.    BSAM, Tannin, Cioffi, and Bear Stearns Companies had the common objective of misleading Barclays and withholding the true facts from Barclays from at least May into the summer of 2007 to keep Barclays in the Enhanced Fund structure and to hide the rapidly deteriorating status of the Enhanced Fund portfolio.  These defendants sought to hide the status of the portfolio and BSAM's lack of a system that could manage that portfolio, so that they could pursue efforts to sell the BSHG funds or come up with other drastic steps to attempt to save the reputations of BSAM, Tannin, Cioffi, and the Bear Stearns Companies.  When that became impossible, Bear Stearns Companies, with the BSAM Defendants, aimed to preserve at least some valuable assets from the High-Grade Fund for the Company, while continuing to support the deception of Barclays until the end and allowing Barclays' losses to mount.

556.    In furtherance of the conspiracy, BSAM and Tannin affirmatively deceived and concealed material facts from Barclays, committing fraud and fraudulent concealment, with Cioffi's and all the BSAM Defendants' knowledge.  In furtherance of the conspiracy, as alleged

above, Bear Stearns Companies also had knowledge of that fraud and fraudulent concealment. BSAM, Tannin, Cioffi, and the Company intentionally participated in the conspiracy.

557.    BSAM's, Tannin's, Cioffi's, and Bear Stearns Companies' fraudulent conduct, as alleged herein, was willful, malicious, and without regard to Barclays' rights and interests.

558.    As a direct, proximate and foreseeable result of these defendants' conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of defendants' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

## EIGHTH CAUSE OF ACTION

### (Negligent Misrepresentation—as to Defendants BSAM and Tannin)

559.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

560.    At the time BSAM or Tannin made the material misrepresentations to secure Barclays' initial participation in the transaction or to increase its financial commitment to the structure, described above, defendants BSAM and Tannin knew, or at a minimum were negligent in not knowing, that those statements were false and misleading.  At a minimum, BSAM and Tannin should have known that the statements were incorrect.

561.    BSAM devised the idea for the "enhanced leverage" structure and came to Barclays seeking its participation in that new structure.

562.    BSAM and Tannin held themselves out as having a unique market position and special expertise with regard to the proposed transaction.  The transaction proposed by BSAM and Tannin was allegedly built on their experience with the High-Grade Fund and their

proprietary risk management and analysis tools, as well as BSAM's and the Company's experience with structured credit products.

563.    BSAM and Tannin, moreover, were uniquely situated to explain the details, attributes, and conditions of the transaction and of BSAM's structured credit investment practices and surveillance capabilities, because BSAM was involved in and had significant control over every aspect of the planned structure and BSAM had the best and only access to information about: BSAM's proprietary systems; BSAM's access to and the quality of information from other Company affiliates; whether BSAM's internal systems and procedures actually functioned; and other non-public information.

564.    BSAM and Tannin explicitly aimed with their representations to provide "comfort" to Barclays and thereby to convince Barclays to enter into the transaction and, subsequently, to increase its commitment to the structure. BSAM and Tannin also carefully controlled the information that was released, or even hinted at, to Barclays.

565.    BSAM and Tannin made numerous and detailed representations personal to Barclays upon which they intended Barclays to rely. BSAM and Tannin were aware, at the time of their misrepresentations, that the information they were conveying was critical to Barclays' decision-making.

566.    BSAM and Tannin entered into a special relationship so close as to approach privity with Barclays. Defendants BSAM and Tannin knew that Barclays was uniquely and specially relying on BSAM's and Tannin's representations in deciding whether to participate in the structure and/or in deciding whether to increase its financial commitment to the structure. BSAM and Tannin thus owed a duty to Barclays to give Barclays accurate information and representations.

567.   Barclays reasonably relied on the representations of defendants BSAM and Tannin, which, in fact, were misrepresentations.  Without those material misrepresentations, Barclays would not have entered into the transaction or increased its commitment to the structure.

568.   As a direct, proximate and foreseeable result of defendants BSAM's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial, as well as interest at the statutory rate.

NINTH CAUSE OF ACTION

(Negligent Misrepresentation—as to Defendants BSAM and Tannin During Management and Operation of the Structure)

569.   Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

570.   Once the "enhanced leverage" structure came into being, BSAM took on all of its various roles, and Barclays became one part of BSAM's overall structure, BSAM and Tannin made myriad personal and material misrepresentations to Barclays about the performance, composition, and status of the Enhanced Fund or the pricing of its assets, as detailed above.

571.   At the time BSAM or Tannin made those material misrepresentations, defendants BSAM and Tannin knew, or at a minimum were negligent in not knowing, that they were false and misleading.  At a minimum, BSAM and Tannin should have known that the statements were incorrect.

572.   Defendants BSAM and Tannin were acting as the investment manager for the Enhanced Fund, and as operators of the entire "enhanced" structure, with their claimed and apparent special expertise in surveillance, marking, and management of liquidity in this

particular type of hedge fund structure, as alleged more fully above.  The BSAM Defendants, who were part of the larger Company and its additional expertise, claimed to be and seemed uniquely qualified to operate this "high-grade" structured credit investment structure.  BSAM was the only entity with the unique and complete knowledge of the Enhanced Fund's portfolio, hedging, and trading details, strategies and performance, including proprietary information, once it was operating.

573.    In addition, based on all the facts alleged herein, BSAM and Tannin stood in a special relationship of trust and confidence to Barclays.  BSAM and Tannin established and proceeded in a special relationship so close as to approach privity with Barclays.

574.    Barclays, as the leverage counterparty and sole participating shareholder in the Enhanced Fund, was the only target and recipient of BSAM's reports and representations to Barclays about the performance, status, and value of the Enhanced Fund alleged above.

575.    Defendants BSAM and Tannin knew that Barclays was relying on their representations, and expected Barclays to do so.  BSAM and Tannin were aware, at the time of their misrepresentations, that the information they were conveying was material to Barclays' decision-making, including with regard to staying in the structure or mandating actions to protect its financial stake.

576.    BSAM and Tannin owed a duty to give Barclays ongoing accurate information regarding the Enhanced Fund's performance, status, and value.

577.    Barclays reasonably relied on the representations of defendants BSAM and Tannin, which, in fact, were misrepresentations.  Without those material representations, Barclays would not have continued in the structure.

578.     As a direct, proximate and foreseeable result of defendants BSAM's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial, as well as interest at the statutory rate.

TENTH CAUSE OF ACTION

(Promissory Estoppel—as to Defendant BSAM)

579.     Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

580.     BSAM made clear and unambiguous promises to Barclays in the Investment Guidelines and the Reporting Requirements, which were the result of months of personal negotiations between BSAM and Barclays.

581.     BSAM's promises to Barclays were memorialized in writing for the benefit of Barclays.

582.     The Investment Guidelines and Reporting Requirements preceded and exist separately from the Confirmations, though they are referenced therein and annexed thereto, for BSAM – the entity making those promises to Barclays – is not a party to the Confirmations and those promises concern BSAM's conduct in managing the Enhanced Fund and operating the overall structure for the benefit of Barclays.

583.     BSAM, in addition, reiterated and reaffirmed those promises to Barclays throughout the history of the transaction.

584.     Barclays reasonably and foreseeably relied on BSAM's promises to Barclays by entering into the transaction.

134

585.    Barclays further reasonably and foreseeably relied on BSAM's promises to Barclays by increasing its financial commitment to the structure and by continuing to participate in the transaction into July 2007.

586.    BSAM did not abide by, fulfill or keep its promises to Barclays, as detailed above.

587.    BSAM's conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

588.    As a direct, proximate and foreseeable result of Barclays' reliance on BSAM's promises and BSAM's subsequent failure to keep those promises, Barclays has been damaged in an amount to be determined at trial.  As a result of BSAM's conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

ELEVENTH CAUSE OF ACTION

(Breach of Fiduciary Duties Owed to Barclays—as to Defendants BSAM, Cioffi and Tannin During Management and Operation of the Structure)

589.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

590.    As set forth above, BSAM created a fiduciary relationship between itself – and its managers Cioffi and Tannin – and Barclays.  As a result of that fiduciary relationship, BSAM, Cioffi and Tannin owed Barclays duties of care, diligence, fairness, good faith and loyalty.

591.    In addition, as a result of that fiduciary relationship, BSAM, Cioffi and Tannin owed Barclays duties of full and candid disclosure, honesty, and accuracy in keeping Barclays apprised of the status and performance of the portfolio, its assets and the structure as a whole.

592.     Barclays made its financial commitment to the structure and the Enhanced Fund after personal negotiations with BSAM, Cioffi and Tannin about the practices and care they would use in managing the Enhanced Fund, including but not limited to the Investment Guidelines and Reporting Requirements.  BSAM specifically tailored its investment portfolio parameters to Barclays' requirements and repeatedly stated to Barclays that BSAM would be protecting Barclays' financial interests.  Because Barclays effectively ceded to these defendants control over and discretion with regard to Barclays' financial exposure to the Enhanced Fund, subject to the Investment Guidelines and Reporting Requirements, and participated in the "enhanced" structure only because of BSAM's specific representations to Barclays, these defendants were obligated to ensure that they invested in accordance with their commitments to Barclays, that they placed Barclays' interests ahead of their own, and that they did not engage in any fraudulent, grossly negligent, negligent, excessively risky, or imprudent investment practices to the detriment of Barclays.

593.     Barclays justifiably placed trust and confidence in BSAM, Cioffi, and Tannin to do so, and to comply fully with all of the BSAM Defendants' fiduciary duties.

594.     By engaging in the conduct alleged herein, BSAM, Cioffi, and Tannin breached the fiduciary duties owed to Barclays.  Cioffi and Tannin, as officers of BSAM and in their roles with respect to the Enhanced Fund and related structures, knew of each breach of fiduciary duty owed to Barclays and participated in each.  They were the officers and employees of BSAM who made the decisions and acted on behalf of BSAM to accomplish the breaches of fiduciary duty.

595.     BSAM, Cioffi and Tannin breached their duties of care, diligence, fairness, good faith and loyalty including, but not limited to, by taking on excessive and unpermitted risk, failing to undertake and use for Barclays' benefit the type of surveillance and monitoring they

had purported to provide, failing to manage liquidity, and putting their own or other Company affiliates' interests ahead of Barclays.

596.     BSAM, Cioffi and Tannin breached their duties of full and candid disclosure, honesty, and accuracy including, but not limited to, by failing to report the actual performance, status and value of the Enhanced Fund portfolio to Barclays on a contemporaneous basis, mismarking individual asset values, failing to inform Barclays of their inadequate hedges and failures of their hedging strategy, and failure to inform Barclays of their efforts to sell or otherwise dispose of the Enhanced Fund because of its severe problems and systemic inadequacies.

597.     BSAM's, Cioffi's and Tannin's conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

598.     As a direct, proximate and foreseeable result of BSAM's, Cioffi's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of BSAM's, Cioffi's and Tannin's conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

## TWELFTH CAUSE OF ACTION

(Aiding and Abetting Breach of Fiduciary Duties Owed to Barclays—as to Defendant Bear Stearns)

599.     Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

600.     As shown above, under the circumstances of this case, defendants BSAM, Cioffi and Tannin owed fiduciary duties specifically to Barclays.

601.    In engaging in the conduct alleged herein, BSAM, Cioffi and Tannin repeatedly breached those fiduciary duties to Barclays.

602.    Bear Stearns knew that BSAM, including through its officers and top managers, Cioffi and Tannin, owed specific fiduciary duties to Barclays and understood Barclays' unique position in the structure.  Bear Stearns had this knowledge from the outset, and gained the knowledge through and related to its role as placement agent for Feeder Fund investors in the Enhanced Fund structure.

603.    Bear Stearns served as placement agent for the Feeder Funds, provided a one-month bridge repo loan to the Enhanced Fund, served as underwriter on the planned Everquest IPO, and served as underwriter on offerings of assets that were sold into the Enhanced Fund.  In each of these capacities, Bear Stearns stood to gain financially – and aimed to guard its reputation – by hiding the performance problems of the Enhanced Fund, continuing the Enhanced Fund's operations (particularly until the bridge loan was repaid), and continuing the Bear Stearns underwriting activities that related to that fund.

604.    Bear Stearns was a knowing and essential participant in the BSAM Defendants' Everquest maneuvers, which breached their fiduciary duties to Barclays.  As underwriter on Everquest, Bear Stearns aided those defendants in concealing performance problems at the Enhanced Fund and dropping asset values in the Everquest assets.

605.    Similarly, Bear Stearns aided BSAM, Cioffi and Tannin in continuing to take on inappropriate risk, failing to manage liquidity, and failing to undertake the surveillance and hedging the BSAM Defendants should have undertaken by providing the April 2007 emergency bridge loan and assisting in the cover-up of the Enhanced Fund's escalating troubles.

606.    Bear Stearns substantially aided and abetted BSAM and its managers, Cioffi and Tannin, in their breach of fiduciary duties to Barclays.  Indeed, Bear Stearns itself took actions and made decisions that caused harm to Barclays.

607.    Bear Stearns knowingly provided its substantial assistance in the breach of the fiduciary duties owed to Barclays.

608.    Bear Stearns' conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

609.    As a direct, proximate and foreseeable result of Bear Stearns' conduct, in aiding and abetting BSAM, Cioffi, and Tannin in the breach of the fiduciary duties owed to Barclays, Barclays has been damaged in an amount to be determined at trial.  As a result of Bear Stearns' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

### THIRTEENTH CAUSE OF ACTION

(Aiding and Abetting Breach of Fiduciary Duties Owed to Barclays—as to Defendant Bear Stearns Companies)

610.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

611.    As shown above, under the circumstances of this case, defendants BSAM, Cioffi and Tannin owed fiduciary duties specifically to Barclays.

612.    In engaging in the conduct alleged herein, BSAM, Cioffi and Tannin repeatedly breached those fiduciary duties to Barclays.

613.    Bear Stearns Companies knew that BSAM, including through its officers and top managers, Cioffi and Tannin, owed specific fiduciary duties to Barclays and understood

Barclays' unique position in the structure. Bear Stearns Companies had that knowledge as a result of Spector's ongoing role in overseeing BSAM's operations and, in particular, its operation of the Enhanced Fund structure. In addition, as the crisis developed, by May and June at the latest, other Bear Stearns Companies executives were briefed in detail about the Enhanced Fund structure and the parties whose financial commitments to that structure were at stake, including Barclays.

614.    Spector and Bear Stearns Companies aimed to guard their reputations by helping to conceal the performance problems in the Enhanced Fund, continuing the Enhanced Fund's operation, and seeking some exit strategy that might conceal forever the fraud and the failures by BSAM, Cioffi and Tannin. Later, Bear Stearns Companies focused on the possibility of retaining assets for itself, for investors in the High-Grade Fund, or for Feeder Fund investors in the Enhanced Fund structure, and continued to conceal information from and forsake the interests of Barclays.

615.    In overseeing and directing the conduct of BSAM, especially in May and June 2007 and later, Bearn Stearns Companies substantially aided and abetted BSAM and its managers, Cioffi and Tannin, in their breach of fiduciary duties to Barclays. Indeed, Bear Stearns Companies itself took actions and made decisions that caused harm to Barclays.

616.    Bear Stearns Companies knowingly provided its substantial assistance in the breach of the fiduciary duties owed to Barclays.

617.    Bear Stearns Companies' conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

618.    As a direct, proximate and foreseeable result of Bear Stearns Companies' conduct, in aiding and abetting BSAM, Cioffi, and Tannin in the breach of the fiduciary duties

owed to Barclays, Barclays has been damaged in an amount to be determined at trial.  As a result of Bear Stearns Companies' conduct, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

<u>FOURTEENTH CAUSE OF ACTION</u>

(Gross Negligence and Negligence With Regard to Barclays—as to Defendants BSAM, Cioffi, and Tannin During Management and Operation of the Structure)

619.    Barclays repeats and realleges the foregoing allegations as though fully set forth herein.

620.    Defendants BSAM, Cioffi and Tannin were acting as the investment manager for the Enhanced Fund portfolio and as operators of the entire "enhanced" structure, with their claimed professional expertise and experience.  In particular, they had committed to manage the portfolio within the constraints of the Investment Guidelines and Reporting Requirements and their other representations to Barclays.  Barclays, pursuant to BSAM's plan and intent, was the sole participating shareholder in the Enhanced Fund and thus had the sole direct stake in the portfolio.

621.    The particular factual circumstances of this case, as alleged in detail above, give rise to a fiduciary and special relationship between BSAM, and its managers Cioffi and Tannin, and Barclays.  The relationship between BSAM and Barclays in the Enhanced Fund structure and based on all the surrounding facts is one so close as to touch the bounds of privity.

622.    BSAM, Cioffi and Tannin owed duties of care, including professional duties of care, to Barclays by virtue of BSAM's relationship with Barclays.  The BSAM Defendants knew that Barclays was uniquely and specially relying on them for their expertise, their care and

diligence, and their specific commitments to Barclays in managing and operating the Enhanced Fund and the "enhanced" structure, and expected Barclays to do so.

623.    BSAM, Cioffi and Tannin breached their duties of care, including, but not limited to, by taking on excessive and unpermitted risk, failing to undertake and use for Barclays' benefit the type of surveillance and monitoring they had purported to provide, failing to manage liquidity, and putting their own or other Company affiliates' interests ahead of Barclays.

624.    BSAM, Cioffi and Tannin also breached their duties of care, including, but not limited to, by failing to report the actual performance, status and value of the Enhanced Fund portfolio to Barclays on a contemporaneous basis, mismarking individual asset values, failing to inform Barclays of their inadequate hedges and failures of their hedging strategy, and failure to inform Barclays of their efforts to sell or otherwise dispose of the Enhanced Fund because of its severe problems and systemic inadequacies.

625.    The BSAM Defendants were grossly negligent, or at a minimum negligent, toward Barclays in doing so.

626.    BSAM's, Cioffi's and Tannin's conduct, as alleged herein, was willful, malicious and without regard to Barclays' rights and interests.

627.    As a direct, proximate and foreseeable result of BSAM's, Cioffi's and Tannin's conduct, Barclays has been damaged in an amount to be determined at trial.  As a result of BSAM's, Cioffi's and Tannin's gross negligence, Barclays is also entitled to punitive damages in an amount to be determined at trial, as well as interest at the statutory rate.

## PRAYER FOR RELIEF

WHEREFORE, Barclays demands judgment and permanent relief against Defendants as follows:

        (a) awarding Barclays compensatory and punitive damages in amounts to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law;

        (b) awarding Barclays its reasonable costs and expenses incurred in this action, including, to the extent applicable, counsel fees; and

        (c) awarding Barclays all such other relief as the Court deems just and proper.

## JURY DEMAND

Barclays hereby demands a trial by jury.

Dated:    July 15, 2008
          New York, New York

                                    Lawrence Byrne
                                    Lance Croffoot-Suede
                                    Ruth E. Harlow
                                    Brenda D. DiLuigi
                                    LINKLATERS LLP
                                    1345 Avenue of the Americas
                                    New York, New York 10105
                                    (212) 903-9000 (phone)
                                    (212) 903-9100 (fax)

                                    Attorneys for Plaintiff, Barclays Bank PLC

Exhibits to Plaintiff's Third Amended Complaint

Case No. 07 Civ. 11400 (LAP) – Honorable Preska

# EXHIBIT A



# EXHIBIT B

Annex 2
Investment Guidelines

**Bear Stearns High-Grade Structured Credit Strategies Enhanced
Leverage Master Fund, Ltd. (the "Fund")**

**1.      General**

The Investment Manager will operate the Fund in accordance with the limits and restrictions below.

The Investment Manager will provide Barclays with risk reports of a format to be agreed; including dv01 and Net Asset Value (NAV) and leverage calculations.

The Reference Fund Administrator will provide Barclays with the necessary information to monitor these guidelines and will detail on request how this information was compiled and will assist in the verification of the information.

**2.      Investment Objectives and Strategy**

The Fund aims to seek high current income and capital appreciation relative to LIBOR.  The Fund intends to achieve its investment objective primarily through leveraged investments in investment-grade structured finance securities, although the Fund intends to seek investment opportunities beyond the structured finance asset category.  As part of its strategy, the Fund intends to gain exposure, on a non-recourse leveraged basis, to investment-grade structured finance securities by means of the purchase of the equity securities and other securities issued by structured vehicles (such as CDOs) that invest, on a leveraged or unleveraged basis, primarily in investment-grade structured finance securities, The Fund invests in floating rate assets so does not does not intend to incur any Interest Rates exposure.  The Fund does not intend to take on FX exposure.

**3.      Permitted instruments**

In order to pursue its investment strategies the Investment Manager will invest exclusively in instruments detailed below and obey all the restrictions detailed.

a)      Overriding all other criteria, instruments, which cannot be independently priced daily by the Reference Fund Administrator, are not eligible as a permitted instrument. Instruments where there is no official public price available are only eligible if the Reference Fund Administrator is able to obtain independent pricings of the instrument on a regular basis from financial counterparties.  The Investment Manager does use an internally approved pricing committee to price the Klio residual interests as discussed in the Fund's offering materials.  The Investment Manager will share the data and the assumptions with Barcap.  The Investment Manager will also provide Barcap with the underlying trustee reports for the Klio investment vehicle.

b)      Long positions in USD denominated, floating rate structured finance securities, with a particular focus on:

       1)      Collateralised Debt Obligations (CDO), this includes Synthetic CDO, High Grade and High Yield CDO,

       2)      Asset Backed Securities (ABS),

       3)      Mortgage Backed Securities (MBS), both Commercial and Residential (CMBS and RMBS respectively),

       4)      Collateralised Loan Obligations (CLO),

       5)      Adjustable Rate Mortgages (ARMS),

       6)      Corporate Bonds

with minimum ratings breakdowns subject to the limits detailed in Table 1, 1a, and 1b.

c)   Long positions in obligations of the United States of America, or any state thereof,

d)   Long and short positions in Credit Default Swaps (CDS) and options on CDS on securities listed in point b) above and on individual credits and (for hedging purposes) on Indices with Counterparties listed in Table 3.

e)   On an ancillary basis and for hedging purposes only, long and short positions in exchange traded Equity, Warrants and exchange traded Options on Equity Indices and Variance Swaps on Equities and Equity Indices.

f)   For hedging purposes only, long and short positions on OTC and exchange-traded Interest Rate Futures, as detailed in Table 2, with Permitted Counterparties as detailed in Table 3.

g)   For hedging purposes only, long positions in OTC and exchange-traded Options and Caps on Interest Rates Futures as detailed in Table 2, with Permitted Counterparties as detailed in Table 3.

**4.    Leverage and exposure**

a)   The overall Net Leverage of the Fund shall be no greater than 2850% of the Fund's Net Asset Value, subject to the provisions detailed in Table 1 and Table 1a below;

b)   Provided that KLIO Equity Tranches represents over 10% of NAV, then the maximum overall Net Leverage will be reduced to a maximum of 2000% of the Fund's Net Asset Value irrespective of the portfolio composition, should the KLIO Notes in the Fund's portfolio be in breach of any of the Overcollateralization Tests, as detailed in the Trustee monthly report (as detailed in Annex x "Reporting Requirements").

c)   The Fund shall not exceed interest rate risk exposure of 0.5% of the Fund's NAV.

d)   The Weighted Average Life (WAL) of the portfolio must at all times be less than 6.0 years .

e)   The Fund will only enter in Repo transactions with Permitted Repo Counterparties as detailed in Table 3 below.

**5.    Diversification**

a)   The Fund will be well diversified at all times, with a minimum of two hundred (200) positions in different issues each representing at least TBD% of the Fund's Total Assets.

b)   Maximum concentration by ratings as a % of the Fund's Total Assets as detailed in Table 1 and 1a will apply.

c)   Maximum concentration per issue as a % of the Fund's Total Assets as detailed in Table 1b will apply.

d)   The following concentration limits by asset classes will apply with respect to the assets of the Fund:

1.   CDO up to 60% of Total Assets,

2.   Synthetic corporate CDO up to 15% of Total Assets (only AAA rated issues),

3.   RMBS up to 60% of Total Assets.

4.   Synthetic ABS up to 20% of Total Assets

5.   Corporate Bonds up to 10%

**6.    Remediation**

Limits and restrictions specified in these Investment Guidelines are to be observed by the Investment Manager at all times.

Unless explicitly agreed by Barclays in advance, upon notice from Barclays to the Investment Manager any breach of any of these limits or restrictions must be remedied by the Investment Manager. Failure to initiate appropriate action to rectify the breaches within the remediation period set out below shall

constitute a Close Out Event and/or a change in the multiplier, as per the Risk Advisory Guidelines at the sole discretion of Barclays. During such remediation periods all contractual rights and obligations of the parties remain unaffected.

The remediation period shall be five (5) calendar days from the date of notice from Barclays.

7.      **NAV Reduction Management**

Based on the daily Investment Manager estimated profit and loss, if the Fund's NAV decreases by 10% during any Observation Period, the Investment Manager will provide a detailed action plan to reduce the risk profile of the portfolio. Any failure to do so within one business day will constitute a breach of the investment guidelines and necessitate remediation in accordance with Section 6 ("Remediation").

For the purposes of the above, "**Observation Period**" means the period, measured on any day, from the latest redemption date in the Fund to the next available redemption date in the Fund.

**Further Definitions**

"**Asset-Backed Security**" or "**ABS**" means a security that entitles the holder thereof to receive payments that depend primarily on the cash flow from, the market value of, or the credit exposure to, a specified pool of financial assets, either fixed or revolving, that by its terms convert into cash within a finite time period, together with rights or other assets designed to assure the servicing or timely distribution of proceeds to the holder of the security.

"**Adjustable Rate Mortgage Securities** " or "**ARMS**" means Mortgage-Backed Securities backed by mortgages that features predetermined adjustments of the loan interest rate at regular intervals based on an established index. The interest rate is adjusted at each interval to a rate equivalent to the index value plus a predetermined spread, or margin, over the index, usually subject to per-interval and to life-of-loan interest rate and/or payment rate caps.

"**Auto Loans**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from balances outstanding under automobile loans.

"**CMBS**" means Asset-Backed Securities (that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from a pool of commercial mortgage loans.

"**Collateralised Debt Obligation**" or "**CDO**" means an Asset-Backed Security that securitizes a diverse pool of debt assets into multiple classes of notes from the cash flows generated by such assets.

"**Credit Spread Risk**" – Definition and on-going, regular monthly information on portfolio Spread Risk to be provided by Investment Manager in the form of Manager calculated DV01 reports..

"**KLIO Notes / KLIO Equity Tranches**": CDO's issued by KLIO Funding Corp (I, II and III) where Bear Stearns Asset Management is Investment Advisor. With KLIO Equity Tranches we refer specifically to KLIO Notes which are either not rated or rated below BBB- by Standard and Poor's or equivalent.

"**NAV**" means Net Asset Value of the Fund, and is equivalent to investors' equity.

"**Net Leverage**" is defined as the total market value of the Fund's investments less the notional value of the Fund's credit default swap hedges divided by the Net Asset Value of the Fund. Short CDS are considered as long Credit positions.

"**Other ABS**" means Asset-Backed Securities other than RMBS, CMBS, CDOs, Synthetic CDOs, Credit-Card Receivables or ABS Leasing Securities.

"**Residential Mortgage Securities**" or "**RMBS**" means Asset-Backed Securities that entitle the holders thereof to receive payments that depend (except for rights or other assets designed to assure the

servicing or timely distribution of proceeds to holders of the Asset-Backed Securities) on the cash flow from residential mortgage loans secured (on a first priority basis, subject to permitted liens, easements and other encumbrances) by residential real estate (single or multi-family properties) the proceeds of which are used to purchase real estate and purchase or construct dwellings thereon (or to refinance indebtedness previously so used).

"**Synthetic ABS**" means short protection (long risk) Credit Derivative positions where the reference obligation is a single name Asset Backed Security.

"**Synthetic CDO**" means an Asset-Backed Security that securitizes a diverse pool of debt assets into multiple classes of notes from the cash flows generated by such assets, but which uses credit derivatives to transfer the credit risk of the reference assets from the issuer to the CDO vehicle without selling those assets.

"**Total Assets**" are defined as the total market value of the Fund's investments less the notional value of the Fund's credit default swap hedges. In order to calculate the Total Assets, short CDS positions are taken with a positive sign

"**WAL**" means weighted average life.

**Table 1**: Maximum Net Leverage as % of NAV by ratings breakdown:

| Max Net Leverage of | Up to 2000% of NAV | Up to 2500% of NAV | Up to 2850% of NAV |
|---|---|---|---|
| Max allocation to paper rated less than BBB- (as % of NAV) | 35% | 25% | 20% |
| Minimum allocation to KLIO Equity tranches (as % of NAV) | 15% | 15% | 10% |

**Table 1a**: Minimum / Maximum aggregate exposure by Ratings as % of Total Assets

| Ratings | Limits for Maximum Net Leverage up to 2000% of NAV | | Limits for Maximum Net Leverage up to 2500% of NAV | | Limits for Maximum Net Leverage up to 2850% of NAV | |
|---|---|---|---|---|---|---|
| | Minimum % of Total Assets | Maximum % of Total Assets | Minimum % of Total Assets | Maximum % of Total Assets | Minimum % of Total Assets | Maximum % of Total Assets |
| AAA through to AA- | 75% | 100% | 85% | 100% | 95% | 100% |
| A+ through to BBB- | - | 20% | - | 15% | | 5% |
| Below BBB- or not rated | - | 3.5% | - | 2% | | 0% |

**Table 1b**: Maximum exposure to single issue by Issue Ratings

| Ratings | Max % of Total Assets | Max % as NAV |
|---|---|---|
| AAA Super Senior | 2.5% | 20% |
| AAA | 2% | 15% |

| | | |
|---|---|---|
| AA | 1% | 5% |
| A | 0.5% | 3.75% |
| Below A- | 0.1% | 2% |

**Table 2:** Permitted Derivatives Products (Please specify which Bond Futures, and on which exchanges they are traded)

| Derivative Products | Symbol | Exchange |
|---|---|---|
| UST Futures | USA,TYA,FVA etc | **CBOT** |
| CDS | ABX CMBX, IG HYVOL HYBOX Tranches off of INDEX Single Name EM Index and Single Country CDS. | OTC |
| | | |

**Table 3:** Permitted Counterparties for Repo / OTC trading (Please provide a list of the Counterparties you will trade Repos / OTC products with)

| |
|---|
| Bear Stearns |
| Goldman Sachs |
| Banc of America |
| Cantor Fitzgerald |
| Lehman Brothers |
| Deutsche Bank |
| Merrill Lynch |
| Morgan Stanley |
| West LB |
| HSBC |
| Countrywide Securities |
| Citigroup |
| ING |
| UBS |
| Barclays Bank |
| CSFB |
| Dresdner Bank |
| Greenwich Capital |

# EXHIBIT C

**Annex 3**
**Reporting Requirements**

1.    The Investment Manager agrees to accommodate on-site renewals of the initial due diligence of the Reference Fund and verification of the reports provided to Barclays, upon five Business Days notice of such proposed on-site due diligence.

2.    In addition the Investment Manager will provide Barclays (by email sent to funds.monitor@barcap.com) with:

   a.    Estimated daily trading profit & loss no later than one Business Day after the end of the respective trading day for the Reference Fund;

   b.    Notice as soon as reasonably possible of any change in circumstances, which might cause the final monthly NAV of the Reference Fund to show a loss in value equal to or more than 10%;

   c.    Monthly Trustee Reports on any Asset Backed product Bear Stearns Asset Management Inc. acts as Investment Advisor included in the Reference Fund, including portfolio profile test summary;

   d.    Reports comparing the Reference Fund portfolio with the Investment Guidelines on a weekly basis; and

   e.    Full investment positions reports on a weekly basis in Microsoft EXCEL format.

   f.    Weekly pricing sheets detailing the sources of the marks of the various underlying products.

3.    In addition the Reference Fund Administrator will provide Barclays with:

   a.    Estimated monthly net asset values for the Reference Fund no later than twelve Business Days following the end of each calendar month.  If the Final Report is not ready by the 15th Business Day, the Investment Manager will highlight the missing marks and will report the reason for the missing marks.

- 23 -

# EXHIBIT D

JM:SPC/JAN
F.#2007R01328

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

  - against -

RALPH CIOFFI and
MATTHEW TANNIN,

       Defendants.

- - - - - - - - - - - - - - - X

I N D I C T M E N T

Cr. No. _____
(T. 15, U.S.C., §§ 78j(b)
and 78ff; T. 18, U.S.C.,
§§ 371, 1343, 2,
981(a)(1)(C) and
3551 et seq.; T. 21
U.S.C. § 853(p); T. 28
U.S.C. § 2461(c))

A TRUE COPY  JUN
ATTEST
DATE_____20__
ROBERT C. HEINEMANN
BY_____CLERK
DEPUTY CLERK

THE GRAND JURY CHARGES:

INTRODUCTION

      At all times relevant to this Indictment, unless otherwise indicated:

I.   Background

    A.   The Defendants and Relevant Entities

      1.   Bear Stearns Companies, Inc. ("BSC") was a Delaware corporation. BSC was a holding company that held various subsidiaries, including Bear Stearns & Co., Inc. ("Bear Stearns") and Bear Stearns Asset Management ("BSAM").

      2.   Bear Stearns was a Delaware corporation with its principal place of business in New York, New York. Bear Stearns was a global financial institution with investment banking, securities trading and brokerage operations.

      3.   BSAM was a New York corporation with its principal

place of business in New York, New York.  BSAM was a registered investment adviser, which meant a company that engaged in the business of advising others on their securities investments, that had approximately $45.6 billion in assets under management as of June 30, 2007.  Those assets were held in various investment vehicles, including a number of hedge funds.

4.   Bear Stearns High Grade Structured Credit Strategies Master Fund Ltd. (the "High Grade Fund") was a hedge fund registered as a Cayman Islands corporation with its principal place of business in New York, New York.

5.   Bear Stearns High Grade Structured Credit Strategies Enhanced Master Fund Ltd. (the "Enhanced Fund") was a hedge fund registered as a Cayman Islands corporation with its principal place of business in New York, New York.

6.   Bear Stearns Securities Corporation ("BSSC") served as the Funds' prime broker, and acted as custodian for the Funds' assets.  In its role with respect to the Funds, BSSC transmitted various documentation concerning the Funds to the Funds' administrator and the Funds' portfolio managers.  BSSC was located in Brooklyn, New York.

7.   The defendant RALPH CIOFFI was the founder and senior portfolio manager of the High Grade Fund and the Enhanced Fund (together, the "Funds") from the inception of the High Grade Fund in October 2003 through at least July 2007.

8.   The defendant MATTHEW TANNIN was a portfolio manager for the Funds who reported directly to CIOFFI.  He served in that position from the inception of the High Grade Fund in October 2003 through at least July 2007.

9.   As employees of BSAM and managers of the Funds, CIOFFI and TANNIN owed duties to BSAM, the Funds and the Funds' investors.  Some of the Funds' investors resided within the Eastern District of New York.

B.   Relevant Terms

10.  A hedge fund's Net Asset Value ("NAV") meant the value of the hedge fund's assets less the value of its liabilities, and was expressed either as the total net value for the entire hedge fund or as the net value for each share of the hedge fund.

11.  A Repurchase Agreement ("Repo"), was a loan arrangement used by hedge funds to create additional buying power. In a typical Repo transaction, the lender purchased securities from the borrower for less than their actual value.  At the end of the term of the loan, the lender would sell the securities back to the borrower.  The parties would agree on the period for the loan and the purchase and sale prices for the securities.  The securities effectively served as collateral for the loan.  If, during the course of the transaction, the value of the securities decreased, the lender could demand in a margin call that the

4

borrower give the lender additional collateral.  Repo transactions were frequently renewed after their initial expiration.

12.  A subprime mortgage was a mortgage obtained by a borrower with a relatively poor credit history or weaker financial credentials than a borrower who qualified for a prime mortgage.

13.  A hedge fund's liquidity generally referred to the amount of cash or cash equivalents held by the hedge fund.

14.  A collateralized debt obligation ("CDO") was a security that was backed by a pool of debt securities, such as mortgages.  The debt securities generated interest, which belonged to the CDO.  A CDO was typically divided into tranches, and a CDO investor could have owned part or all of one or more tranches. The highest tranche was the most secure because it was the last tranche to lose interest payments and return of principal if the underlying debtors defaulted on their mortgages.  Because the highest rated tranche was the safest, its owners were entitled to the smallest percentage of the interest payments owed to the CDO owners.  The lowest tranche was the equity tranche, which was the riskiest because it was the first tranche to be denied interest payments and return of principal if the underlying debtors defaulted on their mortgages.  As compensation for accepting higher risks, the equity tranche holders were entitled to the highest percentage of the interest rate payments flowing to the CDO.

15.   A CDO-squared was a CDO that was backed by other CDOs.

16.   The different tranches of CDOs and CDO-squareds generally received ratings from a ratings agency such as Standard & Poor's, Moody's Investor Service and Fitch Ratings.  The rating was intended to reflect the risk of default by the relevant debtor or debtors.  The highest possible rating, using the Standard & Poor's rating scale, was AAA.  AAA rated securities supposedly carried an extremely limited risk of default.  The highest tranche of a CDO was generally rated AAA, while the lower tranches generally received lower ratings, such as AA, A or BBB.  Debt securities that carried a high risk of default, such as the lowest tranche of a CDO, may have been unrated.

II.   The Formation and Marketing of the Funds

17.   The High Grade Fund was opened to investors in October 2003.  CIOFFI supervised a group of BSAM employees, whose number increased over time, as members of his fund team.  CIOFFI, TANNIN and others told investors that the High Grade Fund invested in low-risk, "high grade" debt securities, primarily AAA and AA rated tranches of CDOs.  The High Grade Fund enhanced its ability to generate returns through leverage.  It borrowed money through, among other means, Repo agreements in order to purchase additional income-producing assets, such as CDOs.  The use of leverage enhanced returns by allowing the High Grade Fund to borrow at

6

lower interest rates than it received from the assets it purchased with the proceeds of Repo loans.

18. As described to investors by the defendants and others, the High Grade Fund's objective was to provide a modest, safe and steady source of returns to its investors. CIOFFI, TANNIN and others told investors that they could expect annual returns of approximately 10 to 12%, and that the High Grade Fund was not designed to hit "home runs." The defendants and others led investors to believe that the High Grade Fund was only slightly riskier than a money market fund.

19. For a considerable period, the High Grade Fund's performance was generally consistent with these representations. By 2006, however, the fund's performance had begun to decline. In part as a response to this performance decline, and as a consequence of threatened investor withdrawals of money ("redemptions") from the High Grade Fund, CIOFFI, TANNIN and others opened the Enhanced Fund in August 2006.

20. The Enhanced Fund invested primarily in CDOs. It employed substantially more leverage than the High Grade Fund. CIOFFI, TANNIN and others told investors that the Enhanced Fund would generate greater profits than the High Grade Fund, but that the Enhanced Fund would carry only limited additional risk, in part because it would invest in an even higher proportion of the

least risky securities.  The increased profits would result from increased leverage.

21.  CIOFFI and TANNIN told, and caused others to tell, investors that they had invested their own money in the Funds. The fact that hedge fund managers had their own money in a fund was critically important to investors because it expressed the managers' faith in the fund and aligned the interests of managers with those of investors.

22.  As of July 31, 2006, investors had invested a total of approximately $1.527 billion in the High Grade Fund.  When the Enhanced Fund opened, many High Grade Fund investors switched their investment to the Enhanced Fund.  They did this, in significant part, because CIOFFI and TANNIN told, and caused others to tell, investors that they were moving their own personal funds from the High Grade Fund to the Enhanced Fund.

23.  As of January 31, 2007, both Funds had reported positive monthly returns for each month since their respective inceptions.

III. The Defendants' Fraudulent Scheme

24.  Starting at least by March 2007, CIOFFI, TANNIN and others believed that the Funds were in grave condition and at risk of collapse.  Rather than disclosing the true state of the Funds to investors and lenders, thus allowing an orderly wind-down of the Funds, CIOFFI and TANNIN agreed to make misrepresentations in

8

the ultimately futile hope that the Funds' bleak prospects would change and that their incomes and reputations would remain intact. On June 9, 2007, when the Funds' collapse was imminent, CIOFFI stated that, "[i]f I can't [turn the Funds around] I've effectively washed a 30 year career down the drain."

25.  In executing their scheme, as detailed below, CIOFFI and TANNIN, together with others, misrepresented or omitted material facts in communications with investors and lenders about a variety of topics, including the financial prospects of the Funds, their opinions regarding the financial prospects of the Funds, their personal investments in the Funds, the Funds' investor redemption requests, the Funds' liquidity picture, and the Funds' exposure to the subprime mortgage market.

A.  The Development of the Funds'
Performance and Liquidity Problems

26.  In February 2007, the Enhanced Fund reported a return of approximately -.08%, which was the first time that either of the Funds had a negative monthly return.  The High Grade Fund reported a return of approximately 1.5%.

27.  On March 2, 2007, CIOFFI hosted an informal meeting attended by TANNIN and two other members of the Funds' portfolio management team.  CIOFFI talked about the extremely difficult month the Funds had experienced in February, stated that the Funds had averted disaster and led a vodka toast to celebrate surviving the month.  Before ending the meeting, CIOFFI directed those

present not to talk about the Funds' difficulties with others, including other members of the Funds' team.

28.   Throughout March 2007, CIOFFI consistently acknowledged to TANNIN and others that he was deeply concerned about the state of the Funds, particularly because of the Funds' exposure to the subprime mortgage market.  On March 3, CIOFFI told TANNIN that at least "[w]e have our health and families . . . [w]e are not a 19 year old Marine in Iraq. . .."  Later that day, CIOFFI told TANNIN, "the worry for me is that sub prime losses will be far worse than any thing people have modeled. . . ."  As early as March 11, 2007, CIOFFI had already concluded that, "[w]e will be hard pressed to be up in [the High Grade Fund] or [the Enhanced  Fund] in March."  Four days later, CIOFFI wrote an email to a colleague, stating that "I'm fearful of these markets.  Matt [TANNIN] said it's either a melt down or the greatest buying opportunity ever, I'm leaning more towards the former.  As we discussed it may not be a melt down for the general economy but in our world it will be."  Toward the end of March, the performance of the Funds had deteriorated to the point where CIOFFI expressed to a Funds team member that, "I'm sick to my stomach over our performance in [M]arch."

29.   CIOFFI was also concerned about the Funds' liquidity position, especially that of the High Grade Fund.  Internal BSAM reports showed throughout March 2007 that the High

Grade Fund was in an extremely precarious liquidity position.
CIOFFI was particularly concerned that he needed to sell the
Funds' assets at unfavorable prices to meet margin calls from Repo
lenders. On March 14, CIOFFI acknowledged to a team member that,
"[w]e do need to take positions down in [the High Grade Fund]. We
are getting loads of margin calls." CIOFFI, TANNIN and others on
the portfolio management team were so concerned about the High
Grade Fund that they discussed the possibility of merging it with
the Enhanced Fund.

    30. Despite his growing concern about liquidity, CIOFFI
made material misrepresentations about that subject, including a
false statement to a Repo lender in March 2007 that the Funds had
more than enough liquidity to meet any likely eventuality.

B.    The Defendants' Attempts to Entice
    More Investor Money into the Funds

    31. Despite the information available to CIOFFI and
TANNIN concerning the poor health of the Funds, they continued to
tout the Funds throughout March 2007 in an effort to improve the
Funds' liquidity positions by enticing more capital into the Funds
and by staving off any potential redemptions.

    32. CIOFFI and TANNIN told, and caused others to tell,
investors throughout March 2007 that the market presented a buying
opportunity. On March 7, CIOFFI told a Bear Stearns broker who
had more than 40 of his clients invested in the Funds that CIOFFI
believed the market was such that, "we have an awesome

opportunity." On the same day, TANNIN told the same broker, "I think [CIOFFI] and I are in agreement that we are looking at some great possibilities for the coming months. I don't know where you are putting your money now but I would suggest we speak about adding more to the fund. That's what I'm thinking." Similarly, TANNIN told investors that he believed that the market presented tremendous "buying opportunities" and that TANNIN himself was so confident in the Funds' prospects that he was going to add money to his investments. For example, on March 15, TANNIN told an investor, that "[w]e are seeing opportunities now and are excited about what is possible. I am adding capital to the Fund. If you guys are in a position to do the same I think think [sic] this is a good opportunity." CIOFFI's and TANNIN's goal in making these representations was to convince investors to invest additional sums in the Funds. In an email message to another member of the portfolio management team at the end of March 2007, TANNIN expressed satisfaction at his success in convincing investors to add more capital to the Funds: "[b]elieve it or not - I've been able to convince people to add more money. . .."

33. In contrast with CIOFFI and TANNIN's representations to investors that the Funds had tremendous opportunities to buy undervalued assets, CIOFFI told TANNIN and another team member on March 15 that the Funds "have to be very light on the investment side and continue to raise cash in [the

12

High Grade Fund] and maintain cash in [the Enhanced Fund],"
primarily to meet margin calls.

34.    Despite his repeated representations to investors
that he was going to add to his own investment in the Funds,
TANNIN never did so.

C.    Cioffi's Transfer of His Own
      Money Out of the Enhanced Fund

35.    CIOFFI acted on his fear of the Funds' incipient
meltdown.  On March 23, 2007, CIOFFI started the process of
transferring $2 million of his approximately $6 million investment
in the Enhanced Fund to another Bear Stearns hedge fund,
Structured Risk Partners ("SRP"), for which CIOFFI had supervisory
oversight, effective April 1, 2007.  SRP, as CIOFFI knew, had
recently experienced returns far superior to those of the Funds.
In fact, on March 22, 2007, in relating to BSAM's president the
returns of the Funds and SRP, CIOFFI stated, "at least [SRP] keeps
getting better."

36.    Despite receiving repeated questions from investors
about his personal investments in the Funds, a material factor in
investors' investment decisions, CIOFFI never told them that he
had transferred $2 million out of the Enhanced Fund and into SRP.
Moreover, CIOFFI falsely informed BSAM that he made the switch so
that one of the SRP managers would have a personal investment in
SRP.

D.    <u>Redemption by a Major Investor</u>

37.  Both Funds experienced losses for March 2007.  The High Grade Fund reported a return of -3.71% and the Enhanced Fund returned -5.41%.

38.  One of the three largest investors in the Funds ("Major Investor #1"), whose identity is known to the Grand Jury, told CIOFFI on April 18 that it was considering redemption of its approximately $57 million investment.  Among other things, CIOFFI falsely informed Major Investor #1 that he and the other portfolio managers had $8 million invested in the Funds and that this represented one-third of their liquid net worth.  CIOFFI failed to inform Major Investor #1, however, that he had recently withdrawn $2 million of his approximately $6 million investment from the Enhanced Fund.

39.  Major Investor #1 informed BSAM the next day that it wished to redeem its entire $57 million investment.  CIOFFI and TANNIN were aware of Major Investor #1's intention to redeem its investment.

E.    Tannin's Recognition of
      <u>The Funds' Imminent Collapse</u>

40.  On April 19, 2007, a member of the Funds' portfolio management team produced a CDO report (the "CDO Report") that showed that CDOs held by the Funds were worth significantly less than had previously been determined.

41.  On April 22, TANNIN recommended to CIOFFI that they either shut the Funds down or significantly change the Funds' investment strategies.  In an email message, TANNIN advised CIOFFI and another manager of the Funds that, "over the last few months" he had believed that the Funds should either be closed or "get very very aggressive."  In support of closing the Funds, Tannin stated that

> the subprime market looks pretty damn ugly . .
> .. If we believe the [CDOs report is]
> ANYWHERE CLOSE to accurate I think we should
> close the funds now.  The reason for this is
> that if [the CDO report] is correct then the
> entire subprime market is toast. . .. If AAA
> bonds are systematically downgraded then there
> is simply no way for us to make money - ever.
> (emphasis in original)

TANNIN concluded that, "caution would lead us to conclude the [CDO Report] is right - and we're in bad bad shape."  TANNIN noted the hurdles that they would meet if they adopted a "very aggressive" investment strategy, including whether investors would remain with the Funds.  TANNIN then asked, "Who do we talk to about this? [BSAM's president]?  [Bear Stearns' co-president]?  Outside counsel?  (And here we have to be careful because our outside counsel is BSAM's counsel NOT our counsel - This is another very big issue we at least need to think about.[)]"  TANNIN circumvented Bear Stearns' email system by sending this email from his personal account to the personal email accounts of CIOFFI's wife and the other Funds manager.

42.  TANNIN cautioned CIOFFI the next day against disclosing anything to other Funds employees that could signal the extent of the Funds' troubles by stating, "I think we should be conscious of statements like 'if we sold all the assets at the mark' while we are on the desk.  We have a lot to do - and we'll do it - but I think it is important to keep everyone else as focused as possible."

43.  TANNIN and CIOFFI never disclosed the gravity of the Funds' problems to investors or more senior BSAM personnel. Instead, at a meeting on April 24, 2007, CIOFFI, TANNIN and others told senior BSAM personnel that they were confident that the Funds were in good shape and would continue to be successful.

F.  The Defendants' Multiple Misrepresentations to Investors on an April 25, 2007 Conference Call

44.  On April 25, 2007, CIOFFI and TANNIN hosted a conference call for Funds investors during which they made misleading statements and omitted material facts.

45.  TANNIN, in stark contrast to the grim views expressed in his email to CIOFFI of just three days before, told investors: "So, from a structural point of view, from an asset point of view, from a surveillance point of view, we're very comfortable with exactly where we are. . .. [T]he structure of the Fund has performed exactly the way it was designed to perform," and "it is really a matter of whether one believes that careful credit analysis makes a difference, or whether you think that this

is just one big disaster.  And there's no basis for thinking this
is one big disaster."

    46.  CIOFFI also addressed the issue of redemptions,
which he characterized on the conference call as "the big -
obviously, the question that we've been getting from a number of
investors . . . ."  CIOFFI answered that question by falsely
claiming that, "[t]he next big redemption date would be June 30th,
and as of now, I believe we only have a couple million of
redemptions for the June 30 date. . . . I believe we have about 45
million in subscription, and 25 of that is from Bear Stearns and
those will be for, I believe those are all for May 1st."

    47.  Despite the acknowledged importance of this issue
to investors, CIOFFI failed to disclose the approximately $57
million redemption submitted by Major Investor #1, with whom
CIOFFI had met on April 18, 2007.

    48.  While noting the May 1 subscriptions, CIOFFI also
omitted any reference to $67 million in redemptions scheduled for
April 30 and May 31, 2007.  As for the "June 30" redemptions,
while CIOFFI stated that there were only "a couple million," in
fact, there were a total of approximately $47 million, which
included a portion of Major Investor #1's $57 million redemption.

    49.  CIOFFI failed to mention that he had pulled $2
million from the Enhanced Fund only 24 days earlier.  TANNIN
failed to mention, despite contrary representations to multiple

investors, that he had not added additional money to his investment in the Funds.

      G.    The Defendants' Continued Misrepresentations
            To Investors While the Funds Collapse

      50.  During May 2007, CIOFFI asked BSAM's Pricing Committee, a group of professionals who were charged with overseeing the ultimate calculation of the Funds' NAV, to use higher values for some assets held by the Funds in calculating the Funds' April 2007 NAV than the values that were set according to the Pricing Committee's rules. The values advocated by CIOFFI would have yielded an April 2007 return of approximately -6.5% for the Enhanced Fund. When challenged by the Pricing Committee as to the basis for using the higher values of the Funds, CIOFFI was unable to produce any evidence supporting his alternative pricing method. Ultimately, the Pricing Committee rejected CIOFFI's method, resulting in an April 2007 return in the Enhanced Fund of approximately -18.97%.

      51.  On May 31, 2007, even after it became apparent that the final return for the Enhanced Fund would be significantly worse than the estimated return, TANNIN asked CIOFFI, "do we give [Major Investor #2, whose identity is known to the grand jury] the -6.5 April or the larger down April?"

      52.  CIOFFI and TANNIN also continued to misrepresent the Funds' financial status and redemption picture in an effort to stem the tide that ultimately resulted in the collapse of the

Funds.  On May 3, 2007, TANNIN informed a Repo lender that the
Funds anticipated no large redemptions.  In fact, between March 1
and May 3, thirteen investors, including two of the largest
investors in the Funds and CIOFFI himself, had requested
redemptions.  As late as May 30, 2007, CIOFFI told an investor
that "so far we have talked any June redemptions of note (other
than about $5M) to pull their redemptions."  Many investors, whose
cumulative redemption requests far exceeded $5 million, had not
withdrawn their June redemption requests.

        53.  On at least one occasion in May 2007, CIOFFI
falsely stated that he still had $5.5 million invested in the
Enhanced Fund, omitting that he had taken $2 million of that
investment and put it into another hedge fund.

        H.    The End of the Funds

        54.  On June 7, 2007, investors were told that they
could no longer redeem their investments in the Enhanced Fund,
regardless of whether or not they had already submitted redemption
requests.  On June 17, 2007, investors were provided the final
April 2007 return of -5.09% for the High Grade Fund and -18.97%
for the Enhanced Fund.  On June 26, 2007, investors were told that
they could no longer redeem their investments in the High Grade
Fund, regardless of whether or not they had already submitted
redemption requests.

        55.  Eventually, investors were told that the Funds had

both lost 100% of their respective values, resulting in a total investor loss of approximately $1.4 billion.

I.   The Investigation and
     The Missing Evidence

56.   The United States Securities and Exchange Commission ("SEC") and others began investigating the Funds' collapse in the Summer of 2007.  As part of its investigation, the SEC requested that Bear Stearns produce documents and materials relating to the Funds.  While gathering the documents and materials, Bear Stearns learned that TANNIN's tablet computer, which he had used to take notes during 2007, and one of CIOFFI's notebooks, in which he had taken handwritten notes for the period January 1, 2007 to June 17, 2007, were both missing.

COUNT ONE
(Conspiracy to Commit Securities Fraud and
Wire Fraud)

57.   The allegations contained in paragraphs one through 56 are hereby realleged and incorporated as if set forth fully in this paragraph.

58.   In or about and between March 2007 and June 2007, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants RALPH CIOFFI and MATTHEW TANNIN, together with others, did knowingly and willfully conspire to:

A.   use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), by (a)

20

employing devices, schemes, and artifices to
defraud; (b) making untrue statements of material
fact and omitting to state material facts necessary
in order to make the statements made, in light of
the circumstances in which they were made, not
misleading; and (c) engaging in acts, practices,
and courses of business which would and did operate
as a fraud and deceit upon members of the investing
public, in connection with the purchases and sales
of shares of the Funds, directly and indirectly, by
use of the means and instrumentalities of
interstate commerce and the mails, contrary to
Title 15, United States Code, Sections 78j(b) and
78ff; and

B.     knowingly and intentionally devise a scheme and
artifice to defraud the Funds' investors and to
obtain money from them by means of materially false
and fraudulent pretenses, representations and
promises, and, for the purpose of executing the
scheme and artifice, and attempting to do so, to
transmit and cause to be transmitted, by means of
wire communication in interstate and foreign
commerce, writings, signs, signals, pictures and
sounds, contrary to Title 18, United States Code,
Section 1341.

59.    In furtherance of the conspiracy and to effect its

objectives, within the Eastern District of New York and elsewhere,

the defendants RALPH CIOFFI and MATTHEW TANNIN, together with

others, committed and caused to be committed, among others, the

following:

<u>OVERT ACTS</u>

a.     On March 7, 2007, CIOFFI told a Bear Stearns
broker, whose identity is known to the Grand
Jury, that the Funds presented an "awesome
opportunity."

b.     On or about March 21, 2007, TANNIN told a Bear
Stearns broker, whose identity is known to the
Grand Jury, that he was adding money to his
personal investment in the Enhanced Fund.

c.   On April 25, 2007, CIOFFI participated in an
     investor conference call during which he made
     material misrepresentations and omitted
     material facts.

d.   On April 25, 2007, TANNIN participated in an
     investor conference call during which he made
     material misrepresentations and omitted
     material facts.

e.   On May 3, 2007, TANNIN told a Repo
     counterparty that he anticipated no large
     redemptions.

f.   In or about mid-May 2007, CIOFFI told a Bear
     Stearns broker, whose identity is known to the
     Grand Jury, that he had $5.5 million
     personally invested in the Funds.

(Title 18, United States Code, Sections 371 and 3551 <u>et
seq.</u>)

<u>COUNT TWO</u>
(Securities Fraud - High Grade Fund)

60.   The allegations contained in paragraphs 1 through
56 are realleged and incorporated as if set forth fully in this
paragraph.

61.   In or about and between March 2007 and June 2007,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendants RALPH CIOFFI
and MATTHEW TANNIN, together with others, did knowingly and
willfully use and employ manipulative and deceptive devices and
contrivances, contrary to Rule 10b-5 of the Rules and Regulations
of the SEC (Title 17, Code of Federal Regulations, Section
240.10b-5), in that the defendants did knowingly and willfully (a)

employ devices, schemes, and artifices to defraud; (b) make untrue
statements of material fact and omit to state material facts
necessary in order to make the statements made, in light of the
circumstances in which they were made, not misleading; and (c)
engage in acts, practices, and courses of business which would and
did operate as a fraud and deceit upon members of the investing
public, in connection with the purchases and sales of shares of
the High Grade Fund, directly and indirectly, by use of the means
and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNT THREE
(Securities Fraud - Enhanced Fund)

62.   The allegations contained in paragraphs 1 through
56 are realleged and incorporated as if set forth fully in this
paragraph.

63.   In or about and between March 2007 and June 2007,
both dates being approximate and inclusive, within the Eastern
District of New York and elsewhere, the defendants RALPH CIOFFI
and MATTHEW TANNIN, together with others, did knowingly and
willfully use and employ manipulative and deceptive devices and
contrivances, contrary to Rule 10b-5 of the Rules and Regulations
of the SEC (Title 17, Code of Federal Regulations, Section
240.10b-5), in that the defendants did knowingly and willfully (a)
employ devices, schemes, and artifices to defraud; (b) make untrue

statements of material fact and omit to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchases and sales of shares of the Enhanced Fund, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

<u>COUNT FOUR</u>
(Securities Fraud - CIOFFI Insider Trading)

64. The allegations contained in paragraphs 1 through 56 are realleged and incorporated as if set forth fully in this paragraph.

65. On or about and between March 23, 2007 and April 1, 2007, within the Southern District of New York and elsewhere, the defendant RALPH CIOFFI did knowingly and willfully use and employ manipulative and deceptive devices and contrivances contrary to Rule 10b-5 of the Rules and Regulations of the SEC (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendant did knowingly and willfully (a) employ devices, schemes, and artifices to defraud; (b) make untrue statements of material fact and omit to state material facts necessary in order to make the

24

statements made, in light of the circumstances in which they were made, not misleading; and (c) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchases and sales of shares of the Enhanced Fund, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails, in that the defendant sold shares he owned in the Enhanced Fund while in possession of material non-public information regarding the Funds' liquidity, the Funds' redemptions and the Funds' prospects as described above.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 2 and 3551 et seq.)

## COUNTS FIVE through NINE
### (Wire Fraud)

66.  The allegations contained in paragraphs 1 through 56 are realleged and incorporated as if set forth fully in this paragraph.

67.  In or about and between March 2007 and June 2007, both dates being approximate and inclusive, within the Southern District of New York and elsewhere, the defendants RALPH CIOFFI and MATTHEW TANNIN, together with others, did knowingly and intentionally devise a scheme and artifice to defraud the Funds' investors and to obtain money from them by means of materially false and fraudulent pretenses, representations and promises.

68.  For the purpose of executing the scheme and artifice, and attempting to do so, on or about the dates set forth below, the defendants RALPH CIOFFI and MATTHEW TANNIN transmitted and caused to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, as follows:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 5 | 3/7/07, 6:12am | Email from CIOFFI to Bear Stearns broker, whose identity is known to the Grand Jury, in which CIOFFI states that the Funds have an "awesome opportunity". |
| 6 | 3/15/07, 6:49am | Email from TANNIN to an investor, informing the investor that "I am adding money to the fund.  If you guys are in a position to do the same I think think (sic) this is a good opportunity." |
| 7 | 3/18/07, 10:22pm | Email from TANNIN to an investor, stating that "Ralph and I each have about 40% of our non-real estate net worth in the fund.  I am adding more this month." |
| 8 | 4/25/07 | Investor conference call, described in paragraphs 44 through 49 herein. |
| 9 | 5/3/07 | Phone call from TANNIN to Repo counterparty in which TANNIN states that Tannin anticipates no large redemptions. |

(Title 18, United States Code, Sections 1343, 2 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

69.  The United States hereby gives notice to the defendants charged in Counts One through Nine that, upon their conviction of any such offense, the Government will seek

26

forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses.

    70.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

        (a)  cannot be located upon the exercise of due diligence;

        (b)  has been transferred or sold to, or deposited with, a third party;

        (c)  has been placed beyond the jurisdiction of the court;

        (d)  has been substantially diminished in value; or

        (e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any

27

other property of such defendants up to the value of the

forfeitable property described in this forfeiture allegation.

    (Title 28, United States Code, Section 2461(c); Title 18,

United States Code, Section 981(a)(1)(C); Title 21, United States

Code, Section 853(p))

A TRUE BILL

_____
FOREPERSON

_____
BENTON J. CAMPBELL
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

# INFORMATION SHEET

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

1.   Title of Case:  **United States** v. **Ralph Cioffi and Matthew Tannin**

2.   Related Magistrate Docket Number(s): N/A

3.   Arrest Date:  **N/A**

4.   Nature of offense(s):   ☒   Felony
                             ☐   Misdemeanor

5.   Related Cases - Title and Docket No(s).  (Pursuant to Rule 50.3 of the
     Local E.D.N.Y. Division of Business Rules):   _____
     _____
     _____

6.   Projected Length of Trial:     Less than 6 weeks     ( )
                                     More than 6 weeks     (X)

7.   County in which crime was allegedly committed: <u>KINGS</u>
     (Pursuant to Rule 50.1(d) of the Local E.D.N.Y. Division of Business Rules)

8.   Has this indictment/information been ordered sealed?     (X) Yes  ( ) No

9.   Have arrest warrants been ordered?                       (X) Yes  ( ) No

BENTON J. CAMPBELL
UNITED STATES ATTORNEY

By:  _____
Sean Patrick Casey
John A. Nathanson
Patrick Sean Sinclair
Assistant U.S. Attorneys
718-254-7000

# EXHIBIT E

JOHN D. WORLAND, JR.(JW1962)
ANTONIA CHION
DANIEL CHAUDOIN
JEFFREY WEISS
JONATHAN COWEN
BRIAN SANO
ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
100 F St., N.E.
Washington, D.C. 20549
Phone: (202) 551-4438 (Worland)
Fax:     (202) 772-9246 (Worland)
E-mail: *worlandj@sec.gov*

**08 2457**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  JUN 19 2008  ★

BROOKLYN OFFICE

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

BLOCK, J.

------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

            Plaintiff,

      -against-

RALPH R. CIOFFI and
MATTHEW M. TANNIN,

           Defendants.

------------------------------------------------------------x

08 Civ._____ ( )  POHORELSKY,

**JURY TRIAL
DEMANDED**

A TRUE COPY
ATTEST
DATE..........................20...
ROBERT C. HEINEMANN
               CLERK
BY............................
             DEPUTY CLERK

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission"), alleges the following

against defendants Ralph R. Cioffi ("Cioffi") and Matthew M. Tannin ("Tannin"):

## SUMMARY OF ALLEGATIONS

1.    This action concerns fraudulent acts and misrepresentations made by

Cioffi and Tannin in connection with the high-profile collapse of two now-defunct hedge

funds which they managed, the Bear Stearns High-Grade Structured Credit Strategies

Fund ("High Grade Fund") and the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leveraged Fund ("Enhanced Leverage Fund"). The funds – which had taken highly leveraged positions in collateralized debt obligations ("CDOs") based on subprime mortgage-backed securities – collapsed in June 2007, causing investor losses of approximately $1.8 billion.

2.      Particularly during the first five months of 2007, as the funds suffered increasing losses to the value of their portfolios and faced growing margin calls and redemptions (i.e., sales by investors of interests in the funds), senior portfolio manager Cioffi and portfolio manager Tannin deceived their own investors, as well as the funds' institutional counterparties, by fraudulently concealing from them the full extent of the funds' deepening troubles.

3.      The two managers brought in new money and persuaded existing investors and counterparties not to withdraw their money by consistently misrepresenting the level of redemptions from the funds, the current state of the funds, and/or the composition of the funds' portfolios. They made these misrepresentations during investor conference calls, in individual discussions with investors, and in written materials provided to investors, among other media and forums.

4.      Cioffi falsely told investors, during a conference call, that the funds had only a couple of million dollars in scheduled redemptions when, in reality, they had approximately $110 million in scheduled redemptions at that time. Tannin and Cioffi repeatedly understated outstanding redemption requests to investors and counterparties during spring 2007.

2

5.      Additionally, although Cioffi and Tannin had continually used their own investments in the funds as a selling point to investors, Cioffi urgently redeemed $2 million of his personal investment in the Enhanced Leverage Fund at the end of March 2007 without revealing the transfer to his own funds' investors. Cioffi's clandestine redemption caused the Enhanced Leverage Fund to pay out $2 million at a time when the markets were weak and the fund was facing another month of losses, as well as escalating margin calls and forced sales.

6.      During this period, although Cioffi had lost faith in the funds – as evidenced by his own redemption from the Enhanced Leverage Fund – he nonetheless falsely expressed his supposed confidence in the funds, encouraging investors to add money to the funds and attempting to dissuade them from redeeming.

7.      Aware of the comfort that the funds' investors took from management's stake in the funds, Tannin also began repeatedly telling investors and the funds' top salespersons, in March 2007, that he was adding to his own investment in the fund. Tannin never added to his investment, yet his misrepresentations contributed to an inflow of subscriptions to the funds in March and April 2007, a time of poor performance.

8.      Through the acts alleged in this complaint, the defendants engaged in, and unless restrained and enjoined by the Court will continue to engage in, transactions, acts, practices, and courses of business that violate Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

3

9.    The Commission seeks a judgment from the Court:  (a) enjoining the defendants from engaging in future violations of the above sections of the federal securities laws; (b) requiring the defendants to disgorge, with prejudgment interest, the illegal profits and proceeds they obtained as a result of their actions alleged in this complaint; and, (c) requiring the defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION

10.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and (d) and 77v(a)] and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and (e) and 78aa].

11.    The defendants made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, practices, and courses of business alleged in this complaint, certain of which occurred within the Eastern District of New York.  Venue is proper in this District pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa].

## THE PARTIES

12.    The plaintiff is the Securities and Exchange Commission, which brings this civil action pursuant to authority conferred on it by Section 20(b) of the Securities Act [15 U.S.C. 77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. 78u(d)(1)].

13.    Defendant Cioffi is a 52-year-old resident of Tenafly, NJ.  Cioffi acted as senior portfolio manager of the High Grade and Enhanced Leverage Funds.

4

14.     Defendant Tannin is a 46-six-year-old resident of New York, NY. Tannin acted as chief operating officer and portfolio manager of the High Grade and Enhanced Leverage Funds.

## RELATED ENTITIES

15.     Founded in 1923 as an equity-trading house, Bear Stearns survived the New York stock market crash of 1929 and eventually grew to become one of the largest brokerages and investment banking firms on Wall Street, with offices in major cities around the world. The firm cultivated an image as an industry innovator and developed an increasing focus on the bond markets. By 2007, it was one of the nation's largest mortgage bond underwriters and brokers to hedge funds.

16.     The Bear Stearns Companies Inc. ("BSC") was incorporated in Delaware on August 26, 1985. A holding company for various Bear Stearns' subsidiaries, BSC had its principal place of business in New York, NY. In March 2008, BSC and a financial services firm entered into a merger agreement. The merger closed on May 30, 2008.

17.     Bear, Stearns & Co. Inc. ("BS&C") was incorporated in Delaware on August 2, 1985 and had its principal place of business in New York, NY. It is registered with the Commission as a broker-dealer, and was a wholly-owned subsidiary of BSC.

18.     Bear Stearns Asset Management ("BSAM") was incorporated in New York on March 15, 1985, and had its principal place of business in New York, NY. It was registered as an investment adviser with the Commission throughout the time period that the fraudulent conduct alleged in this complaint occurred and remains so to date. It acted as general partner and investment adviser to the High Grade and Enhanced Leverage Funds, and was a wholly-owned subsidiary of BS&C.

19.     Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. ("High Grade Master Fund") was incorporated in the Cayman Islands and had its principal place of business in New York, NY. Unregistered with the Commission in any capacity, it functioned as the master fund through which the High Grade domestic and offshore feeder funds invested.

20.     Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, Ltd. ("Enhanced Leverage Master Fund") was incorporated in the Cayman Islands and had its principal place of business in New York, NY. Unregistered with the Commission in any capacity, it functioned as the master fund for the Enhanced Leverage Fund's overseas and domestic feeder funds. However, the feeder funds invested in the master fund only indirectly, through a leveraged total return swap with a foreign bank ("Bank No. 1"), the sole shareholder of the Enhanced Leverage Master Fund.

21.     Bear, Stearns Securities Corp. ("BSSC") was incorporated in Delaware on February 7, 1991 and had its principal place of business in Brooklyn, NY. It acted as the prime broker and custodian to the High Grade Master and Enhanced Leverage Master Funds, and was a wholly-owned subsidiary of BS&C.

## FACTS

**A.     BACKGROUND OF THE FUNDS**

### 1.     The Nature of Hedge Funds

22.     There is no statutory or regulatory definition of the term "hedge fund," although many, such as the High Grade and Enhanced Leverage Funds, have several characteristics in common. Hedge funds are pooled investment vehicles organized by professional investment managers who frequently have a stake in the funds they manage

6

and receive a management fee that includes a substantial share of the profits of the fund. Individuals and institutions invest in the hedge funds through the purchase of securities, such as partnership interests, that the hedge funds typically issue in "private offerings" that are not registered with the Commission. Hedge Funds are not required to make periodic reports to the Commission and typically operate in a manner that does not require regulation as investment companies.

23.     Hedge funds typically provide information to prospective investors during an investor's initial due diligence review of the fund, before an investment is made. Most hedge funds provide written information to their investors in the form of a private offering memorandum or private placement memorandum ("PPM"). PPMs generally disclose in broad terms the fund's investment strategies, practices, operations and "risk factors," and typically include disclosure that an investment in the hedge fund is speculative and includes a substantial risk of loss, including the possibility of a total loss of the investment.

24.     Hedge funds may also provide ongoing information to hedge fund investors in the form of letters, periodic reports, conference calls, financial statements, and individual discussions.

25.     Cioffi and Tannin utilized all of these methods of communication with respect to the High Grade and Enhanced Leverage Funds and typically held investor conference calls following the end of each calendar quarter to discuss fund performance and market conditions. Cioffi and Tannin held such quarterly conference calls on January 18, 2007 and April 25, 2007, as well as a special investor conference call on

7

March 12, 2007. The March call was scheduled specifically to deal with growing investor concern about the funds' performance and market conditions.

26.     Information concerning most aspects of the High Grade and Enhanced Leverage Funds' performance was not available to investors outside of these channels. For example, investors had access to information concerning the funds' subprime exposure, margin calls, redemption requests, asset sales, liquidity, and essential soundness only through Cioffi and Tannin directly, or through the re-transmittal of such information – obtained from Cioffi and Tannin – by the BSAM and BS&C sales forces.

27.     The antifraud provisions of the federal securities laws apply to hedge funds regardless of the sophistication level of the investors to whom material misrepresentations or omissions are made. When hedge fund managers such as Cioffi and Tannin choose to make statements to investors, they must speak truthfully and not omit material information necessary to prevent their statements from being misleading.

## 2.     The Creation of the High Grade Fund and the Enhanced Leverage Fund

28.     Cioffi joined BS&C as a bond salesman in 1985 and continued to work in fixed income sales through early 2003, when he explored leaving BSC to start his own hedge fund based on investments in CDOs, which are structured securities backed by a portfolio of bonds, loans, or other assets.

29.     BSAM had been seeking to expand its small group of hedge funds, and asked Cioffi to stay at BSC, although he had no prior experience as a trader or hedge fund manager. In 2003, BSAM opened the High Grade Fund, bringing in Tannin – who also lacked any prior experience as a trader or fund manager – and another portfolio manager ("Third Manager") to assist Cioffi.

30.    As stated in its PPM, the High Grade Fund's objective was to provide current income and capital appreciation in excess of the London Interbank Offered Rate ("LIBOR"). It sought to achieve this objective by investing in purportedly stable, "high grade" structured finance investments, particularly involving long positions in mostly AAA and AA-rated CDOs.

31.    The fund further sought to hedge risks associated with those positions mostly by purchasing instruments called credit default swaps ("CDS"), and sought to magnify its returns by borrowing money through margin loans and repurchase agreements ("repos"). A CDS is a type of credit derivative that essentially acts like an insurance contract against the risk that a bond or other security will default or experience a downgrade. A repo is a vehicle for extending the equivalent of a secured loan from repo lender to borrower. The fund's CDOs and $CDO^2$s were typically highly illiquid. ($CDO^2$s are essentially CDOs whose underlying assets include tranches of other CDOs.)

32.    Cioffi and Tannin sold the High Grade Fund to investors as a relatively safe source of income, involving only a small amount of well-hedged risk and suitable for investors desiring capital preservation. They fostered this expectation with assertions that the fund operated "like a bank" by borrowing capital at relatively low rates and then redeploying it into investments that yielded slightly higher rates.

33.    The High Grade Fund soon grew to become BSAM's largest hedge fund, with more than $1.5 billion in investor capital and a "team" of assigned personnel. In selling the fund, the defendants typically emphasized BSC's institutional expertise in mortgage-backed bonds, as well as their own acumen and reputation within that sector. Cioffi split 50/50 with BSAM the management and incentive fees that the fund generated,

9

paying Tannin, and other High Grade team members from his half but keeping most of his split for himself, in the form of eight-figure annual bonuses. Tannin received seven-figure bonuses from Cioffi.

34.    Cioffi and Tannin created the Enhanced Leverage Fund, in August 2006, in an effort to provide greater returns than the High Grade Fund. This new fund had the flexibility to boost leverage, beyond the maximum 10x leverage employed by the High Grade Fund, by up to an additional factor of 2.75 (i.e., up to 27.5 times of investor capital), through a leverage arrangement with Bank No. 1, as described more fully below. To encourage investment in the new fund, the defendants moved their own stakes entirely over to the Enhanced Leverage Fund and informed investors of the move. Ultimately, investors moved about one-third of their total capital from the High Grade Fund to the Enhanced Leverage Fund as the latter fund launched.

35.    The "enhanced leverage" employed by the Enhanced Leverage Fund came by virtue of a "total return swap" agreement that had been negotiated by the Enhanced Leverage Fund with Bank No. 1. Bank No. 1 was essentially positioned between the Enhanced Leverage Master Fund and that fund's overseas and domestic feeder funds, adding Bank No. 1's own money to increase the leverage of the investment into the Enhanced Leverage Master Fund. The anticipated benefit for the feeder fund investors was that if the Enhanced Leverage Fund's portfolio increased in value, the feeder fund investors would receive a return, augmented by Bank No. 1, beyond the simple increase in asset value.

36.    By early 2007, investors in the High Grade Fund had made net contributions of $1.08 billion, while those in the Enhanced Leverage Fund had made net

10

contributions of $775 million. The funds' investors consisted of relatively high-net-worth individuals, some of whom invested through closely held corporations, trusts, IRAs, or other vehicles, as well as institutional investors, such as corporations, employee benefit plans, foundations, and "funds of funds," i.e., pooled investment vehicles that themselves invest in other hedge funds. Although the funds required a $1 million minimum investment, BSAM had discretion under the PPM to reduce or waive the requirement, and this discretion was typically exercised through the defendants. Many individual investors put less than $500,000 into the funds. Some invested only $250,000.

37.     By July 18, 2007, BSAM had concluded that the Enhanced Leverage Fund had been completely wiped out and that the High Grade Fund had lost 91% of its value year-to-date. Subsequently, the High Grade Fund's losses were likewise stated to be 100%. Investors consequently lost a total of approximately $1.8 billion in net contributions to the two funds.

38.     Cioffi and Tannin's fraudulent acts and misrepresentations, set forth in this complaint, occurred in connection with the purchase or sale of securities because investors made numerous purchases and sales of partnership interests in the funds during the period of fraudulent conduct. Additionally, investors were dissuaded from making additional redemption requests during the period by the defendants' fraudulent conduct and misrepresentations. The defendants' fraudulent acts and misrepresentations also were made in the offer or sale of securities because each iteration of a fraudulent statement alleged herein – and each omission of a material fact necessary to prevent another statement made by the defendants from being misleading – occurred in

furtherance of Cioffi and Tannin's continuous attempts to sell limited partnership interests in the funds to investors.

**B.    CIOFFI AND TANNIN MATERIALLY MISREPRESENTED THE FUNDS' PORTFOLIO COMPOSITION**

    **1.    Cioffi and Tannin Surreptitiously Moved the Funds into Increasingly Aggressive Investments**

39.    During 2006, without telling the funds' investors, Cioffi and Tannin began to move the funds into ever more aggressive investments in securities backed by subprime mortgage loans.  Indeed, the High Grade Fund, heading into 2007, was little more than a highly leveraged subprime fund with its holdings concentrated in illiquid CDOs and $CDO^2$s.  For its part, the Enhanced Leverage Fund was a still more leveraged version of the High Grade Fund, with an equally illusory margin of safety.

40.    Cioffi controlled the High Grade and Enhanced Leverage Funds, and had complete discretion to make the final investment decisions for the funds.  BSAM gave Cioffi's team great leeway in operating the funds because his team had been profitable for BSAM and had grown rapidly.

41.    From late 2006 through June 2007, Cioffi became increasingly indiscriminate in the management of his funds.  During that time, Cioffi started buying ever-more-risky investments such as ABS significantly backed by subprime securities rated BBB, as well as risker types of CDOs, and even less transparent, illiquid, $CDO^2$s.  Tannin noted Cioffi's lack of buying discipline, in a February 5, 2007 e-mail to the Third Manager:  "Unbelievable.  He is unable to restrain himself."

2.    **The Funds' Subprime Mortgage Exposure**

42.    Cioffi and Tannin misrepresented to their investors the true extent of subprime mortgage exposure in the funds' portfolio. By 2006, it had become increasingly difficult for the High Grade Fund to generate returns in excess of LIBOR. Cioffi began chasing higher yields by shifting an ever-increasing proportion of the High Grade Fund's assets into CDOs and CDO²s backed by subprime mortgages. However, in communications with investors, Cioffi and Tannin never drew attention to the ongoing "drift" in the fund's investment focus. On the contrary, monthly written Preliminary Performance Profiles ("PPPs") that the defendants provided to current and prospective fund investors, purporting to show the fund's composition, consistently understated the fund's subprime exposure by hiding most of it in a catchall asset-backed security ("ABS") category. The only category with "sub-prime" in its title misleadingly showed only a small slice of the fund's overall subprime exposure.

43.    In the monthly PPPs, the defendants represented through recurring bar charts summarizing the funds' portfolios or collateral that, typically, only about 6 – 8% of each fund's portfolio was invested in "sub-prime RMBS." ("RMBS" is the acronym for residential mortgage-backed securities.) This represented only the funds' <u>direct</u> investment in subprime securities. By separating out the funds' direct subprime investments, Cioffi and Tannin misrepresented the true amount of subprime exposure in the funds because the funds also held a much greater amount of subprime, <u>indirectly</u>, through their massive CDO and CDO² positions. This indirect subprime exposure was not reflected in the bar charts at all. The PPP bar charts were the only written indication

13

of the funds' subprime exposure ever provided to fund investors, at least until after the funds collapsed.

44.     Additionally, throughout the Enhanced Leverage Fund's life, the bar charts used for that fund's PPPs were merely copied from the charts used for the High Grade Fund. Because the portfolios of the two funds included different holdings, Cioffi and Tannin misrepresented the Enhanced Leverage Fund's composition to that fund's prospective and existing investors who received the PPPs.

45.     Cioffi and Tannin both received the PPPs monthly, when published, and Tannin also regularly received drafts for his input and shared them with Cioffi. Tannin regularly drafted sections of the PPP, and Cioffi did so occasionally. Tannin approved each fact sheet.

46.     According to an industry-standard Alternative Investment Management Association ("AIMA") due-diligence questionnaire completed by BSAM for the High Grade Fund in August 2006, "[a]s a general practice, positions are limited to a maximum 5% exposure per name with a target of 1% per name and no more than 1/3rd in any one asset class." This questionnaire was sent to prospective investors in both the High Grade and Enhanced Leverage Fund who requested it. Tannin reviewed one or more drafts of the questionnaire and knew, or was reckless in not knowing, that the questionnaire response was misleading because the High Grade Fund had more than one-third of its portfolio exposed to the subprime asset class.

47.     Cioffi also misrepresented the funds' subprime mortgage exposure on the defendants' January 18, 2007 investor conference call, and he and Tannin made further misrepresentations on their March 12 and April 25, 2007 investor conference calls. The

defendants misrepresented the funds' subprime mortgage exposure on these three conference calls as significantly lower than it actually was.

48.    Internally, an April 20, 2007 BSAM risk-exposure report showed the funds' collateral was, in fact, "primarily" subprime, i.e., approximately "60% sub-prime." BSAM disclosed the true nature of the funds' holdings, through its sales force, in a June 13, 2007 sample question and answer:

> **Question:** "I thought I was invested in a 'high grade fund' but it sounds now like the fund(s) may have invested a fair amount of its assets in sub-prime mortgages."

> **Answer:** "Based upon our portfolio managements' analysis, [as of May 31, 2007,] the percentage of underlying collateral in our investment grade structures collateralized by 'sub-prime' mortgages is approximately 60%."

49.    The amount of subprime exposure was material to investors.  On January, March and April 2007 conference calls, Cioffi and Tannin faced constant questioning from investors regarding the extent of subprime assets in the funds' holdings.  E-mails between investors and the funds' sales force similarly showed a keen interest by investors in the percentage of subprime assets.

### 3.    The Funds' Target Composition of 90% "AAA" Through "AA" Rated Securities

50.    The funds had a "target" portfolio composition of 90% securities rated AAA through AA, with the managers having discretion over the remaining 10%.

51.    In oral sales presentations, Cioffi and Tannin typically told investors, "We're 90% AAA or AA."  This was an integral selling point for both funds, as the term "high grade" in the names of the funds was itself a representation that the assets would consist of AAA or AA-rated bonds.  The High Grade Fund's monthly PPPs prominently

stated: "Typically, 90% of the Fund's gross assets are invested in AAA or AA structured finance assets."

52. The "90% AAA/AA" representation was misleading because, at least during 2006, the funds regularly were substantially less than 90% invested in AAA/AA securities.

53. Moreover, the undisclosed characteristics of many of the AAA/AA securities that the funds invested in rendered them fundamentally more likely to default than typical AAA/AA securities. In a private e-mail, Cioffi himself acknowledged that certain types of AAA CDO²s held by the funds were "not really AAA" because, due to the subordination structure of the underlying loans, the CDO²s were subject to a heightened risk of defaults.

54. Cioffi and Tannin knew, or were reckless in not knowing, that their "90% AAA/AA" representation was misleading. This misrepresentation was material to investors, and its significance was magnified by the leverage that the funds applied to the non-AAA/AA portion of their portfolios.

## 4.    The Funds' Hedging Strategy

55. In written materials, individual discussions with investors, and investor conference calls, Cioffi and Tannin constantly stressed that the High Grade and Enhanced Leverage Funds were adequately hedged to survive market gyrations. The funds hedged primarily through the purchase of CDS and CDS-related positions, including options to purchase CDS, which equated to taking "short" positions on the securities or indexes underlying the CDS.

16

56.    Cioffi and Tannin misrepresented the adequacy and effectiveness of the funds' hedges on the January 2007 investor conference call. There, Cioffi stated that his team's "macro-economic view is for a slowing of the economy, [F]ed easing in 2007, spreads widening... [W]e are hoping for that... [W]e have proper hedges in place. We are short a significant amount of the sub-prime space." Tannin stated, on the same January call, that "the bottom line on our exposure is this. If the market were to continue to deteriorate, and spreads were to widen, we would do very well...We have a very nice short position."

57.    However, after the Enhanced Leverage Fund had its first month of negative performance in February 2007, Cioffi admitted in e-mails that the loss came about because the Enhanced Leverage Fund had failed to hedge substantial positions that it had recently entered into. Indeed, according to Cioffi, the losses suffered by the fund on these unhedged positions constituted the Enhanced Leverage Fund's entire loss for the month.

58.    On the March 2007 investor conference call, Cioffi again misrepresented that the funds were effectively hedged, stating: "What's my bottom line take-away here? Well, we've talked about the 100-year storm ... and how we felt we were effectively able to hedge that mark-to-market volatility. And certainly in High Grade we have done that. In Enhanced, we have effectively done that."

59.    However, beginning in late February 2007 and continuing through at least May 2007, the High Grade Fund and Enhanced Leverage Funds actually lost money on *both* the long and short components of their portfolio. As early as January 2007, Cioffi had internally recognized shortcomings with the funds' hedging strategy, noting in an

e-mail to his team that a lack of liquidity in certain CDS index markets could cause the funds' hedges to move against them.  By mid-March, even Tannin began internally to question the funds' hedging strategy, sending an e-mail to the Third Manager, with the subject line "??????????????????," asking, "Is ralph doing what he should be doing right now?  Are we covering [index short positions]?"

60.    Cioffi and Tannin misrepresented to investors that the High Grade and Enhanced Leverage Funds were adequately hedged against losses.  These representations were material to investors, especially when made in conjunction with the 90% AAA/AA representation, because they contributed to the defendants' overall message that the funds were a safe investment.

### C.    CIOFFI AND TANNIN MATERIALLY MISREPRESENTED THE CURRENT STATE OF THE FUNDS

#### 1.    Cioffi and Tannin Misrepresented to Investors that the Funds Were Sound and Remained on Course

61.    Beginning in February 2007, only six months after its inception, the Enhanced Leverage Fund started to experience negative monthly returns as the values of the worst CDOs and CDO²s in its portfolio were quickly impacted by the emerging subprime mortgage crisis and the fund's hedges only partially offset the drop.  The High Grade Fund held up slightly better but realized its first negative returns in March.

62.    To convince Bank No. 1 to commit an additional $100 million to the Enhanced Leverage Fund, Tannin falsely told Bank No. 1, on February 27, 2007, that the Enhanced Leverage Fund had returned positive 4.3% for February, and assured Bank No. 1 the fund was experiencing its "best month ever."  Bank No. 1 then committed the requested funding.

18

63.     Both funds continued to lose money throughout the spring.  It became clear to Cioffi and Tannin, early on, that the High Grade and Enhanced Leverage Funds were extremely unlikely to survive, yet the defendants hid this reality from investors.

64.     On March 1, 2007, Cioffi told a team economist that the Enhanced Leverage Fund would have its first negative month, then cautioned him: "Don't talk about [the February results] to anyone or I'll shoot you…I can't believe anything has been this bad."  On March 8, 2007, however, Tannin asked Bank No. 1 to add another $100 million, falsely representing that "[d]espite dramatic volatility in the structured finance market, our Fund has been extremely stable.  We are seeing the beginning of new asset opportunities."  By this point, Cioffi had concluded that the structured credit markets – and, thus, the funds' fundamental investment strategy of buying and holding CDOs – had been irretrievably broken and would remain so for the foreseeable future.  On March 15, 2007, Cioffi confessed to the team economist, in an e-mail with the subject line "fear":

> I'm fearful of these markets…As we discussed it may not be a melt down
> for the general economy but in our world it will be.  Wall Street will be
> hammered with law suits.  Dealers will lose millions and the cdo business
> will not be the same for years.

65.     By the end of April, Tannin had also come to recognize this reality.  On Sunday, April 22, 2007, only three days before the April 25th investor call, Tannin e-mailed Cioffi.  In order to stay off of the BSC network, he sent the e-mail from his personal Gmail account to a Hotmail account associated with Cioffi's household.  In the e-mail, Tannin noted that the subprime market "looks pretty damn ugly" and argued for closing and liquidating both funds.  Tannin noted that the Third Manager also had "lost confidence in the [CDO] structures."  Later that day, Tannin forwarded his e-mail to the

Third Manager's personal e-mail account – again, off the BSC network – and the Third

Manager agreed with him that "[i]t looks really bad" and stated that "best way to get out

of this risk [is] some form of a liquidating trust."

66.     Tannin based his pessimistic outlook partly on data from the team's

anticipated and recently completed "credit model" that had been forwarded to the

defendants on April 19, 2007. Tannin noted in his Gmail message, "IF we believe the

runs [the analyst] has been doing are ANYWHERE CLOSE to accurate I think we should

close the Funds now. The reason for this is that if [the runs] are correct then the entire

sub-prime market is toast."

67.     However, the defendants decided not to close the funds and, on the

April 25th investor conference call, hid their true, pessimistic views. Contrary to his April

22nd off-network e-mail, Tannin squarely told investors on the call that the outlook for the

funds and the CDO markets was favorable. In his opening remarks on the call, Tannin

stated: "[T]he key sort of big picture point for us at this point is our confidence that the

structured credit market and the sub-prime market in particular, has not systemically

broken down...So from a structural point of view, from an asset point of view..., we're

very comfortable with exactly where we are."

68.     Cioffi presented the same message to investors on the April conference

call, stating that "we are – cautiously optimistic that the CDO market has found its

footing," and claiming, "We have a plan in place that'll get the Funds back on track to

generate positive return...." According to Cioffi, even in the unlikely event that CDO

prices "just stay where they are," the High Grade Fund would still finish the year up 8%

and the Enhanced Leverage Fund up 6%.

69.     Cioffi and Tannin repeated these themes in numerous one-on-one meetings and telephone calls with investors during late April and throughout May.

70.     The representations were material to investors, who were growing increasingly concerned by the funds' negative performance and were asking the managers about the outlook for the funds and the market on a constant basis during this time period.

71.     Tannin knew, or was reckless in not knowing, that his representations were false and misleading, having stated in his e-mails to Cioffi and the Third Manager, only three days prior to the April 25th investor call, that the funds should be liquidated because "we are just too long" and "the distress hasn't even begun."

72.     Cioffi knew, or was reckless in not knowing, that his statements about the funds' ability to generate imminently positive returns were false and misleading.  While he made these misleading statements to investors about the state of the funds, Cioffi declared his true assessment internally to colleagues and Wall Street contacts, admitting that the funds were not capable of overcoming troubles in the markets for the immediate future.

73.     The defendants' misrepresentations bore another benefit.  They succeeded in attracting approximately $23 million in new subscriptions from investors for the May 1st subscription date.

74.     From February through May 2007, as the Enhanced Leverage Fund's positions became increasingly precarious, Cioffi and Tannin enticed Bank No. 1 to add additional money, and sought to inhibit it from pulling out its $400,000,000 total investment in the fund.  Just as in their dealings with other investors, Cioffi and Tannin

21

misrepresented to Bank No. 1 – or failed to report to Bank No. 1 as required by the total

return swap agreement – the Enhanced Leverage Fund's performance, portfolio

composition, and true condition.

75.     By the middle of May, Cioffi had concluded that the Enhanced Leverage

Fund would not survive at all.  On May 13, 2007, he admitted to Tannin and the Third

Manager: "I think…the [Enhanced Leverage Fund] has to be liquidated which seems to

be somewhat certain given the redemption activity."  (emphasis added).  However, Cioffi

and Tannin never disclosed this conclusion to Bank No. 1, despite a duty under the total

return swap agreement to inform Bank No. 1 of material events.

### 2.     Cioffi and Tannin Misrepresented the Funds' Net Asset Value

76.     Most of the funds' short positions had readily obtainable market prices

and were marked to market daily.  However, most of the funds' long portfolio consisted

of highly illiquid securities that lacked a market quotation.

77.     Pursuant to BSAM's pricing policy, the funds sought to obtain multiple

"marks" (i.e., price quotations) for their long securities on a monthly basis, either from

the dealers that had sold them securities or from other dealers who had become familiar

with the funds' holdings.  The funds sent their positions to dealers on the street at the end

of each month and typically averaged the marks that they received to determine a month-

end valuation for each security.  When the funds could not obtain sufficient marks, or

when Cioffi thought the marks were incorrect, the funds relied on so-called "fair market"

valuations, which Cioffi determined.  Any fair market valuations had to be approved by

BSAM's pricing committee.

22

78.    BSAM and the funds, with input from the defendants, computed a daily net asset value ("NAV") and month-to-date return for the High Grade and Enhanced Leverage Funds. However, these figures only took into account month-to-date changes to the funds' hedges and their few exchange-traded long securities and assumed that the rest of the long portfolio had remained at the same valuation as the prior month-end marks. As a result, the funds and the defendants historically did not provide intra-month estimates to most of their investors because such estimates were unreliable. Instead, they provided "preliminary estimates" within a couple of weeks after each month's end, followed by a final NAV about six weeks later. Preliminary estimates were issued after most dealer marks had been received. The final NAV came out once all of the marks were available. By early 2007, many subprime securities were rapidly declining in value, and thus BSAM and the defendants could no longer reasonably rely on stale, prior month-end marks as an indication of current values.

79.    As late as mid-March 2007, Cioffi was adamant that intra-month estimates not be released to investors, castigating a BSAM sales person, internally, that the figures were unreliable: "You should also know better [than to release intra-month figures] in that our hedges are marked real time [and] our assets at the end of each month. We've said that 1000 times!!"

80.    By April 2007, however, Cioffi was anxious to present the funds' April performance in a positive light. Thus, he not only took the unusual step of providing an intra-month estimate on the April 25, 2007 investor conference call, but also did so without any notice to the call participants of the severe limitations inherent in the estimate. The only information that Cioffi provided was as follows: "The estimated

23

returns for April are -0.6 basis points for High Grade and -0.7 for Enhanced [i.e., -0.06% and -0.07%, respectively]." These "estimated returns" were disastrously off the mark, as the final NAVs for April were -5.09% for the High Grade Fund and -18.97% for the Enhanced Leverage Fund, stunningly large monthly losses for funds that Cioffi and Tannin had marketed as operating "like a bank."

81.     Tannin actively participated in the April 25, 2007 call. Although he constantly interjected his opinions to reinforce and explain Cioffi's claims, in this instance, he said nothing to explain the estimates' limitations.

82.     Throughout May, Cioffi became increasingly desperate to fair value his funds' portfolios and bring the final April numbers as much in line with earlier estimates as possible, thereby avoiding the need to report a huge disparity and prompt a likely flood of additional redemptions. Cioffi's efforts, however, ultimately ran into resistance from BSAM's pricing committee.

83.     At a May 31, 2007 meeting, the pricing committee rejected every one of Cioffi's requests to set aside a dealer mark and use his own valuation. When challenged, Cioffi had virtually no evidence to support his desired valuations, and conceded in a contemporaneous e-mail to a committee member, "There is no market... its [sic] all academic anyway [because] -19% [i.e., the Enhanced Leverage Fund's anticipated final April NAV] is doomsday."

84.     Later in the day on May 31st, after the pricing committee had already met, Tannin e-mailed Cioffi to ask whether investors should still be given "the [preliminary]

-6.5 april or the larger down april?" Rather than simply telling Tannin to use the most recent and accurate number, Cioffi even then continued to equivocate, responding, "Ah that's correct[.] I think that one deserves a phone call [to discuss]."

85.    Cioffi and Tannin failed to disclose to the funds' investors the significant limitations on the April 25th "estimated returns," rendering the figures misleading under the circumstances. The estimates were material to investors.

86.    Tannin also independently misrepresented the funds' April NAV. On or about May 3, 2007, he falsely represented to a significant institutional counterparty that the funds' performance had been flat to slightly positive in March and April and that the NAVs continued to increase.

87.    Furthermore, by the middle of May, at the latest, Cioffi and Tannin were aware that the Enhanced Leverage Fund's final April NAV would reflect losses of more than 10%. Even though the total return swap agreement with Bank No. 1 required Cioffi and Tannin to notify Bank No. 1 of any actual or anticipated losses greater than 10%, they failed to make the required disclosure.

88.    On June 7, 2007, BSAM announced the Enhanced Leverage Fund's final April NAV and froze redemptions. The following day, it announced the High Grade Fund's final returns. Margin calls subsequently could no longer be met, and creditors began seizing the funds' assets.

### 3.    Cioffi Misrepresented an Upcoming CDO² Issuance as a Guaranteed Source of Liquidity

89.    From 2005 through December 31, 2006, BSAM and the funds issued approximately seven of their own CDOs or CDO²s into the marketplace. On the April 25, 2007 investor call, Cioffi claimed that the funds had "significant amounts of

liquidity," in part because of what he variously called a "trade," "transaction," "facility," or "funding vehicle" – actually a CDO² issuance – to be undertaken by Cioffi's team and BSAM with a domestic bank ("Bank No. 2"). Cioffi asserted that this transaction "should be done this month and will close in May." According to Cioffi, this was a "significant transaction to get done." Cioffi also had touted the transaction on the March 12, 2007 conference call.

90.    Although Cioffi continually presented the Bank No. 2 CDO² issuance as imminent throughout the spring, he knew, or was reckless in not knowing, that the deal would not actually be available to the funds until late May or early June, at the earliest. Moreover, he knew, or was reckless in not knowing, that the issuance would not solve the funds' current and/or prospective liquidity problems because there were essentially no buyers for new CDOs in the market, which severely limited the amount of money that could be raised in an offering. In mid-April, Cioffi admitted to a broker that there was no "buy interest on anything anywhere in this world or universe[.] [I] think we need to go into outer space to find new buyers of cdo's."

91.    When the deal was ultimately done, in late May 2007, it failed to impart benefits to the funds sufficient to solve their liquidity problems.

92.    Cioffi misrepresented to investors the timing of the Bank No. 2 CDO² issuance and its impact on the funds' liquidity. These misrepresentations were material to investors.

**D.    CIOFFI AND TANNIN MATERIALLY MISREPRESENTED THE LEVEL OF INVESTOR REDEMPTIONS**

93.    As April 2007 progressed, the defendants knew that many investors in the funds were either submitting redemption requests or considering doing so. The

defendants worried that excessive redemption requests would both set off a cascade of further redemption requests by investors and would panic repo counterparties into making margin calls. Thus, information concerning redemptions was material.

94.     On the April 25, 2007 investor conference call, Cioffi acknowledged that "obviously, the [big] question that we've been getting from a number of investors [is] how do we look on a redemption/subscription basis?" Cioffi then reassured investors that the funds had gotten "about 45 million [dollars] in subscriptions, and 25 of that is from Bear Stearns," while "we only have a couple of million of redemptions for the June 30 date... At least on the asset side we had a perfect storm. And we've lived through it, we have plenty of liquidity...So we've weathered the storm."

95.     In fact, Cioffi knew, or was reckless in not knowing, that the funds had received redemptions well in excess of "a couple of million" dollars as of April 25, 2007. As alleged in this complaint, Cioffi alone had redeemed two million dollars from the Enhanced Leverage Fund. Moreover, Cioffi knew, or was reckless in not knowing, that one of the funds' largest institutional investors had given BSAM written notice, only days before, that it wanted to redeem its $56 million interest in the Enhanced Leverage Fund ($29 million on May 31, 2007, and $27 million on June 30, 2007).

96.     Cioffi materially understated the total outstanding redemption requests received by BSAM. He falsely stated that there were only a "couple of million" dollars in June redemptions, when there were in fact tens of millions of dollars in June redemptions. He also indicated that the funds were taking in $45 million, a more attractive and enticing statistic to keep investors from redeeming and encouraging them to invest more.

27

97.    Not only did Cioffi falsely represent June redemptions, he also failed to disclose that total outstanding redemption requests, i.e., for May through August 2007, were approximately $110 million.

98.    Tannin also misrepresented the amount of redemptions.  For example, about a week after the April 25th investor conference call, on or about May 3, 2007, Tannin misrepresented to one of the funds' most significant institutional counterparties that he and Cioffi did not anticipate any large redemptions.  Tannin knew, or was reckless in not knowing, that the funds had more than $100 million in outstanding redemption requests at that time.

99.    Cioffi continued to misrepresent the level of redemptions after the April 25th conference call.  On May 30, 2007, for example, he e-mailed an individual investor that the funds had "talked any June redemptions of note" into pulling their redemption requests, "other than about $5 [million]."

100.    By materially understating the true amount of redemptions, Cioffi and Tannin, knowingly or recklessly, misled investors regarding a material aspect of the funds' condition.

### E.    CIOFFI MOVED HIS MONEY OUT OF THE TROUBLED ENHANCED LEVERAGE FUND

#### 1.    Cioffi Redeemed $2 Million of His Investment from the Troubled Enhanced Leverage Fund

101.    Notwithstanding Cioffi's public assertions that his funds remained sound and would soon generate positive returns, Cioffi nonetheless rushed to redeem $2 million of his investment in the Enhanced Leverage Fund during the thick of its troubles.

28

102.    Cioffi knew, by March 14, 2007, that the High Grade Fund had been getting more margin calls than the team had estimated and that, as a result: "We are now having to sell some bonds and to repo some unmargined stuff to meet margin calls…It's obviously not a great market to sell anything in but we are going to sell what we can quietly." Cioffi also knew by around that time that several of the Enhanced Leverage Fund's largest investors, after learning of the fund's negative results for February 2007, had already told the sales force that they wanted to redeem.

103.    As the High Grade and Enhanced Leverage Funds' portfolios faced losses for March 2007, a third BSAM fund – with which Cioffi was associated as a senior adviser – called the Structured Risk Partners Fund ("SRP Fund"), showed positive results. In contrast to the High Grade and Enhanced Leverage Funds, the SRP Fund had managed to generate impressive returns during the subprime downturn through arbitrage and a relative-value strategy of matched long and short trades. Cioffi was aware of these impressive returns and noted that "SRP was designed to be mostly short sub prime."

104.    On March 23, 2007, Cioffi requested that BSAM transfer $2 million of his own $5.7 million total investment in the Enhanced Leverage Fund to the SRP Fund, effective on April 1, 2007, the next possible subscription date. The requested $2 million redemption represented almost half of Cioffi's $4.2 million original stake in his funds, which had appreciated to $5.7 million over several years.

105.    Cioffi's urgent redemption received special treatment and was processed without adherence to the general notice requirements for redemptions set forth in the Enhanced Leverage Fund's PPM, which restricted withdrawals from the fund to those made on 40 days' notice (with a 2% fee) or on 60 days' notice, at quarter's end.

Although BSAM retained discretion under the PPM to make exceptions to the notice requirements, redemptions had become a concern for the funds by March 2007, and the 40 or 60 days' notice requirements were being strictly applied to investors other than Cioffi, at least for withdrawals. Despite this, Cioffi moved his own money out of the funds on only five full business days' notice. Cioffi's redemption caused the Enhanced Leverage Fund to pay out $2 million at a time when the markets were weak and the fund was facing increasing margin calls and forced sales.

### 2.    Cioffi Concealed his Redemption from Investors

106.    Not only did Cioffi fail to disclose his transfer from the Enhanced Leverage Fund to the SRP Fund, he also lied to investors about his stake in the Enhanced Leverage Fund.

107.    Cioffi and Tannin made a point of telling investors, when marketing first the High Grade Fund and then the Enhanced Leverage Fund, that both managers were invested in the funds, as a sign of confidence. On March 22, 2007, the day before his own redemption, Cioffi told a BS&C salesperson seeking to talk an institutional investor out of a redemption request that "the best action for them [is] to be patient…Really what we should be talking to them about is increasing their investment in either [the Enhanced Leverage Fund] or [the High Grade Fund,] not redeeming."

108.    On the April 25, 2007 conference call for High Grade and Enhanced Leverage Fund investors, Cioffi misleadingly declared, "[Y]ou've got a very devoted, dedicated asset management team here. I mean our money is in … these funds." Cioffi omitted the material information that he had significantly reduced his stake in the

Enhanced Leverage Fund, which was necessary to prevent investors from being misled under the circumstances.

109.    Tannin contemporaneously learned of Cioffi's intent to transfer money from the Enhanced Leverage Fund to the SRP Fund and, on April 2, 2007, questioned the timing of Cioffi's move, telling him, "I'm a tiny bit worried about the message this sends – if we are asked about what we are doing with our personal money – do we want to tell people we are moving our personal money out of [the Enhanced Leverage Fund] and into srp?" Cioffi brushed Tannin's worry aside, responding, "I don't think it's a big problem…SO far no[] one has asked…."

110.    Moreover, the BSAM and BS&C sales forces did not know that Cioffi had transferred nearly half of his original investment out of the Enhanced Leverage Fund. On the contrary, based upon statements by the defendants, the sales forces affirmatively represented to investors during March and April that the funds' managers were adding to their investments. Tannin, likewise, told one of the funds' largest institutional investors, on March 19, 2007, that Cioffi and he were both adding to their investments.

111.    Cioffi's redemption was material to investors, particularly in the context of the poor performance and difficult market conditions faced by the Enhanced Leverage Fund at the time. Moreover, Cioffi and Tannin had themselves marketed the Enhanced Leverage Fund to investors, at its inception, with representations that the two managers were moving their entire investment stakes from the High Grade Fund, because this information was material to the investors.

112.    Cioffi never told investors that he was moving nearly half of his original investment in the Enhanced Leverage Fund to the profitable SRP Fund during a period of

31

increasing margin calls coupled with poor fund performance. Cioffi's redemption further rendered misleading his representations concerning the current state of the fund and its ability to generate positive returns in the near future. Cioffi defrauded investors because he gave the false impression that his money was aligned with and at risk with their own money and interests, and that he had confidence in the funds. In truth, his withdrawal, and his internal statements to his colleagues and contacts on Wall Street, indicated otherwise.

### F. TANNIN FALSELY TOLD INVESTORS THAT HE WAS INCREASING HIS OWN INVESTMENT IN THE ENHANCED LEVERAGE FUND

113.    In March 2007, Tannin began telling investors that he believed in the funds so strongly that he was putting more of his own money into the Enhanced Leverage Fund and encouraging them to do the same. For example, on March 7, 2007, Tannin told one institutional investor, "We see opportunity here...I am [putting] in additional capital – I think you guys should as well."

114.    Relying on his assertions, the BSAM and BS&C sales forces repeated Tannin's claim. In all, from about March 15 to 18, 2007, Tannin told approximately five or more of the funds' major salespersons that he was adding money to the funds and so should their investors. This was the very same week that Cioffi expressed his fear about the funds' ability to meet increasing margin calls, and only one week before Cioffi requested the withdrawal of his own money from the Enhanced Leverage Fund.

115.    Tellingly, however, Tannin never added to his position, and never subsequently advised investors, or the funds' salespersons, that he had not invested. Instead, Tannin mocked investors who lacked his supposed courage in seizing an historic

32

buying opportunity. In a March 30, 2007 e-mail, Tannin wrote to one such investor, who

sought to redeem:

> I think you are being silly…we are now experiencing volatile times
> … You have chosen the absolute silliest time to redeem. In fact, if
> I had any hope whatsoever it would have been that I had prepared
> you for an experience like the one you are having.

116.     Tannin's lies paid off. On March 30, 2007, Tannin bragged to a key

BSAM analyst, "Believe it or not – I've been able to convince people to add more

money…." On April 1, 2007, he transmitted the March subscription totals to the Third

Manager and gloated, "[N]ot bad, eh?" The Third Manager responded, "That's an

understatement."

117.     Tannin made false and misleading representations that he was adding to

his own investment in the Enhanced Leverage Fund. He neither made the additional

investment nor, despite ample opportunity, told investors the truth subsequently. These

statements were material to investors, particularly in the context of the poor performance

and difficult market conditions faced by the Enhanced Leverage Fund at the time.

118.     Tannin further defrauded investors because he gave them the false

impression that an additional amount of his money would be aligned, and at risk, with

their own money and interests, and that he had confidence in the funds. The fact that he

did not add to his investment showed, on the contrary, his actual lack of confidence in the

funds.

### G.     CIOFFI AND TANNIN'S PERSONAL RECORDS FROM THE CRITICAL TIME PERIOD OF THEIR FRAUDULENT CONDUCT ARE MISSING

119.     On June 18, 2007, BSC received a request from the Commission staff to

produce documents relating to the funds. On June 19, 2007, Cioffi and Tannin each

received a document retention and preservation memorandum requiring all BSAM employees to preserve all documents concerning the funds, among other things.

120.    Throughout 2007, Cioffi used notebooks to record work concerning the funds. However, Cioffi's personal notebooks from January 2007 through mid-June 2007 have never been found and were not produced to the Commission staff.

121.    From January through June 2007, Tannin took notes concerning the funds in notebooks and on his "TabletPC," which is a laptop-like device. This TabletPC was never synched to his BSC computer, the BSC system, or his personal home computer. Tannin's TabletPC is now missing and was never produced to the Commission staff.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (Both Defendants)

122.    The Commission realleges and reincorporates by reference paragraphs 1 through 121 above. From at least October 2003 through June 2008, Cioffi and Tannin, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of the securities offered or sold by the defendants.

123.    By reason of their actions alleged in this complaint, the defendants each violated Section 17(a) of the Securities Act of 1933 [15 U.S.C. § 77q(a)].

34

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5
### (Both Defendants)

124.    The Commission realleges and reincorporates by reference paragraphs 1 through 121 above.

125.    From at least October 2003 through June 2008, Cioffi and Tannin, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit.

126.    By reason of their actions alleged in this complaint, the defendants each violated Section 10(b) of the Securities Exchange Act of 1934 and Exchange Act Rule 10b-5 [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that the Court:

### I.

Enter judgment in favor of the Commission finding that the defendants each violated the securities laws as alleged in this complaint;

### II.

Permanently enjoin each of the defendants from violating Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934, Rule 10b-5 promulgated thereunder [15 U.S.C. §§ 77q(a), 78j(b); 17 C.F.R. § 24010b-5];

35

## III.

Order the defendants to disgorge the profits and proceeds they obtained as a result of their illegal actions alleged in this complaint, and to pay prejudgment interest thereon;

## IV.

Order the defendants each to pay civil money penalties pursuant to Section 20(d) of the Securities Act of 1933 and Section 21(d)(3) of the Securities Exchange Act of 1934 [15 U.S.C. §§ 77t(d), 78u(d)(3)];

## V.

Grant such other relief as this Court may deem just and proper.


Dated:  June 19, 2008                           Respectfully submitted,




Of Counsel:                          *John D. Worland Jr.*
Antonia Chion                        John D. Worland, Jr. (JW1962)
Daniel Chaudoin                      Attorney for Plaintiff
Jeffrey Weiss                        Securities and Exchange Commission
Jonathan Cowen                       100 F Street, N.E.
Brian Sano                           Washington, D.C. 20549
                                     (202) 551-4438

                                     (202) 772-9246 (fax)
                                     e-mail:  *worlandj@sec.gov*


36